**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ) | |
| ) | |
| In re: Application to Obtain Discovery from ) | |
| Five Banks for Use in International ) | Case No. _____ |
| Proceedings Pursuant to 28 U.S.C.§ 1782 ) | |
| ) | |
| ) | |
| ) | |

**DECLARATION OF JOSH WONG IN SUPPORT OF
<u>APPLICATION TO TAKE DISCOVERY PURSUANT TO 28 U.S.C. § 1782</u>**

3013624.7

I, JOSH WONG, of Signature Litigation LLP at 138 Fetter Lane, London, EC4A 1BT declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct:

## Section 1: Introduction

1.      I am an English qualified solicitor and partner at Signature Litigation LLP. Signature Litigation LLP represents Energy Exploration and Development Limited ("**ENEXD**") in a prospective claim in the High Court of England and Wales.  I am duly authorised by ENEXD to make this declaration in support of this application pursuant to 28 U.S.C. § 1782 ("**Application**").  The Application is made to obtain discovery in support of:

(a)      Ongoing Proceedings in the Ras Al Khaimah Courts ("**RAK Court**") (case number 4583-2024) brought by ENEXD to enforce an arbitration award ("**UAE Enforcement Proceedings**"), in addition to various other ongoing proceedings in courts in the UAE brought by ENEXD and its ultimate beneficial owner, Ms. Delaram Zavarei.

(b)      Proceedings which ENEXD has taken steps to initiate in the English High Court (the "**English Litigation**").  ENEXD is currently engaged in pre-action steps with multiple parties, including the Kuwaiti Entities and Iranian Entities described at paragraph 7 below.  ENEXD also intends to bring claims against Other Conspirators as identified in paragraph 7 below.  ENEXD's claims which comprise the English Litigation and which fall under English law include:

i.      **Unlawful means conspiracy:** The parties identified in paragraph 7 below conspired to unlawfully deprive ENEXD of its engineering and extraction equipment used in the oil and gas industry with the purpose

2

of causing damage to ENEXD and the owners of ENEXD; and / or alternatively

    ii.   **Tortious interference:** Some of the parties identified in paragraph 7 variously unlawfully or intentionally interfered with ENEXD's contractual and legal right to its engineering and extraction equipment and interfered and prevented the return of that equipment in circumvention of an arbitration award.

2.     The contents of this declaration are true and are within my own knowledge, except where I have obtained information or documents from others (as indicated), in which case I believe that information to be true.

3.     I refer in this declaration to certain documents. Unless otherwise stated, references to pages in this statement in the form "**Exhibit X**" are reference to the numbered exhibits. Where relevant, page numbers will be included in the format **"Exhibit X, p.Y"**.

4.     This declaration is structured as follows:

(a)     Section 1: Introduction

(b)     Section 2: Background to ENEXD's Claims

(c)     Section 3: The Status of the UAE Enforcement Proceedings

(d)     Section 4: The English Litigation

(e)     Section 5: The Status of the English Litigation

## Section 2: Background to ENEXD's Claim

### *Relevant Parties*

5.     ENEXD is the claimant in the UAE Enforcement Proceedings and prospective claimant in the English Litigation. For the purposes of this Application, ENEXD is the interested party in the discovery sought.

3013624.7

6.     The respondents in the UAE Enforcement Proceedings are Nordic Energy FZE, Mr Kjell Inge "Sonny" Sola, and Mr Hamad Al Qahtani.

7.     The intended defendants in the English Litigation include but are not limited to:

(a)     The "**Kuwaiti Entities**", namely:

(i)     Kuwait Finance House ("**KFH**"), a Kuwaiti financial institution publicly listed on the Kuwait Stock Exchange.  The Kuwait government owns a significant portion of KFH.  KFH was at all material times the ultimate beneficial owner of Energy House and Nordic (as defined below).  KFH also owns 57.81% of Kuveyt Türk Katilim Bankasi.  That bank was used by the Iranian Regime to make USD payments relevant to the English Litigation to Petrolem Gulf Energy Trading LLC and Energy House (as defined below).  In the English Litigation ENEXD will claim that KFH conspired with the Iranian Entities and the other Kuwaiti Entries (that it controlled) to deprive ENEXD of its assets. KFH interfered with ENEXD's legal and contractual entitlement to its assets;

(ii)     Energy House Holding Company ("**Energy House**"), a public company listed on the Kuwait Stock Exchange which is indirectly owned by KFH (Energy House is 95.77% owned by Development Enterprises Holdings Company KSCC ("**DECH**"), which was in turn fully owned by KFH). Energy House also partly owned Synfuels International Inc ("**Synfuels**"), Exhibit 4, p.9, which received payments totaling at least USD5,580,994.21 via an account held at Turkiye Finans Katilim Bankasi from the Iranian Regime. Turkiye Finans Katilim Bankasi is owned 67.03% by Saudi National Bank and 10.57% by Gözde Girişim

4

Sermayesi Yatırım Ortaklığı A.Ş.  ENEXD recently sought to join Energy House as a defendant in the pending enforcement actions in the RAK Court due in part to Energy House's ownership and control over Nordic.  In the English Litigation, ENEXD will claim that Energy House conspired with the Iranian Entities and the other Kuwaiti Entries to deprive ENEXD of its assets. Alternatively, the English Litigation will allege, Energy House interfered with ENEXD's legal and contractual entitlement to its assets; and

(iii) Nordic Energy FZE ("**Nordic**"), at all material times owned 92.5% by Energy House.  Nordic entered a Profit-Sharing Agreement dated 19 December 2017 (the "**PSA**") with ENEXD, under which ENEXD provided equipment to Nordic for oil and gas projects (the "**Equipment**"). As explained below (at paragraph 23), the Equipment was never returned to ENEXD despite an arbitral award requiring it to do so. Further, in 2019 Nordic was the co-beneficiary (with the Mapna Kish Drilling Co) of a sum totaling USD3,380,800, which was transferred from the Iranian Offshore Oil Company and / or the National Iranian Oil Company via accounts at Turkiye Finans Katilim Bankasi, a bank which is relevant to the English Litigation, from the Iranian Regime. ENEXD is currently engaged in litigation against Nordic in the RAK Court regarding Nordic's failures to comply with an arbitral award issued against Nordic. In the English Litigation ENEXD will claim that Nordic conspired with the Iranian Entities and the other Kuwaiti Entries to deprive our client of its assets.

5

(b)  The "**Iranian Entities**", which the US Department of the Treasury have broadly identified have links to the Islamic Revolutionary Guard Corps and which have been labelled by multiple states as a terrorist organization, links which are widely publicized and have been brought to the attention of US courts, namely:

(i)  National Iranian Oil Company ("**NIOC**"), which is an Iranian state-owned entity in the Middle East oil and gas sector.  NIOC is a US sanctioned company.  In the English Litigation ENEXD will claim that NIOC sought to damage ENEXD and ENEXD's owner and conspired to damage ENEXD and tortiously interfere with the PSA and in doing so deprived ENEXD of its Equipment;

(ii)  NIOC International Affairs (London) Limited ("**NIOC (International)**"), which is an Iranian state-owned entity controlled by NIOC.  It too is US sanctioned.  NIOC transferred US funds to Energy House and third parties including Synfuels through accounts held at least at Kuveyt Türk Katilim Bankasi and Turkiye Finans Katilim Bankasi. In the English Litigation ENEXD will claim that NIOC (International) sought to damage ENEXD and tortiously interfere with the PSA and in doing so deprived ENEXD of its Equipment; and

(iii)  Iranian Offshore Oil Company ("**IOOC**"), which is an Iranian state-owned entity controlled by NIOC through which contracts were awarded. In the English Litigation ENEXD will claim that IOOC sought to damage ENEXD and tortiously interfere with the PSA and in doing so deprived ENEXD of its Equipment.

(c)  The "**Other Conspirators**", namely:

6

(i)     Mr Walid Alhashash ("**Mr Alhashash**"), Chairman of Nordic and the CEO of Energy House at the time that the PSA was signed so he was party to the negotiation of the PSA;

(ii)    Mr Hamad Al Qahtani ("**Mr Al Qahtani**"), who took over from Mr Al Hashash in both the role of Nordic Chairman and Energy House CEO, and who ENEXD understands remains in these roles;

(iii)   Mr Kjell Inge "Sonny" Sola ("**Mr Sola**"), the former CEO and current minority shareholder of Nordic,and shareholder of other related entities including Nordtech Oilfield Technologies, Nordic Oilfield Technologies LLC and Norseman Oilfield Technologies FZCO. Mr Sola negotiated the PSA and is understood to have facilitated the transfer of certain parts of the Equipment from Nordic to Pars Petro Zagros and owns entities that continue to profit from trade with the Iranian Entities;

(iv)    Pars Petro Zagros ("**PPZ**"), an Iranian entity based in Tehran with links to NIOC. PPZ is understood to have purchased certain elements of the Equipment supplied by ENEXD to Nordic under the PSA from Mr Sola and/or Nordic, and it is understood that this equipment was shipped to PPZ in Iran using false documentation;

(v)     Mr Morteza Azizi ("**Mr Azizi**"), the owner of PPZ and a former Managing Director of NIOC;

(vi)    Gulf Energy Integrated Services ("**Gulf Energy**"), a company to which Nordic owed separate contractual obligations at the time of the PSA and which itself had drilling obligations to the Saudi Arabian Oil Company. The nature of the relationship, and any payments that may have been

7

3013624.7

made, between Gulf Energy and Nordic and/or Mr Sola are unknown to ENEXD; and

(vii)    Dana Energy ("**Dana Energy**"), an Iranian based oil and gas company who ENEXD understand may have been involved in purchasing elements of the Equipment.

(collectively, and in the context of the English Litigation, the "**Conspirators**").

*ENEXD and the Kuwaiti Entities*

8.    ENEXD provides a comprehensive range of products and services across the onshore and offshore oil industry but primarily focuses on oil production through well intervention techniques and providing equipment to facilitate these operations. ENEXD is incorporated under the laws of the DMCC Licensing Authority in the United Arab Emirates with license no. DMCC-30261.  ENEXD is also registered in the British Virgin Islands. ENEXD is headquartered in Dubai and has an international presence.

9.    At all material times Nordic was 92.5% owned by Energy House and Energy House was 95.77% owned by DECH.  DECH was in turn fully owned by KFH.  It is clear from the shareholding structure and business dealings of KFH, DECH, Energy House, and Nordic that they are intertwined and share finances and resources.  It is also clear that KFH is the *de facto* controller of Nordic, Energy House, and DECH.

*The PSA*

10.    ENEXD provided the Equipment to Nordic under the PSA, Exhibit 7. The PSA was governed by English Law and incorporated an arbitration agreement.  The PSA was entered into further to meetings between representatives of ENEXD and Nordic (including Mr Alhashash) which took place in the United Kingdom.

3013624.7

11.     Under the PSA, ENEXD was to supply the Equipment to Nordic in exchange for a share of the profits that were to be derived from contracts Nordic/Energy House obtained and operated, Exhibit 7, p.5.The value of the equipment that was supplied by ENEXD to Nordic under the PSA, including a payment from ENEXD to Nordic to contribute to the costs of any necessary alterations of the Equipment, is estimated to be approximately USD15 million.

12.     Under Clause 3 of the PSA, it was agreed that ENEXD would provide the Equipment to enable Nordic to fulfil its separate contractual obligations to Gulf Energy, Exhibit 7, pp.4-5. In turn this would enable Gulf Energy to fulfil its drilling obligations to Saudi Arabian Oil Company as contained in Contract No 6600039722 (the "**Aramco Contract**"). There was no direct contractual obligation linking the PSA (between ENEXD and Nordic) and the Aramco Contract.

13.     In November 2017, ENEXD transferred the Equipment to Nordic's facility at the Dubai Investment Park in the UAE, in advance of the execution of the PSA.  In January 2018, issues were reported to ENEXD and by mid-2018 it became apparent to ENEXD that there were issues as the project contemplated by the Aramco Contract had not commenced and correspondingly there were no profits being distributed under the PSA.  Meetings were held between ENEXD and variously the Kuwaiti Entities, including two meetings in 2019 at KFH's offices in Kuwait and Dubai.  I understand that Mr Ahmed Al Sumait, Mr Abdulrahman Al Barajas, and Mr Abdullah Abuhadedah variously of KFH, Energy House, and Nordic attended these meetings.

14.     One of the reasons ENEXD entered into the PSA was that Nordic, a comparatively small and new company, had the backing of Energy House and KFH.  ENEXD also entered the PSA and was content to do business with Nordic because ENEXD and Ms Zavarei believed that the Kuwaiti Entities had no connection to Iran.

*The Arbitration*

15.     By August 2019, the relationship between ENEXD and Nordic had broken down.  On 29 August 2019, ENEXD terminated the PSA pursuant to its terms and requested the return of the Equipment.  On 5 September 2019, ENEXD requested the return of the Equipment.  Nordic failed to return the Equipment.

16.     On 5 November 2019, ENEXD commenced a London Court of International Arbitration ("**LCIA**") arbitration against Nordic in accordance with the terms of the PSA ("**Arbitration**").  On 7 November 2019, ENEXD again filed an application for interim measures to preserve the Equipment in the Arbitration under which it sought, amongst other things, an order entitling ENEXD to inspect the Equipment.  Nordic opposed the measures and made representations that the Equipment would only be used in respect of the Aramco Contract and would never be misused.

17.     On 19 December 2019, the arbitrator authorized ENEXD to inspect the Equipment on an ongoing basis and required Nordic to file an inventory which showed the whereabouts and condition of each item comprising the Equipment. The arbitrator also ordered that ENEXD be added as a beneficiary to all insurance policies in respect of the Equipment.

18.     On 14 December 2020, the Arbitration hearing commenced and on 5 March 2021, post hearing briefs were submitted.  During the hearing, evidence and expert testimony were introduced showing that Nordic had forged the signature of the ENEXD CEO on purchase orders.  ENEXD also learned during the hearing that the Equipment had been moved.  Some parts remained in Saudi Arabia at the Gulf Energy Yard (the "**KSA Equipment**"), while others were moved to the storage facilities in Umm Al Quwain in the UAE (the "**UAE Equipment**").

19.     On 6 March 2021, ENEXD asked the arbitrator to facilitate the inspection of the KSA Equipment and UAE Equipment.  On 10 March 2021, Nordic admitted that "*most of the*

3013624.7

*equipment located in KSA was seized by Gulf Energy in mid-January 2021 and moved to an unknown location*", Exhibit 10, p.41. No explanation was provided by Nordic for its two-month delay in reporting this information to ENEXD.

20.     To date, Nordic has failed and refused to return the Equipment or to provide any information regarding where the Equipment is or who has possession of it. Evidence suggests that at least some of the Equipment is being sold on the secondary market.

21.     The extent to which payments were made between Gulf Energy and Nordic are unknown to ENEXD. However, ENEXD assumes that Energy House or Nordic must have deliberately transferred or assisted with the transfer of the Equipment to Gulf Energy. Given Energy House and Nordic knew the Equipment belonged to ENEXD such a transfer would have been unlawful and amount to misappropriation of assets.

22.     I have also seen evidence from a currently anonymous source who is high up in the Iranian oil and gas industry, who confirms that PPZ purchased the snubbing unit, which was part of the Equipment, from Mr Sola and/or Nordic in January 2025 and that this unit was shipped to PPZ in Iran using false documentation.

*The Award*

23.     On 1 September 2021, the arbitrator ruled in ENEXD's favor (the "**Award**"), Exhibit 10.  The arbitrator ruled that ownership of the Equipment remains with ENEXD and requires Nordic to return the Equipment to ENEXD.  To date, Nordic has failed to return the Equipment in breach of the terms of the Award.

**Section 3: The Status of the UAE Enforcement Proceedings**

24.     In the UAE Enforcement Proceedings, ENEXD seeks to enforce the Award to secure the return of the Equipment.  The UAE Enforcement Proceedings are separate from the English Litigation, albeit they both originate from the same factual matrix.  For the avoidance

11

of doubt, Signature Litigation LLP is not instructed in the UAE Enforcement Proceedings, but we and ENEXD's UAE lawyers, Habib Al Mulla and Partners, have provided mutual assistance to each other.

25.     The UAE Enforcement Proceedings were commenced in the RAK Court and are ongoing.  Following recognition of the arbitral award by the RAK Court in Case No. 4583/2024, ENEXD brought enforcement proceedings in the same court under Case No. 425/2025.  During the UAE Enforcement Proceedings evidence has come to light that suggests that Nordic, the Iranian Entities, and others conspired to interfere with ENEXD's business from at least September 2017 onwards and deprive ENEXD of its Equipment.

26.     With respect to the current status of the UAE Enforcement Proceedings, we understand from local counsel that the Award has been recognized and the matter has progressed to the enforcement phase.  We understand that on 6 May 2025, the RAK Court ordered Nordic to submit documentation proving that it was not in possession of the equipment. On 16 May 2025, the RAK Court ruled that Nordic had failed to comply with that order and ordered Nordic to deliver the equipment within one week to avoid the initiation of judgment execution proceedings.  Nordic failed to respond, and, on 18 June 2025, the RAK Court ordered Nordic to return the equipment to ENEXD.  Nordic failed to respond.  Accordingly, in July 2025, ENEXD filed a related claim seeking $20 million for the equipment and related damages, Exhibit 13.  I have been informed that ENEXD recently filed a new request to join Energy House as a defendant in enforcement action in the RAK Court.

27.     In addition to the UAE Enforcement Proceedings, we understand that the following civil proceedings are also ongoing in courts in the UAE on behalf of ENEXD and Ms Zavarei:

(a)     Proceedings in the Dubai Courts (case number 1730/2024) brought by ENEXD against Nordic Energy PJSC, Nordic Energy PJSC (Oman Branch), Mr Sola and Mr Al Qahtani relating to a Koomey Unit are ongoing and judgment is expected imminently.  The claim is for AED 9,825,654.30 (unpaid rentals and accrued interest) plus AED 20,000,000 in damages for breach of contractual obligations.  The matter is at an advanced stage and an expert committee has recently been appointed by the court.

(b)     Civil compensation proceedings in the UAE filed by Ms Zavarei against Nordic Energy PJSC, Mr Sola, and Mr Al Qahtani, the value of which amounts to AED 80,000,000.

## Section 4: The English Litigation

### *The Business of Ms Zavarei and Mr Tabatabaei*

28.     Ms Zavarei, the ultimate beneficial owner of ENEXD, and her husband and business partner, Mr Tabatabaei, have been involved in the global oil and gas industry for decades, particularly in the Middle East and Iran.  They held significant real estate as well as oil and gas assets in Iran (the "**Iranian Assets**") and ran their non-Iranian businesses from Dubai.

29.     In 2002, Ms Zavarei and her family moved from Iran to Dubai due to the political unrest in Iran.  Ms Zavarei was a vocal opponent of the Iranian Regime, and she openly criticised it on social media.  Ms Zavarei continued to run the Iranian Assets from Dubai.

30.     One of the Iranian Entities, IOEC, which is a subsidiary of NIOC, began criminal proceedings in Iran and civil proceedings in England against Mr Tabatabaei and some of his corporate entities in respect to the failed purchase of a rig which Mr Tabatabaei was involved in.

31.     The cases caused Mr Tabatabaei serious harm and as such comprise part of the state-sponsored campaign against him and Ms Zavarei, their family, and their corporate interests.  This was made known to Butcher J in the main English proceedings brought by IOEC who summarised Mr Tabatabaei's stance on the case brought against him and Sepanta International FZE as "*a "state sponsored" and politically-motivated one, brought by IOEC, which they contended is owned by the government of the Islamic Republic of Iran*".  Butcher J also "*formed the clear view that the links between IOEC and the executive of the Islamic Republic of Iran were close, and that it would be very unlikely that IOEC would contravene the wishes of the government of Iran on any material matter*" and that he was "*prepared to accept that Mr Tabatabaei's political and ideological positions have contributed to the vigour with which IOEC has pursued him*".  Butcher J found against Mr Tabatabaei in respect to some of the claims.  However, despite allegations by IOEC that Mr Tabatabaei had personally received funds transferred to the Dean entities which allegedly benefitted from fraud, the court refused to make any such finding.

32.     Importantly for the purposes of the English Litigation, Ms Zavarei had nothing to do with the transaction underlying these cases and has never been accused or charged with any wrongdoing or any involvement whatsoever.  Despite this, the Iranian Regime targeted Ms Zavarei's personal assets as well as those of Mr Tabatabaei in its attempts to allegedly recover its losses from the failed purchase.

*The Targeting of Ms Zavarei and her Relations by the Iranian Regime*

33.     Evidence establishes that there was and continues to be a programme of targeted persecution by the Iranian regime against Ms Zavarei despite her having nothing to do with the charges against Mr Tabatabaei and the Iranian Regime being fully aware that she independently

3013624.7

owns and controls her own businesses and assets. The Iranian Regime has enlisted the Kuwaiti Entities to assist in those attacks:

(a)    The seizure of Ms Zavarei as well as Mr Tabatabaei's assets was confirmed in a report from the Intelligence Organisation of the Islamic Revolutionary Guard Corps, dated 5 April 2015:

>    "*Reza Mostafavi Tabatabaei and his relatives (first row) were banned from any trade/deal due to his attorney activities and from buying and selling his properties and belongings.*" Exhibit 1, p.2.

(b)    Thereafter, in a letter/announcement dated 31 August 2015, marked "*Extremely Confidential - Extremely Urgent*", the then Iran Minister of Oil, Mr Bijan Zangeneh, wrote to the Managing Director of NIOC and ordered that Mr Tabatabaei was the main director of the Sepanta Company and as he resided in Europe and was "*out of reach*" all due payments to the company to be frozen for the benefit of NIOC:

>    "*Firstly, if there are any contracts with Sepanta Company, the full quality of all of them should be reported immediately to the legal affairs of the oil company and me for a maximum period of 72 hours and Second, arrangement should be made that if there is a contract with this company, until further notice of any payment, even for the final claims should be prevented.  Of course, in any case that according to the legal affairs of the National Iranian Oil Company and in order to prevent losses to the treasury, making a payment to this company is deemed inevitable, this should be stated with reasons for the decision for your Excellency*" Exhibit 2, p.3.

3013624.7

However, as NIOC knew full well, the managing director of Sepanta International Iran was not Mr Tabatabaei, who was not a shareholder and had nothing to do with the company. Ms Zavarei is the Chairman of this company and the majority shareholder.

(c)     In a letter dated 7 September 2015 marked "*Extremely Urgent - Extremely Confidential*", the then Iran Minister of Oil, Mr Zangeneh, requested Mr Javardi, Managing Director of NIOC, to expand the remit of the 31 August 2015 letter to include Sepanta International Iran, Petro Hortash, and Persia Energy.  Again, these are companies owned by Ms Zavarei and not by Mr Tabatabaei and is a further example of targeting Ms Zavarei when she had nothing to do with any charges in respect to the failed rig purchase, Exhibit 3, p.3.

34.    These documents indicated to Ms Zavarei the systematic persecution being undertaken by the Iranian Regime against her and her relations.  At the date of the PSA, Ms Zavarei was not aware of the above actions or the extent to which she and her relations were being targeted. This only became apparent subsequently, as did the involvement of the Kuwaiti Entities in the scheme to unlawfully deprive ENEXD of the Equipment.

35.    It was clear to ENEXD's management by 2017 that it was important to generate business away from Iranian influence.  The PSA was believed to meet these criteria as:

(a)     Nordic was a UAE company run by a European national, Mr Sola, looking to engage in snubbing activities in Saudi Arabia; and

(b)     Nordic was owned by Energy House and, as per paragraph 7(a)(i) above, ultimately owned by KFH, a state-owned finance house of Kuwait

36.    Having now understood the information set out in paragraphs 28-35 above and paragraph 37 below, it is clear to Ms Zavarei that in fact the Iranian Regime had considerable

16

influence over the Kuwaiti Entities and sought to interfere with ENEXD's business relationship with the Kuwaiti Entities as continuation of its targeting of Ms Zavarei's Iranian assets and interests.  It is ENEXD's view that either:

(a) The PSA was never a genuine commercial opportunity as presented by the Kuwaiti Entities and was instead a front contrived with the Iranian Entities to deprive ENEXD of its assets; or

(b) Shortly after the execution of the PSA, and following the transfer of the Equipment, the Kuwaiti Entities abandoned the PSA at the direction of the Iranian Entities.

*Involvement of the Other Conspirators and Iranian Entities in the Affairs of the Kuwaiti Entities*

37.    It is now clear that the Kuwaiti Entities, were rewarded handsomely by Iran for pursing the conspiratorial vendetta against ENEXD:

(a) On 18 October 2017, IOOC extended a tender process to Nordic for the provision of an offshore drilling rig, Exhibit 5. This parallels the initial negotiations between ENEXD and its representatives and the representatives of Nordic / Energy House.

(b) On 17 December 2017, around the time the PSA was entered, IOOC awarded Nordic a contract for EUR36,122,020.00, subject to approval from NIOC (Iran), and the payment of a performance guarantee, Exhibit 6.

(c) On 4 June 2018, Nordic was invited to participate in another tender round with IOOC which was then extended to September 2018, Exhibit 8. This tender process exactly parallels the period in which the Equipment was meant to be used and profits generated.

3013624.7

(d)     On 12 March 2019 (which is around the time that there was a complete breakdown in the relationship between Nordic and ENEXD for the failure to return the Equipment culminating in the commencement of Arbitral proceedings), a payment of USD3,380,800.00 was made to Mapna Kish Drilling Co. (Nordic Co.) by NIOC (International)/IOOC using an account held at Turkiye Finans Katilim Bankasi, Exhibit 9.

(e)     On 14 February 2023 (which is around the time that ENEXD understands that the Equipment appears to have been available on the secondary market without their permission and in breach of the terms of the Award), a payment of USD5,705,441.82 was made to Petrolem Gulf Energy Trading LLC and Energy House from NIOC (International) using an account held at Kuveyt Turk Katilim Bankasi (the bank which, as explained above, is 57.81% owned by KFH), Exhibit 11.

(f)     On 8 May 2023, a payment of USD5,580,944.21 was made by NIOC (International) to Dar Al Aman Trading / Synfuels using an account held at Turkiye Finans Katilim Bankasi, Exhibit 12.  Energy House partially owned Synfuels, in addition to owning Nordic.  The consignee, Three Energy FZE, is sanctioned, the vessel M/T Leonid has been linked to the trading of Iranian oil, and the shipper, Dar Al Aman Trading & Transport Co., is based in Iraq – a well-known tactic to evade sanctions.

38.     It is ENEXD's case that these contracts and payments were inducements from the Iranian Regime to convince the Kuwaiti Entities to conspire against Ms Zavarei's company, ENEXD.

3013624.7

39.     These dealings show that the Iranian Regime, via the Iranian Entities, enlisted the Kuwaiti Entities to pursue their conspiratorial vendetta to ruin Ms Zavarei, her relations, and her financial and corporate interests.

40.     The financial transactions involving Iran's payments to the companies identified in paragraph 37 above are very likely in direct violation of US sanctions laws by KFH.  KFH used the Turkish bank it owns to move USD funds and in so doing utilized the correspondent banking facilities of US bank(s).  As set out in paragraphs 37(d) and 37(f) above, Turkiye Finans Katilim Bankasi facilitated payments by Iranian state-owned entities, including the Iranian Entities, in USD to parties who are either the Conspirators, controlled and/or managed and/or related to the Other Conspirators, or otherwise closely linked to the Conspirators.  Further, as set out in paragraph 37(e) above, NIOC (International) used an account held at Kuveyt Türk Katilim Bankasi, a bank 57.81% owned by KFH, was used to make a significant USD transaction to Petrolem Gulf Energy Trading LLC and Energy House.

41.     Per its standard settlement instructions, Kuveyt Türk Katilim Bankasi is known to use at least Standard Chartered Bank; Citibank N.A.; HSBC Bank (USA) N.A.; Bank of New York Mellon; and JP Morgan Chase Bank N.A. as correspondent banks in the United States, Exhibit 14.  I understand from a UK-registered data aggregator that maintains a comprehensive database of standard settlement instructions for correspondent relations that Turkiye Finans Katilim Bankasi uses the same five institutions as correspondent banks, Exhibit 15.

42.     These known transfers more likely than not violated international sanctions and in furtherance of the matters alleged in the English Litigation.  Obtaining further evidence of transactions made by the Conspirators is important to understanding relations between them and the scope of the conspiracy alleged in the English Litigation.

3013624.7

43.     Leaving to one side the role of the Iranian Entities in the facts underpinning the English Litigation; outlined above (at paragraph 37) are transactions and dealings that have taken place between the Other Conspirators and the Kuwaiti Entities, in particular between Mr Sola and/or Nordic and PPZ in relation to the transfer of the Equipment. There is also a potential transaction between Faris Bin Nashat Al Otaibi General Contracting and Gulf Energy in connection with the alleged transfer of the Equipment. It is important for the purposes of the English Litigation to understand what, if any, transactions PPZ and/or Gulf Energy entered with respect to the Equipment.

*ENEXD's Allegations in the English Litigation*

44.     In view of the above, in the English Litigation ENEXD will claim that:

(a)     The Iranian Entities, after having terminated their own commercial relations with Ms Zavarei and Mr Tabatabaei for political reasons, conspired with the Kuwaiti Entities, specifically Nordic, to enter the PSA with the intention of indirectly gaining control over the Equipment; and

(b)     The Iranian Entities then, via their influence over KFH and Energy House, instructed Nordic to unlawfully (and in breach of the PSA) permanently retain the Equipment, act in breach of an arbitration award, and frustrate the enforcement of that award.

45.     ENEXD also intends to allege that the Conspirators, in particular the Iranian Entities and the Kuwaiti Entities, in collusion with each other, unlawfully or intentionally interfered with both ENEXD's contractual and legal right to its assets in the form of the Equipment and / or prevented them being returned both in accordance with ENEXD's contractual rights and in circumvention of the Award.

3013624.7

46.     The Conspirators took these steps with the primary intention of inflicting injury and loss on ENEXD, its ultimate beneficial owner, Ms Zavarei, and Ms Zavarei's relations. Injury was foreseeable and caused by the alleged conspiracy and/or the tortious interference.

**Section 5: The Status of the English Litigation**

47.     The Pre-Action Protocols of the Civil Procedure Rules of England and Wales require claimants to issue Letters Before Action to defendants and communicate about the allegations before the actual claim can be filed.

48.     As at the date of this declaration, ENEXD has issued Letters Before Action and engaged a number of the Conspirators, as well as certain other prospective defendants, in pre-action correspondence.    Once ENEXD has taken sufficient pre-action steps, including gathering discovery via this Application, ENEXD has authorised Signature Litigation LLP to formally commence the English Litigation at the High Court by filing a Claim Form.

I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on 17 September 2025

_____

Josh Wong

3013624.7