# Exhibit 10

LONDON COURT OF INTERNATIONAL ARBITRATION

LCIA ARBITRATION NO. 194478

ENERGY EXPLORATION AND DEVELOPMENT COMPANY

Claimant

versus

NORDIC ENERGY FZC (United Arab Emirates)

Respondent

**FINAL AWARD**

1 September 2021

**Error!**

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................9
        A.      PARTIES.......................................................................................................9
        B.      TRIBUNAL................................................................................................10
        C.      DISPUTE ...................................................................................................10
II.     PROCEDURAL HISTORY ...............................................................................11
III.    PARTIES' SUBMISSIONS ...............................................................................46
        A.      CLAIMANT'S SUBMISSIONS .................................................................46
        B.      RESPONDENT'S SUBMISSIONS ............................................................47
IV.     PARTIES' REQUESTS FOR RELIEF..............................................................48
        A.      CLAIMANT'S REQUEST FOR RELIEF ...................................................48
        B.      RESPONDENT'S REQUEST FOR RELIEF ..............................................51
V.      TRIBUNAL'S DECISION................................................................................53
        A.      PRELIMINARY PROCEDURAL ISSUE ...................................................54
        B.      FACTUAL BACKGROUND......................................................................54
        C.      RELEVANT PROVISIONS OF THE PSA .................................................58
        D.      CLAIMANT'S CLAIMS............................................................................64
                1.      Alleged Breaches of the PSA by the Respondent.............................64
                2.      Alleged Misrepresentation by the Respondent.................................93
                3.      Alleged Termination of the PSA by the Claimant...........................101
                4.      Alleged Misappropriation of the Equipment by the Respondent, and
                        Claimant's Claim for Rental Value of the Equipment....................106
        E.      RESPONDENT'S COUNTERCLAIMS ....................................................126
                1.      Alleged Breaches of the PSA by the Claimant................................126
                2.      Alleged Wrongful Termination of the PSA By the Claimant...........138
        F.      INTEREST ...............................................................................................138
                1.      Claimant's Submissions................................................................138
                2.      Respondent's Submissions.............................................................138
                3.      Tribunal's Decision......................................................................138
        G.      COSTS .....................................................................................................140
                1.      Claimant's Submissions................................................................140
                2.      Respondent's Submissions.............................................................140
                3.      Tribunal's Decision......................................................................140
VI.     AWARD...........................................................................................................144

## TABLE OF ABBREVIATIONS AND DEFINITIONS

| Abbreviation | Definition |
|---|---|
| **2018 Audit Report** | Audit report prepared by Baker Tilly for the period from 19 December 2017 to 31 December 2018 and dated 9 December 2020 |
| **2019 Audit Report** | Audit report prepared by Baker Tilly for the year ended 31 December 2019 and dated 9 December 2020 |
| **Additional Purchase Orders** | 863 additional purchase orders for the period from March 2018 to December 2019, submitted by the Respondent on 14 December 2020 |
| **Al Bah Expert Report** | Expert report issued by Mr Ahmed Obaid Al Bah, dated 5 March 2021 |
| **Amended Montesinos Report** | Addendum to Mr Montesinos' Expert Report submitted by the Respondent on 14 December 2020 |
| **Amendment** | Amendment to the Saudi Aramco Contract dated 25 December 2017 |
| **Application for Expedited Formation** | Claimant's application for expedited formation of the arbitral tribunal filed on 18 September 2019 |
| **Application for Interim Measures** | Claimant's application for interim measures, filed on 7 November 2019 |
| **Applications** | The Security for Costs Application and Vacation of the Partial Award on Interim Measures Application |
| **Arbitration Costs** | The costs of the arbitration other than legal or other expenses |
| **Arius** | Arius Litigation Funding LLC |
| **Bifurcation Application** | Claimant's request that the Tribunal bifurcate the final award, as submitted on 11 March 2021 |
| **BOP** | Blowout preventer unit |
| **BOP Stack** | Blow-out prevention system provided by the Claimant to the Respondent |
| **C-2 Application** | Respondent's request that the Tribunal disregard and strike from the record Claimant's Exhibit C-2, made on 13 December 2019 |
| **Case Management Conference** | Case management conference held on 22 November 2019 |

| | |
|---|---|
| **Claimant** | ENERGY EXPLORATION AND DEVELOPMENT COMPANY LTD |
| **Claimant's Correction Request** | Claimant's request for correction of the Partial Award on Interim Measures, filed on 6 December 2019 |
| **Claimant's New Documents** | The Halliburton Proposal and an exchange of emails between counsel for the Claimant and counsel for the Respondent with respect to accepting the Halliburton Proposal |
| **Claimant's New Evidence Application** | Claimant's application to admit Annexes F and H of its Post-Hearing Brief to the evidentiary record, submitted on 5 March 2021 |
| **Claimant's Request for Adverse Inferences** | Claimant's request that the Tribunal should draw adverse inferences against the Respondent, submitted on 14 November 2020 |
| **CWS-1 Eskici** | First Witness Statement of Mr Mo Eskici, dated 11 August 2020 |
| **CWS-2 Zavarei** | First Witness Statement of Ms Delaram Zavarei, dated 11 August 2020 |
| **CWS-3 Eskici** | Second Witness Statement of Mr Mo Eskici, dated 28 August 2020 |
| **CWS-4 Zavarei** | Second Witness Statement of Ms Delaram Zavarei, dated 28 August 2020 |
| **CWS-5 Minasova** | Minasova Witness Statement, dated 1 March 2021 |
| **Dubai Account** | A joint bank account opened by the Parties in Dubai |
| **EAA** | English Arbitration Act 1996 |
| **ENEXD Equipment** | Equipment Type 1, Equipment Type 3 and Equipment Type 4 |
| **Equipment** | Equipment provided by the Claimant and used on the Project |
| **Equipment Type 1** | Equipment listed in Clause 3 of the PSA as "equipment items based on [the Claimant]'s equipment portfolio" |
| **Equipment Type 2** | Equipment listed in Clause 3 of the PSA as "equipment items based on [the Respondent]'s equipment portfolio" |
| **Equipment Type 3** | Equipment listed in Clause 3 of the PSA as "[e]quipment to be manufactured by [the Respondent] and purchased by [the Claimant]" |
| **Equipment Type 4** | Equipment listed in Clause 3 of the PSA as "[e]quipment form other manufacturer to be purchased by [the Claimant]" |
| **Equipment Type 5** | Equipment listed in Clause 3 of the PSA as "[e]quipment from other manufacturers to be purchased by [the Respondent] (with the |

|  | approval of [the Claimant]) through the joint account Operation under this agreement" |
|---|---|
| **First P&L Account** | Profit and loss account provided by the Respondent to the Claimant on 1 November 2017 |
| **Fourth P&L Account** | Revised profit and loss account provided by the Respondent on 9 August 2018 |
| **Further Application for Interim Measures** | Claimant's application for a further award of interim measures in respect of the Partial Award on Interim Measures, filed on 18 June 2020 |
| **Further Interim Application** | Claimant's application for a further award of interim measures, filed on 21 November 2020 |
| **GBP** | Great Britain Pound Sterling |
| **Gulf Agency Agreement** | Agency agreement between the Respondent and Gulf Energy, dated 15 November 2016 |
| **Gulf Energy** | Gulf Energy Integrated Services |
| **Halliburton Proposal** | A proposal dated 24 September 2020 by Halliburton to lease the Equipment |
| **Handy Expert Report** | Further expert report by Mr Handy, which the Respondent sought to file on 26 March 2021 |
| **Hearing** | Hearing held remotely from 14 to 16 December 2020 |
| **Jurisdictional Objections** | Respondent's Memorial on Objections to Jurisdiction over the Koomey Unit, filed on 28 November 2019 |
| **LCIA Rules** | LCIA Rules of Arbitration (in force as of 1 October 2014) |
| **Legal Costs** | The Parties' legal and other expenses |
| **Minasova Witness Statement** | First Witness Statement of Ms Alina Minasova dated 1 March 2021 |
| **Montesinos Expert Report** | Expert report issued by Mr Adolfo Montesinos of A&R Holdings LLC, as submitted by the Respondent on 10 November 2020 |
| **New Iqbal Witness Statement** | Witness statement of Mr Imran Iqbal, as submitted by the Respondent on 26 March 2021 |
| **New Sola Witness Statement** | Further witness statement of Mr Kjell Inge Sola, as submitted by the Respondent on 26 March 2021 |
| **Partial Award on Interim Measures** | Tribunal's first partial award on interim measures, issued 5 December 2019 |
| **Partial Award on Jurisdiction** | Tribunal's second partial award on the Jurisdictional Objections, issued 26 January 2020 |

| | |
|---|---|
| **Parties** | Claimant and Respondent |
| **Party** | Claimant or Respondent |
| **Post-Hearing Briefs** | The Parties' post-hearing briefs |
| **Procedural Order No. 1** | Procedural order issued on 4 December 2019 |
| **Procedural Order No. 2** | Procedural order issued on 11 February 2020 |
| **Procedural Order No. 3** | Procedural order issued on 9 March 2020 |
| **Procedural Order No. 4** | Procedural order issued on 16 March 2020 |
| **Procedural Order No. 5** | Procedural order issued on 7 May 2020 |
| **Procedural Order No. 6** | Procedural order issued on 26 May 2020 |
| **Procedural Order No. 7** | Procedural order issued on 31 May 2020 |
| **Procedural Order No. 8** | Procedural order issued on 4 July 2020 |
| **Procedural Order No. 9** | Procedural order issued on 7 July 2020 |
| **Procedural Order No. 10** | Procedural order issued on 11 August 2020 |
| **Procedural Order No. 11** | Procedural order issued on 7 September 2020 |
| **Procedural Order No. 12** | Procedural order issued on 27 September 2020 |
| **Procedural Order No. 13** | Procedural order issued on 6 November 2020 |
| **Procedural Order No. 14** | Procedural order issued on 6 December 2020 |
| **Procedural Timetable** | Procedural timetable included in Procedural Order No. 1 |
| **Project** | Parties' servicing of the Saudi Aramco Contract |

| **PSA** | Profit-sharing agreement entered into by the Parties on 19 December 2017 |
|---|---|
| **Remote Hearing** | Hearing held remotely from 14 to 16 December 2020 |
| **Remote Inspection** | Parties' agreement in light of COVID-19 pandemic and difficulty of accessing the Equipment in Saudi Arabia, to allow the Parties' experts to remotely inspect the Equipment |
| **Renewed Security for Costs and Stay Application** | Respondent's renewed security for costs application and stay application, filed on 9 July 2020 |
| **Request** | Claimant's request for arbitration filed on 18 September 2019 |
| **RER-1 Montesinos** | Montesinos Expert Report |
| **RER-1A Montesinos** | Amended Montesinos Report |
| **RER-2 Handy** | Handy Expert Report |
| **Respondent** | NORDIC ENERGY FZC |
| **Respondent's Correction Request** | Respondent's request for correction of the Partial Award on Interim Measures, filed on 16 December 2019 |
| **Respondent's New Documents** | The Additional Purchase Orders, the Summary, the 2018 Audit Report and the 2019 Audit Report |
| **Respondent's New Evidence** | The Respondent's New Exhibits, the New Sola Witness Statement, the New Iqbal Witness Statement and the Handy Expert Report |
| **Respondent's New Exhibits** | Exhibits R-89, R-90 and R-91, as submitted by the Respondent on 26 March 2021 |
| **Response** | Respondent's response to the Request, filed on 16 October 2019 |
| **Revenue Representation** | Representation that the Claimant alleges the Respondent made regarding the profitability of the Project |
| **RWS-1 Sola** | First Witness Statement of Mr Kjell Inge "Sonny" Sola, dated 18 November 2019 |
| **RWS-2 Aidasani** | First Witness Statement of Mr Ramesh Aidasani, dated 11 August 2020 |
| **RWS-3 Sola** | Second Witness Statement of Mr Kjell Inge "Sonny" Sola, dated 11 August 2020 |
| **RWS-4 Sola** | Reply Witness Statement of Mr Kjell Inge "Sonny" Sola, dated 28 August 2020 |

| | |
|---|---|
| **RWS-5 Aidasani** | Reply Witness Statement of Mr Ramesh Aidasani, dated 28 August 2020 |
| **RWS-6 Iqbal** | New Iqbal Witness Statement |
| **RWS-7 Sola** | New Sola Witness Statement |
| **Sanctions Application** | Claimant's request that the Tribunal sanction the Respondent's authorized representatives, as submitted on 11 March 2021 |
| **Saudi Account** | Bank account in Saudi Arabia into which all monies received under the Saudi Aramco Contract were to be paid prior to being transferred to the Dubai Account |
| **Saudi Account II** | Joint bank account in Saudi Arabia provided for under Clause 7.13 of the PSA |
| **Saudi Arabia Items** | Items identified in Table 2 of the Montesinos Expert Report, stated to be located in the Respondent's yard in Saudi Arabia |
| **Saudi Aramco** | Saudi Arabian Oil Company |
| **Saudi Aramco Contract** | Contract dated 16 April 2017 entered into by the Respondent (via its agent Gulf Energy) with Saudi Aramco |
| **Saudi Proceedings** | Respondent's court proceedings against Gulf Energy before the courts in Saudi Arabia regarding the Equipment |
| **Second P&L Account** | Updated version of the First P&L Account, provided by the Respondent on 6 August 2018 |
| **Security for Costs Application and Vacation of the Partial Award on Interim Measures Application** | The Respondent's application for security for costs and vacation of the Partial Award on Interim Measures, filed on 9 April 2020 |
| **Statement of Case** | Claimant's statement of claim, filed on 10 January 2020 |
| **Statement of Defence and Counterclaim** | Respondent's statement of defence and counterclaim, filed on 14 February 2020 |
| **Statement of Reply and Defence to Counterclaim** | Claimant's statement of reply and defence to counterclaim, filed on 27 March 2020 |
| **Summary** | Spreadsheet containing a summary of the Additional Purchase Orders, submitted by the Respondent on 14 December 2020 |
| **Termination Notice** | Notice sent by the Claimant to the Respondent on 29 August 2019 purporting to terminate the PSA |

| | |
|---|---|
| **Third P&L Account** | Further version of the First P&L Account, with different figures from the Second P&L Account, also provided by the Respondent on 6 August 2018 |
| **Timeliness Requirement** | Implied term contended for by the Claimant to the effect that the Respondent would "take all necessary steps to ensure that the Project was operation [sic] as soon after delivery of the Equipment as possible" |
| **Transcript** | Finalised transcript of the Remote Hearing provided to the Tribunal by the Respondent on 9 March 2021 |
| **Tribunal** | The arbitral tribunal consisting of sole arbitrator Prof Maxi Scherer of WilmerHale |
| **Tribunal Secretary** | Mr Joe Rich of WilmerHale |
| **UAE Items** | Six items of Equipment identified in Table 2 of the Montesinos Expert Report stated as being stored in the "Nordic Yard UAE" |
| **USD** | United States of America Dollars |
| **Wright Expert Report** | Expert report issued by Mr Colin Wright of Global Oilfield Consulting, as submitted by the Claimant on 16 October 2020 |

## I.    INTRODUCTION[1]

### A.    PARTIES

1.    The claimant in this arbitration is ENERGY EXPLORATION AND DEVELOPMENT COMPANY LTD (the "**Claimant**").  The Claimant's contact details are:

> P.O. Box 11430
> Jumeriah Lake Towers
> Dubai, United Arab Emirates

2.    The Claimant is represented in this arbitration by:

> Dr Ahmed Mohamed Abdelhafez Badr
> Khalifa Bin Zayed City A, 54th Street - A - Abu Dhabi, Mezzanine Floor, Office 202,
> PO Box 5254, Abu Dhabi, United Arab Emirates
> ahmed.hafez@fz-dreyfus.com
>
> and
>
> Mr Fernando Ortega
> CVML
> Suite 104, Liberty House, DIFC, Dubai
> PO Box 482025, Dubai, United Arab Emirates
> f.ortega@cvml.ae

3.    The respondent in this arbitration is NORDIC ENERGY FZC (the "**Respondent**").  The Respondent's contact details are:

> P.O. Box 38094
> Ras Al Khaimah
> United Arab Emirates

4.    The Respondent is represented by:

> Mr Jeremy Miocevic
> CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
> Emirates Financial Tower - North, Dubai International Financial Centre PO Box 9498,
> Dubai, United Arab Emirates
> jmiocevic@curtis.com
>
> and
>
> Ms Serena Boscia Montalbano / Ms Sehnaz Gungor / Mr Angus Thompson
> CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
> 99 Gresham Street, London EC2V 7NG, United Kingdom
> smontalbano@curtis.com / sgungor@curtis.com / athompson@curtis.com

---

[1] Capitalized terms, unless defined otherwise herein, shall have the meaning as defined in the Tribunal's Procedural Orders.

5.      The Claimant and the Respondent are individually referred to as "**Party**" or together as the "**Parties**."

### B.     TRIBUNAL

6.      The arbitral tribunal (the "**Tribunal**") in this arbitration is composed of the sole arbitrator appointed by the LCIA Court on 5 November 2019:

> Prof Dr Maxi Scherer
> Wilmer Cutler Pickering Hale and Dorr LLP
> 49 Park Lane, London W1K 1PS, United Kingdom
> Email: maxi.scherer@wilmerhale.com

7.      None of the Parties have raised any objections regarding the constitution of the Tribunal.

### C.     DISPUTE

8.      The Parties' dispute, among other things, arises from a profit-sharing agreement entered into on 19 December 2017 (the "**PSA**").

9.      The purpose of the PSA is for the Parties to service a contract which had previously been entered into by the Respondent (via its agent Gulf Energy Integrated Services ("**Gulf Energy**")) with Saudi Arabian Oil Company ("**Saudi Aramco**") (the "**Saudi Aramco Contract**"). The Parties' servicing of the Saudi Aramco Contract is referred to as the "**Project**." The equipment provided by the Claimant and used on the Project is referred to as the "**Equipment**".[2]

10.     Clause 15 of the PSA provides as follows:

> "This Agreement and any dispute or claim arising out of or in connection with it or its subject matter or formation (including non-contractual disputes or claims) shall be governed by and construed in accordance with the law of England and Wales.
>
> The Agreement and any dispute or claim arising out of or in connection with it or its subject matter or formation (including non-contractual disputes or claims) shall be referred to and finally resolved by arbitration under the LCIA Rules, which are deemed to be incorporated by reference into this Clause. The number of arbitrators shall be

---

[2] The definition of the Equipment is discussed in further detail at Section V.D.4 below.

one, the seat, or legal place, of arbitration shall be LCIA, in London, United Kingdom. The language to be used in the arbitral proceedings shall be in English."[3]

11.     Pursuant to Clause 15 of the PSA, the PSA is governed by the laws of England and Wales.

12.     Further pursuant to Clause 15 of the PSA, this arbitration is governed by the LCIA Rules of Arbitration (in force as of 1 October 2014) (the "**LCIA Rules**") and the English Arbitration Act 1996 (the "**EAA**").

13.     This is the final award in this arbitration and resolves the matters set out in the Parties' pleadings.

## II.     PROCEDURAL HISTORY[4]

Request for Arbitration and Response

14.     On 18 September 2019, the Claimant filed with the LCIA its request for arbitration (the "**Request**") and its application for expedited formation of the arbitral tribunal and notice of application of interim measures (the "**Application for Expedited Formation**").

15.     On 23 September 2019, the Respondent filed its comments on the Application for Expedited Formation.

16.     On 24 September 2019, the LCIA advised the Parties that the LCIA Court had decided that the exceptional urgency requirement under Article 9A of the Rules had not been established, and therefore the LCIA Court had denied the Application for Expedited Formation.

17.     On 16 October 2019, the Respondent filed its response to the Request (the "**Response**").

Constitution of the Tribunal and Procedural Order No. 1

18.     On 5 November 2019, the LCIA notified the Parties of the Tribunal's appointment and forwarded the file to the Tribunal.

---

[3] PSA, Clause 15, Exhibit C-3. The PSA was also exhibited as Exhibit R-2. Here and for other instances where the Parties submitted one and the same document several times with different Exhibit numbers, the Tribunal only refers to one such Exhibit without mentioning the others.
[4] This section is not an exhaustive summary of the procedural history of the arbitration, but sets out its most relevant steps.

19.     On 6 November 2019, the Tribunal wrote to the Parties regarding, among other things, the procedural timetable for the arbitration and possible dates for a case management conference with the Parties.

20.     On 28 November 2019, the Respondent filed a Memorial on Objections to Jurisdiction over the Koomey Unit (the "**Jurisdictional Objections**").  The Respondent submitted that the Tribunal had no jurisdiction to hear or determine the dispute insofar as it concerned the Koomey Unit.

21.     On 4 December 2019, the Tribunal issued procedural order no. 1 ("**Procedural Order No. 1**").  This included a procedural timetable for this arbitration (the "**Procedural Timetable**") with a bifurcation of the proceedings into a jurisdictional phase and a merits phase, and a timetable for submissions regarding the Jurisdictional Objections.

Application for and Partial Award on Interim Measures

22.     On 7 November 2019, the Claimant filed its application for interim measures (the "**Application for Interim Measures**").  The Claimant sought two categories of interim measures: (i) measures relating to the inspection, inventory, insurance, and storage of the Equipment; and (ii) measures relating to any funds generated under the Saudi Aramco Contract and the operations of two accounts, one held by the Respondent and Gulf Energy in the Kingdom of Saudi Arabia and one held by the Claimant and the Respondent in Dubai.

23.     The Claimant also undertook that "if the Tribunal subsequently finds that the award of interim measures ought not to have been made then the Claimant will account to the Respondent for any loss or damage suffered by the Respondent as a result of this award having been made."

24.     On 8 November 2019, the Tribunal acknowledged receipt of the Claimant's Application for Interim Measures and invited the Respondent to provide its comments thereon by 15 November 2019.  The Tribunal further indicated that it intended to hear the Parties' submissions on the Claimant's Application for Interim Measures during a case management conference with the Parties.

25.     On 9 November 2019, at the Respondent's request, the Tribunal extended the deadline for the Respondent's comments on the Claimant's Application for Interim Measures until 18 November 2019.

26.     On 15 November 2019, having received the availabilities of both Parties for a case management conference, the Tribunal confirmed that it would be held by phone on 22 November 2019 from 9-11 am London time (the "**Case Management Conference**").

27.     On 18 November 2019, the Respondent filed its comments on the Claimant's Application for Interim Measures, including a witness statement of Mr Kjell Inge "Sonny" Sola.

28.     On the same day, the Tribunal acknowledged receipt of the Respondent's comments on the Claimant's Application for Interim Measures and provided the Parties with a draft agenda for the Case Management Conference for their comments.

29.     On 20 November 2019, the Claimant filed further (unsolicited) comments on its Application for Interim Measures.

30.     On 21 November 2019, the Tribunal provided the Parties with a revised agenda, taking into account the Parties' comments.

31.     On the same day, the Respondent requested that the Claimant's letter dated 20 November 2019, providing unsolicited comments on the Application for Interim Measures, be struck from the record.

32.     The Tribunal reminded the Parties to seek leave from the Tribunal before filing any unsolicited comments and noted that it saw no need to disregard the Claimant's letter since both Parties would have a full opportunity to be heard at the upcoming Case Management Conference.

33.     On 21 November 2019, the Claimant also stated that it wished to add a "minor addition to the interim relief sought," requesting confirmation from the Respondent "whether there had been any modifications or amendments to the contractual arrangement between Nordic and Saudi Aramco."

34.     On 22 November 2019, the Tribunal held the Case Management Conference with the Parties.  Following the agenda circulated on 21 November 2019, the Tribunal, among other things, heard the Parties on the Claimant's Application for Interim Measures, including the examination of the Respondent's witness, Mr Sola.

35.    On 5 December 2019, the Tribunal issued its first partial award on interim measures (the "**Partial Award on Interim Measures**").  The Tribunal partially granted the two categories of measures requested on 7 November 2019.  It dismissed the measure requested on 21 November 2019.  The Tribunal also ordered the Claimant to provide the cross-indemnity offered in its application.

36.    The Tribunal reserved its decision on costs relating to the Claimant's Application for Interim Measures.

37.    On 16 December 2019, the Claimant requested permission to address the Tribunal on the costs of the Partial Award on Interim Measures.

38.    On 18 December 2019, the Respondent noted its position that the decision as to the costs of the Application on Interim Measures should be made with the costs of the arbitration at the end of these proceedings.

39.    On 19 December 2019, the Claimant made further comments, noting that it was undisputed that the Tribunal had discretion to deal with costs either now or later.

40.    On 19 December 2019, the Tribunal sent a letter to the Parties in which it stated that it would deal with the Parties' costs relating to both preliminary issues (interim relief and jurisdictional objections, further discussed below) together and would issue further directions to this effect in due course.

Correction of Partial Award on Interim Measures

41.    On 6 December 2019, the Claimant made a request for correction of the Partial Award on Interim Measures pursuant to Article 27.1 of the LCIA Rules (the "**Claimant's Correction Request**").  According to the Claimant, paragraph 90(c) of the Partial Award contains "a typographical slip," and should read "provide" rather than "procure."

42.    On 9 December 2019, the Tribunal invited the Respondent to comment on the Claimant's Correction Request on or before 16 December 2019.

43.    On 16 December 2019, the Respondent confirmed that it had no objection to the correction suggested by the Claimant with respect to paragraph 90(c) of the Partial Award on Interim Measures.

- 14 -

44.    At the same time, the Respondent made a request for correction of the Partial Award on Interim Measures pursuant to Article 27.1 of the LCIA Rules (the "**Respondent's Correction Request**").  According to the Respondent, paragraph 60 of the Partial Award misstated Mr Sola's Witness Statement.

45.    On 17 December 2019, the Tribunal invited the Claimant to comment on the Respondent's Correction Request on or before 20 December 2019.

46.    On 20 December 2019, the Claimant wrote to the Tribunal that it had requested some clarification from the Respondent regarding the Respondent's Correction Request.  The Claimant therefore requested to provide comments on the Respondent's Correction Request once it had received such clarification.

47.    On the same day, the Tribunal noted that the deadline for the Claimant's comment was extended.

48.    On 22 December 2019, the Respondent made clarifications regarding its Correction Request.

49.    On 23 December 2019, the Claimant provided its comments on the Respondent's Correction Request.

50.    On 24 December 2019, the Tribunal informed the Parties that it would now decide on both the Claimant's and the Respondent's Correction Requests pursuant to Article 27.1 of the LCIA Rules.

51.    On 3 January 2020, the Tribunal issued the memorandum of correction concerning Partial Award on Interim Measures.  The Tribunal corrected paragraph 90(c) of the Partial Award on Interim Measures, replacing the word "procure" with "provide".  The Tribunal dismissed all other requests.

52.    The Tribunal reserved its decision on costs relating to the Claimant's and the Respondent's correction requests.

<u>Application to Strike Exhibit C-2 from the Record</u>

53.     On 13 December 2019, the Respondent requested the Tribunal to disregard and strike from the record Claimant's Exhibit C-2, entitled "Transcript of Mr Sola's cross examination on 22 November 2019" (the "**C-2 Application**").

54.     On 16 December 2019, the Claimant commented on the C-2 Application.

55.     On 18 December 2019, the Respondent provided further comments on the C-2 Application.

56.     On 19 December 2019, the Tribunal sent a letter to the Parties in which it stated that it did not grant the Respondent's application to strike Exhibit C-2 from the Record.

<u>Statement of Case</u>

57.     On 10 January 2020, the Claimant served its statement of case (the "**Statement of Case**"), including Exhibits C-9 to C-33 and CLA-7 to CLA-19.

<u>Respondent's Objections to the Jurisdiction of the Tribunal and Tribunal's Partial Award on Jurisdiction</u>

58.     In accordance with Procedural Order No. 1 and the Tribunal's further directions of 24 December 2019 and 7 January 2020, the Parties filed the following submissions regarding the Respondent's Jurisdictional Objections:

     a.     on 28 November 2019, the Respondent filed its memorial on the Jurisdictional Objections (as referred to at paragraph 20 above);

     b.     on 9 December 2019, the Claimant filed its response on the Jurisdictional Objections;

     c.     on 23 December 2019, the Respondent filed its Rejoinder on the Jurisdictional Objections; and

     d.     on 10 January 2020, the Claimant filed its Further Reply to the Jurisdictional Objections.

59.     The Parties agreed that the Tribunal would decide on the Respondent's Jurisdictional Objections on paper only, without the need for an oral hearing.[5]

60.     On 26 January 2020, the Tribunal issued its second partial award on the Jurisdictional Objections (the "**Partial Award on Jurisdiction**").   The Tribunal decided that it had jurisdiction to hear the dispute except insofar as it concerned the Koomey Unit.[6]   It dismissed all other requests.[7]   In the Partial Award on Jurisdiction, the Tribunal reserved its decision on costs.[8]

Procedural Order No. 2 – Revised Procedural Timetable

61.     On 11 February 2020, the Tribunal issued procedural order no. 2 ("**Procedural Order No. 2**"), revising the Procedural Timetable set by Procedural Order No. 1.

Statement of Defence and Counterclaim

62.     On 14 February 2020, the Respondent submitted its statement of defence and counterclaim (the "**Statement of Defence and Counterclaim**"), including Exhibits R-12 to R-39 and RLA-2 to RLA-10.

Procedural Order No. 3 – Revised Procedural Timetable

63.     On 2 March 2020, the Claimant requested an extension for its statement of reply and defence to counterclaim until 17 April 2020.

64.     On 3 March 2020, the Respondent commented on the Claimant's request for an extension, noting that the request should be denied.

65.     On 9 March 2020, the Tribunal issued procedural order no. 3 ("**Procedural Order No. 3**"), partially granting the Claimant's request for an extension.   An extension was granted to

---

[5]  Tribunal's letter, dated 23 November 2019, summarising the Case Management Conference held on 22 November 2019, at p. 4 ("Both Parties agree that it would be beneficial to determine the Respondent's [J]urisdictional [O]bjections upfront in an expedited fashion.  The Parties do not foresee this issue to raise complicated questions that would require witness evidence or a hearing, and therefore agree that it can be determined on paper only.").

[6]  Partial Award on Jurisdiction, para. 46(a).

[7]  Partial Award on Jurisdiction, para. 46(c).

[8]  On 28 January 2020, the Tribunal wrote to the Parties about the costs relating to the preliminary issues having been dealt with in the Partial Award on Interim Measures and the Partial Award on Jurisdiction.  The Tribunal suggested that the Parties consider agreeing that each Party bear its own costs relating to the and the Arbitration Costs pursuant to Article 28.2 of the LCIA Rules be determined at a later stage.  The Parties did not reply to this invitation.

27 March 2020, with all further deadlines with the exception of the hearing being accordingly adjusted.

Change of Parties' Legal Representation

66.     On 2 March 2020, the Claimant informed the Tribunal of a change in its legal representation.

67.     On 3 March 2020, the Respondent informed the Tribunal of a change in its legal representation.

68.     On 6 March 2020, the Respondent, as invited by the Tribunal, provided its comments on the change of Claimant's legal representation.

69.     On 9 March 2020, pursuant to Article 18.3 of the LCIA Rules, the Tribunal approved the change of the Claimant's legal representation.

70.     On 11 March 2020, the Claimant, as invited by the Tribunal, provided its comments on the change of Respondent's legal representation.

71.     On 16 March 2020, pursuant to Article 18.3 of the LCIA Rules, the Tribunal approved the change of the Respondent's legal representation.

Third-Party Funding for Claimant

72.     On 6 March 2020, the Respondent referred to an email sent by Ms Delaram Zavarei which stated that the Claimant "had to work with the funder to help [] move forward with this arbitration process."  The Respondent requested the Tribunal to order the Claimant to provide (i) the name of the "funder" and (ii) a copy of the funding agreement between "the funder" and the Claimant.

73.     On 9 March 2020, the Tribunal invited the Claimant to comment on that request.

74.     On 11 March 2020, the Claimant informed the Tribunal that it was "funded by Arius Litigation Funding LLC of State of Delaware, 113 Barksdale Professional Center in the City of Newark, County of New Castle, Zip Code 19711 [("**Arius**")]" and that "Dr Ahmed Abdel Hafez is an authorised representative of Arius" whom the Claimant requested should be "copied into future correspondence in connection with this arbitration."

75.     On 16 March 2020, the Tribunal stated that it was not agreeable to include Dr Hafez in future correspondence on the basis that it was not established that Dr Hafez was a legal representative within the meaning of Article 18.1 of the LCIA Rules.

Procedural Order No. 4 – Revised Procedural Timetable

76.     On 10 March 2020, the Respondent referred to Procedural Order No. 3 and requested the Tribunal to grant a one-week extension, extending the deadline for its statement of rejoinder and reply on counterclaims to 24 April 2020, with all remaining deadlines with the exception of the hearing dates being amended by one week.

77.     On 11 March 2020, the Tribunal invited the Claimant to comment on the Respondent's request.

78.     On the same day, the Claimant noted that it had "no objection to the extension of time sought by the Respondent for the submission of its Rejoinder to 24 April 2020, with the remaining dates on the procedural timetable to be amended accordingly, save for the hearing window."

79.     On 16 March 2020, the Tribunal granted the Respondent's request and issued a revised Procedural Timetable in procedural order no. 4 ("**Procedural Order No. 4**").

Statement of Reply and Defence to Counterclaim

80.     On 27 March 2020, the Claimant submitted its statement of reply and defence to counterclaim, including Exhibits C-34 to C-37 and CLA-20 to CLA-21 (the "**Statement of Reply and Defence to Counterclaim**").

Procedural Order No. 5 – Claimant's Legal Entity and Incorporation; Respondent's Applications for Security for Costs and Vacation of the Award on Interim Measures

81.     In the Request for Arbitration, the Claimant listed its details as "Energy Exploration and Development Company Ltd" and "P.O. Box 11430, Jumeriah Lake Towers, Dubai, United Arab Emirates."

82.     On 11 December 2019, the Claimant requested to change its incorporation from "United Arab Emirates" to "British Virgin Islands."

83.     On 19 December 2019, the Tribunal invited the Claimant to clarify which entity was a party to this arbitration and provide its correct contact details.

84.    On 7 January 2020, the Claimant provided some clarification on the Claimant's entity and registered address.

85.    On 13 January 2020, the Tribunal invited the Respondent's comments.

86.    On 20 January 2020, the Respondent informed the Tribunal that it had requested additional information from the Claimant before it could provide further comments.

87.    On 2 March 2020, the Respondent commented further on the Claimant's legal entity and incorporation.

88.    Also on 2 March 2020, Ms Zavarei of the Claimant, among other things, wrote an email to the Tribunal only, commenting on the Claimant's change of legal representatives.  She wrote as follows:

> "In a seperate note, I would like to inform you that I was really happy to work with Farrer. They are really great lawyers but unfortunately due to the financial situation that has been provided by this profit-sharing agreement with Nordic, I was not in a proper financial position to continue with Farrer and fund the rest of the process and I had to work with the funder to help me to move forward with this arbitration process and that's why the new law firm has been instructed."

89.    On 3 March 2020, the Tribunal, among other things, (i) invited the Claimant to provide a reply on the Respondent's 2 March comments on its incorporation by 12 March 2020; (ii) noted that Ms Zavarei's email of 2 March was addressed to the Tribunal only, reminded the Parties not to engage in any *ex parte* communication with the Tribunal and enclosed Ms Zavarei's email for the full information of all Parties involved.

90.    On 11 March 2020, the Claimant provided further comments on its incorporation, adding that "any relevant documents required to be produced as per the Respondent's request can be requested during the production of documents phase as directed by the Sole Arbitrator."

91.    On 15 March 2020, the Respondent provided further comments.  Among other things, the Respondent requested the Tribunal to "order [the] Claimant to explain on which legal basis ENEXD BVI purports to lawfully conduct business under the PSA."

- 20 -

92.    On 16 March 2020, the Tribunal directed the Claimant by 27 March 2020 to provide all necessary information and underlying evidence regarding (i) the Claimant's incorporation; and (ii) the Claimant's valid license to conduct business in the UAE for the purposes of the PSA.

93.    On 27 March 2020, the Claimant provided comments and documents relating to its incorporation and its license to conduct business in the UAE for the purposes of the PSA.

94.    On 9 April 2020, the Respondent filed (i) an application for security for costs and (ii) an application for vacation of the Partial Award on Interim Measures, including Exhibits R-40 to R-45 and RLA-12 to RLA-46 (together the "**Security for Costs Application and Vacation of the Partial Award on Interim Measures Application**" or "**Applications**").

95.    On the same day, the Tribunal acknowledged receipt thereof, and invited the Claimant to comment by 20 April 2020 on these Applications, as well as on the Respondent's suggestion that they "be decided on the papers, without a hearing, in order to save additional costs."

96.    On 20 April 2020, the Claimant filed its reply to the Applications, including Exhibits C-38, C-39, CLA-22 and CLA-23.  The Claimant did not make any specific comments on the Respondent's suggestion that the Applications be decided on-papers only, nor did the Claimant request a hearing thereon.

97.    On 22 April 2020, the Tribunal acknowledged receipt of the Claimant's reply and invited the Respondent by 29 April 2020 to comment thereon, if it wished, and in particular on the "Conditional Offer to Fund Security for Costs" at paragraphs 15–17 of the reply.

98.    On 29 April 2020, the Respondent filed a rejoinder to its Applications, among other things, rejecting the Claimant's "Conditional Offer to Fund Security for Costs."

99.    On 5 May 2020, the Claimant noted that it relied "upon the matters set out in its Reply" and "reiterate[d] its position that [the Applications] should be dismissed."  The Claimant also agreed that the Applications "should be dealt with on paper."

100.    On 7 May 2020, the Tribunal issued procedural order no. 5 ("**Procedural Order No. 5**"):

a.       In respect of the Claimant's legal entity and incorporation, the Tribunal noted that there appeared to be two entities with the name Energy Exploration & Development Co. Ltd and that the entity that could enter into the PSA and bring this arbitration against the Respondent was Energy Exploration & Development Co. Ltd, as incorporated in the British Virgin Islands.

b.       The Tribunal dismissed the Respondent's Security for Costs Application.

c.       The Tribunal also dismissed the Vacation of the Partial Award on Interim Measures Application. However, it found that the simple cross-indemnity ordered in the Partial Award on Interim Measures had proved to be insufficient. The Tribunal therefore granted the Respondent's alternative request to order the Claimant to fortify its cross-indemnity by making a payment of GBP 350,000 into the LCIA's escrow account.

d.       The Tribunal dismissed all other requests and reserved its decision on costs relating to the Respondent's Applications.

Procedural Order No. 6 – Document Production

101.    On 19 May 2020, the Parties submitted their respective requests for document production to the Tribunal in accordance with the Procedural Timetable in Procedural Order No. 4.

102.    On 26 May 2020, the Tribunal issued procedural order no. 6 ("**Procedural Order No. 6**"), providing its decision on the Parties' requests for document production. The Tribunal noted that, pursuant to the Procedural Timetable in Procedural Order No. 4, each Party was required to produce the documents indicated in the appendices to the requesting Party by 9 June 2020.

103.    The Tribunal reserved its decision on costs in relation to Procedural Order No. 6.

Procedural Order No. 7 – Claimant's Legal Representation and Amendment to Procedural Order No. 5

104.    On 18 May 2020, the Claimant wrote to the Tribunal "to request pursuant to Article 18.3 of the LCIA Rules that Dr Ahmed Mohamed Abdelhafez Badr be added as a legal representative of the Claimant." The Claimant noted that "Dr Ahmed Mohamed Abdelhafez

Badr is authorised to act as an [a]ttorney on behalf of the Claimant in these proceedings" and attached a copy of a special power of attorney.

105.    On the same day, the Tribunal acknowledged receipt of the Claimant's request and invited the Respondent to comment thereon by 20 May 2020.

106.    Also on 18 May 2020, the Claimant wrote to the Tribunal requesting an amendment to the terms of the Tribunal's Procedural Order No. 5.

107.    On the same day, the Tribunal acknowledged receipt of the Claimant's amendment request and invited the Respondent to provide its comments by 26 May 2020.

108.    On 20 May 2020, the Respondent requested the Claimant "to clarify who is Dr Badr who appears not to be affiliated with Fenwick Elliott." The Respondent further noted that the power of attorney provided by the Claimant regarding the appointment of Dr Badr "refers to the DMCC license No. 30261 for Energy Exploration and Development Company Ltd" and that "the said license has expired in September 2019." The Respondent noted that the Claimant was therefore "to provide a copy of the new license."

109.    On 26 May 2020, the Respondent provided its comments on the Claimant's amendment request.

110.    On 28 May 2020, the Claimant wrote to the Tribunal that "[t]he [s]pecial [p]ower of [a]ttorney shared on 18 May 2020 confirmed Dr Badr is authorised to act as an [a]ttorney on behalf of the Claimant in these proceedings" and that therefore he should be "added to the present legal representatives of the Claimant." The Claimant further noted that "Dr Badr is not affiliated to Fenwick Elliott, however, his addition to the Claimant's legal representation is unrelated to such an affiliation."

111.    On 31 May 2020, the Tribunal issued procedural order no. 7 ("**Procedural Order No. 7**"). The Tribunal approved the addition of Dr Badr as a legal representative of the Claimant, dismissed the Claimant's request to amend the terms of Procedural Order No. 5 and reserved its decision on costs relating to these issues.

112.    On 15 June 2020, the Tribunal requested that the Claimant provide Dr Badr's full contact details and inform the Tribunal whether he should be added to any future correspondence to the Claimant on or before 22 June 2020.

113.    On 19 June 2020, the Tribunal acknowledged receipt of a letter from Fenwick Elliott LLP informing the Tribunal that it no longer acted for the Claimant in the proceedings.

114.    The Tribunal informed the Parties that it had updated its file accordingly and directed the Parties to use Dr Badr's email address for any correspondence to the Claimant going forward.

Procedural Order No. 8 – Claimant's Further Application for Interim Measures

115.    On 18 June 2020, the Claimant filed an "Application for a Further Award of Interim Measures in Respect of the Partial Award Dated 5 December 2019", including Exhibits C-41 to C-44 (the "**Further Application for Interim Measures**").

116.    On 26 June 2020, the Respondent filed its response on the Further Application for Interim Measures, including Exhibits R-57 to R-59 and RL-50 and RL-51.

117.    On 4 July 2020, the Tribunal issued procedural order no. 8 ("**Procedural Order No. 8**").    The Tribunal partially granted the Claimant's Further Application for Interim Measures and ordered the Respondent to (i) share the geo-coordinates on Google Earth for the exact location of the Equipment supplied or purchased by the Claimant for use on the Project, and provide evidence that such Equipment is stored in that location; and (ii) arrange an appointment for the Claimant's representative, Mr Sufyan, to inspect the Equipment.

118.    The Tribunal dismissed all other requests and reserved its decision on costs.

Procedural Order No. 9 – Revised Procedural Timetable

119.    On 7 July 2020, the Tribunal issued procedural order no. 9 with a revised procedural timetable which took into account the Parties' submissions in respect of the same ("**Procedural Order No. 9**").    The revised timetable provided *inter alia* for witness statements and expert reports to be exchanged on 4 August 2020, with reply witness statements to be exchanged on 18 August 2020 and reply expert reports on 2 September 2020.    The revised timetable also provided for a hearing to take place in the week commencing 21 September 2020.

<u>Procedural Order No. 10 – Respondent's Renewed Application for Security for Costs and Application to Stay Proceedings Pending Fortification</u>

120.    On 9 July 2020, the Respondent filed its renewed security for costs application and stay application (the "**Renewed Security for Costs and Stay Application**"), including exhibits R-60, R-61, RLA-52 and RLA-53.

121.    On the same day, the Tribunal acknowledged receipt of the Respondent's Renewed Security for Costs and Stay Application and invited the Claimant to comment thereon by 30 July 2020.

122.    On 30 July 2020, the Claimant filed its comments on the Renewed Security for Costs and Stay Application, including exhibits C-45 to C-49 and CLA-24.

123.    On 11 August 2020, the Tribunal issued procedural order no. 10 ("**Procedural Order No. 10**").  The Tribunal dismissed the Respondent's Renewed Security for Costs Application and Stay Application.

124.    The Tribunal reserved its decision on costs relating to the applications.

<u>Further Revisions to Procedural Timetable</u>

125.    On 22 July 2020, the Respondent requested the Tribunal "to suspend the current timetable until travel to [the Kingdom of Saudi Arabia] is again possible or, in the alternative, extend the deadline for submission of expert reports by an additional month assuming that international flights to [the Kingdom of Saudi Arabia] resume in August 2020".

126.    On 30 July 2020, as invited by the Tribunal, the Claimant provided its comments on the Respondent's request.

127.    On 30 July 2020, and independently from the above, the Claimant requested the Tribunal "to extend the time-limit for submitting the fact and expert witness statements related to the identifying and assessing the rental value of the Equipment until 11 August 2020".

128.    On 3 August 2020, the Tribunal informed the Parties that it was satisfied that the deadline for the exchange of expert reports needed to be varied in light of the COVID-19 travel restrictions.  The Tribunal adjusted the Procedural Timetable accordingly.  The Tribunal also directed the Parties to discuss their availability for certain potential fall-back hearing dates.

129.    On 11 August 2020, the Tribunal noted that the Parties had not been able to find common availability for the fall-back hearing dates identified by the Tribunal.  The Tribunal directed that these issues be discussed during the second pre-hearing conference on 13 August 2020.

Witness Statements

130.    On 12 August 2020, the Tribunal acknowledged receipt of (i) the Claimant's witness statements (First Witness Statement of Mr Mo Eskici and First Witness Statement of Ms Delaram Zavarei), including Exhibits C-50 to C-58; and (ii) the Respondent's witness statements (Second Witness Statement of Mr Kjell Inge "Sonny" Sola and First Witness Statement of Mr Ramesh Aidasani) including Exhibits R-62 to R-77.

Hearing Arrangements and First Pre-Hearing Conference

131.    On 3 May, 31 May and 15 June 2020, the Tribunal invited the Parties to confer and provide their positions, ideally jointly, on the organization of the hearing to be held during the week commencing 21 September 2020, and in particular regarding (i) steps to be taken for the organization of a physical hearing; and (ii) whether and how a hearing might be conducted remotely, fully or in part, with concrete proposals.

132.    On 4 July 2020, the Tribunal wrote to the Parties noting its understanding that the Parties had agreed that:

      a.    in the event that the hearing proceeded on an in-person basis, it would be held at the International Arbitration Centre (IAC), London, and the Parties had made or would make the necessary arrangements;

      b.    they would make arrangements for court reporting services; and

      c.    the hearing would be held remotely in the event that an in-person hearing was not possible.

133.    On 13 August 2020, the Tribunal and the Parties held the first pre-hearing conference. During the first pre-hearing conference, among other things, the Parties agreed that:

      a.    the hearing, if it was to proceed during the week commencing 21 September 2020, would have to be held remotely;

b. the expected length of the hearing would be two, maximum three, days; and

c. due to travel restrictions and other COVID-19-related measures, it was currently impossible for the Parties' experts to physically access the Equipment for the purpose of rendering their expert reports.

134. On 14 August 2020, given the uncertainties concerning the expert reports, the Tribunal directed the Parties to confer and respond to the Tribunal regarding their joint availability for potential fall-back dates that the Tribunal identified in November and December 2020 if it proved to be impossible to maintain the hearing as scheduled during the week commencing 21 September 2020. The Tribunal also invited the Parties to provide, if possible jointly, their proposals on the service providers and their comments on the draft remote hearing protocol on or before 27 August 2020.

135. On 20 August 2020, the Respondent commented on the possibility for the experts to access the Equipment and requested, among other things, that the current hearing dates, beginning on 21 September 2020, be vacated.

136. On 21 August 2020, the Claimant objected to the postponement of the hearing but confirmed its availability for one of the fall-back dates in December 2020.

137. On 21 August 2020, having considered the Parties' comments, the Tribunal determined that it would not be possible to maintain the hearing dates for the week commencing 21 September 2020. The Tribunal noted that it would not be reasonably possible for the Parties' experts to organize the inspection of the Equipment and exchange their reports and reply reports before the hearing. The Tribunal accordingly vacated the hearing dates and directed that the hearing take place on 14-16 December 2020 (one of the fall-back dates identified by the Tribunal). The Tribunal also vacated the second pre-hearing conference on 11 September 2020 and suggested that it be held on 17 November 2020 instead.

Procedural Order No. 11 – Remote Inspection Protocol

138. Having determined that it would not be possible to maintain the scheduled hearing dates, on 21 August 2020, the Tribunal also noted the Parties' agreement, in light of the COVID-19 pandemic and difficulty of accessing the Equipment in Saudi Arabia, to allow the Parties' experts to remotely inspect the Equipment, including by using one or more local

technicians to send photographs and videos of the Equipment to the Parties' experts, under their remote supervision and directions (the "**Remote Inspection**").

139.    At the same time, the Tribunal invited the Parties to confer on the (i) protocol for the Remote Inspection; and (ii) timetable to produce the expert reports and reply expert reports.

140.    On 3 September 2020, the Respondent provided the Parties' joint submission (with one point of disagreement).

141.    On 5 September 2020, the Claimant confirmed its agreement with the position as set out by the Respondent.

142.    On 7 September 2020, the Tribunal issued procedural order no. 11 ("**Procedural Order No. 11**").  The Tribunal directed:

> a.    each Party to schedule its own photographer for a site visit of the Equipment; and
>
> b.    the Claimant to provide the Respondent with at least 24 hours advance notice for the photographer's visit to the yard/Equipment.

143.    The Tribunal further directed that:

> a.    any expenses related to Claimant's site visit for purposes of taking pictures or recording the Equipment should be borne by the Claimant;
>
> b.    each Party's photographer would run through any piece of the Equipment, as directed by the Party, and video-record the same, and a reference number would be assigned; and
>
> c.    if necessary for the purpose of clarification, a second inspection to capture targeted areas for proof might be required.

144.    In Procedural Order No. 11, the Tribunal also issued a revised Procedural Timetable.

Procedural Order No. 12

145.    On 27 September 2020, the Tribunal issued procedural order no. 12 ("**Procedural Order No. 12**").  This recorded the Parties' agreement to hold remotely the hearing scheduled

from 14 to 16 December 2020 (the "**Remote Hearing**" or "**Hearing**") and provided for the organization of the Remote Hearing.

Procedural Order No. 13 – Tribunal Secretary

146.    On 13 October 2020, the Tribunal proposed to appoint Mr Joe Rich of WilmerHale as administrative secretary to the Tribunal (the "**Tribunal Secretary**"), advised the Parties of the Tribunal Secretary's envisaged tasks, provided his *curriculum vitae* and asked the Parties for their comments.

147.    The Parties indicated that they did not have any comments on or objections to Mr Rich's appointment as the Tribunal Secretary. Mr Rich's statement of independence and impartiality was circulated by the LCIA on 20 October 2020 and the Tribunal issued procedural order no. 13, appointing Mr Rich as Tribunal Secretary on 6 November 2020 ("**Procedural Order No. 13**").

Expert Reports

148.    On 16 October 2020, the Claimant submitted an expert report issued by Mr Colin Wright of Global Oilfield Consulting (the "**Wright Expert Report**").

149.    On the same date, the Respondent wrote to the Tribunal stating that it was "not in a position to submit an expert report by today's deadline."

150.    On 19 October 2020, the Tribunal wrote to the Parties, acknowledging, among other things, receipt of the Claimant's Wright Expert Report. With regard to the Respondent's email, the Tribunal stated that "[g]iven that the Respondent did not provide any reasons for not-submitting an expert report, nor filed a reasoned request for an extension of the deadline, the Tribunal assumes that the Respondent does not wish to produce any expert report in this arbitration." The Tribunal invited the Respondent to provide any comments on or before 22 October 2020.

151.    On 22 October 2020, the Respondent acknowledged that it had not submitted any expert report by the deadline, but noted it would submit a reply expert report according to the Procedural Timetable.

152.    On 10 November 2020, the Respondent submitted an expert report issued by Mr Adolfo Montesinos of A&R Holdings LLC ("**Montesinos Expert Report**").

Claimant's Additional Legal Representative

153.    On 12 November 2020, the Tribunal noted that the Claimant had informed it of a proposed change in its legal representation (adding Mr Fernando Ortega of CVML Limited as a legal representative) and invited the Respondent to provide any comments.

154.    On 16 November 2020, the Respondent stated that it "takes issue with the timing of Claimant's letter." The Respondent alleged that, pursuant to the power of attorney provided by the Claimant, Mr Ortega had been appointed to represent the Claimant on 23 September 2020. The Respondent further alleged that it was "unclear … why it took Claimant two months to inform the Tribunal and Respondent of the addition of Mr Ortega to its legal team."

155.    The Parties provided further comments on the proposed change in legal representation at the second pre-hearing conference on 17 November 2020.

156.    On 17 November 2020, pursuant to Article 18.3 of the LCIA Rules, the Tribunal approved the change of the Claimant's legal representation.

Document Production Issues

157.    On 14 November 2020, the Claimant wrote to the Tribunal concerning the Respondent's alleged failure to comply with the Tribunal's directions to produce documents relating to the Claimant's document requests nos. 3, 5, 7, 9 and 10. The Claimant requested that, if the Respondent continued to refuse to produce the documents it sought, the Tribunal should draw adverse inferences against the Respondent.

158.    On 17 November 2020, the Tribunal wrote to the Parties inviting, among other things, the Respondent to provide its comments on the Claimant's letter of 14 November 2020 by 23 November 2020.

159.    On 23 November 2020, the Respondent wrote to the Tribunal in response to the Claimant's letter of 14 November 2020. The Respondent argued that the Tribunal should not draw the adverse inferences sought by the Claimant for the following reasons:

> a.    The Respondent had complied with its obligation to produce the responsive documents that were within its possession, custody or control and by contacting Gulf Energy to obtain responsive documents in Gulf Energy's control;

b.      The Claimant's request for relief was not warranted in circumstances where the Respondent had a valid explanation for the non-production of certain documents, namely the fact that the documents were in the possession of a third party who was not a party to the proceedings;

c.      Even if the test for the imposition of adverse inferences were met, the Claimant had failed to identify which inferences the Tribunal should draw or to submit *prima facie* evidence of the facts it purports to exist and asks that the Tribunal acknowledges.

160.    The Respondent also set out its responses on a request-by-request basis.

161.    On 24 November 2020, the Tribunal informed the Parties that it would deal with the Claimant's application regarding the Respondent's alleged failure to comply with the Tribunal's document production requests together with the merits at the Hearing.

Claimant's Application for a Further Award of Interim Measures

162.    On 14 November 2020, the Claimant, referring to the Montesinos Expert Report, wrote to the Respondent and alleged that the reference in that expert report to the "majority of the assets" being located at the "Nordic Yard in UAE" meant that a considerable part of the Equipment was located "in a place that is unknown to the Claimant and should have been disclosed" by the Respondent pursuant to the PSA and the Tribunal's Partial Award on Interim Measures. The Claimant requested that the Respondent (i) provide the whereabouts of the "Nordic Yard in UAE" referred to in the Montesinos Expert Report; and (ii) arrange a visit for the Claimant's representative to verify the existence of the items in Table 2 of the Montesinos Expert Report. The Claimant indicated that if the Respondent failed to comply with these requests within three days of the letter, it would seek interim measures and seek leave from the Tribunal to amend its claim to include the entire value of the Equipment said to be missing.

163.    On 21 November 2020, the Claimant submitted an application for a further award of interim measures ("**Further Interim Application**"), seeking relief from the Tribunal in the form of an award ordering the Respondent to:

a.      Immediately share with the Claimant the geo-coordinates of the exact location of six items of Equipment identified in Table 2 of the Montesinos Expert Report[9] stated

---

[9] The items were: EED-1-11-001; EED-1-14-005; EED-1-14-003; EED-1-14-004; EED-1-14-004A; EED-1-70-002.

as being stored in "Nordic Yard UAE" (the "**UAE Items**") and provide evidence that the UAE Items were stored in that location;

    b.    Arrange an appointment for the Claimant's representative to inspect the UAE Items;

    c.    Arrange an appointment for the Claimant's representative to inspect the other items identified in Table 2 of the Montesinos Expert Report, stated to be located in the Respondent's yard in Saudi Arabia ("**Saudi Arabia Items**").

164.    On 23 November 2020, the Respondent, copying the Tribunal, replied to the Claimant's letter of 14 November 2020 and the Further Interim Application. The Respondent stated, among other things, that (i) five of the UAE Items (EED-1-14-003 through 005 and EED-1-70-002) were part of the blowout preventer unit ("**BOP**"); (ii) the sixth (EED-1-11-001) was the Koomey Unit and therefore outside the scope of the arbitration; (iii) the Respondent had repeatedly stated in its submissions that the BOP had been sent back to the UAE; and (iv) this had further been corroborated by the inventory produced by the Respondent in May 2020 as part of the voluntary document production.

165.    As a "show of goodwill", the Respondent attached the geo-coordinates of the Nordic Yard in Umm al Quwain, UAE and stated that it could arrange a visit by the Claimant's representative during the week of 22 November 2020 provided that at least 24 hours' notice was given and the cost of arranging such a visit was borne by the Claimant. The Respondent also noted the Claimant's submission of the Further Interim Application, alleging that this had caused additional and unnecessary costs for the Parties.

166.    On 24 November 2020, the Tribunal wrote to the Parties stating that it would entertain the Further Interim Application once the Claimant confirmed whether the application was maintained or whether further time was required for discussion between the Parties.

167.    On 27 November 2020, the Claimant wrote to the Tribunal stating that the Respondent had not (i) provided any response or comment in its letter of 23 November 2020 to the Claimant's request that a visit be arranged for the Claimant's representative to inspect the Saudi Arabia Items; and (ii) confirmed arrangements for a visit by the Claimant's representative during the week of 22 November 2020. Accordingly, the Claimant requested that the Tribunal (i) proceed with the Further Interim Application in respect of Saudi Arabia Items; and (ii)

proceed with the Further Interim Application in respect of the UAE Items unless the Respondent replied to its request to inspect the UAE Items by the close of business on 27 November 2020.

168.    On 30 November 2020, the Claimant sent an email to the Tribunal alleging that the Respondent was moving part of the Equipment out of Saudi Arabia and the UAE for use on a project in Africa. The Claimant requested that the Tribunal deal urgently with its Further Interim Application.

169.    On the same day (30 November 2020), Tribunal wrote to the Parties acknowledging receipt of the Claimant's correspondence and requesting that the Respondent provides its comments on the Further Interim Application at its earliest convenience and in any event on or before 3 December 2020.

170.    Later on 30 November 2020, the Respondent, copying the Tribunal, sent an email to the Claimant stating that (i) it had already shared the geo-coordinates of the Respondent's yard in the UAE and informed the Claimant that its authorised representative could visit the yard; and (ii) the Claimant's representative had previously visited the yard in Saudi Arabia but the Respondent would accommodate another visit by the Claimant's representative if the Claimant provides a date for the visit and gave at least 24 hours' notice.

171.    The Claimant replied on the same day (30 November 2020), stating that it would not comment on the assertions in the Respondent's email and would focus on ensuring the visits were arranged promptly. The Claimant said that its previous requests for visits to the yard in the UAE had not been answered (attaching a request and follow-up dated 24 November 2020), but that its representatives were available to visit the UAE yard on the following day (1 December 2020). The Claimant also stated that its representative was available to visit the Saudi Arabia yard on the following day (1 December 2020).

172.    The Parties then arranged visits to the relevant yards in *inter partes* correspondence on 30 November 2020 and 1 December 2020 (on which the Tribunal was copied).

173.    On 3 December 2020, the Respondent wrote to the Tribunal regarding the Further Interim Application. The Respondent stated its position that the Further Interim Application was now moot and should be denied by the Tribunal. The Respondent also rejected the

allegations made in the Claimant's first email of 30 November.  The Respondent requested that these matters be taken into consideration by the Tribunal when allocating costs.

174.     On 6 December 2020, the Tribunal wrote to the Parties inviting the Claimant to confirm at its earliest convenience whether it maintained the Further Interim Application and whether it required a decision on thereon.  The Claimant never provided such confirmation.  The Tribunal thus considered that there was no need to entertain the Claimant's Further Interim Application.

Second Pre-Hearing Conference, Remote Hearing Arrangements and Procedural Order No. 14

175.     On 17 November 2020, the Tribunal held the second pre-hearing conference with the Parties, following an agenda circulated on 16 November 2020.

176.     On the same day, the Tribunal summarised the matters discussed at the second pre-hearing conference in a letter to the Parties.  These included: the schedule for the Remote Hearing; logistical arrangements for the Remote Hearing (including testing sessions); the oaths to be sworn by the witnesses; and the preparation of an electronic hearing bundle.

177.     On 24 November 2020, the Tribunal noted the Parties' agreement on the form of oath to be adopted at the Remote Hearing.

178.     On 6 December 2020, the Tribunal issued procedural order no. 14 ("**Procedural Order No. 14**"), providing a timetable for the Remote Hearing and the arrangements in place for the evidence to be given by the Parties' witnesses.  On 8 December 2020, the Tribunal re-issued Procedural Order No. 14, with minor modifications.

179.     A testing session for the Remote Hearing took place on 8 December 2020.

Respondent's Additional Legal Representative and Power of Attorney

180.     On 10 December 2020, the Respondent informed the Tribunal of a proposed addition to its legal representation, appointing Mr Toby Brown of South Square Chambers as its barrister for the Remote Hearing.

181.     On 10 December 2020, the Tribunal acknowledged the Respondent's proposed addition and invited the Claimant to provide any comments pursuant to Article 18.3 of the LCIA Rules.

182.    On 11 December 2020, the Claimant responded to the Respondent's proposed change, requesting that the Respondent provide a power of attorney for both Mr Brown and Curtis, Mallet-Prevost, Colt & Mosle to act on the Respondent's behalf.

183.    On 11 December 2020, the Tribunal noted the Parties' communications, approved the proposed addition to the Respondent's legal representation (pursuant to Article 18.3 of the LCIA Rules) and requested the Respondent's legal representatives to provide a power of attorney as requested.

184.    On 11 December 2020, the Respondent's legal representatives provided a power of attorney authorising Curtis, Mallet-Prevost, Colt & Mosle to act on the Respondent's behalf in the arbitration and to delegate that authority to any third party.

Remote Hearing

185.    On 14-15 December 2020, the Remote Hearing took place. The following were present, at different times of the Remote Hearing:

    a.    on behalf of the Claimant:

        i.    Dr Ahmed Hafez Badr;

        ii.    Mr Fernando Ortega;

        iii.    Ms Delaram Zavarei;

        iv.    Mr Mo Eskici;

    b.    on behalf of the Respondent:

        i.    Mr Toby Brown;

        ii.    Ms Serena Boscia Montalbano;

        iii.    Ms Sehnaz Gungor;

        iv.    Mr Ramesh Aidasani;

        v.    Mr Kjell Inge "Sonny" Sola.

186.    A finalised transcript of the Remote Hearing was subsequently provided to the Tribunal by the Respondent on 9 March 2021 (the "**Transcript**"). The Transcript was said to reflect the Parties' agreed corrections.

187.    In the course of the Hearing, on 14 December 2020, the Respondent submitted an Addendum to Mr Montesinos' Expert Report (the "**Amended Montesinos Report**").  After hearing submissions from both Parties on whether the Amended Montesinos Report should be admitted, the Tribunal permitted it to be added to the record.[10]

<u>Submission of New Documents During and After the Remote Hearing</u>

188.    On 14 December 2020 (i.e. the first day of the Remote Hearing) at 08:55, the Tribunal received an email from the Respondent containing 863 additional purchase orders for the period from March 2018 to December 2019 (the "**Additional Purchase Orders**") and an excel spreadsheet containing a summary of such purchase orders (the "**Summary**").  The Respondent requested leave from the Tribunal to add the Additional Purchase Orders and the Summary to the record.

189.    At 09:02, the Tribunal received a further email from the Respondent containing a document entitled "Financial Statements for the Period From 19 December 2017 to 31 December 2018 and Independent Auditor's Report" (the "**2018 Audit Report**").  The 2018 Audit Report was prepared by Baker Tilly and dated 9 December 2020.  The Respondent stated that it "hereby submits the Audit Report for 2018 and for the joint operations." The Respondent further stated that it "will submit the Audit Report for 2019 as soon as it receives the same from the auditors."

190.    On 15 December 2020 (i.e. the second day of the Remote Hearing) at 13:39, the Tribunal received an email from the Respondent containing a document entitled "Financial Statements for the Year Ended 31 December 2019 and Independent Auditor's Report" prepared by Baker Tilly, dated 9 December 2020 (the "**2019 Audit Report**").  The 2019 Audit Report was also prepared by Baker Tilly and dated 9 December 2020.  The Respondent stated that it was seeking to submit the 2019 Audit Report to the record, together with the 2018 Audit Report, and wished to rely upon the same.

191.    These documents are referred to collectively as the "**Respondent's New Documents**".

---

[10] Transcript, {Day 2, 541:7-19}.

Procedural Order No. 15

192.    During the Remote Hearing, the Tribunal proposed that the Respondent make a properly reasoned application to introduce the Respondent's New Documents to the record, on which the Claimant could comment in due course.

193.    On 16 December 2020, the Claimant wrote to the Tribunal also requesting permission to add certain new documents to the record.  These were:

    a.    A proposal dated 24 September 2020 by Halliburton to lease the Equipment (the "**Halliburton Proposal**"); and

    b.    An exchange of emails between counsel for the Claimant and counsel for the Respondent with respect to accepting the Halliburton Proposal (together with the Haliburton Proposal, the "**Claimant's New Documents**").

194.    Also on 16 December 2020, the Tribunal sent a letter to the Parties:

    a.    Regarding the Respondent's New Documents, it requested the Respondent to submit such documents as it wished to place on the record on or before 23 December 2020.  The Tribunal directed that "[t]he Respondent should explain why it contends that such documents should be placed on the record at this stage of proceedings".  The Respondent should further explain whether the Audit 2018 and the Audit 2019, which have been specifically produced for the purposes of this arbitration, are to be considered as new expert reports or factual evidence.  The Tribunal further indicated that the Claimant should then provide any comments on the Respondent's application on or before 3 January 2021.

    b.    Regarding the Claimant's New Documents, the Tribunal (i) invited the Respondent to comment on the Claimant's application to place them on record on or before 23 December 2020; and (ii) invited both Parties at the time of making these submissions to provide any comments on how they consider that these matters should affect the procedure for the final determination of the dispute (if at all).

195.    The Respondent submitted its application on 23 December 2020.  The Claimant provided its comments on the Respondent's application on 3 January 2021.

196.    On 5 January 2021, the Tribunal invited the Respondent to provide any further comments it might have on or before 8 January 2021. The Tribunal stated that, in the event the Respondent filed further comments, the Claimant would have the opportunity to reply on or before 14 January 2021.

197.    The Respondent submitted its rejoinder on the Claimant's application on 8 January 2021. The Claimant submitted its own rejoinder on 14 January 2021.

198.    The Tribunal determined the applications to admit the Respondent's New Documents and the Claimant's New Documents in Procedural Order No. 15, which was issued on 5 February 2021. The Tribunal (i) admitted the Halliburton Proposal as Exhibit C-66 onto the record; (ii) admitted the Additional Purchase Orders and the Summary as Exhibits R-87 and R-88 onto the record; and (iii) held that the Parties should file post-hearing briefs, pursuant to a timetable to be further discussed with the Parties.

Timetable for Post-Hearing Briefs

199.    The Parties made proposals as to the timetable for submission of post-hearing briefs (the "**Post-Hearing Briefs**") on 11 February 2021 (Respondent) and 12 February 2021 (Claimant). With reference to those proposals, on 13 February 2021 the Tribunal directed the Parties to file their Post-Hearing Briefs on or by 5 March 2021. The Tribunal stipulated that the Post-Hearing Briefs should be limited to a maximum of 20 pages and should not contain any new evidence.

200.    The Tribunal also invited the Parties to confer on their preferred timetable for costs submissions, and to inform the Tribunal of the outcome.

Timetable for Costs Submissions

201.    On 19 February 2021, the Respondent proposed that cost submissions be filed in two rounds on 17 March 2021 and 26 March 2021. The Claimant communicated its agreement to this proposal on the same date, and the Tribunal confirmed the same on 21 February 2021.

202.    On 9 March 2021, the Respondent requested that the timetable set for costs submissions be vacated in light of the Claimant's New Evidence Application (discussed below).

203.    On 11 March 2021, the Tribunal stated that new dates for cost submissions would be set once the Tribunal had determined the Claimant's New Evidence Application.

<u>Submission of Post-Hearing Briefs and Claimant's Application to Admit New Documents</u>

204.    The Parties submitted their Post-Hearing Briefs on 5 March 2021, pursuant to the agreed timetable.

205.    At the same time as filing its Post-Hearing Brief, the Claimant filed an application to admit Annexes F and H to the evidentiary record (the "**Claimant's New Evidence Application**").  The Annexes contained the First Witness Statement of Ms Alina Minasova, dated 1 March 2021 (the "**Minasova Witness Statement**") and the Expert Witness Statement of Mr Ahmed Obaid Al Bah, dated 5 March 2021 (the "**Al Bah Expert Report**").  According to the Al Bah Expert Report, signatures on some of the Additional Purchase Orders were forged.

206.    On 6 March 2021, the Tribunal invited the Respondent to comment on the Claimant's New Evidence Application on or before 15 March 2021.

207.    On 9 March 2021, the Respondent requested a time extension until 26 March 2021 to file its comments on the Claimant's New Evidence Application.

208.    Pursuant to this request, on 11 March 2021, the Tribunal extended the deadline to comment on the Claimant's New Evidence Application until 22 March 2021.

209.    On 19 March 2021, the Respondent requested a further time extension to 1 April 2021. The Respondent stated that it was "in the process of gathering evidence but this is taking longer than hoped.  In part this is because employees who previously worked on the project are in some cases no longer with Nordic and so access to the necessary records is proving slow."

210.    On 21 March 2021, the Tribunal invited the Claimant's comments on this request.

211.    On 22 March 2021, the Claimant opposed the Respondent's further extension request.

212.    On the same day, the Tribunal granted "a final extension of the deadline for the Respondent's comments on the Claimant's [New Evidence] Application until 25 March 2021."

213.    On 26 March 2021, the Tribunal noted that the final deadline for the Respondent's comments on the Claimant's New Evidence Application had passed and that it had not received any comments.

214.    Later on 26 March 2021, the Respondent provided its comments on the Claimant's New Evidence Application.  Among other things, the Respondent attached to its comments (i) new documentary evidence (Exhibits R-89, R-90 and R-91) (the "**Respondent's New Exhibits**"); and (ii) further witness statements of Mr Kjell Inge Sola (the "**New Sola Witness Statement**") and of Mr Imran Iqbal (the "**New Iqbal Witness Statement**").  The Respondent further noted that it wished to file a further expert report by Mr Handy, in response to the Al Bah Expert Report (the "**Handy Expert Report**").  The Respondent's New Exhibits, the New Sola Witness Statement, the New Iqbal Witness Statement and the Handy Expert Report together are referred to as the "**Respondent's New Evidence**".

215.    On 27 March 2021, the Tribunal acknowledged receipt of the Respondent's submission dated 26 March 2021, including the Respondent's New Evidence.  The Tribunal noted that it would "issue further directions in the present matter, including regarding the admission of the Parties' additional evidence" and that "[i]n the meantime, the Tribunal direct[ed] the Parties to refrain from any further unsolicited submissions, including the [Handy Expert Report] referred to in the Respondent's submission of 26 March 2021."

216.    On 30 March 2021, the Respondent submitted that if the Claimant's Minasova Witness Statement and Al Bah Expert Report were admitted onto the record, then Respondent too should be allowed to file the Handy Expert Report.

Claimant's Application Regarding Inspection of the Equipment

217.    By email of 6 March 2021, the Claimant requested the Tribunal to order the Respondent to immediately facilitate the inspection of the Equipment both in the UAE (by Ms Minasova and/or Ms Pochtaryova) and in Saudi Arabia (by Mr Sufyan).  The Claimant appended communication between itself and the Respondent concerning the inspection of the Equipment. In that communication, counsel for the Claimant had on 26 February 2021 requested to be permitted to inspect the Equipment.  Counsel for the Respondent had replied on 2 March 2021 stating that it was taking instructions.

218.    On 10 March 2021, counsel for the Respondent stated by email that it had been informed by its client on 2 March 2021 that "most of the equipment located in KSA was seized by Gulf Energy in mid-January 2021 and moved to an unknown location."  Counsel for the Respondent said that they were "currently seeking further clarifications from Nordic on the details pertaining to the seizure and will inform the Tribunal as soon as possible."

219.    On 11 March 2021, the Claimant referred to the email sent by counsel for the Respondent on 10 March 2021.  The Claimant alleged *inter alia* that the Respondent had "taken the Equipment deliberately and was only forced to confess on such fact when put under pressure by the Sole Arbitrator".  The Claimant also alleged that counsel for the Respondent "knew of the seizure on 2 March 2021 and did not inform the Sole Arbitrator and the Claimant until almost 10 days after it was informed".  The Claimant requested that the Tribunal take immediate action and "bifurcate" the final award in the following manner (the "**Bifurcation Application**"):

      a.     "Issue a First Final Partial Award to deal with the Claimant's claims that are not affected by the Respondent's New Documents and the subsequent issues raised and new evidence submitted by the Claimant as a result."

      b.     "Issue a Second Final Partial Award to deal with the Claimant's claims that are potentially affected by the Respondent's New Documents. This would include the Claimant's claim to order the Respondent to pay the Claimant restitutionary damages for its continued use of and income from the Equipment from 9 November 2017 to date in the sum quantified by Mr. Wright's Report. This would be in addition to the Respondent's counterclaim."

220.    The Claimant also requested the Tribunal to "order sanctions against the Respondent's authorized representatives as set out under Article 18.6 of the LCIA Rules" (the "**Sanctions Application**").

221.    On 12 March 2021, the Tribunal acknowledged receipt of the Claimant's correspondence of 11 March 2021 and invited the Respondent's comments thereon at its earliest convenience, but in any event on or before 18 March 2021.  The Tribunal also directed the Respondent, by the same deadline, to provide detailed information about (i) the circumstances of the invoked "seizure" of the Equipment by Gulf Energy, including but not limited to its date, location of occurrence, nature, and legal basis; and (ii) the current location of the Equipment.

222.    On 18 March 2021, the Respondent commented on the Claimant's 11 March 2021 letter, including the Bifurcation Application, and provided further information about the current location of the Equipment.  Among other things, the Respondent stated that it had commenced

court proceedings against Gulf Energy before the courts in Saudi Arabia regarding the Equipment (the "**Saudi Proceedings**").

223.    On 19 March 2021, the Claimant made further (unsolicited) comments and reiterated its Bifurcation Application.  Among other things, the Claimant questioned the existence of the Saudi Proceedings and alleged that "[t]he Respondent and Gulf Energy (which is fully controlled by Energy House […]) are granting themselves the right to misappropriate and deal with the Equipment that are undisputedly owned by the Claimant."

224.    On 21 March 2021, with reference to the Claimant's letter of 19 March 2021, the Tribunal invited the Respondent by 24 March 2021 to "(i) provide an official document containing information regarding the [Saudi Proceedings]; and (ii) inform the Tribunal about any corporate link between the Respondent and Gulf Energy, including whether, and to what extent, each entity is directly or indirectly controlled by Energy House."  The Tribunal also directed the Respondent to keep the Tribunal promptly informed about any development in the Saudi Proceedings.

225.    On 24 March 2021, the Respondent provided information about the Saudi Proceedings and stated, among other things, that there was "no corporate link between [the] Respondent and Gulf Energy" and that "Gulf Energy forms no part of the corporate group under Energy House, or is in any other way related to Energy House."

226.    The Respondent provided further updates concerning the Saudi proceedings on 12 May 2021, 25 May 2021 and 9 June 2021.  As at 9 June 2021, the status of the proceedings appeared to be that amicable settlement had not progressed and a hearing was to be scheduled.

Aramco Contract Notice of Termination

227.    On 14 March 2021, the Respondent provided the Tribunal with a Notice of Termination dated 17 February 2021.  The Notice was stated to relate to "Contract No. 6600039722 by and between Saudi Arabian Oil Company ("SAUDI ARAMCO") and Gulf Energy Integrated Services ("Contractor") dated April 16, 2017".  It appeared to have been signed on behalf of Saudi Aramco on "3/1/2021" with receipt acknowledged on behalf of Gulf Energy on "3/3/2021".

Procedural Order No. 16

228.    On 5 April 2021, the Tribunal issued Procedural Order No. 16.  Therein, the Tribunal dealt with the Claimant's New Evidence Application, Sanctions Application and Bifurcation Application.  The Tribunal also addressed the Respondent's New Evidence.

229.    The Tribunal ordered as follows:

a.    admitted the Minasova Witness Statement and the Al Bah Expert Report, submitted by the Claimant, onto the record;

b.    admitted the Respondent's New Exhibits, New Sola Witness Statement and New Iqbal Witness Statement onto the record;

c.    allowed the Respondent to file the Handy Expert Report;

d.    dismissed the Claimant's Bifurcation Application;

e.    directed the Respondent to keep the Tribunal promptly informed about any development in the Saudi Proceedings; and

f.    dismissed any other request.

Further Procedural Steps

230.    On the same date, the Tribunal sent a letter to the Parties regarding further procedural steps to handle the new evidence submitted by both Parties since the Remote Hearing.  The Tribunal explained that this new evidence raised "potentially relevant and important questions, including the authenticity of documents before the Tribunal".  The Tribunal proposed that the Respondent file the Handy Expert Report on or before 15 April 2021, and that the Parties then file further and final briefings on 6 May 2021 (Claimant) and 27 May 2021 (Respondent).  The Tribunal proposed that those final briefings be limited to a series of questions.  These were:

"1.    Authenticity of the purchase orders;

2.    Nature of the purchase orders, including but not limited to the following questions:

a.    Leaving aside questions of authenticity, which purchase orders are signed by the Respondent only (and what is their aggregate amount)?

- 43 -

b.      Leaving aside questions of authenticity, which purchase orders are signed by both Parties (and what is their aggregate amount)?

c.      Leaving aside questions of authenticity, of those purchase orders that are signed by both Parties, which purchase orders have been paid and by whom (and what is their aggregate amount)?

d.      Leaving aside questions of authenticity, of those purchase orders that are signed by both Parties and have been paid:

i.      Which purchase orders relate to modifications of existing equipment (and what is their aggregate amount)?

ii.      Which purchase orders relate to new equipment to be bought (and what is their aggregate amount)?

iii.      Which purchase orders relate to other expenses and, if so, what are they (and what is their aggregate amount)?

e.      Leaving aside questions of authenticity, of those purchase orders that are signed by both Parties and have <u>not</u> been paid:

i.      Which purchase orders relate to modifications of existing equipment (and what is their aggregate amount)?

ii.      Which purchase orders relate to new equipment to be bought (and what is their aggregate amount)?

iii.      Which purchase orders relate to other expenses and, if so, what are they (and what is their aggregate amount)?

3.      Relevance of the Additional Purchase Orders, including but not limited to the following questions:

a.      To what extent are mutually agreed purchase orders relevant under Section 9.5 of the PSA?

b.      To the extent mutually agreed purchase orders are relevant under Section 9.5 of the PSA, how do they have to be paid by the Parties? Are they paid from the revenues from the Saudi Aramco Contract or otherwise?"[11]

231.      The Tribunal also referred to the possibility of a further oral hearing.

232.      The Tribunal invited the Parties to comment on these proposals on or before 8 April 2021, and to inform the Tribunal whether, in their view, a further oral hearing was required to

---

[11] Letter from the Tribunal to the Parties, dated 5 April 2021.

examine the witnesses and experts who had provided witness statements and expert reports since the Remote Hearing.

233.    On 8 April 2021, the Respondent commented on the Tribunal's letter.  The Respondent submitted that no further hearing was required to examine the additional evidence.  The Respondent stated that it agreed with the Tribunal's proposal as to the filing of further written submissions.  The Respondent requested an extension of the filing deadline for its written submissions from 27 May 2021 to 10 June 2021, due to pre-existing commitments.

234.    On the same date, the Claimant also commented on the Tribunal's letter.  The Claimant stated that any further submissions should be limited to the questions posed by the Tribunal in its letter of 5 April 2021.  The Claimant further stated that it did not consider a further hearing to be required, instead requesting the Tribunal to make a decision on the basis of the documents.

235.    On 12 April 2021, the Respondent submitted the Handy Expert Report.

236.    On the same date, the Tribunal invited the Claimant to comment on the Respondent's requested extension of the filing deadline for the final written submissions.  On 15 April 2021, the Claimant objected to the Respondent's request and proposed instead that both Parties provide final submissions on 20 May 2021.

Procedural Order No. 17

237.    On 16 April 2021, the Tribunal issued Procedural Order No. 17, requiring the Claimant to file its final written submission on or before 12 May 2021 and the Respondent to file its final written submission on or before 10 June 2021.  The Tribunal stipulated that the written submissions should be limited in the manner it had proposed on 5 April 2021.

Final Written Submissions

238.    The Claimant filed its final written submission and accompanying appendices on 12 May 2021.

239.    The Respondent filed its final written submission on 10 June 2021.

Cost Submissions

240.    The Tribunal directed the Parties to confer regarding the format of their costs submissions on 13 July 2021.  Following agreement between the Parties in respect of the same,

the Tribunal directed the Parties to file one round of costs submissions on 19 July 2021. The Parties did so on 19 July 2021.

## III.    PARTIES' SUBMISSIONS

### A.    CLAIMANT'S SUBMISSIONS

241.    In this arbitration, the Claimant filed, among others, the following submissions:

    a.    Request, dated 18 September 2019;

    b.    Statement of Case, dated 10 January 2020;

    c.    Statement of Reply and Defence to Counterclaim, dated 27 March 2020;

    d.    Post-Hearing Brief (including Appendices A to H referred to therein), dated 5 March 2021; and

    e.    Supplementary Post-Hearing Brief (including Appendices A to E referred to therein), dated 12 May 2021.

242.    The Claimant's submissions were accompanied by:

    a.    Fact exhibits C-1 to C-65;

    b.    Legal exhibits CLA-1 to CLA-24;

    c.    Witness Statements:

        i.    First Witness Statement of Mr Mo Eskici, dated 11 August 2020 ("**CWS-1 Eskici**");

        ii.    First Witness Statement of Ms Delaram Zavarei, dated 11 August 2020 ("**CWS-2 Zavarei**");

        iii.    Second Witness Statement of Mr Mo Eskici, dated 28 August 2020 ("**CWS-3 Eskici**");

        iv.    Second Witness Statement of Ms Delaram Zavarei, dated 28 August 2020 ("**CWS-4 Zavarei**");

v.     Minasova Witness Statement, dated 1 March 2021 ("**CWS-5 Minasova**").

d.    Expert reports:

i.      Wright Expert Report, dated 16 October 2020 ("**CER-1 Wright**"), with accompanying Appendices A to I; and

ii.     Al Bah Expert Report, dated 5 March 2021 ("**CER-2 Al Bah**").

**B.    RESPONDENT'S SUBMISSIONS**

243.    In this arbitration, the Respondent filed, among others, the following submissions:

a.    Response, dated 16 October 2019;

b.    Statement of Defence and Counterclaim, dated 14 February 2020;

c.    Statement of Rejoinder and Reply on Counterclaim, dated 24 April 2020;

d.    Post-Hearing Brief (including Annex A), dated 5 March 2021; and

e.    Supplementary Post-Hearing Brief, dated 10 June 2021.

244.    The Respondent's submissions were accompanied by:

a.    Fact exhibits R-1 to R-91;

b.    Legal exhibits RLA-1 to RLA-53;

c.    Witness Statements:

i.      First Witness Statement of Mr Kjell Inge "Sonny" Sola, dated 18 November 2019 ("**RWS-1 Sola**");

ii.     First Witness Statement of Mr Ramesh Aidasani, dated 11 August 2020 ("**RWS-2 Aidasani**");

iii.    Second Witness Statement of Mr Kjell Inge "Sonny" Sola, dated 11 August 2020 ("**RWS-3 Sola**");

- 47 -

      iv.     Reply Witness Statement of Mr Kjell Inge "Sonny" Sola, dated 28 August 2020 ("**RWS-4 Sola**");

      v.     Reply Witness Statement of Mr Ramesh Aidasani, dated 28 August 2020 ("**RWS-5 Aidasani**");

      vi.     New Iqbal Witness Statement, dated 26 March 2021 ("**RWS-6 Iqbal**");

      vii.     New Sola Witness Statement, dated 26 March 2021 ("**RWS-7 Sola**").

    d.     Expert reports:

      i.     Montesinos Expert Report, dated 4 November 2020 ("**RER-1 Montesinos**");

      ii.     Amended Montesinos Report, dated 14 December 2020 ("**RER-1A Montesinos**"); and

      iii.     Handy Expert Report, dated 1 April 2021 ("**RER-2 Handy**").

## IV.    PARTIES' REQUESTS FOR RELIEF

### A.    CLAIMANT'S REQUEST FOR RELIEF

245.    The Claimant's request for relief has changed over the course of this arbitration.

246.    In the Request, the Claimant indicated that it intended to seek the following relief (while reserving its rights to amend and supplement its claims and make additional claims):

> "6.3.1  immediately, as an emergency interim measure, an order safeguarding the Equipment (set out in a separate urgent application);
>
> 6.3.2  on an urgent basis (as again explained the separate application):
>
>     (a)    a declaration that Nordic has no right to assert the Purported Lien;
>
>     (b)    a declaration that the Equipment is held on trust by Nordic or its agent(s) for ENEXD absolutely; and
>
>     (c)    an order for immediate delivery up of the Equipment forthwith to ENEXD's yard in Jebel Ali, Dubai, UAE; and
>
> 6.3.3  in due course, following arbitral proceedings in the ordinary way:

(a)      a declaration that it does not owe Nordic the 'Provisional Claim Amount' or any other sums pursuant to the PSA;

(b)      an indemnity pursuant to clause 10.3 of the PSA and/or damages for the losses incurred as a result of Nordic's breaches of the PSA in an amount to be quantified, including (without limitation) for the loss of ENEXD's investment, loss of value to the Equipment and loss of profit; and

(c)      its costs in the arbitration."[12]

247.    In the Statement of Case, the Claimant sought the following relief:

"36.1   To declare that Nordic breached the following clauses of the PSA:

    36.1.1          4.1;

    36.1.2          7.4;

    36.1.3          7.5;

    36.1.4          7.10;

    36.1.5          7.12;

    36.1.6          7.13;

    36.1.7          7.14;

    36.1.8          7.16;

    36.1.9          7.17;

    36.1.10        9.1;

    36.1.11        9.3;

    36.1.12        9.4;

    36.1.13        9.5; and

    36.1.14        10.5.

36.2    To declare that the Timeliness Requirement was an implied term of the PSA and to declare that Nordic breached the Timeliness Requirement.

36.3    To declare that the Revenue Representation was false, ENEXD relied on it to its detriment, and that the Revenue Representation was made negligently

---

[12] Request, paras. 6.3.1 to 6.3.3.

and/or in deceit and/or establishes a claim under the Misrepresentation Act 1967.

36.4    To declare that it was an implied term of the PSA that it would terminate contemporaneously with the Saudi Aramco Contract.

36.5    To declare that ENEXD's termination of the PSA on 29 August 2019 was valid and effective.

36.6    To declare that ENEXD has sole and unencumbered ownership of the Equipment and that Nordic has no equitable or legal claim to it.

36.7    To declare that Nordic must deal with the Equipment as directed by ENEXD.

36.8    To declare that to the extent Nordic has made any modifications to the Equipment, it must either:

> 36.8.1        return the Equipment to the condition it was in when first delivered to Nordic for the purposes of the Project; or

> 36.8.2        if ENEXD consents, leave the modifications in place and account to ENEXD for any decrease in value that the modifications may have caused.

36.9    To order that Nordic pay ENEXD the sum due for the rental of the Koomey Unit, being USD 568,500 as at 10 January 2019, and that Nordic pay ENEXD USD 750 per day in respect of the Koomey Unit until it is returned to ENEXD.

36.10   To declare that ENEXD has a proprietary claim to the rental monies that have been withheld from it by Nordic in respect of the Koomey Unit.

36.11   To order that Nordic pay ENEXD the monies due to it from the Project in accordance with the terms of the PSA.

36.12   To order that Nordic pay ENEXD interest on any sums awarded pursuant to the Tribunal's powers under rule 26.4 of the LCIA Rules 2014 and/or s.49 of the Arbitration Act 1996.

36.13   To order that Nordic shall pay ENEXD all of its costs incurred in connection with this arbitration, such costs to be assessed if not agreed.

36.14   To order any other relief the Tribunal might find to be fair and appropriate."[13]

248.    In the Statement of Reply and Defence to Counterclaim, the Claimant repeated the paragraph 36 of the Statement of Case and also sought the following relief:

---

[13] Statement of Case, para. 36.1-36.14.

- 50 -

"161   In particular, ENEXD requests the Tribunal to order the following monies due to ENEXD from the Project in accordance with the terms of the PSA:

161.1       To order Nordic to indemnify ENEXD pursuant to clauses 10.3 and 10.4 in respect of:

161.1.1       its loss of profits arising from Nordic's breaches of the PSA in a sum to be quantified, or alternatively;

161.1.2       its loss of use of the Equipment from 9 November 2017 to date, representing ENEXD's loss of rental income for the relevant period, in a sum to be quantified; and

161.1.3       any loss of, physical damage to or diminution in value of the Equipment, in a sum to be ascertained.

161.2   Alternatively, to order Nordic to pay ENEXD damages at law in respect of rental income from the Equipment from 9 November 2017 to date, in a sum to be quantified; and/or

161.3   In the further alternative:

161.3.1       to declare that Nordic has been unjustly enriched by its continued free-of-cost use of the Equipment; and

161.3.2       To order Nordic to pay ENEXD restitutionary damages against Nordic for its continued use of, and income from, the Equipment from 9 November 2017 to date, in a sum to be quantified.

162   Order Nordic to pay:

162.1.1       The amount of US$ 1,714,026 paid by ENEXD to satisfy the cash funding needs of the Project.

162.1.2       US$ 250,775 related to Mr. Alireza's salary and end of service benefits for the period from 17 July 2018 until 28 February 2019.

162.2   To order Nordic to pay interest on any sums awarded pursuant to Article 26.4 of the LCIA Rules and/or section 49 of the *Arbitration Act 1996* in the amount 12% per annum or such other amount as the Tribunal sees fit."[14]

## B.   RESPONDENT'S REQUEST FOR RELIEF

249.   The relief sought by the Respondent has also changed over the course of this arbitration.

---

[14] Statement of Defence and Counterclaim, paras. 161-162.

250.   In the Response, (while reserving its rights) the Respondent sought the following relief:

"29.   For the reasons set out above and to be developed further during the course of these proceedings, Respondent seeks an award which:

(a) dismisses ENEXD's claims against Nordic in full;

(b) declares that the purported termination of the PSA by ENEXD is invalid;

(c) awards damages to Nordic for its counterclaim against ENEXD in a sum to be ascertained;

(d) grants Nordic its costs of the arbitration and its legal fees and disbursements; and

(e) such other relief as the Tribunal may order."[15]

251.   In the Statement of Defence and Counterclaim, the Respondent sought an award:

"a.   Dismissing ENEXD's claims in their entirety as without merit;

b.   With respect to Counterclaims:

(i) Declaring that ENEXD's purported termination of the PSA was unlawful, invalid and ineffective;

(ii) Declaring that ENEXD has breached the PSA;

(iii) Declaring that Nordic has a proprietary interest to the value that has been added to the equipment;

(iv) Ordering ENEXD to pay Nordic damages as a consequence of ENEXD's breaches of the PSA provisionally estimated at US$7.53m and which will be particularized by Nordic in this Arbitration; and

(v) Ordering ENEXD to pay Nordic interest on any sums awarded pursuant to the Tribunal's powers under rule 26.4 of the LCIA Rules and/or section 49 of the Arbitration Act 1996.

c.   In any event:

(i) assess against ENEXD the costs of this Arbitration, including Nordic's legal fees and expenses;

(ii) grant Nordic any other relief that the Tribunal may deem appropriate."[16]

---

[15] Response, para. 29.
[16] Statement of Defence and Counterclaim, para. 146.

252.    The Respondent requested relief in the same terms in the Statement of Rejoinder and Reply on the Counterclaim.[17]

## V.    TRIBUNAL'S DECISION

253.    Before dealing with the Claimant's claims and the Respondent's counterclaims, the Tribunal briefly decides a preliminary procedural issue (Section A), summarizes the relevant factual background (Section B) and refers some of the relevant provisions of the PSA (Section C).

254.    The Tribunal then sets out the Parties' submissions and the Tribunal's decision on each of the following issues:

a.    Whether the Respondent has committed the following alleged breaches of the PSA (Section V.D):

i.    Breaches of the contractual procedure in the PSA for the management of revenue from the Saudi Aramco Contract (Clauses 3, 9.1(A), 9.1(C), 9.5, 7.12 and 7.13 of the PSA) (Section V.D.1.a);

ii.    Breaches of the reporting clauses (Clauses 4.1, 7.4 and 7.16 and an implied term to the effect that the Respondent would arrange for the Project to be independently audited once a year) and inspection clauses (7.10 and 7.14) of the PSA (Section V.D.1.b);

iii.    Unauthorised amendments to the Saudi Aramco Contract in breach of Clause 7.17 of the PSA (Section V.D.1.c);

iv.    Breach of the insurance provisions in Clause 10.5 of the PSA (Section V.D.1.d);

v.    Breach of the implied term in the PSA that the Respondent would take all necessary steps to ensure that the Project was operational as soon after delivery of the Equipment as possible (Section V.D.1.e).

---

[17] Statement of Rejoinder and Reply on the Counterclaim, para. 114.

b.      Whether the Respondent is liable in misrepresentation as alleged (Section V.D.2);

c.      Whether, as a result, the Claimant's purported termination of the PSA was lawful (Section V.D.3 and V.E.2);

d.      Whether, as a result, the Respondent misappropriated the Equipment as alleged and whether the Claimant as a result may claim compensation (Section V.D.4);

e.      Whether the Claimant has breached Clauses 3, 7.1 and/or 9.5 of the PSA, as alleged by the Respondent (Section V.E.1);

f.      What interest is due on any award and which Party bears the costs of this arbitration (Sections F and G).

## A.      PRELIMINARY PROCEDURAL ISSUE

255.    As detailed above, on 14 November 2020, the Claimant wrote to the Tribunal concerning the Respondent's alleged failure to comply with the Tribunal's directions to produce documents relating to the Claimant's document requests nos. 3, 5, 7, 9 and 10.  The Claimant requested that, if the Respondent continued to refuse to produce the documents it sought, the Tribunal should draw adverse inferences against the Respondent (the "**Claimant's Request for Adverse Inferences**").

256.    The Tribunal, having provided the Respondent with an opportunity to comments on the Claimant's Request for Adverse Inferences, noted that in light of the upcoming Hearing it would deal with the Claimant's request together with the merits.

257.    Having considered the Parties' respective arguments, the Tribunal decides that the Claimant has not established that the Respondent's failure to comply with the Tribunal's order to produce documents and thus the Tribunal sees no need to draw any adverse inferences.  As a consequence, the Tribunal dismisses the Claimant's Request for Adverse Inferences.

## B.      FACTUAL BACKGROUND

258.    This section sets out some of the facts that constitute the framework for the present dispute.  It is not an exhaustive summary of all facts, nor does it imply that the facts, as set out

here, are necessarily all relevant and material facts for the Tribunal's decision. Relevant and disputed facts are further discussed in Sections V.C and V.D below.

259.    The Claimant describes itself as an upstream oil and gas company, specializing in operations in the Middle East.[18]  The Respondent describes itself as a drilling, work-over and well-intervention company that has had a presence in the Middle East for more than a decade.[19]

260.    On 15 November 2016, the Respondent entered into an agency agreement with Gulf Energy (the "**Gulf Agency Agreement**").[20]  The Recitals to the Gulf Agency Agreement provided that the Respondent believed "there are opportunities and need for its services in the region that can be best achieved by its presence in the region and in association with [Gulf Energy] through cooperation agreement."[21]  Under the Gulf Agency Agreement, Gulf Energy was required *inter alia* to use its best efforts to promote the Respondent's products and services in Saudi Arabia and to facilitate contact with clients in Saudi Arabia.

261.    Following a successful bid in a tender organized by Saudi Aramco for the procurement of snubbing services, the Saudi Aramco Contract was signed between Saudi Aramco and Gulf Energy, effective as of the 16 April 2017.  The Saudi Aramco Contract was entitled "Contract for Drilling General Services".[22]  The "Work" to be performed under the Saudi Aramco Contract was set out in Schedule B to the contract.  The "General Description of the Work" at Clause 2.1 of Schedule B provided as follows:

> "CONTRACTOR shall provide Snubbing Workover Services to conduct live well intervention operations on high pressure high temperature (HTHP) natural gas producers.  The WORK shall consist of but not necessarily be limited to, the provision of equipment, supplies, support facilities, field personnel, technical support personnel, and management at onshore locations for Snubbing Workover Services on a 12-hour basis for the purpose of working over, repairing, fishing, de-completing, completing, stimulating and conducting well intervention operations."[23]

262.    This Work was to be performed on Saudi Aramco's gas wells located in Saudi Arabia.[24]

---

[18] Statement of Case, para. 2.1.
[19] Statement of Defence and Counterclaim, para. 8.
[20] Gulf Agency Agreement, Exhibit R-1.
[21] Gulf Agency Agreement, Exhibit R-1, p. 2.
[22] Saudi Aramco Contract, Exhibit R-14, p.1.
[23] Saudi Aramco Contract, Exhibit R-14, Schedule B, Clause 2.1.
[24] Saudi Aramco Contract, Exhibit R-14, Schedule B, Clause 2.2.

263.    The Parties began exploring the possibility of collaboration in 2017. On 26 July 2017, the Respondent sent the Claimant the Saudi Aramco Contract.[25]

264.    On 27 October 2017, the Parties met in the United Kingdom. They discussed the terms of the contract and the investment required by the Claimant. Mr Reza Tabatabaei, Mr Alireza Sadat and Ms Noosha Varzandeh were present on behalf of the Claimant, Mr Sonny Sola on behalf of the Respondent.[26]

265.    On 1 November 2017, the Respondent provided the Claimant with the first P&L account ("**First P&L Account**").[27]

266.    The Claimant states that the Equipment was shipped to the Respondent between 9 and 11 November 2017.[28]

267.    On either 17 or 19 December 2017, the Parties then appear to have signed the PSA.[29] The title page of the PSA stated that it was "[f]or the joint operation of Saudi Aramco Contract".[30] The recitals in Clause 2 of the PSA stipulates, among other things, that the Respondent "is a qualified vendor to Saudi Aramco and has entered into" the Saudi Aramco Contract, which requires the Respondent "to deliver a portfolio of equipment items … for the fulfilment of said contract" and that the Respondent "has therefore approached [the Claimant] to consider a cooperation as [the Claimant] has available equipment required for the fulfilment of the Saudi Aramco Contract."[31] It further provides that the Claimant wishes "to provide Nordic with its equipment items necessary to fulfil the requirement described in the Saudi Aramco Contract … in consideration for a share of the profits…."[32]

268.    On 26 March 2018, Mr Sonny Sola of the Respondent emailed the Claimant stating that the Respondent had received only USD 1.4 million out of the "agreed budget" of USD 2.5

---

[25] Emails from Nordic to ENEXD regarding the Saudi Aramco Contract, Exhibits R-34 to R-37.

[26] CWS-1 Eskici, para. 12; RWS-4 Sola, para. 8.

[27] First P&L Account, Exhibit C-12.

[28] CWS-1 Eskici, para. 9; Claimant's Post-Hearing Brief, para. 7.4; Delivery Note, Exhibit R-6.

[29] The PSA at R-2 and C-3 refers to 19 December 2017 at para. 1. The Claimant affirmed that the PSA was executed on 17 December 2017 (Statement of Case, para. 11.2), but subsequently referred to it as having been entered into on 19 December 2017 (Statement of Case, para. 3.1). The Respondent has referred to 19 December 2017 as the date of execution (Statement of Defence and Counterclaim, para. 13). Nothing appears to turn on this, so it is not discussed further.

[30] PSA, Exhibit C-3.

[31] PSA, Exhibit C-3, Clause 2.

[32] PSA, Exhibit C-3, Clause 2.

million.[33]  Ms Delaram Zavarei responded on 3 April 2018.[34]  These matters were discussed again in or around May 2018.[35]

269.    On 6 August 2018, the Respondent provided an updated version of the First P&L Account ("**Second P&L Account**").[36]  On the same day, a further version with different figures was sent by the Respondent ("**Third P&L Account**").[37]  On 9 August 2018, the Respondent sent a fourth P&L Account ("**Fourth P&L Account**"), with additional revisions.[38]

270.    The Saudi Project commenced on 10 January 2019.[39]

271.    On 10 February 2019, Ms Delaram Zavarei sent an email to Mr Sonny Sola stating, among other things, that "[c]urrent situation with the mobilization payment is the breach of Article 7.12 and 7.13 of the Profit Sharing Agreement [sic]" and "[i]n order to avoid legal consequences, you must immediately implement the Article 7.12 and 7.13".[40]  In response, Mr Sonny Sola stated, among other things, that (in respect of Article 7.12) "as ENEXD is aware of there is no bank account held by Nordic and ENEXD in the territory" and (in respect of Article 7.13) "there is a joint account set up between the parties in ADIB."[41]

272.    On 29 May 2019, Curtis, Mallet-Prevost, Colt & Mosle (on behalf of the Respondent) wrote to the Claimant alleging that the Claimant owed the Respondent "in accordance with ENEXD's 60% share under the PSA an amount of approx. US$7.19 million on account of ENEXD's share of the capital expenditure under the PSA and other major costs."[42]  The Claimant was requested to "forthwith remedy its breach of the PSA".[43]

273.    On 23 June 2019, Hadef & Partners wrote to the Respondent on behalf of the Claimant.[44]  In that letter, the Claimant alleged that the Respondent was in breach of several provisions of the PSA, including Clauses 4.1, 7.4, 7.11, 7.12, 7.13 7.16, 7.17, 9.1(A) and 10.5.[45]

---

[33] Email from Sonny Sola dated 26 March 2018 (08:19), Exhibit C-25.
[34] Email from Delaram Zavarei dated 3 April 2018 (13:42), Exhibit C-25.
[35] Email exchange between Sonny Sola and Delaram Zavarei, Exhibit C-50.
[36] Second P&L Account, Exhibit C-15.
[37] Third P&L Account, Exhibit C-16.
[38] Fourth P&L Account, Exhibit C-17.
[39] Northern Area Workover Letter of Acceptance, Exhibit R-22; CWS-2 Zavarei, para. 54.
[40] Email from Delaram Zavarei dated 10 February 2019 (17:29), Exhibit C-53.
[41] Email from Sonny Sola dated 11 February 2019 (09:45), Exhibit C-53.
[42] Letter from Curtis, Mallet-Prevost, Colt & Mosle dated 29 May 2019, Exhibit C-21.
[43] Letter from Curtis, Mallet-Prevost, Colt & Mosle dated 29 May 2019, Exhibit C-21.
[44] Letter from Hadef & Partners dated 23 June 2019, Exhibit C-22.
[45] Letter from Hadef & Partners dated 23 June 2019, Exhibit C-22.

274.    On 29 August 2019, the Claimant sent a notice to the Respondent purporting to terminate the PSA (the "**Termination Notice**").[46]

### C.    RELEVANT PROVISIONS OF THE PSA

275.    This section sets out some (but not all) provisions of the PSA that are relevant for the resolution of the Parties' dispute.[47]

276.    Clause 1 of the PSA states (among other things):

"ENEXD is a company registered in BVI with a branch in Dubai and upon finalising this contract will register a branch of their company in Saudi Arabia. If registration of ENEXD's Saudi Arabia is complete before mobilisation of the equipment for the purposes under this agreement, Nordic will deal with ENEXD Saudi. However, if registration completes after mobilisation, Nordic will accept switching from dealing with ENEXD Dubai branch to ENEXD Saudi branch at that time."

277.    Clause 2 of the PSA contains the recitals. These are as follows:

"Whereas Nordic

Nordic is a qualified vendor to Saudi Aramco and has entered into a 3 year plus 1-year option Snubbing Services contract with Gulf Energy to fulfil the contract Gulf Energy holds with Saudi Aramco effective from April 2017 to April 2021. Appendix 7 shows contractual relationship between Nordic & Saudi Aramco for the aforementioned snubbing services (Nordic & Gulf Energy contract, and Gulf Energy & Saudi Aramco contract). To fulfil said contract requirements Nordic is obligated to deliver a portfolio of equipment items described in the Saudi Aramco contract document for the fulfilment of said contract. Nordic has therefore approached ENEXD to consider a cooperation as ENEXD has available equipment required for the fulfilment of the Saudi Aramco Contract.

And whereas ENEXD

Desire to provide Nordic with its equipment items necessary to fulfil the requirement described in the Saudi Aramco Contract document in consideration for a share of the profits from the contract between Nordic & Gulf Energy."

278.    Clause 3 states:

"As aforementioned, equipments to be supplied to fulfil Saudi Aramco Contract No 6600039722 are as follows –

To supply the following equipment items based on ENEXD's equipment portfolio:

1. 2 each C-15 Power packs for snubbing unit

---

[46] Letter from Hadef & Partners dated 29 August 2019, Exhibit C-23.
[47] For all quotes in this section, unless noted otherwise, emphasis from the original omitted.

2. 6 each 460K Slip bowls

3. Snubbing unit Operators Panel

4. Rotary Husco with rotary control panel

5. Main winch and control panel for Gin Pole

6. Generators and distribution panels and lights

7. 13-5/8-inch 10K BOPs

8. 1502 Package 2" and 3"

9. Tongs / Inrock tongs

10. Fuel tank 15000L transfer pump Wilden

11. Mud system

12. 2 each mix hoppers

13. 2 each shakers

14. 3 each 100hp mud hogs

15. 5 each mud tanks 250BBL and trip tank

16. All Agitators

17. Other mud system related equipment such as diaphragm pumps/small centrifugal 30HP transfer pump etc.

18. Camp with Mess hall, laundry, 2 Rig Office containers and sewerage system

19. Any spare parts needed for modification of ENEXD existing equipment to be agreed upon in Appendix 9

20. All remaining spare parts used as required and paid for by this joint venture, costs to be split respective of their profit sharing percentage (Section 8).

1-18 full equipment list in full detail is in Appendix 8

Spare parts needed for modification in Appendix 9

Delivery point where all responsibilities pass over to Nordic shall be the Nordic warehouse in Dubai.

Both parties agree that the above equipment is delivered to Nordic without warranty as seen and inspected by Nordic.

To supply the following equipment items based on Nordic's equipment portfolio:

1. 24,000 FT/lb Rotary

2. Cat Walk with ramp

3. Certified Structure for Snubbing unit

4. 50 ft. length & 20-ton capacity Gin Pole

5. Additional 3 Mud tanks with a capacity of 1,200 bbl.

Equipment to be manufactured by Nordic and purchased by ENEXD:

1.      3 each Substructure, as per Nordic design and manufactured by Nordic

2.      Rig Assist Unit Manufactured by Nordic

- 59 -

1-2 full equipment list in full detail is in Appendix 11 (including but not limited to specification, licence, warranty, drawings, time schedule)

Equipment from other manufacturers to be purchased by ENEXD:

1.      GD Mud pumps, new purchase, manufactured by MSI (manufacturer recommended by Nordic)

2.      Subbing Jacking System, manufactured by Depro (manufacturer recommended by Nordic)

3.      Riser Spools and crossovers for BOP relevant to the job

4.      DAS (Data Acquisition System) (manufacturer is Rig Smart, Canada)

5.      Degasser flare off line

6.      Gin Pole Winch's

7.      Compressor to suit volume requirement to run the Rig

1-7 full equipment list in full detail is in Appendix 12 (including but not limited to specification, licence, warranty drawings, time schedule, contract/purchase order/rent proposal, terms of payment)

Equipment from other manufacturers to be purchased by Nordic (with approval of ENEXD) through the joint account Operation under this agreement:

1. Additional required Riser Spools and crossovers for BOP relevant to the job

2. BOP Closing Unit with 9 Station

1-2 full equipment list in full detail is in Appendix 13 (including but not limited to specification, licence, warranty drawings, time schedule, contract/purchase order/rent proposal, terms of payment)

Throughout the term of this contract, if either party decides additional equipment is required, once written permission is granted from the other party, this additional equipment will be funded from joint operation cost of operations.

If the joint operation decide that equipment needs to be rented during the term of this contract, and one party has the opportunity to buy the equipment, the party will hold priority to rent equipment to joint operation at the lowest documented market price."

279.   Clause 4.1 states:

"Appendix 14 shows the workforce structure of operations of this joint venture and snubbing service operations. ENEXD must be part of the Nordic reporting operation and will receive all the reports for maintenance, purchase, operation and every other report related to this project."

280.   Clause 7.1 states:

"ENEXD shall provide Nordic with the support necessary for the conduct of business activities under this agreement in the Territory including mutually financial support at the outset of this agreement for purchasing and upgrading equipment (as described in Section 3) as well as managerial support as requested."

- 60 -

281.   Clause 7.3 states:

"ENEXD shall have sole ownership to all equipment as defined in Article 3.1 provided they are supplied by them or purchased by them."

282.   Clause 7.4 states:

"Invoicing to Clients shall be done by Nordic through its agent Gulf Energy.  ENEXD shall receive copies of such commercial invoices immediately after they are issued to Client."

283.   Clause 7.5 states:

"Nordic shall not have the right to use any (part or whole) of the equipment owned by ENEXD except for fulfilling duties of snubbing services under this contract unless written permission is obtained beforehand."

284.   Clause 7.8 states:

"It is Nordic's responsibility to obtain any permit necessary to import equipment to [the Kingdom of Saudi Arabia]. With the option that once the ENEXD Saudi branch has been established, Nordic will transfer import documents to ENEXD."

285.   Clause 7.11 states:

"It is Nordic's responsibility to obtain for any initial certifications required for operations of snubbing services. During the operational period, all certifications required for equipment of operations shall always remain valid and be renewed throughout, the cost of this will be bared [sic] as cost of operations."

286.   Clause 7.12 states:

"Nordic will add ENEXD or its authorised person on as a third signatory to the bank account held by Gulf Energy & Nordic in the Territory – based on Appendix 1 OF THE gulf Energy & Nordic contract. ENEXD or its authorised person will be kept on as a signatory to this aforementioned account for the duration of the term of this agreement. None of the three parties to this account shall be entitled to withdraw cash without the consent and signature of the other parties."

287.   Clause 7.13 states:

"Nordic & ENEXD, or their authorised persons, must open a joint bank account in Dubai within 30 days of finalising of this contract, for the duration of the term of this agreement (until ENEXD Saudi branch is established, when Nordic and ENEXD must open up a joint account in Kingdom of Saudi to fulfill this purpose), and Nordic must ensure that all payments for mobilisation, demobilisation and any other payments will

be deposited into this account. Based on section 8, each party will then take their owed payments from this joint account, and any expenses required under this agreement will be paid from this joint account also. Neither of the two parties to this account shall be entitled to withdraw cash without the consent and signature of the other parties."

288.    Clause 7.14 states:

"When a representative from ENEXD wishes to visit the well site, Nordic shall to their best endeavour, ascertain to obtain any relevant passes/vias/permissions in a reasonable time."

289.    Clause 7.16 states:

"ENEXD will have the full right to the yearly audit reports of Nordic regarding this project."

290.    Clause 7.17 states:

"Nordic or Gulf Energy should not be permitted to amend the terms of the contract between Nordic & Gulf Energy or the contract between Gulf Energy & Saudi Aramco regarding fulfilment of Saudi Aramco Contract No 6600039722 without the prior written approval of ENEXD."

291.    Clause 9.1 states:

"Remuneration in the form of sharing of profits from conduct of business under this agreement to fulfil Saudi Aramco contract number 6600039722 within Territory shall be as follows:

A)      ENEXD or their authorised person are added as third signatory onto first joint account Nordic hold with Gulf Energy

B)      From Aramco payment, 6% is paid to Gulf Energy from the joint account Nordic hold with Gulf Energy. Remaining 94% then is transferred within 2 bank working days to ENEXD & Nordic joint account.

C)      From this second joint account and the amount deposited in, Nordic take their 3% management fee and 1.5% will be left for any joint venture expenses.

D)      Operational expenses are to be deducted from this amount (using agreed forecast financial statements – Appendix 15)

E)      This final amount after the management fee and expenses will then be split between Nordic & ENEXD, 40/60 respectively. Mobilisation and Demobilisation will follow the same respective patterns as above."

292.    Clause 9.3 states:

"Both parties will meet quarterly to decide whether the percentage kept for expenses is sufficient and balance amounts, if not, this can be amended by a document signed by both parties and added as an appendix to this agreement."

293.    Clause 9.5 states:

"Any mutually agreed upon additional expense will be split between Nordic & ENEXD, 40/60 respectively."

294.    Clause 10.3 states:

"As Nordic are in charge of operations, they shall indemnify and keep ENEXD harmless from any loss, damage, injury or claim from any third party in connection with operation, use or sublease of equipment including but not limited to loss of or damage to hole or equipment."

295.    Clause 10.4 states:

"As Nordic are in charge of operations, they shall be responsible for and shall defend, indemnify and hold ENEXD harmless from and against its own special, indirect, punitive or consequential damages including, without limitations, loss of profit or business interruptions or loss of use of assets except where the same is directly or indirectly attributable to gross misconduct."

296.    Clause 10.5 states:

"Both parties agree to finalise insurance requirements at a maximum of 30 days after signing of this agreement with all insurance policies in Appendix 16. Insurance to cover, but not be limited to, transportation of equipment, holding of equipment when not at well site. Saudi Aramco to cover insurance of equipment at well site. ENEXD are to be named beneficiary of their equipment in all insurance documentation. ENEXD are to agree on insurance amount to cover their equipment."

297.    Clause 11.1 states (in part):

"…either party will automatically hold the optional right to terminate the Agreement in the event that:

…

c) Finally, either party may terminate the Agreement if the other party is in material breach in form of non-performance of any of its obligations or violates any of terms and conditions under this Agreement and the breaching party has not rectified the breach within 60 days after receiving written notice by the non-breaching party.

Excepted are instances with the prior written permission of the other party."

298.    Clause 11.3 states:

"Both parties are bound by the agreement for its full term, or must be financially compensated for loss of profit for its early termination by the other party."

### D.    CLAIMANT'S CLAIMS

1.    Alleged Breaches of the PSA by the Respondent

a)    Breach of the Contractual Procedure in the PSA for the Management of Revenue from the Saudi Aramco Contract

(1)    Claimant's Submissions

299.    First, according to the Claimant, the Respondent breached Clause 7.13 of the PSA by failing to pay any money received from Saudi Aramco under the Saudi Aramco Contract into a joint bank account opened by the Parties in Dubai (the "**Dubai Account**"), which was to be the final destination of any revenue received from the Project before it was paid out to the Parties.[48]

300.    Second, according to the Claimant, the Respondent breached Clause 9.1(A) of the PSA by failing to add the Claimant or an authorised signatory other than the Claimant as a signatory to an account in Saudi Arabia into which all monies received under the Saudi Aramco Contract were to be paid (the "**Saudi Account**") prior to being transferred to the Dubai Account.[49] The Claimant submits that this was also a breach of Clause 7.12.[50]

301.    Third, according to the Claimant, the Respondent breached Clause 3 of the PSA and related project expense provisions (including Clause 9.1(C) and Clause 9.5) by paying away the revenue that the Project had generated to cover expenditure, without agreeing those payments in advance with the Claimant or making any attempt to do so.[51] In the Statement of Case, the Claimant also reserved its position in relation to whether it would rely on the law of

---

[48] Statement of Case, paras. 21.2-21.3; Reply and Defence to Counterclaim, paras. 81. 82.3; Claimant's Opening Presentation, Slide 35; Transcript, {Day 1, 75:8-75:18}.
[49] Statement of Case, para. 21.4.
[50] Statement of Case, paras. 21.4, 21.5.2; Reply and Defence to Counterclaim, para. 82.4; Transcript {Day 1, 75:19-76:8}.
[51] Statement of Case, para. 21.10.

agency in order to hold the Respondent responsible for any wrong that may have been committed by Gulf Energy in this regard.[52]

302.    In response to the Respondent's assertion that Gulf Energy was using the entire revenue generated from Saudi Aramco to pay vendors,[53] the Claimant alleges that all expenses of the Project should have been paid by the Respondent rather than Gulf Energy.[54]  The Claimant contends that the Respondent's assertion that the Project money is kept with Gulf Energy and not paid to the Respondent is inconsistent with the Respondent's indication that "Net Invoice Value" for all invoices issued is "SAR (Saudi Riyal) 31,328,129.81, '*commission 6%*', which is clearly Gulf Energy's commission and what Nordic called 'Receipts' is for SAR 30,614,026.69".[55]

303.    Mr Eskici states that he is aware of the Respondent receiving payments from Saudi Aramco in relation to the Saudi Project and that those payments have not been transferred to the Dubai Account.[56]  He says that the payments have instead been set-off against the Claimant's alleged share of the operational costs of the Saudi Project.[57]

(2)    Respondent's Submissions

304.    The Respondent submits that the breaches alleged by the Claimant in respect of the "project expense provisions" are based on an incorrect interpretation of the PSA.  As to this, the Respondent argues that:

a.    the Dubai Account was not supposed to be the final destination for any revenue generated under the Project.  Instead, the Dubai Account "was only meant as a temporary fix until ENEXD's incorporation of its Saudi branch and the subsequent opening of a Nordic-ENEXD joint account in KSA";[58] and

b.    the Claimant's case is inconsistent with the practical reality of the Project as it would require that funds be transferred out of Saudi Arabia, "only to be re-transferred

---

[52] Statement of Case, para. 21.8.
[53] Statement of Defence and Counterclaim, para. 49.
[54] Reply and Defence to Counterclaim, para. 86.2.
[55] Reply and Defence to Counterclaim, para 86.3.
[56] CWS-1 Eskici, para. 62.
[57] CWS-1 Eskici, para. 62.
[58] Statement of Defence and Counterclaim, para. 73.  See also Statement of Rejoinder and Reply on Counterclaim, paras. 40-42, 66; Claimant's Opening Presentation, Slide 26; Transcript, {Day 1, 134:12-17}.

- 65 -

there to pay the vendors". This is commercially illogical and would create a tax burden which the Parties did not intend to undertake.[59]

305.    The Respondent contends that the Claimant's argument that the Respondent failed to add the Claimant as a signatory to the Saudi Account is "misleading". As the Claimant failed to open a Saudi branch, it could not be added as a joint signatory due to a residency requirement.[60] Mr Sola states that "[i]t was impossible to add ENEXD as an authorized signatory" to the bank account in Saudi Arabia and "under the PSA, it was for ENEXD to set up a branch in Saudi Arabia".[61]

306.    The Respondent also disputes the allegation that the Respondent made payments using revenue generated under the Project.[62] The Respondent claims that the entirety of the revenue generated under the Project was used to honour Gulf Energy's obligations vis-à-vis the vendors.[63] With regard to the Claimant's allegation that the funds were paid by Gulf Energy to the Respondent, the Respondent asserts that it did not receive any funds from Gulf Energy "for the simple reason that there was no profit to be distributed in the Project."[64]

307.    In this regard, Mr Aidasani states that the Claimant's "refusal to abide by its financial commitments" under the PSA meant that the Respondent was unable to pay third party vendors.[65] According to Mr Aidasani:

> "On or around early 2019, all the vendors started demanding payments from Gulf Energy for their outstanding invoices and rumors were spreading in the market that Gulf Energy was late with such payments. Gulf Energy had no choice but to pay vendors invoices to avoid its own liability with the consequence that all the money generated under the Aramco Contract was used by Gulf Energy to pay the vendors after deducing Gulf fees. The Project did not generate any profits and no money was ever paid to Nordic."[66]

308.    Mr Aidasani further claims that, "[d]espite Gulf Energy using the revenues generated under the Project to pay vendors, the amount still outstanding to the vendors is approximately

---

[59] Statement of Defence and Counterclaim, para. 74.
[60] Statement of Defence and Counterclaim, para. 75.
[61] RWS-4 Sola, para. 39.
[62] Statement of Defence and Counterclaim, para. 76-77.
[63] Statement of Defence and Counterclaim, para. 77.
[64] Statement of Rejoinder and Reply on Counterclaim, para. 67.
[65] RWS-3 Sola, para. 18.
[66] RWS-3 Sola, para. 19.

USD 2.6 million."[67] Mr Sola similarly states that the Respondent did not receive any payments from Saudi Aramco in relation to the Saudi Aramco Contract.[68]

309.     The Respondent places emphasis on the nature of the Saudi Aramco Contract, which it characterizes as a call-off contract.   According to the Respondent, there is no guaranteed minimum amount of work under the Saudi Aramco Contract and Saudi Aramco does not pay unless the snubbing unit is rigged up on a Saudi Aramco well.[69]

310.     In response to the agency relationship alluded to by the Claimant in the Statement of Case, the Respondent claims that the Gulf Agency Agreement is governed by the laws of Saudi Arabia and under Saudi law, absent any express liability of the principal in the agency agreement, the principal will not be held liable for the actions of the Saudi agent.[70]

(3)     Tribunal's Decision

i.     <em>Saudi Account</em>

311.     The question here is whether the Respondent was obliged under Clause 7.12 and/or Clause 9.1(A) of the PSA to add the Claimant or an authorised signatory other than the Claimant as a signatory to the Saudi Account, and if so, whether the Respondent complied with that obligation.

312.     Clause 7.12 of the PSA provides that "*[the Respondent] will add [the Claimant] or its authorised person on* as a third signatory to the bank *account held by Gulf Energy & [the Respondent] in the Territory*."[71]   Similarly, Clause 9.1 of the PSA provides that "[r]emuneration in form of sharing of profits from conduct of business under this agreement to fulfil [the] Saudi Aramco [C]ontract number … shall be as follows: A) *[Claimant] or their authorised person* are *added as third signatory* onto *first joint account [the Respondent] hold with* [sic] *Gulf Energy* …".[72]

313.     It does not appear to be in dispute that "the bank account held by Gulf Energy & [the Respondent] in the Territory" in Clause 7.12 of the PSA, as well as the "first joint account [the

---

[67] RWS-3 Sola, para. 19.
[68] RWS-4 Sola, para. 40.
[69] Statement of Defence and Counterclaim, para. 86.
[70] Statement of Defence and Counterclaim, para. 77.
[71] PSA, Clause 7.12, Exhibit C-3. (emphasis added).
[72] PSA, Clause 9.1, Exhibit C-3 (emphasis added).

Respondent h[e]ld with Gulf Energy" in Clause 9.1(A) of the PSA are references to the Saudi Account.[73] The Saudi Account was thus meant to be a joint account between the Claimant, the Respondent, and Gulf Energy.

314.    The Respondent does not appear to dispute that Clause 7.12 and/or Clause 9.1(A) of the PSA *prima facie* required it to add the Claimant as a joint signatory to the Saudi Account, and that the Respondent did not comply with that obligation.[74] The Respondent instead argues that it was unable to add the Claimant as a joint signatory to the Saudi Account because the Claimant did not open a branch office in Saudi Arabia. The Claimant accepts that it did not open a branch office in Saudi Arabia.[75]

315.    The question therefore is whether the Respondent is correct when asserting that a party cannot be added as a joint signatory to a Saudi account, supposedly as a matter of Saudi law, if it does not have a Saudi branch. Mr Sola made a representation to this effect during the hearing on the Claimant's Application for Interim Measures.[76] The Claimant does not appear to challenge the Respondent's assertion on this point.[77] Moreover Clause 7.13 of the PSA (further discussed below), seems to imply that the opening of a bank account in Saudi Arabia requires a Saudi branch. It provides that the Dubai account is used "until [the Claimant]'s Saudi branch is established, when [the Respondent] and [the Claimant] must open up a joint account in Kingdom of Saudi to fulfill this purpose".[78]

316.    In light of the above, in the absence of any other indication to the contrary, the Tribunal is prepared to accept that the Claimant could not be added as a joint signatory to the Saudi Account pending the Claimant's establishment of a Saudi branch.

317.    However, Clauses 7.12 and 9.1(A) of the PSA also contain an alternative obligation to add the Claimant's "authorised person" to the Saudi Account. Given that the Claimant itself could not be added to the Saudi Account, the question is whether the Respondent was obliged to add an authorised person of the Claimant instead. There is no evidence on file that the

---

[73] *See, e.g.,* Statement of Defence and Counterclaim, para. 75; Transcript of Mr Sola's cross-examination on 22 November 2019, Exhibit C-2, p. 3.
[74] *See, e.g.,* Statement of Defence and Counterclaim, para. 75.
[75] Statement of Case, para. 21.7.
[76] Transcript of Mr Sola's cross-examination on 22 November 2019, Exhibit C-2, p.3.
[77] Reply and Defence to Counterclaim, para. 21.5 ("Nordic's Mr Sola has since claimed (in oral evidence, see C-2) that it would be impossible to add ENEXD as a signatory to the Saudi Account because of residency requirements under Saudi law. Whilst that is a bare assertion, even on the assumption it is true [...].")
[78] PSA, Exhibit C-3, Clause 7.13.

Claimant requested the Respondent to add an authorised person as a signatory to the Saudi Account, or that it provided information necessary to carry out such a request. The Tribunal is of the view that the obligation to add an authorised person as signatory must be interpreted in light of the fact that the Claimant would have needed to give the necessary details and authorisation, and the Respondent could only have added an authorised person once such information had been provided.

318.    Accordingly, the Tribunal finds that the Respondent has not breached Clauses 7.12 or 9.1(A) of the PSA by not adding the Claimant or its authorised person as signatory to the Saudi Account.

### ii.    Dubai Account

319.    In relation to the Dubai Account, the question is whether the Respondent was obliged under Clause 7.13 of the PSA and/or Clause 9.1(B) of the PSA to pay any monies received from Saudi Aramco under the Saudi Aramco Contract into the Dubai Account, and if so, whether it breached this obligation.

320.    Clause 7.13 of the PSA provides in relevant part that "[the Respondent] & [the Claimant], or their authorised persons, must open a *joint bank account in Dubai* within 30 days of finalising of this contract … and [the Respondent] must ensure that *all payments for mobilisation, demobilisation and any other payments will be deposited into this account*." It was accordingly "all payments for mobilisation, demobilisation and any other payments" that the Respondent was obliged to pay into the Dubai Account. The Respondent appears to accept that this encapsulated all payments "related to" the Project.[79]

321.    It is undisputed between the Parties that the Dubai Account was opened and operational.[80]

322.    The Dubai Account, however, was meant to be in use pending the Claimant's establishment of a branch in Saudi Arabia. Indeed Clause 7.13 of the PSA provides that the Dubai Account is to be used "until [the Claimant's] Saudi branch is established, when [the Respondent] and [the Claimant] must open a joint account in Kingdom of Saudi to fulfil this

---

[79] Statement of Rejoinder and Reply, para. 40.
[80] Statement of Case, para. 21.3. The Respondent does not appear to have disputed this, and Mr Sola refers in his email dated 20 December 2018 (06:40), Exhibit C-39, to bank details for "the Nordic/ENEXD joint bank account in the UAE".

purpose". This joint account in Saudi Arabia (the "**Saudi Account II**") was never opened.[81] For the sake of clarity, this planned joint Saudi Account II is different from the Saudi Account with Gulf Energy, discussed above.

323.    Furthermore, Clause 9.1(B) of the PSA provides that "[f]rom Aramco payment, 6% is paid to Gulf Energy from the joint account [the Respondent] h[e]ld with Gulf Energy [i.e. the Saudi Account]. Remaining 94% then is transferred within 2 bank working days to [the Claimant's] & [the Respondent's] joint account."

324.    From the combined reading of the above-mentioned provisions, it is clear that the Parties had planned that the payments under the Aramco Contract were paid into the Saudi Account (i.e. the account held by Gulf Energy), and from there Gulf Energy would take 6% (supposedly as its fees) with the remaining 94% being transferred to the Parties' joint account, i.e. either the Dubai Account or, once established, the Saudi Account II.

325.    It is not disputed that no payments were ever deposited in the Dubai Account (or in the Saudi Account II for that matter, which was never opened). The Respondent makes two main arguments to explain this absence of payment. First, the Respondent argues that it did not receive any funds from Gulf Energy because there was no profit to be distributed.[82] Second, the Respondent maintains that the Dubai Account was only intended to be temporary.[83]

326.    In the view of the Tribunal, neither of these arguments may justify any absence of payment into the Dubai Account.

327.    First, the obligation to deposit the monies from the Saudi Aramco Contract into the Saudi Account and from there on into the Dubai Account does not concern only profits, as alleged by the Respondent. To the contrary, Clause 7.13 of the PSA provides that "[the Respondent] must ensure that *all payments* for mobilisation, demobilisation *and any other payments will be deposited into this account*."[84] It is also clear from Clause 7.13 that any expenses under the PSA should have also been paid from the joint account:

---

[81] See, e.g., Respondent's Post-Hearing Brief, para. 12.
[82] *See, e.g.,* Statement of Rejoinder and Reply, para. 67.
[83] Statement of Defence and Counterclaim, paras. 33, 73; Respondent's Opening Presentation, Slide 33; Transcript, {Day 1, 111:1-6}.
[84] PSA, Clause 7.13, Exhibit C-3.

"Based on section [9], each party will then take their owed payments from this joint account, and *any expenses required under this agreement will be paid from this joint account also*."[85]

328.    Accordingly, Clause 7.13 of the PSA is explicit that the monies that should have arrived in the Dubai Account are all the payments under the Aramco Contract and not merely remaining profits. The fact that payments have been made under the Aramco Contract at the amount of USD 9,788,091 is not disputed by the Respondent.[86]

329.    It also results from the above that the Respondent should not have instructed its agent, Gulf Energy, to pay any expenses to third-party vendors before depositing the monies in the Saudi Account and then the Dubai Account pursuant to Clause 9.1(A) and (B). The Respondent indeed admitted that it did instruct Gulf Energy to this effect:

"ARBITRATOR SCHERER:  These were purchase order that were then sent by Gulf Energy on behalf of Nordic or were they purchase order that were sent and signed by Nordic and ENEXD?

THE WITNESS:  The purchase orders were sent in by Nordic Energy. However, they used to write instructions on the purchase order, to invoice Gulf Energy.

ARBITRATOR SCHERER:  *So Nordic was instructing Gulf Energy to pay those vendors.*

THE WITNESS:  *Yes*.

ARBITRATOR SCHERER:  And you said that was for tax reasons?

THE WITNESS:  Not for tax reasons. They were invoicing the vendor, Gulf Energy, because we -- there is VAT involved, so we have – there is – I mean, they have to invoice Gulf Energy.

ARBITRATOR SCHERER:  That is what I am referring to, for tax reasons, because of VAT.

THE WITNESS:  Yes. We were interested in instructing Gulf Energy to pay certain vendors, yes.

ARBITRATOR SCHERER:  The transcript says "He was instructing Gulf Energy." Who is he?

THE WITNESS:  "We, we" sorry. We were interested in instructing.

ARBITRATOR SCHERER:  *So Nordic was instructing Gulf Energy to pay the vendors [regarding] Saudi Aramco.*

THE WITNESS:  *Yes*."[87]

---

[85] PSA, Clause 7.13, Exhibit C-3 (emphasis added). Clause 7.13 contains a reference to section 8, which appears to be a typo and should be read as section 9. Section 8 deals with "force majeure", whereas section 9 deals with "remuneration and payment".
[86] RWS-2 Aidasani, fn. 9; Tally Screenshot dated 8 August 2020, Exhibit R-70.
[87] Mr Aidasani, Transcript, {Day 2, 524:18–526:1 }.

330.    The Tribunal is also not convinced by the Respondent's further argument that the contractual arrangement would be inconsistent with the practical reality of the Project as it would require that funds be transferred out of Saudi Arabia, "only to be re-transferred there to pay the vendors".[88]  While the Respondent might be right that this could create an additional VAT tax burden for the Parties, the fact is that the Parties did provide for such mechanisms in Clauses 7.13 and 9.1 of the PSA.  It is not for this Tribunal to assess whether the Parties' contractual arrangement is tax-favourable to them.

331.    Second, in this context, it is also important that the joint Dubai Account was indeed meant to be replaced at some point by the joint Saudi Account II.  However, the fact that the joint Saudi Account II was never opened cannot relieve the Respondent from its contractual obligation under Clauses 7.13 and 9.1 of the PSA to deposit the payments from the Saudi Aramco Contract into the joint account (after transitioning through the Saudi Account).  If there is no joint Saudi Account II, the obligation remains for the joint Dubai Account.  Nothing in Clause 7.13 PSA (or otherwise) speaks to the contrary.  Rather, Clause 7.13 of the PSA clearly states that the Dubai Account would be "*for the duration of the term of this agreement* (until [the Claimant]'s Saudi branch is established, when [the Respondent] and [the Claimant] must open up a joint account in Kingdom of Saudi to fulfill this purpose)."[89]  There was therefore no time limit for the opening of the Saudi Account II under the PSA.

332.    In sum, for the reasons detailed above, the Tribunal finds that the Respondent should have deposited payments under the Aramco Contract into the joint Dubai Account and by not doing so breached Clauses 7.1 and 9.1(B) of the PSA.

### iii.    Project Expense Provisions

333.    The question here is whether the Respondent was obliged under Clause 3 of the PSA and/or related project expense provisions (including Clause 9.1(C) and Clause 9.5) to agree or attempt to agree payments with the Claimant before making payments from the revenue of the Project to cover its expenditure.

334.    Clause 3 provides in relevant part that "throughout the term of this contract, if either party decides *additional equipment* is required, *once written permission is granted* from the

---

[88] Statement of Defence and Counterclaim, para. 74.
[89] PSA, Clause 7.13, Exhibit C-3 (emphasis added).

other party, this additional equipment will be **funded from joint operation cost of operations**."[90]

335.     As discussed above, Clause 9.1 of the PSA, after having set out at (B) that payments under the Aramco Contract must be deposited into the joint Dubai Account, provides in (C) that "[f]rom this second joint account and the amount deposited in, [the Respondent] take their 3% management fee and **1.5% will be left for any joint venture expenses**" and in (D) that **"[o]perational expenses are to be deducted from this amount (using agreed forecast financial statements – Appendix 15)**."[91]

336.     Concerning "the agreed forecast financial statements" that were supposed to be found in Appendix 15, the Tribunal notes here that the PSA on file does not contain any such appendix. Also, as discussed in more detail below, the Tribunal is unconvinced that the Parties agreed on forecast financial statements otherwise.[92]

337.     Clause 9.5 of the PSA further provides that "[a]ny **additional mutually agreed upon expense** will be split between Nordic & ENEXD, 40/60 respectively."

338.     It follows from these provisions of the PSA that any expenses – be it for additional equipment (Clause 3) or joint venture expenses (Clause 9.1 (C)) or any other expenses more broadly (Clause 9.5) – must be either mutually agreed upon between the Parties (Clauses 3 and 9.5) and/or taken from the joint Dubai Account (Clauses 9.1 (C) and (D).

339.     As further discussed below, the Parties are in dispute whether the Claimant signed and thus agreed on a number of purchase orders.[93] At this stage, it is sufficient to note that there are, undisputedly, approximately 570 purchase orders which have not been signed by the Claimant.[94] For these expenses, the Respondent did neither seek the Claimant's agreement nor

---

[90] PSA, Clause 3, Exhibit C-3 (emphasis added).
[91] PSA, Clause 9.1, Exhibit C-3 (emphasis added).
[92] *See below* at paras. 450-451.
[93] *See below* at Section V.E.1.
[94] Claimant's Post-Hearing Brief, para. 5.4(a) (alleging that 573 of the Additional Purchase Orders were not signed by the Claimant); Respondent's Final Submission, para. 7 (alleging that 567 Purchase Orders are signed by the Respondent only). The summary provided by the Respondent in its email of 14 December 2020 showed 573 of the Additional Purchase Orders not to be signed by the Claimant. *See* Summary of Additional Purchase Orders, Exhibit R-88.

does it appear to have paid the sums from the joint Dubai Account, thus violating the above-mentioned provisions.[95]

340.    In sum, the Respondent has breached the above-mentioned Clauses 3, 9.1 and 9.5 of the PSA by failing to seek the Claimant's agreement of these expenses and/or pay them from the joint Dubai Account.

b)    Breach of the Reporting and Inspection Requirements

(1)    Claimant's Submissions

341.    The Claimant submits that the Respondent was subject to "robust reporting requirements" under the PSA.[96]  It divides these into two categories: (i) obligations on the Respondent to report on the finances of the Project, to allow the Parties jointly to agree on the distribution of expenses and revenue in accordance with Clause 9 of the PSA; and (ii) safeguards that would permit the Claimant to ensure that the Equipment was being maintained in good condition and not placed at risk.[97]

342.    In addition to the express requirements that it relies upon in the PSA, the Claimant also pleads the existence of an implied term to the effect that the Respondent would arrange for the Project to be independently audited once a year.[98]

343.    The Claimant submits that the Respondent breached these reporting requirements. Specifically, the Claimant argues that:

a.    in breach of Clause 4.1, the Respondent did not ensure that the Claimant was "part of the Nordic reporting operation".  The Claimant did not "receive all the reports for maintenance, purchase, operation and every other report related to this project";[99]

b.    in breach of Clause 7.4, the Claimant was not, until 24 December 2019, sent any invoices prepared in respect of the servicing of the Aramco Contract;[100] and

---

[95] Appendix A to the Respondent's Final Submission includes separate categories for Purchase Orders paid "by Nordic" and "By Aramco Revenue".  *See* Respondent's Final Submission, Appendix A.
[96] Statement of Case, para. 22.1.
[97] Statement of Case, para. 22.1.
[98] Reply and Defence to Counterclaim, para. 78.3.
[99] Statement of Case, para. 22.2.1.  The Claimant also characterizes these as "operational reports". *See* Reply and Defence to Counterclaim, para. 88.5.
[100] Statement of Case, para. 22.2.2; Claimant's Opening Presentation, Slide 39.

- 74 -

      c.      in breach of Clause 7.16 and the implied term referred to above, the Respondent did not provide yearly audit reports to the Claimant.[101]

344.    Mr Eskici refers to the Respondent's alleged failure to provide the Claimant with "regular financial and project information as required under the PSA".[102] He states, "[b]y way of example" that the Claimant was not provided with (i) "[c]opies of commercial invoices issued to clients by Nordic and / or Gulf Energy", (ii) "[w]eekly operational meeting reports, daily reports and financial reports" or (iii) "[a]udit reports of the Saudi Project".[103] Mr Eskici further states that "[w]e repeatedly requested Nordic to arrange a forensic audit of its books (due to the large discrepancies in the P&L accounts) in relation to the Saudi Project and as per to the terms of the PSA. However, Nordic consistently denied or ignored our requests to comply with the terms of the PSA on this issue."[104]

345.    In support of these claims, the Claimant relies, among other things, upon an alleged admission by Mr Sola in his witness statement dated 18 November 2019. At paragraph 20, Mr Sola stated that "[a]fter the Claimant stopped making payments as required under the PSA and the relationship between the Parties became antagonistic, Respondent stopped providing reports to Claimant."

346.    In respect of the Tally accounting software relied on by the Respondent in its defence of these allegations, the Claimant states that accounting software of this kind does not include reports as required by the PSA. The Claimant also argues that the entries recorded in accounting software may be incomplete or inaccurate, unlike audited reports.[105]

347.    Ms Zavarei also refers to requests made by the Claimant for accounting information which were not answered by the Respondent. In particular, she refers to an email from Mr Alireza to Mr Sola in August 2018 and emails from Ms Heather Souter (and Mr Alireza) to Mr Sola in December 2018 and January 2019.[106]

348.    The Claimant also submits that the Respondent breached Clauses 7.10 and 7.14 (which it refers to as the "inspection clauses") of the PSA by failing to permit the Claimant to inspect

---

[101] Statement of Case, para. 22.2.3; Reply and Defence to Counterclaim, paras. 13.1, 88.4; Claimant's Opening Presentation, Slide 34.
[102] CWS-1 Eskici, para. 50.
[103] CWS-1 Eskici, para. 50.
[104] CWS-1 Eskici, para. 53.
[105] Reply and Defence to Counterclaim, para. 88.5-6.
[106] CWS-2 Zavarei, para. 12.

the Equipment.[107]  The Claimant submits that, if it is correct that the Respondent placed the Equipment in a location where it could not be inspected by the Respondent, it "ought not to" have done so or "ought not to have agreed to" Clauses 7.10 and 7.14.[108]

(2)     Respondent's Submissions

349.    The Respondent denies the Claimant's allegations in respect of the reporting requirements.  The Respondent submits that (i) the Claimant had access to financial and operational data regarding the Project through "Tally" accounting software and (ii) the Claimant's accountant visited the Respondent's offices for several weeks in mid-2019 and had access to the latest financial data regarding the Project.[109]  The Respondent submits that the Claimant has failed to explain why the information available on Tally was insufficient.  The Respondent maintains that the Tally software contained the necessary information regarding Project expenses and revenue vouchers recording payments received from Saudi Aramco.[110] The Respondent further alleges that the Claimant had access to Tally in 2018 "as well as in 2019 when backups were provided by Nordic to ENEXD".[111]

350.    Mr Sola states that "[b]etween December 2017 and May 2019, Respondent provided Claimant with accounting reports using the Tally software."[112]  He further states that "[a]fter Claimant stopped making payments as required under the PSA and the relationship between the Parties became antagonistic, Respondent stopped providing reports to Claimant."[113]

351.    With regard to Clause 7.16, the Respondent submits that Clause 7.16 does not provide for an obligation to prepare audit reports.  Instead, "[t]o the extent that the audit reports are prepared, ENEXD may have access to these reports.  However, if no such report was prepared by Nordic, Nordic cannot be under an obligation to prepare the same on the basis of Clause 7.16."[114]

352.    In respect of the Claimant's assertion that the PSA contains an implied term requiring the Respondent to conduct yearly independent audits of the Project, the Respondent argues that

---

[107] Statement of Case, paras. 10.5-10.7, 22.6.
[108] Statement of Case, para. 22.8.
[109] Statement of Defence and Counterclaim, para. 79.
[110] Statement of Defence and Counterclaim, para. 80; Statement of Rejoinder and Reply, para. 71.
[111] Statement of Rejoinder and Reply, para. 71.
[112] RWS-1 Sola, para. 19.
[113] RWS-1 Sola, para. 20.
[114] Statement of Defence and Counterclaim, para. 81.

- 76 -

Clause 7.16 already provides that the Respondent will have access to audit reports, "if and when Nordic conducts yearly reports of the Project."[115]  According to the Respondent, it is not required to conduct such audits if it chooses not to.[116]

353.    The Respondent denies that the Claimant was not permitted to inspect the Equipment. The Respondent states that the Claimant's representatives were granted full access to the well site, the Equipment, and to the Claimant's personnel during the modification, manufacturing, mobilization and acceptance process.[117]  The Respondent alleges that the Claimant has failed to provide any evidence that it was prevented from accessing the Equipment before or after the start of the current arbitral proceedings.[118]

(3)    Tribunal's Decision

i.    <em>Reporting Requirements</em>

354.    The Claimant alleges breaches of Clauses 4.1, 7.4, 7.16 of the PSA and its implied terms.  The Tribunal examines these claims in turn.

355.    First, Clause 4.1 of the PSA stipulates that the Claimant "must be part of the [Respondent]'s reporting obligations and will receive **all the reports for maintenance, purchase, operation** and **every other report related to this project**."[119]  The provision thus encapsulates a broad duty that calls for transparency in respect of reports which are prepared in relation to the Project.  Similarly, Clause 7.16 of the PSA sets out that the Claimant "will have the **full right to the yearly audit reports** of [the Respondent] regarding this [P]roject."[120]

356.    The Parties are in disagreement as to whether the above-mentioned provisions of the PSA, or its implied terms, require the Respondent to prepare any audit reports in relation to the Project (according to the Claimant) or whether the obligation to share audit reports under these provisions only exists to the extent reports were in fact prepared (according to the Respondent).

---

[115] Statement of Rejoinder and Reply on Counterclaim, para. 60.
[116] Statement of Rejoinder and Reply on Counterclaim, para. 60.
[117] Statement of Defence and Counterclaim, para. 82.
[118] Statement of Rejoinder and Reply, para. 72.
[119] PSA, Clause 4.1, Exhibit C-3 (emphasis added).
[120] PSA, Clause 7.16, Exhibit C-3 (emphasis added).

357.     The Tribunal finds that this question is moot: the evidence on file shows that audit reports were prepared by the Respondent in relation to the Project.  Mr Sola testified that the Respondent has prepared audited reports every year:

> "[O]ur requirement is from our owner, Energy House; they require an audited report, every year.  And actually, we are audited four times a year, so **we have been doing audited reports every year** for as long as Energy House has been an owner."[121]

> "... **Nordic has audited reports every year**."[122]

358.     This seems also confirmed by Mr Aidasani at the Hearing.  He agreed that "ENEXD have [the] right to see the reports of Saudi joint operation books"[123] and replied affirmatively in answer to the question "[i]s ENEXD entitled to an audit report of the project, on a yearly basis?"[124]

359.     It is also clear from the evidence on file that those reports were not shared, at least not all the time.  Concerning audit reports, Mr Sola gave evasive answers and eventually could not confirm whether or not any audit report had been shared with the Claimant:

> "Q.     And why was that not done?
> A.     A yearly audit report?
> Q.     Yes.
> A.     Well, one of the issues was that, you know, the Saudi operation was not separated out from the yearly audit report for Nordic.  And secondly, I think we did send them enough reports for them to have a clear picture of the situation.
> Q.     **But it was an audit report, Mr. Sola**.
> A.     Yes.
> Q.     It was an audit report?
> A.     Was it an audited report?
> Q.     Yes.
> A.     Well, **Nordic has audited reports every year.**
> Q.     Okay.  But my question is was an audited report provided to ENEXD in compliance to this clause here, Mr. Sola?
> A.     Well, I would recommend you to ask Ramesh Aidasani that question.

---

[121] Transcript, {Day 2, 421:9-14} (emphasis added).  Mr Sola has already made a similar statement at the hearing on the Claimant's Application for Interim Measures.  See Transcript of Mr Sola's cross-examination on 22 November 2019, Exhibit C-2, p.8 (Mr Sola replied, "I do – trust me, Nordic is owned by a public listed company. We get audited every 3 months; our auditors are EY plus the internal auditor of the public listed company ….").
[122] Transcript, {Day 2, 414:8-9}
[123] Transcript, {Day 2, 475:18-20}.
[124] Transcript, {Day 2, 479:13-16}.

Q.      I am asking you; you are managing director of the company, are you not?

A.      Well, not any more.

Q.      No.  At that time, though, you were, were you not?

A.      I was, yes.

Q.      And why wasn't this complied?

A.      Are you saying that they did not get a report?

Q.      Yes.  ***ENEXD did not get a report.  And my question is why Nordic didn't provide this report?***

A.      ***I cannot answer that question***."[125]

360.    In cross-examination, Mr Aidasani also appeared to agree that the audit reports were not shared with ENEXD:

"Q.      We talked quite a bit about audit reports earlier on and you – until your resignation in December 2019, do you know whether any audit reports were shared with the Claimant during that time?

A.      After the resignation?

Q.      Before your resignation, during your time at Nordic.

A.      No."[126]

361.    Concerning other reports more generally, Mr Sola states that "[b]etween December 2017 and May 2019, Respondent provided Claimant with accounting reports using the Tally software."[127]  The Respondent has provided a screenshot of the Tally software from 23 January 2019 to support this assertation.[128]  From that screenshot, the Tribunal is able to gather that some information and figures were shared with the Respondent, who does not seem to dispute that it had access to this shared software.[129]  However, the Tribunal is not in a position to assess whether the information shared included "all the reports for maintenance, purchase, operation and every other report related to this project" as required under Clause 4.1 of the PSA.

362.    In any event, the Respondent admits that it stopped sharing the reports via the Tally software in May 2019, as confirmed by Mr. Sola in the above-mention quote of his witness statement that "[b]etween December 2017 ***and May 2019***, Respondent provided Claimant with accounting reports using the Tally software."[130]  He also explained that this was due to the

---

[125] Transcript, {Day 2, 413:17-415:4}.
[126] Transcript, {Day 2, 513:6-15}.
[127] RWS-1 Sola, para. 19.
[128] Screenshot of Tally System dated 23 January 2019, Exhibit R-53.
[129] Reply and Defence to Counterclaim, para. 88.5; CWS-4 Zavarei, para. 12(c).
[130] RWS-1 Sola, para. 19 (emphasis added).

Claimant's refusal to make payments, which he considered unjustified: "[a]fter [the] Claimant stopped making payments as required under the PSA and the relationship between the Parties became antagonistic, [the] ***Respondent stopped providing reports to Claimant***."[131]

363.    Other evidence referred to by the Respondent[132] suggests that it had provided some reports on an ad hoc basis prior to May 2019.[133]

364.    The Claimant's lack of access to reports seems also confirmed by contemporaneous documents, including the minutes of the Dubai Meeting of 13 March 2019, which record that the Claimant "requested access to information relating to expenses" and "all past and daily reports".[134]  While the Tribunal is mindful that the minutes of this meeting were not signed and agreed by the Respondent, it notes that the above-mentioned quote is in line with Mr. Sola's own evidence.

365.    In light of the above, the Tribunal is satisfied that the Respondent breached its reporting obligations under Clauses 4.1 and 7.16 of the PSA by failing to share existing audit reports and any other reports in relation to the Project with the Respondent, at least as from May 2019.

366.    Second, the Claimant also refers to Clause 7.4 of the PSA which provides that "[i]nvoicing to Clients shall be done by [the Respondent] through its agent Gulf Energy.  [The Claimant] ***shall receive copies of such commercial invoices immediately after they are issued to Client***."[135]  Pursuant to Clause 4.3 of the PSA the "Client" or "Clients" shall mean Saudi Aramco.

367.    The Claimant alleges that it was not, until 24 December 2019, sent any invoices prepared in respect of the servicing of the Aramco Contract.[136]  According to the Respondent, these invoices were provided through the Tally software.[137]

368.    On the one hand, the Tribunal had found in its Partial Award on Interim Measures that "the Respondent does not seem to contest … that it did not provide it with copies of invoices."[138]

---

[131] RWS-1 Sola, para. 20 (emphasis added).
[132] Statement of Defence and Counterclaim, para. 79.
[133] Email correspondence between Claimant and Respondent, Exhibits R-25, R-26, R-27 and R-28.
[134] Minutes of the Dubai Meeting, Exhibit C-13.
[135] Statement of Case, para. 22.2.2; Claimant's Opening Presentation, Slide 39.
[136] Statement of Case, para. 22.2.2; Claimant's Opening Presentation, Slide 39.
[137] Statement of Defence and Counterclaim, para. 79; Respondent's Opening Presentation, Slide 34.
[138] Partial Award on Interim Measures, para. 75.

Contemporaneous evidence also suggests that the Respondent was not providing invoices in a timeous manner.[139]

369.     On the other hand, it is undisputed that the first invoice to Saudi Aramco was issued on 13 January 2019 only.[140]  The screen shot of the Tally software from 23 January 2019 indeed shows a reference to an amount invoice to and/or received from Saudi Aramco.  Accordingly, the Tribunal is not satisfied that, at that time, the Respondent failed to provide invoices to the Claimant pursuant to its obligation under Clause 7.4 of the PSA.

370.     However, as established above, the Respondent has stopped providing access to the Tally software since May 2019.[141]  At that time, the Tribunal is satisfied that the Respondent stopped providing invoices to the Claimant by any means.

371.     In light of the above, the Tribunal is satisfied that the Respondent breached its reporting obligations under Clause 7.4 of the PSA by failing to provide access to the Tally software and invoices contend therein as from May 2019.]

*ii.     Inspection Requirements*

372.     As detailed above, the Claimant also submits that the Respondent breached Clauses 7.10 and 7.14 of the PSA by failing to permit the Claimant to inspect the Equipment.[142]  As equally detailed above, the Respondent does not deny this obligation *per se*, but denies that the Claimant was not permitted to inspect the Equipment.[143]

373.     Clause 7.10 of the PSA provides that the Parties "accept that ***both a [Respondent] and [Claimant] representative*** will every 6 months (from the start of operations) ***check*** inventory list [sic] against the ***inventory of equipment*** supplied under this agreement to fulfil Saudi Aramco contract."  Clause 7.14 of the PSA further requires the Respondent to use its "best endeavour" to "ascertain to obtain any relevant passes/visas/permissions in a reasonable time" when a representative from the Claimant "wishes to visit the well site."

---

[139] Email from Heather Souter to Sonny Sola dated 12 December 2018 (17:30), Exhibit C-63.  See also Ms Zavarei at CWS-2 Zavarei, para. 11.
[140] Statement of Defence and Counterclaim, para. 54; Respondent's Opening Presentation, Slide 28; Invoices from Gulf Energy to Saudi Aramco dated 13 January 2019, Exhibit R-23.
[141] *See above* at para. 362.
[142] *See above* at para. 348.
[143] *See above* at para. 353.

374.    It is clear from the above that the Respondent was required to permit the Claimant to access and inspect the Equipment every six months, and to the extent any "passes/visas/permissions" were required to access the well site where the Equipment was located, to use its "best endeavour" to obtain those.

375.    According to Mr Sola, the Equipment was being stored in a secure site in Saudi Arabia to which the Respondent did "not have the right to grant access". [144] This *prima facie* corroborates the Claimant's allegation at the Hearing that "until the Tribunal was constituted and until the Tribunal ordered the Respondent to show the location of the equipment, [the Claimant] was precluded from the inspection of the equipment." [145]

376.    However, there is no evidence on file that the lack of a right to access the site in Saudi Arabia was due to the Respondent's failure to use its "best endeavour" to obtain any relevant passes/visas/permissions to gain access.  Neither Party has made any submission to this effect.

377.    The Tribunal cannot accept the Claimant's submission that the Respondent "ought not to have agreed to" Clauses 7.10 and 7.14 if it could not grant access to the Equipment. [146]  The "best endeavour" language in Clause 7.14 of the PSA with regard to "any relevant passes/visas/permissions" required in accessing the well site shows precisely that such access might depend on third parties, and in particular on Saudi Aramco.

378.    In light of the above, the Tribunal finds no breach of Clauses 7.10 and/or 7.14 of the PSA by the Respondent.

c)    Unauthorised Amendment to the Saudi Aramco Contract

(1)    Claimant's Submissions

379.    The Claimant submits that the Respondent breached Clause 7.17 of the PSA by amending the Saudi Aramco Contract to change the type of work that was to be done on the Project. [147]  According to the Claimant, the Saudi Aramco Contract was amended "to include oil and water wells." [148]  The Claimant alleges that Clause 7.17 of the PSA required that the

---

[144] RWS-1 Sola at para. 14.
[145] Transcript, Day 1 {33:19-23}.
[146] Statement of Case, para. 22.8.
[147] Statement of Case, para. 23.2.
[148] Statement of Case, para. 23.2, referring to Amendment to the Saudi Aramco Contract, Exhibit C-26.

Saudi Aramco Contract should not be amended without the Claimant's written consent.[149] According to the Claimant, it did not provide written approval to the amendment, and thus the Respondent's unilateral amendment constitutes a breach of the PSA.[150]

380.    Mr Eskici explains that the Claimant was "notified that on 25 December 2017, six (6) days after we signed the PSA, Nordic signed an amendment to the contact [sic] with Saudi Aramco without our knowledge and / or permission."[151]  According to Mr Eskici, this caused "significant losses in terms of revenue" to the Claimant, decreasing the "daily charge out rate of the Saudi Project by US $7,000 per day" and causing "significant losses in terms of revenue to ENEXD".[152]  Ms Zavarei further alleges that the Respondent "was negotiating the amendments to the Saudi Aramco contract through Gulf Energy behind our backs.  If we would have known this was the case[,] we would not have signed the PSA."[153]

(2)    Respondent's Submissions

381.    The Respondent denies that it breached Clause 7.17 of the PSA by amending the Saudi Aramco Contract without authorisation.[154]  The Respondent claims that the Claimant was informed of the amendment to the Saudi Aramco Contract prior to the signing of the PSA.[155] Specifically, the Respondent relies upon an email from Mr Sola to the Claimant on 28 October 2017 which it says constituted a sharing of the Respondent's intention to expand the scope of the Saudi Aramco Contract to include the oil and water wells.[156] According to the Respondent, the Claimant's failure to respond to Mr Sola's email precludes it from denying that it gave tacit consent.[157]

382.    Mr Sola confirms that the Claimant was aware of the amendment since before the PSA was signed.[158]  He adds that the Claimant did not object to the amendment prior to the commencement of the arbitration.[159]

---

[149] Reply and Defence to Counterclaim, para 90.
[150] Reply and Defence to Counterclaim, para 90.4.
[151] CWS-1 Eskici, para. 63.
[152] CWS-1 Eskici, para. 64.
[153] CWS-2 Zavarei, para. 24.
[154] Statement of Defence and Counterclaim, paras. 83-87; Respondent's Opening Presentation, Slide 37; Transcript, {Day 1, 145:6-22}.
[155] Statement of Defence and Counterclaim, para. 84.
[156] Statement of Defence and Counterclaim, paras. 84-85.
[157] Statement of Defence and Counterclaim, para. 85.
[158] RWS-4 Sola, para. 24.
[159] RWS-4 Sola, para. 24.

383.    The Respondent further submits that there is no rational basis for the Claimant to object to the inclusion of the oil and water wells.  The Respondent states, among other things, that the amendment to the Saudi Aramco Contract was aimed at increasing the utilization of the Equipment and, as a result, the revenue under the Saudi Aramco Contract.[160]

384.    The Respondent also disputes that the Claimant has proved any loss allegedly arising from the expansion of the scope of the Saudi Aramco Contract.[161]  The Respondent states that the Equipment did not undergo further material modification for use on oil and water wells. The Respondent states that the Claimant has also failed to prove that the Equipment was used at any given time to service oil and water wells.[162]

(3)    Tribunal's Decision

385.    Clause 7.17 of the PSA prohibits amendment of "the terms of the contract between [the Respondent] & Gulf Energy or the contract between Gulf Energy & Saudi Aramco regarding fulfilment of Saudi Aramco Contract No 6600039722 without the prior written approval of ENEXD".  It appears to be common ground between the Parties that "the contract between Gulf Energy & Saudi Aramco regarding [the] fulfilment of Saudi Aramco Contract No 6600039722" is the Saudi Aramco Contract itself.[163]

386.    Exhibit C-26 is an amendment to the Saudi Aramco Contract.  The amendment is signed on behalf of both Saudi Aramco and Gulf Energy, with the Gulf Energy signature dated 25 December 2017, thereby post-dating the PSA.  There was therefore an amendment to the Saudi Aramco Contract after the signing of the PSA (the "**Amendment**").

387.    The question then is whether the Amendment was made in breach of Clause 7.17 of the PSA.  That raises in turn two issues: (i) whether the Amendment was made by the Respondent (acting through Gulf Energy); and (ii) whether the Claimant had provided prior written approval.

388.    On the first issue, the Amendment is signed by Gulf Energy with no indication that it was signing on behalf of the Respondent.[164]  However, the Respondent has entered into the Gulf

---

[160] Statement of Case, para. 23.1; Statement of Defence and Counterclaim, para. 86.
[161] Statement of Rejoinder and Reply on Counterclaim, fn. 47; Respondent's Opening Presentation, Slide 37; Transcript, {Day 1, 145:14-22}.
[162] Statement of Defence and Counterclaim, para. 87.
[163] Statement of Defence and Counterclaim, para. 83.
[164] Amendment to the Saudi Aramco Contract, Exhibit C-26.

Agency Agreement, according to which the Respondent appoints Gulf Energy as its exclusive agent in the Saudi Arabia.[165]  Also, the Respondent does not appear to seriously dispute that Gulf Energy was authorised to enter into the Amendment on its behalf.  Similarly, there does not appear to be any serious dispute that the Amendment was authorised by the Respondent.

389.    On the second issue, the Respondent relies on the suggestion that the Claimant was aware of the Amendment prior to the signing of the PSA and did not object to it.  It refers to an Email exchange between Mr Sola and Ms Zavarei, dated 28 October 2017 in which Mr Sola wrote:

> "I have included the proposed equipment list for Oil and Water wells for Aramco. We are awaiting approval from Aramco for said equipment list. As can be seen the list is considerable simpler equipment wise compared to gas wells and will save time and investments for us if approved."[166]

390.    It can be deduced from the above that the Claimant was aware that the Project and thus the Saudi Aramco Contract was supposed to cover oil & water wells, and not only gas wells. The Claimant does not seem to have objected to this point, but it also did not formally approve the Amendment, in writing or otherwise.

391.    Clause 7.17 of the PSA expressly requires a "prior *written* approval" by the Claimant, which is lacking in the case at hand.  However, this provision is best interpreted as applying only to amendments that, at the time of the signing the PSA, the Claimant would not have been aware of.  Given that the Claimant was aware of the scope of the Saudi Aramco Contract including oil & water wells, as shown above, it cannot invoke Clause 7.17 of the PSA to claim a formal breach thereof.

392.    In light of the above, the Tribunal finds no breach of Clause 7.17 of the PSA by the Respondent.

---

[165] Gulf Agency Agreement, Exhibit R-1, Article 4 ("Contracts shall be negotiated by Nordic directly with TERRITORY Clients with the participation and / full knowledge of [Gulf Energy].  Before signing and acceptance of Contracts, Nordic shall have the right, after consultation with [Gulf Energy] to accept or reject any contract that may not suite [sic] the Company for any reason whatsoever.").
[166] Email Correspondence Between Claimant and Respondent regarding Oil & Water Well, Exhibit R-31, p. 1, point 5.

d)      Breach of the Insurance Provisions

(1)      Claimant's Submissions

393.    The Claimant submits that the Respondent breached Clause 10.5 of the PSA by failing to put in place any insurance for the Equipment.[167]  In support of this allegation,[168] the Claimant relies on Mr Sola's alleged failure to exhibit any policy documentation or other documentary evidence to support the claim in his witness statement dated 18 November 2019 that "[t]he transport of the Equipment from the Saudi Aramco well site to the secure yard in Abqaiq is performed by a Saudi Aramco approved rig mover, which provides insurance coverage during the move.  While the Equipment is inactive and being stored in the Respondent's secured yard, it will be insured by the Respondent."[169]

394.    The Claimant argues that, while Clause 10.5 of the PSA refers to a joint obligation to finalise insurance agreements, the entire responsibility for insurance should rest with the Respondent because the Respondent has possession of the Equipment.[170]  The Claimant states that "it is clear that a construction which requires Nordic to obtain that insurance should be preferred."[171]

395.    In relation to the Respondent's assertion that the Claimant was covered by a third-party liability insurance policy, the Claimant submits that this policy does not cover the Equipment because it does not name the Claimant as a beneficiary and does not refer to the Equipment.[172]  Further, under the third-party policy, the Claimant submits that "the insured … is responsible for their damages or losses".[173]

396.    Mr Eskici explains that the Claimant requested the Respondent "on many occasions to provide the information and / or confirm that the equipment was insured for the Saudi Project", but the Respondent did not provide this information.[174]

---

[167] Statement of Case, para. 24.4.  See also Reply and Defence to Counterclaim, paras. 91-95; Claimant's Opening Presentation, Slide 44; Transcript, {Day 1, 82:7-88:2}.
[168] Statement of Case, para. 24.5.
[169] RWS-1 Sola, para. 15.
[170] Reply and Defence to Counterclaim, para. 92.1.
[171] Reply and Defence to Counterclaim, para. 94.2.3.
[172] Reply and Defence to Counterclaim, para. 94.
[173] Reply and Defence to Counterclaim, para. 94.1.
[174] CWS-1 Eskici, para. 67.

- 86 -

(2)    Respondent's Submissions

397.    The Respondent denies that it breached its obligation to insure the Equipment.

398.    The Respondent submits that the Claimant's claim is based on a flawed interpretation of the terms of Clause 10.5 of the PSA.[175]  In particular, the Respondent argues:

a.    any obligation to agree on insurance policies, as well as preparing the relevant appendix, was incumbent on both Parties.  The Claimant wrongly interprets Clause 10.5 as a unilateral obligation on the Respondent;[176]

b.    Clause 10.5 specifically excludes the well site and does not require that the Respondent procure that Saudi Aramco put in place insurance at the well site.  Clause 10.5 indicates that the Respondent has no control over the Equipment when at the well site, where it is instead under the control and custody of Saudi Aramco.[177]

399.    In his Third Witness Statement, Mr Sola reasons that the Respondent did not have sole responsibility for obtaining insurance because "it was impossible for [the Respondent] to get the insurance, we told ENEXD to insure the equipment themselves and to send the costs to the JV."[178]

400.    The Respondent further submits that even though Appendix 16 was never compiled, the Equipment was nonetheless covered by insurance throughout the term of the PSA.[179]  It refers to a copy of third-party liability insurance provided to the Claimant on 3 February 2020.[180]  The Respondent maintains that this policy covers any damages suffered by the Claimant up to the policy limit.[181]

401.    Mr Sola states that "[a]s long as the Equipment is on a Saudi Aramco well site, it is covered by the terms of the Aramco Contract.  This is in line with best practices in the oil and gas industry, where a contractor's equipment is under the responsibility of the oil company

---

[175] Statement of Defence and Counterclaim, para. 88.
[176] Statement of Defence and Counterclaim, para. 89.
[177] Statement of Defence and Counterclaim, para. 90.
[178] RWS-4 Sola, para. 42.
[179] Statement of Defence and Counterclaim, para. 89.
[180] Statement of Defence and Counterclaim, fn. 125.
[181] Statement of Rejoinder and Reply on Counterclaim, para. 75.

when located on the oil company's well site, and is insured by third party transfer companies when being transported."[182]

### (3)    Tribunal's Decision

402.    Clause 10.5 of the PSA provides that "[b]oth parties *agree to finalise* insurance requirements a maximum of 30 days after signing of this agreement with all insurances policies in Appendix 16." Clause 10.5 then details what that insurance should cover.

403.    As noted in the Tribunal's Partial Award on Interim Measures, "[t]he Tribunal understands that the Parties never agreed on the 'insurance requirement' referred to in Clause 10.5 of the PSA and that Appendix 16 of the PSA thus does not exist."[183] This understanding has not changed, and the Parties appear to accept that Appendix 16 does not exist.[184]

404.    The references to "*both* parties" and to them "*agree*[ing] to finalise" insurance requirements in Clause 10.5 of the PSA suggests that the Parties' agreement on appropriate insurance was necessary. Accordingly, neither Party could (or should) have provided for insurance without the other's agreement. Therefore, the Claimant's allegation that the entire responsibility for insurance rested with the Respondent because the Respondent had possession of the Equipment[185] is not covered by the plain terms of Clause 10.5 of the PSA.

405.    While there seems to be some insurance in place in relation to the Equipment,[186] the insurance certificate on file indicates that (i) only the Respondent and not the Claimant can invoke rights under this policy;[187] and (ii) it is the Respondent's worldwide (excluding US and Canada) insurance for third party liability.[188] Hence, the existing insurance policy does provide for specific coverage for any loss or damages to the Equipment.

406.    However, the evidence on file also suggests that, at least as of June 2018 (i.e. well past the 30-days deadline mentioned in Clause 10.5 of the PSA), the Parties were still discussing the insurance requirements. In an email exchange between Mr Sola and Mr Saadat (then CEO

---

[182] RWS-1 Sola, para. 16.
[183] Partial Award on Interim Measures, at para. 60.
[184] Statement of Case, para. 24.3.1; Statement of Defence and Counterclaim, para. 89.
[185] Reply and Defence to Counterclaim, para. 92.1.
[186] See already Partial Award on Interim Measures, at para. 60.
[187] Claimant's Third Party Liability Insurance Policy, Exhibit R-33, p. 1 (various Nordic entities are listed as "insured").
[188] Claimant's Third Party Liability Insurance Policy, Exhibit R-33, p. 1 ("[j]urisdiction" is stated to be "WORLDWIDE EXCLUDING USA AND CANADA").

of the Claimant), Mr Saadat wrote, "Please ask your team to clarify the status of the following points which I am worried about: 1) ENEXD equipment insurance for Saudi Project…".[189] Mr Sola forwarded this email internally at the Respondent, copying Mr Saadat and either him or Mr Saadat noted, "We need to finalize the insurance issue now. Let's discuss on Sunday."[190] It is not established which Party failed to follow-up further and thus, the Tribunal cannot find any clear responsibly for either Party in failing to provide the insurance provided for in Clause 10.5 of the PSA.

407.    In light of the above, the Tribunal finds no breach of Clause 10.5 of the PSA by the Respondent.

e)    Alleged Delay by the Respondent

(1)    Claimant's Submissions

408.    The Claimant submits that it was an implied term of the PSA that the Respondent would "take all necessary steps to ensure that the Project was operation [sic] as soon after delivery of the Equipment as possible" (the "**Timeliness Requirement**").[191]  In support of the implication of such a term, the Claimant relies on *Liverpool City Council v Irwin* [1977] AC 239 and states that "it is clear that the parties intended the Equipment to be put to use on the Project as soon as possible – delay would be to the commercial detriment of both parties and would defeat the object of the PSA."[192]  The Claimant refers to the First P&L Account provided to the Claimant by the Respondent on 1 November 2017 as illustrating the Parties' intention to begin operations as soon as possible.[193]

409.    The Claimant also submits that such a term should be implied in order to give the PSA business efficacy.[194]  The Claimant argues that, in order for the PSA to work, the Project had to be serviced by the Parties and, in order for the Project to be serviced, the Equipment had to be delivered without delay.[195]  The Claimant submits that it was only the Respondent who

---

[189] Email chain commencing 15 May 2018, Exhibit C-14, p. 2.
[190] Email chain commencing 15 May 2018, Exhibit C-14, p. 1.  It is not clear from the email exchange (and ultimately not relevant) whether it was Mr Sola or Mr Saadat who added this sentence.
[191] Statement of Case, para. 26.2.
[192] Statement of Case, para. 26.3.
[193] Statement of Case, para. 26.3.
[194] Statement of Case, para. 26.4.
[195] Statement of Case, para. 26.5.

would have been capable of making delivery in this way. In support of this, the Claimant relies on Clauses 3, 10.2, 10.3 and 10.4.[196]

410.     According to the Claimant, the Respondent breached this implied term by failing to ensure that the Equipment was delivered to the Project site in a timely manner.[197] Mr Eskici also states that the delay was caused by the Respondent's "failure and delays to meet Saudi Aramco's specifications for the equipment to be used for the Saudi Project."[198]

(2)     Respondent's Submissions

411.     The Respondent submits that the test for implying a term into the PSA that the Respondent was required to "ensure that the Project was operation[al] as soon after delivery of the Equipment as possible" is not met.[199] Specifically, the Respondent contends:

a.     the PSA is effective without the need to imply a timeliness obligation on the part of the Respondent;[200] and

b.     implying a timeliness requirement would contradict the express terms of the PSA.[201] The Saudi Aramco Contract regulated the commencement of the work for Saudi Aramco, as well as the terms applicable to mobilization of the Equipment.[202]

412.     The Respondent further argues that even if such a term were to be implied, the Respondent has not breached the obligation contained therein.[203] The Respondent claims that it acted swiftly and diligently to bring the Equipment to a stage where it would be compliant with Saudi Aramco's requirements and ready for mobilization.[204] According to the Respondent, the start of the Project was dependent not on the Respondent, but on Saudi Aramco.[205]

---

[196] Statement of Case, para. 26.7.
[197] Statement of Case, para. 26.8.
[198] CWS-1 Eskici, para. 68.
[199] Statement of Defence and Counterclaim, para. 53.
[200] Statement of Defence and Counterclaim, para. 60.
[201] Statement of Defence and Counterclaim, para. 61.
[202] Statement of Defence and Counterclaim, para. 61.
[203] Statement of Defence and Counterclaim, para. 53.
[204] Statement of Defence and Counterclaim, para. 64.
[205] Statement of Rejoinder and Reply, para. 56.

413.    Mr Sola denies that he led Ms Zavarei to believe that the use of the Claimant's Equipment would lead to the immediate commencement of the Project.[206]  He further denies that he made any promise to the effect that the Project would start in January 2018, claiming that this would have been "a ridiculous promise to make" in circumstances where the Respondent received the Equipment from the Claimant in Dubai in November 2017 and "knew it would be impossible to upgrade, add new equipment in the Nordic yard in Dubai, ship it to Saudi Arabia, and then have Saudi Aramco accept it in 2-3 months."[207]

414.    With regard to the blow-out prevention system provided by the Claimant to the Respondent ("**BOP Stack**"), Mr Sola explains that "Nordic shipped the BOP Stack to KSA in the hope that the snubbing equipment would be accepted by Saudi Aramco and the operation would start prior to the BOP's API certification expiring."[208]  He adds that "[i]n any case, the Joint Operation did not have the funds to re-certify the BOP stack".[209]

(3)    Tribunal's Decision

415.    The test for the implication of terms under English law is strict.  Among other things, the term must be necessary to give business efficacy to a contract or so obvious that it goes without saying.[210]  According to *Marks and Spencer*, quoting the Privy Council in *BP Refinery (Westernport)*:

> "[F]or a term to be implied, the following conditions (which may overlap) must be satisfied: (1) it must be reasonable and equitable; (2) it must be necessary to give business efficacy to the contract, so that no term will be implied if the contract is effective without it; (3) it must be so obvious that 'it goes without saying'; (4) it must be capable of clear expression; (5) it must not contradict any express term of the contract."[211]

416.    In the case at hand, the Tribunal is not required to decide whether the Timeliness Requirement meets this test and thus was an implied term under the PSA, as the Claimant

---

[206] RWS-4 Sola, para. 7.
[207] RWS-4 Sola, para. 20.
[208] RWS-4 Sola, para. 17.
[209] RWS-4 Sola, para. 17.
[210] *Marks and Spencer PLC v BNP Paribas Securities Services Trust Company (Jersey) Ltd* [2015] UKSC 72, Exhibit CLA-13; *Nazir Ali v Petroleum Company of Trinidad and Tobago* [2017] UKPC 2, Exhibit CLA-9.
[211] *Marks and Spencer v BNP Paribas*, at 18 (quoting *BP Refinery (Westernport) Pty Ltd v President, Councillors and Ratepayers of the Shire of Hastings* (1977) 52 ALJR 20, 26), Exhibit CL-13.

contended. This is because, in any event, the Tribunal is unconvinced that, even if such term existed, the Claimant has shown that the Respondent breached it.

417. The Tribunal has not been presented with conclusive evidence that the Respondent delayed the commencement of the Project under the Saudi Aramco Contract. Mr Eskici's statement that there was delay caused by the Respondent's "failure and delays to meet Saudi Aramco's specifications for the equipment to be used for the Saudi Project"[212] is contradicted by Mr Sola's evidence who explains that the delay was the Claimant's fault, relying on the alleged unsuitability of the Equipment and the Claimant's alleged failure to provide the required funding.[213]

418. The Claimant also refers to a UK Meeting in mid-January 2018 where the Respondent allegedly "admitted there were delays to the commencement of the Saudi Project and no works had begun at the site".[214] The Respondent denies that such a meeting ever took place, relying on Mr Sola's UAE immigration reports.[215]

419. Moreover, the mere fact that the Project commenced only in January 2019, about one year after the Parties entered into the PSA, does not in and of itself show any delay that would be attributable to the Respondent. Rather, it is clear from the Saudi Aramco Contract that the commencement of the Project was dependent upon Saudi Aramco. Pursuant to the Aramco Contract, the commencement of work was dependent on the fact that "SAUDI ARAMCO shall notify CONTRACTOR in writing to mobilize the required Snubbing Equipment and Personnel forty five (45) days in advance of the expected start of snubbing operations on the first gas well."[216] The Saudi Armco Contract also provides that "CONTRACTOR shall perform specific Snubbing services only when specified in a Contract Release PO that will be issued, as required, throughout the Contract period …."[217]

420. The Claimant was well aware (or should have been aware) of those conditions in the Saudi Aramco Contract. It is undisputed that the Saudi Aramco Contact was appended to the

---

[212] CWS-1 Eskici, para. 68.
[213] RWS-3 Sola, para. 20; RWS-4 Sola, para. 30.
[214] CWS-1 Eskici, para. 26.
[215] RWS-4 Sola, para. 21; Mr. Sola's UAE Entry-Exit Report, Exhibit R-51.
[216] Saudi Aramco Contract, Exhibit R-14, Schedule B, Clause 3.1.
[217] Saudi Aramco Contract, Exhibit R-14, Schedule B, Clause 4.

PSA.[218]  In any event, it is equally clear that the Claimant was aware of the Saudi Aramco Contract before entering into the PSA.  On 26 July 2017, prior to the PSA's signature on 19 December 2017, Mr Sola sent the Saudi Aramco Contract to the Claimant in several emails.[219]

421.    Accordingly, the Claimant could not have ignored that the commencement of the Project is not guaranteed.  Therefore, the Claimant's assertation that the "the Project should have started in December 2017" is not tenable.[220]  There is no conclusive evidence on file that Saudi Aramco requested the commencement of the work under the Saudi Aramco Contract and the Respondent delayed the same.

422.    In light of the above, the Tribunal finds no delay by the Respondent in relation to the Project.

2.    Alleged Misrepresentation by the Respondent

a)    Claimant's Submissions

423.    The Claimant alleges that the Respondent is liable in misrepresentation.[221]

424.    The Claimant submits that the Respondent made an express representation as to the profitability of the Project (the "**Revenue Representation**").[222]  According to the Claimant, the Revenue Representation arose from the provision by the Respondent to the Claimant of the First P&L Account on 1 November 2017.  The First P&L Account stated that the Project revenue would be USD 49,981,450 and that operational costs would amount to USD 27,658,497 plus USD 3,056,546 in other expenses.  The Claimant contends that this amounted to a representation that the Parties would recover EBITDA of USD 22,591,580.[223]

425.    The Claimant asserts that the Respondent provided the Claimant with the profit and loss statements "and despite doing so has provided no explanation as to their purpose if they

---

[218] Request for Arbitration, para. 5.2.2 ("Saudi Aramco dated 16 April 2017 and enclosed with the PSA as appendix 7b (the Saudi Aramco Contract, see pages 44-46)."), para. 5.2.3 ("Gulf Energy were party to an agency contract with Nordic dated 15 November 2016, also for the purposes of servicing the Saudi Aramco Contract, and enclosed with the PSA as appendix 7a (the Gulf Energy Contract, see pages 19-43)."); Statement of Case, para. 5.1 (refers to the Saudi Aramco Contract "(part of which was enclosed with the PSA as appendix 7b)"), para. 5.3; Respondent's Opening Presentation, Slide 24.
[219] Emails from Nordic to ENEXD regarding the Saudi Aramco Contract, Exhibits R-34 to R-37.
[220] Claimant's Opening Presentation, Slide 42.
[221] Statement of Case, para. 27; Reply and Defence to Counterclaim, para. 98.4.
[222] Statement of Case, para. 27.4.
[223] Statement of Case, paras. 27.3-27.4.

- 93 -

were not intended to be actionable."[224]  The Claimant further argues that a representation as to the future may entail a separate implied representation about the present, i.e. "that the forecaster believes the forecast or that the forecaster has taken reasonable care in making it".  The Claimant invokes *FoodCo Uk LLP (t/a Muffin Break) and Others v Henry Boot Developments Limited* [2010] EWHC 358 (Ch) in support of this proposition.[225]

426.    The Claimant submits that it relied on this representation in entering into the PSA.[226]  According to the Claimant, "the First P&L [Account] was the only representation that Nordic had made to ENEXD in relation to the Project's finances" and so the Claimant "must have relied" on the representation when entering into the PSA and the Respondent "must have known" that the Claimant would and did rely on the representation.[227]

427.    Mr Eskici states that initial negotiations with Nordic (prior to the provision of the First P&L Account) did not give the Claimant "too much confidence in the project" and the Claimant "had reason to doubt the profitability of the project" for the Claimant.[228]  Mr Eskici also states that "[i]t's mine experience [sic] that P&L accounts normally set a budget and once the project commences, the actual figures are compared to the budgeted figures."[229]

428.    Mr Eskici further alleges that the Respondent made the First P&L Account appear very attractive to the Claimant in order to convince the Claimant to invest in the Saudi Project while negotiating at the same time with Saudi Aramco to amend their contract.[230]  He alleges that the Claimant agreed to invest USD 1.7 million to USD 2 million toward the Saudi Project "on the basis of the figures in the first P&L account".[231]  He firmly denies that the P&Ls were "simply forecasts".[232]  Ms Zavarei reiterates this, stating that the First P&L Account "was what Nordic used to convince us to invest in the Saudi Project.  Nordic guaranteed us that this was what the project would generate."[233]

---

[224] Reply and Defence to Counterclaim, para. 98.1.
[225] Reply and Defence to Counterclaim, para. 98, referring to *FoodCo Uk LLP (t/a Muffin Break) and Others v Henry Boot Developments Limited* [2010] EWHC 358 (Ch), at p. 63.
[226] Statement of Case, para. 27.6.
[227] Statement of Case, para. 27.6.
[228] CWS-1 Eskici, para. 15.
[229] CWS-1 Eskici, para. 49.
[230] CWS-1 Eskici, para. 18.
[231] CWS-1 Eskici, para. 19.
[232] CWS-3 Eskici, paras. 9-10.
[233] CWS-4 Zavarei, para. 5.

429.    Ms Zavarei points out that she "insisted to include the financial projections as part of the PSA in order to provide basis for accountability for Nordic and to provide the equipment to Nordic. These financial projects were attached as Appendix 15 to the PSA."[234] Ms Zavarei further states that the Claimant entered into the PSA "based on" the following matters: (i) "Nordic's acceptance of the equipment that was already in its possession"; (ii) "[h]aving a P&L account from Nordic"; (iii) "Mr. Sola's indication that the project will start generating money in 2018"; (iv) "[h]aving a firm commitment that ENEXD's contribution in the project will be limited to: i. the equipment listed in the agreement; and ii. a contribution of US $2 million".[235]

430.    The Claimant asserts that the representation was false. The Claimant refers to Section V of Mr Sola's first witness statement to demonstrate that "[A]ccording to Nordic", the Project has not yielded any profit.[236]

431.    In the Statement of Case, the Claimant stated that it did not have sufficient information to determine whether the representation was made in deceit or negligently.[237]

432.    However, Mr Eskici states that the Respondent must have known that the First P&L Account was inaccurate in representing that the Saudi Project would be in operation for a 24-hour period for 120 days of the year.[238] He relies on the fact that the Respondent was also negotiating with Saudi Aramco to amend their contract at the same time as it made the representation.

433.    The Claimant submits in the alternative that, if the Revenue Representation is not actionable, the Respondent by making the Revenue Representation represented that "it believed it or that it had taken reasonable care in making it".[239] The Claimant contends that this alternative representation was false and amounts to a negligent misrepresentation.[240]

434.    With regard to the Respondent's reliance on Clause 16.8 of the PSA, the Claimant submits that Clause 16.8 does not extinguish the existence of the Revenue Representation, nor does it exclude or limit liability for misrepresentation.[241]

---

[234] CWS-2 Zavarei, para. 11.
[235] CWS-2 Zavarei, para. 18.
[236] Statement of Case, para. 27.7.
[237] Statement of Case, para. 27.8.
[238] CWS-1 Eskici, para. 17.
[239] Reply and Defence to Counterclaim, para. 98.2.
[240] Reply and Defence to Counterclaim, paras. 98.3-98.4.
[241] Reply and Defence to Counterclaim, para. 103.5-8.

b)        Respondent's Submissions

435.    The Respondent denies the Claimant's claim in misrepresentation.[242]  Specifically:

a.        the Respondent rejects that the profit and loss forecasts are actionable representations.  Relying on *FoodCo Uk LLP (t/a Muffin Break) and Others v Henry Boot Developments Limited* [2010] EWHC 358 (Ch) and *Tudor Grange Holdings Ltd. and Others v Citibank N.A. and Another* [1990 T. No. 8533], the Respondent argues that the profit and loss forecasts were predictions as to the future rather than representations of present fact and are therefore not actionable.  The Respondent states that the Claimant has not alleged that the Respondent made any allegation as to a present state of affairs.[243]  The Respondent also denies that the profit and loss forecasts contained an implied representation regarding the state of affairs that was present at the time;[244]

b.        the Respondent refutes that the Claimant had to rely on the information it received from the Respondent as to the Project's potential to generate revenue.  The Respondent submits that the Claimant had sight of the Saudi Aramco Contract from as early as July 2017.  Therefore, the Claimant ought to have known from the start of the Project that there was no guarantee of a given amount of revenue under the Saudi Aramco Contract;[245] and

c.        the Respondent maintains that, even if the profit and loss forecasts constituted actionable representations, the Claimant would be precluded from relying on them by Clause 16.8 of the PSA, which it characterises as an entire agreement clause.[246]  The Respondent submits that, while Appendix 15 contains the "Agreed Projected Financial Statements", no such document was compiled and appended to the PSA by the Parties.  According to the Respondent, Clause 16.8 therefore operates to exclude any representations made by the Parties outside the ambit of the PSA.  The Respondent refers to *Al-Hasawi v Nottingham Forest Football Club Ltd* [2018] EWHC 2884 and *Axa Sun Life Services Plc v Campbell Martin Limited and others* [2011] EWCA Civ

---

[242] Statement of Defence and Counterclaim, paras. 91-109; Statement of Rejoinder and Reply on Counterclaim, paras. 77-86; Respondent's Opening Presentation, Slides 42-43; Transcript, {Day 1, 148:3-149:12}.
[243] Statement of Defence and Counterclaim, paras. 92-93.
[244] Statement of Rejoinder and Reply on Counterclaim, para. 83.
[245] Statement of Defence and Counterclaim, para. 95.
[246] Statement of Defence and Counterclaim, para. 100.

133 in support of its argument that Clause 16.8 precludes reliance on an actionable representation.

436.   The Respondent also submits that the Claimant fails to prove that any representation which was made was made in deceit or negligently. The Respondent states that "ENEXD fails to prove that it understood the P&L Forecasts in the sense which it argues that it bears."[247]

437.   Mr Aidasani states that "during our discussions with ENEXD, it was made clear that the P&Ls represented our estimates as to the revenue that could be potentially generated under the Aramco Contract."[248] He further explains that "[d]ue to the "call-off" nature of the Aramco Contract, there was no minimum amount of revenue that was guaranteed under the contract by Saudi Aramco and in fact, at no point did we commit to a baseline revenue with ENEXD."[249] He alleges that "Enexd's former CEO Mr. Saadat, its present CEO, Ms. Zavarei, and the former shareholder, Mr. Tabatabai, were all fully aware that the P&Ls were simply forecasts."[250] In support of this, he relies on an email from Mr Saadat dated 15 May 2018 (Exhibit C-14) in which Mr Saadat states that "[w]e need the project updated P&L. This information will help them to plan their financial activities for project due payments."[251]

438.   With regard to the accuracy of the P&L accounts, Mr Aidasani states that "[a] comparison of the forecasted revenues with the actual revenues generated under the Aramco Contract shows a negative difference of only USD 504,406, i.e., 4.9%, which is negligible for a project of this size."[252] Mr Aidasani further points out that "[a]lthough the agreed upon P&Ls were intended to be part of the PSA, the discussions continued well into 2018."[253] According to Mr Aidasani, the Parties' failure to "formally agree" on the P&Ls meant that they were not attached to the PSA.[254]

439.   In respect of the differences between distinct versions of the P&L Account, Mr Aidasani explains that "[w]hile the first P&L was based on the assumption that Enexd would only invest cash, and that its equipment would not be used, the latter version was revised to include the new plan of utilizing the unit for oil and water wells. The oil wells had the

---

[247] Statement of Defence and Counterclaim, para. 109.
[248] RWS-2 Aidasani, para. 12.
[249] RWS-2 Aidasani, para. 12.
[250] RWS-3 Sola, para. 14.
[251] RWS-3 Sola, para. 14; Email chain commencing 15 May 2018, Exhibit C-14.
[252] RWS-2 Aidasani, para. 13.
[253] RWS-2 Aidasani, para. 15.
[254] RWS-2 Aidasani, para. 15.

potential for generating more long term revenue and ENEXD was aware of this plan."[255]  He also explains the assumptions with regard to the length of operating days in the following way: "[o]perations began in January 2019, and were indeed initially based on a twelve hour period. However, by July 2019, operations had moved to a twenty four hour period.  And by the end of the year, there would have been 120 days on a 24 hour basis."[256]

440.    Mr Sola states that "[i]t was made clear to ENEXD that the P&Ls were estimates. Because this was a call-off contract, there was no minimum guaranteed level of revenue.  They were thus best estimates, made on the data available, and were certainly never intended to mislead.  Our estimates were also fairly accurate."[257]

441.    Finally, Mr Sola alleges that "Ms Zavarei was not personally involved in the negotiation of the PSA" and Mr Eskici was "involved only in the initial negotiations of the PSA during a limited period from October 2017 to December 2017."[258]

### c)    Tribunal's Decision

442.    The Claimant's claim in misrepresentation is founded on the submission that the First P&L Account (or the Respondent's provision of the same) constituted a representation by the Respondent to the Claimant to the effect that the Claimant could expect to make a profit under the Project which was aligned with the figures given in the First P&L Account.  The Claimant alleges that it relied on the representation to enter into the PSA which proved to be false.

443.    The Tribunal will address in turn whether the First P&L Account constitutes an actionable representation and whether such a representation (if any) could have induced the Claimant to enter into the PSA.

444.    First, in assessing whether there has been an actionable representation, the Tribunal is concerned with what a reasonable person in the position of the Claimant would have understood by the provision of the First P&L Account.  Whether or not the First P&L Account

---

[255] RWS-5 Aidasani, para. 9.
[256] RWS-5 Aidasani, para. 7.
[257] RWS-4 Sola, para. 38.
[258] RWS-4 Sola, paras. 5-6.

was appended to the PSA will be discussed below.[259]  It appears that the First P&L Account at a minimum was provided to the Claimant by the Respondent prior to the signing of the PSA.[260]

445.    According to *FoodCo Uk LLP (t/a Muffin Break) and Others v Henry Boot Developments Limited* [2010] EWHC 358 (Ch) and *Tudor Grange Holdings Ltd. and Others v Citibank N.A. and Another* [1990 T. No. 8533], profit and loss forecasts are *in principle* predictions as to the future rather than representations of present fact and (unless accompanied by an implicit representation of present fact) are therefore not actionable.[261]

446.    This is also how a reasonable person would have understood the provision of the First P&L Account and, indeed, how the Claimant understood it in the case at hand.  While in written testimony Ms Zavarei claimed that the First P&L Account would constitute a "guarantee[] … what the project would generate"[262] and Mr Eskici denied that it was to "simply forecast[]",[263] a different picture emerged at the Hearing.  Mr Eskici repeatedly confirmed that the P&L accounts are mere forecasts:

> "The gentleman in asking for the **P&L is not guarantee**.  And he doesn't know the pricing of it.  That is my answer to you."[264]

> "***Every P&L is forecast***. Everything P&L, everything is forecast."[265]

447.    In light of the above, the Tribunal finds that the First P&L Account contained predictions as to the future (i.e forecasting likely profits) which are not actionable.

448.    For the sake of completeness, *FoodCo Uk LLP (t/a Muffin Break) and Others v Henry Boot Developments Limited* [2010] EWHC 358 (Ch) also states at [207] that a forecast "***may*** carry with it an ***implicit representation about a present fact*** (e.g. that the forecaster believes the forecast or that he has taken reasonable care in making it)", though in those circumstances it will be "that implicit representation about a present fact rather than the forecast itself that constitutes the actionable representation."[266]  Here, the Tribunal is unconvinced that the First

---

[259] *See below* at paras. 450-452.
[260] *See, e.g.,* RWS-2 Aidasani, para. 12.
[261] *FoodCo Uk LLP (t/a Muffin Break) and Others v Henry Boot Developments Limited* [2010] EWHC 358 (Ch) at 207; *Tudor Grange Holdings Ltd. and Others v Citibank N.A. and Another* [1990 T. No. 8533] at 67H – 68A.
[262] CWS-3 Zavarei, para. 5.
[263] CWS-4 Eskici, paras. 9-10.
[264] Transcript, {Day 1, 325:22-24} (emphasis added).
[265] Transcript, {Day 1, 325:4-5} (emphasis added).
[266] *FoodCo Uk LLP (t/a Muffin Break) and Others v Henry Boot Developments Limited* [2010] EWHC 358 (Ch) at 207 (emphasis added).

P&L Account did contain, in addition to the future predictions as to the likely profits, also any implied representation about the present on which it would have relied.

449.    Second, and in any event, the Tribunal is unconvinced about the Claimant's allegation that it relied on the forecast prediction in the First P&L Account when entering into the PSA.

450.    This claim is, among other things, based on the assertation that the First P&L Account was appended to the PSA.  According to Ms Zavarei, she "insisted to include the financial projections as part of the PSA in order to provide basis for accountability for Nordic …," adding that "[t]hese financial projects were attached as Appendix 15 to the PSA."[267]  Similarly, Mr Eskici also noted that "the first P&L account was attached to the PSA as Appendix 15 which formed part of the agreement between Nordic and ENEXD."[268]

451.    However, the Respondent's witnesses contest that the First P&L Account (or any other P&L account) was appended to the PSA.[269]  Also, at the Hearing, when asked again about her recollection which of the appendices of the PSA were included in the PSA, Ms Zavarei stated that she could not remember:

> "ARBITRATOR SCHERER: At the moment of signing the contract, were the appendices attached to the document you signed? Or not?
> THE WITNESS: *I cannot remember*.
> ARBITRATOR SCHERER: Okay.
> THE WITNESS: *I really can't remember; I am so sorry*."[270]

452.    In light of the above, the Tribunal cannot establish that the First P&L Account was indeed appended to the PSA when the Parties entered into it.  The Tribunal can only speculate about the reasons for the Parties' failure to include it, but Mr Aidasani's explanation seems plausible, i.e. that the Parties failed to "formally agree" on the P&Ls which meant that they were not attached to the PSA.[271]  In these circumstances, the Claimant's assertion that it relied upon the forecast prediction in the First P&L Account when entering into the PSA becomes

---

[267] CWS-2 Zavarei, para. 11.
[268] CWS-3 Eskici, paras. 4-7.
[269] RWS-4 Sola, para. 7 ("the financial projections that Ms. Zavarei refers to were explicitly labeled as "Forceast" and were neither intended to be, nor ultimately used, as an appendix to the PSA"); RWS-2 Aidasani, para. 15 ("the parties failed to formally agree on the P&Ls and attach the same to the PSA.").
[270] Transcript, {Day 1, 299:7-15} (emphasis added).
[271] RWS-2 Aidasani, para. 15.

difficult to follow given that these predictions seem not agreed and thus not appended to the PSA.

453.    Finally, as discussed above, the Claimant was aware of the Saudi Aramco Contract when entering into the PSA.[272]  According to the Saudi Aramco Contract, the work thereunder was dependent on Saudi Aramco.  Not only could Saudi Aramco terminate the Saudi Aramco Contract any time (with compensation), it also had control over what work was to be done by issuing relevant "Contract Release Pos".[273]  The Saudi Aramco Contact specially notes that the work under it "is of a sporadic nature and continuity may not be maintained between Contract Release POs.  Consequently, CONTRACTOR Equipment and CONTRACTOR Personnel may become idle for such periods."[274]  It is thus clear from the Saudi Aramco Contract that there was no guarantee of a minimum amount of work (and thus profit).

454.    The Claimant therefore was aware (or should have been aware) of the nature of the Saudi Aramco Contact and, thus, could not have relied on any positive guarantees of future profit of the Project.

455.    In sum, for all the reasons above, the Tribunal dismisses the Claimant's claim in misrepresentation.

### 3.    Alleged Termination of the PSA by the Claimant

#### a)    Claimant's Submissions

456.    The Claimant seeks a declaration that its "termination of the PSA on 29 August 2019 was valid and effective.[275]  The Claimant argues that the Respondent not only breached the PSA, but its breaches were also "material" within the meaning of the PSA.  The Claimant contends that Clause 11.1(c) of the PSA means that a Party is in "material breach" when there is "non-performance of any of its obligations or [when it] violates any of terms and conditions under this Agreement".[276]  The Claimant alleges that the Parties agreed that "in effect, any breach constituted a material breach entitling the other party to terminate."[277]

---

[272] *See above* at paras. 389-391, 420.
[273] *See above* at para. 419.
[274] Saudi Aramco Contract, Exhibit R-14, Schedule A, Clause 26.2(b).
[275] Statement of Case, para. 36.
[276] Reply and Defence to Counterclaim, para. 151.2.
[277] Reply and Defence to Counterclaim, para. 151.4.

457.    The Claimant argues in parallel that, as a matter of construction, a "material" breach means "a breach that is not merely technical or trivial in nature."[278]  It connotes, according to the Claimant, the extent or seriousness of the defaulting party's non-performance, rather than what particular obligation it failed to perform.[279]

458.    The Claimant submits that, in any event, the Respondent's breaches were material, such that the Claimant properly terminated the PSA.[280]  It did so on 29 August 2019 by the Termination Notice,[281] having provided written notice of the Respondent's breaches 67 days prior.[282]

### b)    Respondent's Submissions

459.    The Respondent submits that the Claimant did not validly terminate the PSA on 29 August 2019 under Clause 11.1 of the PSA.[283]  The Respondent disputes that it committed any of the breaches alleged by the Claimant.  The Respondent also disputes that any of the alleged breaches were material, as it says is required by Clause 11.1(c) of the PSA.

460.    The Respondent alleges that the Claimant misconstrues the terms of Clause 11.1(c) of the PSA when it contends that under the PSA, "any breach" constitutes a "material breach." According to the Respondent, such interpretation is unfounded and cannot be given credence. If the Parties' intention was for "any breach" to constitute sufficient ground for termination, they would have said so.  The Respondent notes that, instead, Clause 11.1(c) specifically refers to "material breaches," and as such, the will of the Parties shall be respected.[284]

### c)    Tribunal's Decision

461.    On 29 August 2019, the Claimant sent the Termination Notice in which it stated, among other things:

> "… pursuant to Clause 11.1(c) of the PSA, [the Claimant] required [the Respondent] to remedy its material breaches of the PSA within 60 days.  [The Respondent] has however failed to do so.  We also afforded [the Respondent] 7 days from our Response Letter

---

[278] Reply and Defence to Counterclaim, para. 151.5.1
[279] Reply and Defence to Counterclaim, para. 151.5.1.
[280] Reply and Defence to Counterclaim, para. 151.5.2.
[281] Request for Arbitration, para. 5.7.4.
[282] Statement of Case, para. 18.8.
[283] Statement of Defence and Counterclaim, paras. 130-135; Statement of Rejoinder and Reply on Counterclaim, para. 103; Respondent's Post-Hearing Brief, paras. 33-34; Respondent's Opening Presentation, Slides 45, 55; Transcript, {Day 1, 114:13-23}.
[284] Statement of Defence and Counterclaim, para. 135.

(i.e. until 30 June 2019) to reply to the Response Letter, which [the Respondent] has failed to.

Given [the Respondent]'s failure to remedy its breaches of the PSA by 23 August 2019 (i.e. within 60 days from receiving the Response Letter), [the Claimant] hereby: (i) terminates the PSA with immediate effect, pursuant to Clause 11.1(d) of the PSA and (ii) demands that [the Respondent] return all of [the Claimant]'s equipment provided for the Saudi Project within 14 days of receipt of this Termination Notice, i.e. by 12 September 2019."[285]

462.    The Tribunal notes that the reference to Clause 11.1(d) of the PSA was visibly a typographical error, since Clause 11.1(d) of the PSA provides for termination "[b]y mutual consent". However, Clause 11.1(c) of the PSA provides that a Party may terminate the PSA "if the other party is in material breach in the form of non-performance of any of its obligations or violates any of terms and conditions under this Agreement and the breaching party has not rectified the breach within 60 days after receiving written notice by the non-breaching party."

463.    In determining whether the Claimant lawfully terminated the PSA under Clause 11.1(c) of the PSA on 29 August 2019, there are accordingly three questions: (i) did the Respondent breach the PSA prior to termination; (ii) if so, did such breach constitute a "material breach" within the meaning of Clause 11.1(c) of the PSA; and (iii) did the Respondent fail to rectify that breach within 60 days after receiving written notice of the breach from the Claimant.

464.    Regarding the first question, the Tribunal has established above that the Respondent breached (i) Clauses 7.1 and 9.1(B) of the PSA by failing to deposit payments under the Aramco Contract into the joint Dubai Account; (ii) Clauses 3, 9.1 and 9.5 of the PSA by failing to seek the Claimant's agreement in relation to Project expenses and/or pay them from the joint Dubai Account; (iii) Clauses 4.1 and 7.16 of the PSA by failing to share existing audit reports and any other reports in relation to the Project with the Respondent, at least as from May 2019; and (iv) Clause 7.4 of the PSA by failing to provide access to the Tally software and invoices contend therein as from May 2019.

465.    These breaches existed as of 29 August 2019 when the Claimant sent its Termination Notice to the Respondent.

466.    Regarding the second question, whether those breaches constitute a "material breach" within the meaning of Clause 11.1(c) of the PSA, the Tribunal needs first to determine the

---

[285] Letter from Hadef & Partners dated 29 August 2019, Exhibit C-23.

- 103 -

meaning of the same. English law governs the PSA.[286] As demonstrated in the discussion of English law authority in *Dalkia Utilities Services PLC v Celtech International Limited* [2006] EWHC 63, the notion of what constitutes a material breach is, in essence, a matter of construing the particular contract.[287]

467.    Here, Clause 11.1(c) of the PSA seems infelicitously drafted, but it appears that the notion of "material breach" is qualified by the words "in the form of non-performance of any of its obligations." Such a specific language seems to indicate that the Parties agreed that any "non-performance of any of its obligations" would have the "form" of a material breach. Accordingly, the mere fact that Respondent breached the above-mentioned provision of the PSA would be sufficient to constitute a "material breach" within the meaning of Clause 11.1(c) of the PSA.

468.    However, such a construction of Clause 11.1(c) of the PSA would make little commercial sense, since the most minor and inconsequential breach could give rise to a termination. Therefore, under this view, the Parties did not mean to qualify the notion of "material breach" by the words "in the form of non-performance of any of its obligations" but rather left is undefined in the PSA. Accordingly, the Claimant would still need to show that the Respondent's breaches constitute "material breaches" within the meaning that a reasonable party would have given to it.

469.    The Tribunal need not decide the above-mentioned question since, in any event, even under the second view, it is satisfied that a material breach occurred. Indeed, without any specific party definition, a material breach is one "which is more than trivial, but need not be repudiatory"[288] or "neither trivial nor minimal."[289]

470.    In the case at hand, the Respondent's breaches concerned the way it handled the payments arising from the Aramco Contract (Clauses 3, 7.1, 9.1 and 9.5 of the PSA) and its reporting obligations to the Claimant (Clauses 4.1, 7.4 and 7.16 of the PSA). Without the Saudi Aramco Contact payments being deposited in the Parties' joint account, and without being

---

[286] PSA, Exhibit C-3, Clause 15.
[287] *See Dalkia Utilities Services PLC v Celtech International Limited* [2006] EWHC 63, Exhibit CLA-18 at 93-100.
[288] *Mid Essex Hospital Services NHS Trust v Compass Group UK and Ireland Ltd (Trading As Medirest)* [2013] EWCA Civ 200 at 126.
[289] *Dalkia Utilities Services PLC v Celtech International Limited* [2006] EWHC 63 (Comm) at 102, Exhibit CLA-18.

provided with the necessary information about the Project, the Claimant had no oversight on how its Equipment was being used and whether it was making any money from it. As such, these beaches are more than trivial and go to the very purpose of why the Claimant entered into PSA, namely because of its "[d]esire to *provide [the Respondent] with its equipment* items necessary to fulfil the requirement described in the Saudi Aramco Contract document *in consideration for a share of the profits* from the contract between [the Respondent] and Gulf Energy."[290]

471. In light of the above, the Tribunal is thus satisfied that the Respondent's breaches constituted material breaches within the meaning of Clause 11.1(c) of the PSA.

472. The Tribunal now turns to the third and final question whether the Respondent failed to rectify those breaches within 60 days after receiving written notice of the breach from the Claimant, as required by Clause 11.1(c) of the PSA.

473. On 23 June 2019, in advance of the alleged termination of the PSA, the Claimant's external counsel wrote to the Respondent' external counsel. Among other things, it complained about the Respondent's "failure to transfer funds to the Joint Dubai Account"[291] and requested that it be given "immediately … access to all past, current and future financial and project information, as required by the PSA."[292] The letter also stated that the Claimant "has only ever been provided with very limited financial information in relation to the Saudi Project and that [the Claimant] has been effectively 'left in the dark' regarding: (i) the expenses which were or are being incurred on the Saudi Project by [the Respondent], (ii) the reason for the expenses and (iii) the reason for the delays on the Saudi Project."[293] The letter specifically requested that the Respondent "*immediately remedy the breaches* listed above and that [it] provide [the Claimant] with access to all financial and project information …."[294]

474. This notice was sent 60 days before the Termination Notice of 29 August 2019 and there is no evidence on file that the Respondent remedied any of its breaches within that timeframe.

---

[290] PSA, Exhibit C-3, Clause 2 (emphasis added).
[291] Letter from Hadef & Partners dated 23 June 2019, Exhibit C-22, III.
[292] Letter from Hadef & Partners dated 23 June 2019, Exhibit C-22, para. 58(a).
[293] Letter from Hadef & Partners dated 23 June 2019, Exhibit C-22, para. 3.1.
[294] Letter from Hadef & Partners dated 23 June 2019, Exhibit C-22, para. 36 (emphasis added).

475.    Therefore, in light of the above, the Tribunal finds that the Claimant's termination of the PSA on 29 August 2019 was valid and effective.

4.    <u>Alleged Misappropriation of the Equipment by the Respondent, and Claimant's Claim for Rental Value of the Equipment</u>

a)    Claimant's Submissions

476.    The Claimant has made several different requests for relief in respect of the Equipment:

a.    In its Statement of Case, the Claimant requested the Tribunal to:

i.    "declare that ENEXD has sole and unencumbered ownership of the Equipment and that Nordic has no equitable or legal claim to it."[295]

ii.    "declare that Nordic must deal with the Equipment as directed by ENEXD."[296]

iii.    "declare that to the extent Nordic has made any modifications to the Equipment, it must either: (1) return the Equipment to the condition it was in when first delivered to Nordic for the purposes of the Project; or (2) if ENEXD consents, leave the modifications in place and account to ENEXD for any decrease in value that the modifications may have caused."[297]

iv.    "order that Nordic pay ENEXD the sum due for the rental of the Koomey Unit, being USD 568,500 as at 10 January 2019, and that Nordic pay ENEXD USD 750 per day in respect of the Koomey Unit until it is returned to ENEXD."[298]

v.    "declare that ENEXD has a proprietary claim to the rental monies that have been withheld from it by Nordic in respect of the Koomey Unit."[299]

b.    In its Statement of Reply and Defence to Counterclaim, the Claimant sought in addition:

i.    Orders that the Respondent indemnify the Claimant "pursuant to clauses 10.3 and 10.4 [of the PSA]" in respect of:

"its loss of use of the Equipment from 9 November 2017 to date, representing ENEXD's loss of rental income for the relevant period, in a sum to be quantified; and"

---

[295] Statement of Case, para. 36.6.
[296] Statement of Case, para. 36.7.
[297] Statement of Case, para. 36.8.
[298] Statement of Case, para. 36.9.
[299] Statement of Case, para. 36.10.

"any loss of, physical damage to or diminution in value of the Equipment, in a sum to be ascertained."[300]

ii.        Alternatively, an order that the Respondent "pay ENEXD damages at law in respect of rental income from the Equipment from 9 November 2017 to date, in a sum to be quantified."[301]

iii.       In the further alternative:

"to declare that Nordic has been unjust enriched by its continued free-of-cost use of the Equipment; and

to order Nordic to pay ENEXD restitutionary damages against Nordic for its continued use of, and income from, the Equipment from 9 November 2017 to date, in a sum to be quantified."[302]

477.    At the Hearing, the Claimant noted that it would now seek return of the Equipment.[303]

478.    Similarly, in the Post-Hearing Brief, the Claimant requested the return of the Equipment, submitting that it was the "natural consequence" of the Claimant's request to "declare that Nordic must deal with the Equipment as directed by ENEXD".[304]

479.    The Equipment as the term is used by the Claimant is defined at paragraph 5.2.4 of its Request for Arbitration, which in turn cross-refers to Appendix 9 of the PSA. According to the Claimant, Exhibit C-11 corresponds to Appendix 9 of the PSA and to the Equipment Claimant seeks to be returned.[305]

480.    The Claimant further submits that the PSA contained an implied term to the effect that, upon termination of the PSA, the Respondent was required to return the Equipment to the Claimant.[306] The Claimant contends that such a term is necessary to give efficacy to the PSA because the PSA does not stipulate what happens to the Equipment upon termination. The Claimant further argues that such a term is obvious and does not contradict any other express term of the PSA.[307]

---

[300] Statement of Reply and Defence to Counterclaim, para. 161.1.
[301] Statement of Reply and Defence to Counterclaim, para. 161.2.
[302] Statement of Reply and Defence to Counterclaim, para. 161.3.
[303] Transcript, {Day 1, 87:4-87:17}, {Day 1, 92:3-6}.
[304] Claimant's Post-Hearing Brief, para. 7.2.
[305] Statement of Case, para. 6.1; Reply and Defence to Counterclaim, para. 107.3; Claimant's Post-Hearing Brief, para. 7.3. However, the Claimant notes at para. 7.3(b) of its Post-Hearing Brief that it does not seek return of the "Power Pack 3 HPU461A", "Catwalk" or "Slide" because they are "not related to the Claimant".
[306] Statement of Case, para. 9.6; Reply and Defence to Counterclaim, para. 78.1.
[307] Reply and Defence to Counterclaim, para. 78.1.

481.    In respect of the BOP Stack, the Claimant alleges that it asked the Respondent to return the BOP Stack in October 2018 after the Respondent informed the Claimant that it could not be used on the Project.[308]  According to the Claimant, the Respondent has failed to return the BOP Stack or provide an explanation for this failure.[309]  The Claimant alleges that the BOP Stack is part of the Equipment and should have been returned to the Claimant promptly upon termination of the PSA.[310]

482.    In the Reply and Defence to Counterclaim, the Claimant submitted that it was "entitled to the rent of the Equipment starting from 9 November 2017" because any delay in the Project was the Respondent's responsibility under the terms of the PSA.[311]  It sought an indemnity and/or damages in respect of this.[312]  The Claimant also sought the return of the Equipment and recovery of actual costs incurred in relation to the Project.[313]

483.    The Claimant also contends for the existence of an implied term that the Respondent would compensate the Claimant for the use of the Equipment if the Claimant gave permission for it to be used for purposes other than the Project.[314]  It argues that such a term is necessary to give efficacy to the PSA.  This is because the Equipment used for the Project is compensated by way of Clause 9 of the PSA, but there is no such mechanism for Equipment used for purposes other than the Project under Clause 7.5.[315]  The Claimant also argues that an officious bystander would have considered such a term to be obvious.[316]

484.    In the Wright Expert Report, Mr Wright provides a list of equipment that he identifies as missing based on a comparison between the list of equipment shipped to the Respondent and the pictures taken in the course of a physical inspection by the Claimant's representative on 6 August 2020.[317]  He estimates the cost of this missing equipment as USD 1,695,838.12.[318]

485.    Mr Wright also assesses the normal rental value of the Equipment and therefore the value of any loss of use of the Equipment.  He estimates the total annual rental value of the

---

[308] Statement of Case, para. 25.2.1.
[309] Statement of Case, para. 25.2.5.
[310] Statement of Case, para. 25.2.5(a).
[311] Statement of Reply and Defence to Counterclaim, para. 107.1.
[312] Statement of Reply and Defence to Counterclaim, para. 161.1.2-161.2.
[313] Statement of Reply and Defence to Counterclaim, para. 107.3-4.
[314] Statement of Reply and Defence to Counterclaim, para. 78.4.
[315] Statement of Reply and Defence to Counterclaim, para. 78.4.1.
[316] Statement of Reply and Defence to Counterclaim, para. 78.4.1.
[317] CER-1 Wright, Appendix B.2.
[318] CER-1 Wright, Appendix B.1.

Equipment as USD 2 million.[319]  This is based on an estimated useful life without any major renovation for 5 years, a rate of 15% for direct costs, a rate of 7% for administrative costs and a 20% mark up.[320]  He states that his market approach is based on communications between the Claimant and Halliburton, in which Halliburton was willing to lease the Equipment for USD 150,000 to 180,000 per month.[321]

b)    Respondent's Submissions

486.    The Respondent alleges that the certification for the BOP Stack expired after it was shipped to Saudi Arabia, resulting in its refusal by Saudi Aramco.  The Respondent states that it had to find a replacement equipment and cover the cost of the replacement equipment.[322]  The Respondent contends that it consequently incurred expenses that it should be compensated for. It claims to exercise a common law lien over the Equipment that it has in its custody based on its counterclaims in this arbitration.[323]  This includes the BOP Stack.[324]  The Respondent argues that this renders its possession of the BOP Stack lawful.[325]  The Respondent further submits that the Claimant has in any event failed to allege or prove any damages arising from the Respondent's possession of the BOP Stack.[326]

487.    In respect of the Claimant's assertion that a term should be implied into the PSA to the effect that the Respondent was required to compensate the Claimant if the Equipment was used for purposes other than the Project, the Respondent submits that the conditions for implying such a term into the PSA are not satisfied.  Further, the Claimant has, according to the Respondent, failed to establish that the Respondent used the Equipment for purposes other than the Project.

488.    In his Second Witness Statement, Mr Sola appears to cast doubt on the Claimant's ownership of the Equipment.  He explains: "I am aware that Enexd appears to have taken the position in this Arbitration that it owns the Equipment.  In this respect, it is important to clarify that Enexd provided certain pieces of equipment for the Project but the Equipment as it stands today and which has been used for the purposes of the Aramco Contract is very different from

---

[319] CER-1 Wright, p. 9.
[320] CER-1 Wright, p. 9.
[321] CER-1 Wright, p. 9.
[322] Statement of Defence and Counterclaim, para. 70.
[323] Statement of Defence and Counterclaim, para. 71.
[324] Statement of Defence and Counterclaim, para. 71.
[325] Statement of Defence and Counterclaim, para. 71.
[326] Statement of Defence and Counterclaim, para. 71.

what was originally provided by Enexd."[327]  He further notes that he has "been informed" that "parts of equipment allocated to the Project" are "subject to court proceedings whereby the ownership of such pieces of equipment is in dispute between Enexd and a third party."[328]

489.    In the Montesinos Expert Report, Mr Montesinos states that the Equipment identified by Mr Wright as missing is in fact either located in equipment yards or has been returned to the Claimant.[329]  Mr Montesinos states that "of the 178 assets only 63 list image reference files and thus the basis for assessment is unclear".[330]

490.    Mr Montesinos takes issue with a number of aspects of Mr Wright's assessment of the value of the Equipment.  Mr Montesinos states that "where the age of the equipment has exceeded the equipment's useful life, assigning any Real Value introduces a significant overvaluation error even under an accounting methodology."[331]  He also states that rating the equipment in its current state as worthless due to the modifications "fails to recognize several important points", including (i) the modifications address requirements of the Saudi Aramco Contract; (ii) the modifications allow the Equipment to meet specifications under any future contract tenders with the same requirements; (iii) the Equipment can be returned to its original operating state at a cost of USD 250,000.[332]

491.    Mr Montesinos also takes issue with Mr Wright's assessment of the rental value of the Equipment, noting *inter alia* that (i) a mark-up of 20% is high relative to prevailing market conditions and (ii) customers generally receive significant discounts from list price, limiting the utility of this measure.[333]  He also states that the utility of the Claimant's reference to a communication with Halliburton is limited given that (i) it lacks specificity as to the contractual terms to be used and (ii) it did not result in a rental agreement.[334]  Mr Montesinos proposes two methods of rental value assessment: a market-based approach and an accounting-based approach.  He argues that the market-based approach is likely to be superior as rental value is established by marketplace transactions.[335]  On this methodology, he estimates the annual rental

---

[327] RWS-3 Sola, para. 22.
[328] RWS-3 Sola, para. 25.
[329] RER-1 Montesinos, pp. 7-8.
[330] RER-1 Montesinos, p. 4.
[331] RER-1 Montesinos, p. 6.
[332] RER-1 Montesinos, p. 7.
[333] RER-1 Montesinos, p. 9.
[334] RER-1 Montesinos, p. 9.
[335] RER-1 Montesinos, p. 15.

value of the new Equipment as USD 132,313.[336] He states that the total annual rental value of all Equipment is USD 456,250, but that only new Equipment should be taken into account because the age of the remaining Equipment is such that it is unlikely to have any rental value.[337]

492.    In the Amended Montesinos Report, which was submitted after "A&R learned that the timeframe of relevance for the Tribunal's decision with respect to rental value of the equipment covered November 2017 to present,"[338] Mr Montesinos provided updated estimates of rental values under the two methodologies. Using a market-based approach, Mr Montesinos estimated the rental value of the Equipment from November 2017 to October 2020 to be USD 1,428,464.[339] Using an accounting-based approach, he estimated it to be USD 2,609,806 (adjusting for alleged "potential duplication of equipment in the listing included in ENEXD's Report").[340]

c)    Tribunal's Decision

i.    *Definition and Ownership of the Equipment*

493.    The Tribunal, until now, has used the term "Equipment" broadly in the sense of the equipment provided by the Claimant and used on the Project.[341] However, at this stage, it is necessary to look in more detail at the definition of the Equipment under the PSA in order to decide on who owns the Equipment.

494.    Clause 3 of the PSA is entitled "Equipment" and distinguishes different types of equipment "to be supplied to fulfil" the Saudi Aramco Contract.

495.    First, it refers to "equipment items based on [the Claimant]'s equipment portfolio" and lists them as follows:

"1. 2 each C-15 Power packs for snubbing unit

2. 6 each 460K Slip bowls

3. Snubbing unit Operators Panel

4. Rotary Husco with rotary control panel

---

[336] RER-1 Montesinos, p. 12.
[337] RER-1 Montesinos, p. 12.
[338] RER-1A Montesinos, p. 2.
[339] RER-1A Montesinos, p. 7.
[340] RER-1A Montesinos, p. 7.
[341] *See above* at para. 9.

5. Main winch and control panel for Gin Pole

6. Generators and distribution panels and lights

7. 13-5/8-inch 10K BOPs

8. 1502 Package 2" and 3"

9. Tongs / Inrock tongs

10. Fuel tank 15000L transfer pump Wilden

11. Mud system

12. 2 each mix hoppers

13. 2 each shakers

14. 3 each 100hp mud hogs

15. 5 each mud tanks 250BBL and trip tank

16. All Agitators

17. Other mud system related equipment such as diaphragm pumps/small centrifugal 30HP transfer pump etc.

18. Camp with Mess hall, laundry, 2 Rig Office containers and sewerage system

19. Any spare parts needed for modification of ENEXD existing equipment to be agreed upon in Appendix 9

20. All remaining spare parts used as required and paid for by this joint venture, costs to be split respective of their profit sharing percentage (Section 8)."

(the "**Equipment Type 1**")

496.    Concerning items 1-18, Clause 3 of the PSA states that "full equipment list in full detail is in Appendix 8" and "[s]pare parts needed for modification in Appendix 9".

497.    Second, Clause 3 of the PSA also refers to "equipment items based on [the Respondent]'s equipment portfolio" and lists them as follows:

"1. 24,000 FT/lb Rotary

2. Cat Walk with ramp

3. Certified Structure for Snubbing unit

4. 50 ft. length & 20-ton capacity Gin Pole

5. Additional 3 Mud tanks with a capacity of 1,200 bbl."

(the "**Equipment Type 2**")

498.    A "full equipment list in full detail" is said to be found in Appendix 10.

499.    Third, Clause 3 of the PSA lists "[e]quipment to be manufactured by [the Respondent] and purchased by [the Claimant]", i.e.: "1. 3 each Substructure, as per Nordic design and

- 112 -

manufactured by Nordic; 2. Rig Assist Unit Manufactured by Nordic" (the "**Equipment Type 3**"), with further details in Appendix 11.

500.    Fourth, Clauses 3 of the PSA refers to "[e]quipment form other manufacturer to be purchased by [the Claimant]" such as:

> "1.    GD Mud pumps, new purchase, manufactured by MSI (manufacturer recommended by Nordic)
>
> 2.    Subbing Jacking System, manufactured by Depro (manufacturer recommended by Nordic)
>
> 3.    Riser Spools and crossovers for BOP relevant to the job
>
> 4.    DAS (Data Acquisition System) (manufacturer is Rig Smart, Canada)
>
> 5.    Degasser flare off line
>
> 6.    Gin Pole Winch's
>
> 7.    Compressor to suit volume requirement to run the Rig"
>
> (the "**Equipment Type 4**")

501.    Further details thereof should be found in Appendix 12 of the PSA.

502.    Fifth, Clause 3 of the PSA refers to "[e]quipment from other manufacturers to be purchased by [the Respondent] (with the approval of [the Claimant]) through the joint account Operation under this agreement", namely:

> "1. Additional required Riser Spools and crossovers for BOP relevant to the job
>
> 2. BOP Closing Unit with 9 Station"
>
> (the "**Equipment Type 5**")

503.    Further details for this type of equipment should be found in Appendix 13.

504.    The version of the PSA on file in this arbitration does not contain any of the Appendices 8-13.

505.    Moreover, Clause 3 *in fine* of the PSA also provides that "[t]hroughout the term of this contract, if either party decides additional equipment is required, once written permission is granted from the other party, this additional equipment will be funded from joint operation cost of operations".

506.    Finally, Clause 7.3 of the PSA provides:

"ENEXD shall have sole ownership to all equipment as defined in Article 3.1 provided they are supplied by them or purchased by them."

507.    The reference in Clause 7.3 of the PSA to "Article 3.1" seems to be a typographical error, since there is no Clause 3.1 in the PSA, but only Clause 3 (or 3.0), as detailed above. Neither of the Parties has made any submission on this point. In the absence of any Clause 3.1, the Tribunal is satisfied that the reference in Clause 7.3 of the PSA was meant to be to Clause 3.

508.    It results from Clause 7.3 of the PSA that for those types of equipment listed in Clause 3 as "supplied" or "purchased" by the Claimant, the Claimant shall "have sole ownership". No similar provision concerning the ownership of other types of equipment is found in the PSA.

509.    In applying Clauses 3 and 7.3 of the PSA, the Tribunal is thus satisfied that the Parties agreed in the PSA that the Claimant is (and would remain) the owner of the Equipment Type 1, the Equipment Type 3, and the Equipment Type 4 (together the "**ENEXD Equipment**"), being the equipment that the Claimant was supposed to supply or purchase pursuant to Clause 3 of the PSA.

510.    The question remains whether the Tribunal can determine with more detail the equipment items that fall in the category of the ENEXD Equipment as defined above. The version of the PSA submitted to the Tribunal does not contain any appendices, and in particular not Appendices 8-13 referred to in Clause 3 of the PSA.[342] According to the Claimant, the list of pieces of equipment in Exhibit C-11 corresponds to Appendix 9 and to the items it delivered to the Respondent and seeks to be returned.[343] The Respondent contests that Exhibit C-11 correspondents to Appendix 9 of the PSA:

"First, Appendix 9 to the PSA refers to the 'spare parts needed for modification' of the equipment. … Second, and more importantly, C-11 simply contains a list titled 'ENEXD equipment sent to KSA,' which is a document unilaterally prepared by ENEXD and was never formally attached to the PSA as an appendix."[344]

---

[342] PSA, Exhibit C-3, Clause 3.
[343] Statement of Case, para. 6.1; Statement of Reply and Defence to Counterclaim, para. 107.3; Claimant's Post-Hearing Brief, para. 7.3.
[344] Statement of Defence and Counterclaim, fn.20.

511.    The Tribunal notes that the Respondent is correct that Appendix 9 of the PSA should list "[s]pare parts needed for modification" and not to the full list of items to be delivered by the Claimant.[345]

512.    Furthermore, the Tribunal also notes a discrepancy between the list of items found in Exhibit C-11 and Appendix B.1 to the Wright Expert Report.  Mr Wright states in his report that "the list of equipment in Appendix B.1 represents the accurate list of equipment agreed upon between ENEXD and Nordic and accepted, the list included in Clause 3 of the PSA presented differently. I undertand [sic] that the final list in Appendix B.1 was confirmed and agreed upon between ENEXD and Nordic."[346]  The Respondent, however, questions that Exhibit C-11 corresponds to an agreed list.   Indeed, it is not apparent from Exhibit C-11 or Appendix B.1 to the Wright Expert Report that these lists were agreed.  Moreover, Mr Wright, as an independent expert, cannot (and did not) provide evidence as to what the Parties agreed to at the time.[347]

513.    In light of the above, the Tribunal is not in a position to confirm with more detail which items fall in the category of the ENEXD Equipment, other than what transpires from Clause 3 of the PSA, as defined above.  The Tribunal is comfortable that that the lists included in Clause 3 of the PSA are accurate.  At the moment when the Parties entered into the PSA (i.e. on 17 or 19 December 2017, as discussed above),[348] the Claimant had already shipped the items and the Respondent had already received them (i.e. on 9-11 November 2017).[349]

514.    Finally, for the sake of completeness, the Tribunal notes that, as set out in the Claimant's Request, the Equipment defined therein included the Koomey Unit.[350]  As stated above, the Tribunal found in the Partial Award on Jurisdiction that it has no jurisdiction to determine the dispute insofar as it concerned the Koomey Unit.[351]  Accordingly, the ENEXD Equipment as defined above does not contain the Koomey Unit, since the Tribunal has no jurisdiction to make any determination in this respect.

---

[345] PSA, Exhibit C-3, Clause 3.
[346] CER-1, p. 8. See also Transcript {Day 2, 563:7 – 564:3}.
[347] Transcript {Day 2, 566:18 – 568:1}.
[348] *See above* at para. 267.
[349] CWS-1 Eskici, para. 9; Claimant's Post-Hearing Brief, para. 7.4; Delivery Note, Exhibit R-6.
[350] Request for Arbitration, para. 5.8.
[351] *See above*, at para. 60.

515.   The Tribunal now turns to the question whether the Respondent has any proprietary interest in the ENEXD Equipment.  The Respondent presents several arguments to the effect.

516.   First, the Respondent appears to argue that it made modifications to the ENEXD Equipment and thus that it would no longer be the Claimant's property.[352]  This is also framed in terms of the Respondent having a "proprietary interest to the value that has been added to the Equipment."[353]  The Tribunal holds that the Respondent has not identified any clear legal basis on which its modifications of the ENEXD Equipment, if any, would affect the Claimant's title thereto.  Indeed, even if the Respondent had made modifications to the ENEXD Equipment and the Claimant has failed to satisfy an obligation to reimburse the Respondent in respect of the same (as alleged by the Respondent[354]) – questions on which the Tribunal expresses no view at this stage – there is no pleaded basis for finding that the Claimant has somehow acquired legal or equitable title to the ENEXD Equipment.

517.   Second, the Respondent also submits that it is entitled to assert a common law lien over the ENEXD Equipment under English law until such time as the monies allegedly due by the Claimant to the Respondent are paid in full.[355]  The Respondent claims that it was left with no option but to exercise a lien as a means of enforcing its rights arising out of the Claimant's breaches of the PSA (including expenses arising from improvements and upgrades to the ENEXD Equipment for which the Claimant did not pay its share under the PSA).[356]  The Respondent refers to *Tappenden (trading as English & American Autos) v Artus and Another* (1963) 3 All ER 213 in support of its claim to exercise a lien.[357]  It cites the following passage:

> "Since a common law lien is a right to continue an existing actual possession of goods (ie, to refuse to put an end to a bailment), it can only be exercised by an artificer if his possession was lawful at the time at which the lien first attached. To entitle him to exercise a right of possession under his common law lien adverse to the owner of the goods, he must show that his possession under the original delivery of the goods to him was lawful— Bowmaker Ltd v Wycombe Motors, Ltd—and continued to be lawful until some work was done by him on the goods."[358]

---

[352] RWS-3 Sola, at para. 25.
[353] Respondent's Opening Presentation, Slide 57.
[354] *See, e.g.,* Respondent's Opening Presentation, Slide 21.
[355] Statement of Defence and Counterclaim, paras. 71, 138-141; Statement of Rejoinder and Reply on Counterclaim, paras. 105-110.
[356] Statement of Defence and Counterclaim, para. 137.
[357] Statement of Defence and Counterclaim, para. 139.
[358] *Tappenden (trading as English & American Autos) v Artus and Another* (1963) 3 All ER 21 at 216E-F.

518.    The Respondent submits that these conditions are satisfied as (i) it has actual possession of the ENEXD Equipment and (ii) its possession of the ENEXD Equipment was lawful at the time that the lien attached to the ENEXD Equipment.[359]  The Respondent further submits that "[t]o the extent that the PSA provided, among others, for [the Respondent] to carry out modifications and upgrades on the equipment and that monies owing with respect to such modifications and upgrades are outstanding, it satisfies the requirement for common law lien to attach".[360]

519.    To the contrary, the Claimant states that no lien could have attached to the ENEXD Equipment in circumstances where the PSA did not give the Respondent a right to receive payment for upgrading the ENEXD Equipment.[361]  The Claimant further submits that, even if a possessory lien did arise in favour of the Respondent, its scope would be strictly limited to the value of the work actually performed by the Respondent in upgrading the ENEXD Equipment.[362]  This value would have to be determined with reference to either (i) the difference, if any, between the market value of the ENEXD Equipment as delivered to the Respondent and its current market value; or (ii) in the absence of agreed labour rates for the Respondent's employees or third-party contractors who carried out the work, a valuation of that work on a *quantum meruit* basis.[363]  The Claimant asserts that the Respondent has provided no evidence of the value of the work that it performed.[364]  The Claimant also submits that a lien would attach specifically to the items of ENEXD Equipment that the Respondent claims to have upgraded; it would not act as a global security for all of the Respondent's monetary counterclaims that are unrelated to the Equipment.[365]

520.    Having considered the Parties' submissions, the Tribunal decides as follows.  A common law lien only arises in a limited set of circumstances under English law.[366]  A common law lien entitles a person who has done work for another to detain goods in his or her possession belonging to that other until the charges for the work have been paid.[367]  Except for a limited

---

[359] Statement of Defence and Counterclaim, para. 140.
[360] Statement of Rejoinder and Reply on Counterclaim, para. 108.
[361] Statement of Reply and Defence to Counterclaim, para. 153.1.5.
[362] Statement of Reply and Defence to Counterclaim, para. 153.1.6.
[363] Statement of Reply and Defence to Counterclaim, para. 153.1.6.1-2.
[364] Statement of Reply and Defence to Counterclaim, para. 153.1.7.
[365] Statement of Reply and Defence to Counterclaim, para. 153.1.8.
[366] *See, e.g., Tappenden (trading as English & American Autos) v Artus and Another* (1963) 3 All ER 21 at 216E-H.
[367] *See, e.g., Tappenden (trading as English & American Autos) v Artus and Another* (1963) 3 All ER 21 at 215I-216C.

number of general liens (which do not appear to be alleged here),[368] a lien is only a particular lien in that it entitles the lienee to hold the debtor's goods pending payment of charges incurred in relation to the goods detained.[369]

521.    It follows from the above that a lien could only attach to the ENEXD Equipment in circumstances where the Respondent had a right to receive payment from the Claimant for upgrading the ENEXD Equipment, and where that payment was not made. These issues will be discussed further below.[370]

522.    Even assuming for the sake of the argument at this stage that the Respondent had made out a claim regarding modifications it had done to the ENEXD Equipment, it could not claim a lien to all parts of the ENEXD Equipment, but only to those on which the modifications had been made.  The Respondent has not provided any such detail.  In these circumstances, the Tribunal cannot find a common law lien in favour of the Respondent over the entire ENEXD Equipment.

523.    In light of the above, the Tribunal decides that the Claimant remains the owner of the ENEXD Equipment.  It therefore grants the Claimant' claim for a declaration it has sole and unencumbered ownership of the ENEXD Equipment (as defined above) and that the Respondent has no equitable or legal claim to it.

*ii.    Return of the Equipment*

524.    As detailed above, the Claimant's request for relief also includes declarations that:

a.    "[the Respondent] must deal with the Equipment as directed by [the Claimant]";[371]

b.    "to the extent [the Respondent] has made any modifications to the Equipment, it must either: (1) return the Equipment to the condition it was in when first delivered to [the Respondent] for the purposes of the Project; or (2) if [the Claimant] consents, leave the modifications in place and account to [the Claimant] for any decrease in value that the modifications may have caused."[372]

---

[368] The Respondent does not appear to challenge the statement at paragraph 32.3 of the Statement of Case that only a particular lien can arise here.
[369] *See, e.g., Tappenden (trading as English & American Autos) v Artus and Another* (1963) 3 All ER 21 at 216D-E.
[370] *See below* at Section V.E.1.
[371] Statement of Case, para. 36.7.
[372] Statement of Case, para. 36.8.

525.    With regard to the first declaration, as a preliminary point, the Tribunal notes that the Claimant's claim to order the Respondent to deal with the ENEXD Equipment as directed by the Claimant, necessarily includes the possible return of the ENEXD Equipment.  The Tribunal notes that the Claimant requested the return of the ENEXD Equipment when it terminated the PSA.  In its Termination Notice, the Claimant wrote:

> "Given [the Respondent]'s failure to remedy its breaches of the PSA by 23 August 2019 …, [the Claimant] hereby: (i) terminates the PSA with immediate effect, pursuant to Clause 11.1(d) of the PSA and (ii) *demands that [the Respondent] return all of [the Claimant]'s equipment provided for the Saudi Project within 14 days of receipt of this Termination Notice*, i.e. by 12 September 2019."[373]

526.    The Tribunal therefore does not find that the Claimant belatedly changed its request for relief at the Hearing or otherwise.

527.    Given that the Tribunal has already found that the Claimant (i) remains the owner of the ENEXD Equipment;[374] and (ii) validly terminated the PSA on 29 August 2019,[375] the Respondent has no legal right – contractual or otherwise – that would allow it to keep the ENEXD Equipment.

528.    Moreover, there can be no doubt that a term should be implied into the PSA to the effect that the Respondent is obligated to return the ENEXD Equipment supplied by the Claimant within a reasonable time of termination of the PSA.  Such a term is both necessary to give business efficacy to the PSA and so obvious that it goes without saying.  It also meets the other requirements set out above for any implication of terms under English law.[376]  By retaining the ENEXD Equipment unlawfully, the Respondent is in breach of that implied term.

529.    In sum, for the reasons set out above, the Tribunal grants the Claimant's request and orders the Respondent to deal with the ENEXD Equipment as directed by the Claimant, including any possible return of the ENEXD Equipment.

530.    Second, the Tribunal now turns to the Claimant's further request for a declaration that the Respondent must – to the extent that it has made any modifications to the ENEXD Equipment – either return the ENEXD Equipment to the condition it was in when it was first

---

[373] Letter from Hadef & Partners dated 29 August 2019, Exhibit C-23 (emphasis added).
[374] *See above* at para. 523.
[375] *See above* at para. 475.
[376] *See above* at para. 415.

delivered to the Claimant, or if the Claimant consents, leave the modifications in place and account to the Claimant for any decrease in value that the modifications.

531.    The question of whether the Claimant is entitled to the return of the in the form it was originally provided (or payment for any decrease in value as a result of modifications made thereto) turns on the terms of the PSA.  Clause 7.1 of the PSA requires that the Claimant provide the Respondent with "the support necessary for the conduct of business activities under this agreement in the Territory including mutually [sic] financial support at the outset of this agreement for purchasing and *upgrading equipment* (as described in Section 3)".[377]

532.    It clearly results from this provision – and it is accepted by the Claimant[378] – that the Parties envisaged that the Respondent would upgrade, i.e. modify, the equipment listed in Clause 3 of the PSA, including the ENEXD Equipment.  It is equally clear from the contemporaneous evidence that the Claimant was aware that the Respondent would proceed with the envisaged upgrades or modifications.  In an email exchange with Mr Sola, Ms Zavarei states:

> "Thank you Mr Sonny, I appreciate what you have done and *we know all the equipment has been modified to be in the best condition* as I have heard and seen photos of."[379]

533.    In circumstances where the PSA contemplated (and the Claimant was aware) that the ENEXD Equipment be "upgraded" or modified by the Respondent and nothing in the PSA suggests that the Claimant should be entitled to payment in respect of the same, there is no basis on which to conclude that the Claimant should be entitled to the return of the ENEXD Equipment in the form it was originally delivered or for payment in respect of modifications that have been made in order to upgrade the ENEXD Equipment to carry out business activities under the PSA.

534.    In sum, for the reasons set out above, the Tribunal dismisses the Claimant's request for relief in this respect.

        *iii.    Indemnification/Damages  in  Relation  to  the Equipment*

---

[377] PSA, Exhibit C-3, Clause 7.1 (emphasis added).
[378] *See, e.g.,* Statement of Case, para. 32.4.4.
[379] Email correspondence between Delaram Zavarei and Sonny Sola, Exhibit C-25, p.3.

535.    This section addresses the Claimant's further requests for relief for indemnification (e.g. rental value) or damages or other amounts in relation to the ENEXD Equipment.

536.    First, concerning those requests that relate to the Koomey Unit,[380] the Tribunal has already decided that it has no jurisdiction to deal with them.

537.    Second, the Tribunal now turns to the Claimant's request to order the Respondent to indemnify the Claimant "pursuant to clauses 10.3 and 10.4 [of the PSA] in respect of …its loss of use of the Equipment from 9 November 2017 to date, representing ENEXD's loss of rental income for the relevant period, in a sum to be quantified; and any loss of, physical damage to or diminution in value of the Equipment, in a sum to be ascertained."[381]

538.    Clause 10.3 of the PSA states:

> "As [the Respondent] [is] in charge of operations, [it] shall indemnify and **keep [the Claimant] harmless from** any loss, damage, injury or **claim from any third party** in connection with operation, use or sublease of equipment including but not limited to loss of or damage to hole or equipment."

539.    Clause 10.3 of the PSA is a hold harmless clause relating to claims from third parties and thus is inapposite for the Claimant's claims against the Respondent for its alleged loss of the ENEXD Equipment.

540.    Clause 10.4 of the PSA states:

> "As [the Respondent] [is] in charge of operations, [it] **shall be responsible for and shall defend, indemnify and hold [the Claimant] harmless from and against its** own special, indirect, punitive or consequential **damages** including, without limitations, loss of profit or business interruptions or loss of use of assets except where the same is directly or indirectly attributable to gross misconduct."

541.    Clause 10.4 of the PSA is a hold harmless clause providing that the Respondent might not claim from the Claimant any damages it (i.e. the Respondent) suffered arising out of the operations under the PSA.   It is thus inapposite for the Claimant's claims against the Respondent for its (i.e. the Claimant's) alleged loss of the ENEXD Equipment.

---

[380] Statement of Case, paras. 36.9 and 36.10.
[381] Statement of Reply and Defence to Counterclaim, para. 161.1.

542.     Third, turning now to the Claimant's alternative request to order that the Respondent "pay ENEXD damages at law in respect of rental income from the Equipment from 9 November 2017 to date, in a sum to be quantified."[382]

543.     As a preliminary point, the Claimant itself only alleges that the PSA was terminated on 29 August 2019 and it requested the return of the ENEXD Equipment by 12 September 2019.[383] In circumstances where the purpose of the PSA was to provide the Equipment for use on the Saudi Aramco Contract, it is inconceivable that the Claimant has any claim for rental income prior to that date.  To the extent that the Claimant can be said to have suffered a loss of rental income up to 29 August 2019 or 12 September 2019, that loss was caused by its own decision to enter into the PSA and cannot be recoverable.

544.     Moreover, to the extent that the Claimant's claim is based on its assertation that it was entitled to the rent of the Equipment starting from 9 November 2017 because of the Respondent's alleged delay,[384] the Tribunal has already found no delay by the Respondent in relation to the Project.[385]

545.     Accordingly, the question which arises is whether the Claimant has a claim in respect of a possible rental income after 29 August 2019 or 12 September 2019 following its termination of the PSA.  The answer to that turns on (i) whether the Claimant was entitled to the return of the ENEXD Equipment at that time and (ii) whether the Claimant would have rented out the ENEXD Equipment during the subsequent period but for the Respondent's alleged unlawful refusal to return the ENEXD Equipment.

546.     As detailed above, the Tribunal has found that the Claimant remained the owner of the ENEXD Equipment under the PSA and validly terminated the PSA on 29 August 2019, and that therefore the Respondent had no legal right – contractual or otherwise – that would allow it to keep the ENEXD Equipment.[386]  Therefore, the Tribunal has also found that the ENEXD Equipment must be returned to its owner.[387]  The Tribunal further noted that the Claimant had requested for the ENEXD Equipment to be returned as of 12 September 2019.[388]  As from that

---

[382] Statement of Reply and Defence to Counterclaim, para. 161.2.
[383] *See above* at paras 274, 525.
[384] Statement of Reply and Defence to Counterclaim, para. 107.1.
[385] *See above* at para. 422.
[386] *See above* at para. 527.
[387] *See above* at para. 529.
[388] *See above* at para. 525.

date, the Respondent's refusal to return the ENEXD Equipment and its continued use was thus unlawful and the Claimant may seek compensation in form of the rent it could have otherwise obtained from the ENEXD Equipment.

547.    Both Parties have produced expert evidence in relation to the rental value of the Equipment, as detailed above.[389]  Having carefully considered both Parties' evidence, the Tribunal decides to adopt, for the following reasons, the Respondent's expert analysis, as presented in his Amended Expert Report.

548.    First, Mr Wright's calculation of the rental value is based on the equipment list in Appendix B.1 to his expert report.  As detailed above, the Tribunal notes that this is different from the list presented by the Claimant itself.[390]  Mr Wright based its assumption on his understanding that "the final list in Appendix B.1 was confirmed and agreed upon between ENEXD and Nordic"[391] – an assumption that he did not verify, and one that the Tribunal has not been able to confirm.[392]

549.    Second, the Claimant argues that the utilization rate of the Equipment should be 100% based on Clause 10.4 of the PSA.[393]  The Tribunal has already established above that Clause 10.4 of the PSA is inapposite to the question at hand.[394]  In any event, the relevant utilization rate would not be the one provided for in the PSA, but that of any alternative utilization, had the Respondent returned the ENEXD Equipment on 12 September 2019, as requested.

550.    Third, the Claimant also contends that that there should be no depreciation due to the diminishing condition of the Equipment because the Parties agreed in Clause 3 of the PSA "that the above equipment is delivered to [the Respondent] without warranty as seen and inspected by [the Respondent]."[395]  However, the contractual provision that the ENEXD Equipment was accepted by the Respondent under the PSA in its current conditions does not mean that in calculating any rental value for the ENEXD Equipment by a third party, the Tribunal should not take into account the diminishing condition and value thereof.

---

[389] *See above* at paras. 484-485, 489-492.
[390] *See above* at para. 512.
[391] CER-1 Wright, p. 8.
[392] Transcript {Day 2, 563:7 – 564:3}.
[393] Claimant's Post-Hearing Brief, paras. 8.11-8.15.
[394] *See above* at para. 541.
[395] Claimant's Post-Hearing Brief, paras. 8.16-8.20.

551.    Accordingly, the Tribunal decides to adopt Mr Montesinos' calculation of the rental value using a market approach. For November 2018 to October 2019, the annual rental value is 315,360 USD[396] and for November 2019 to October 2020, it is USD 146,000.[397] For the relevant timeframe (12 September 2019 to October 2020), the rental value is thus USD 188,336 (i.e. (USD 315,360 / 356 x 49) for 12 September to 30 October 2019 + USD 146,000 for November 2019 to October 2020).

552.    In sum, for the reasons detailed above, the Tribunal orders the Respondent to pay 188,336 USD to the Claimant.

553.    For the avoidance of doubt, the Tribunal considers that this order renders it unnecessary to deal with the Claimant's alternative request for relief, which asks the Tribunal to "to declare that Nordic has been unjustly enriched by its continued free-of-cost use of the Equipment; and to order Nordic to pay ENEXD restitutionary damages against Nordic for its continued use of, and income from, the Equipment from 9 November 2017 to date, in a sum to be quantified."[398] The Tribunal has already found that the Claimant may seek compensation in the form of the rent it could have otherwise obtained from the ENEXD Equipment.

554.    Moreover, and for the sake of completeness, the Tribunal deals here with the Claimant's claim for payment in respect of its alleged cash contributions into the Project.

555.    The Claimant seeks payment of USD 313,817 in respect of "Claimant's cash contributions into the Project, which shall be paid back to the Claimant in restitution for the Claimant to be placed, therefore, far as money can do it, in the same position as he would have been if the PSA had been performed in accordance with its terms."[399] The specific payments in respect of which the Claimant seeks this relief are listed at paragraph 7.6 of the Claimant's Post-Hearing Brief, and include payments to Danzaz, the Respondent (in the sum of USD 49,760), Coordinadora, and for "Air ticket."[400]

556.    The Tribunal finds that the Respondent has not made out its claim in this regard. Restitution, as a remedy for unjust enrichment, will only be available if (inter alia) the

---

[396] RER-1 A Montesinos, Figure 2.
[397] RER-1 A Montesinos, Figure 3.
[398] Statement of Reply and Defence to Counterclaim, para. 161.3.
[399] Claimant's Post-Hearing Brief, para. 7.6. See also Statement of Reply and Defence to Counterclaim, para. 107.4.
[400] Claimant's Post-Hearing Brief, para. 7.6.

Respondent has been enriched at the expense of the Claimant.[401]  The Claimant accepts this in its pleadings.[402]  Despite this, the Claimant has failed to explain how payments made to Danzaz, Coordinadora, and "Air ticket" have enriched the Respondent.  Moreover, aside from a third-party report,[403] the Claimant does not appear to have adduced any evidence to conclusively prove the fact of payment of AED 182,288 or USD 49,670 to the Respondent.  The Claimant has thus not made out its case in respect of these sums in unjust enrichment.  The Tribunal considers that such a claim would also be precluded by the fact that it would result in double recovery in circumstances where the Claimant already claims for loss of profits arising from the Respondent's breaches of the PSA.

557.    Finally, the Claimant argues that (i) the PSA contains an implied term that the Respondent would compensate the Claimant for use of the ENEXD Equipment if the Claimant gave permission for it to be used for purposes other than the Project;[404] and (ii) some pieces of the ENEXD Equipment, estimated by the Claimant's expert at USD 1,695,838.12, have gone missing.[405]

558.    The Tribunal finds that the Claimant has not provided any conclusive evidence that the Respondent used the ENEXD Equipment for a purpose other than the Project or that pieces of the ENEXD Equipment are missing.  In particular, the only item in respect of which the Claimant has alleged usage on other projects without appropriate permission is the Koomey Unit.[406]  As set out above, the Tribunal decided in the Partial Award on Jurisdiction that it had jurisdiction to hear the dispute except insofar as it concerned the Koomey Unit.[407]

*       *       *

559.    In sum, for the reasons detailed above, the Tribunal grants the following of the Claimant's claims:

a.    Declares that the Respondent breached Clauses 3, 4.1, 7.1, 7.4, 7.16, 9.1 and 9.5 of the PSA;

---

[401] Halsbury's Laws of England – 410 The structure of an unjust enrichment claim, Exhibit RLA-48.
[402] Statement of Case, para. 25.18.
[403] United Auditing Report, Exhibit C-51.
[404] Statement of Case, fn. 59; Statement of Reply and Defence to Counterclaim, para. 78.4.
[405] CER-1 Wright, Appendix B.2.
[406] *See, e.g.,* Statement of Case, para. 25.9.
[407] Partial Award on Jurisdiction, para. 46(a).

b.    Declares that the Claimant's termination of the PSA on 29 August 2019 was valid and effective;

c.    Declares that the Claimant has sole and unencumbered ownership of the ENEXD Equipment (as defined above) and that the Respondent has no equitable or legal claim to it;

d.    Declares that the Respondent must deal with the ENEXD Equipment as directed by the Claimant, including any possible return of the ENEXD Equipment; and

e.    Orders the Respondent to pay 188,336 USD to the Claimant.

560.    The Tribunal dismisses the Claimant's other claims.

### E.    RESPONDENT'S COUNTERCLAIMS

1.    Alleged Breaches of the PSA by the Claimant

a)    Respondent's Submissions

561.    The Respondent alleges that the Claimant breached the PSA by failing to comply with its obligations under Clauses 3 and 7.1 of the PSA.[408]

562.    According to the Respondent, the Claimant failed to provide the Respondent with (i) USD 1.01 million, being the outstanding balance of the Claimant's agreed USD 2.5 million contribution to the Project; and (ii) its 60% share of additional capital expenditure, operational costs and loss excluding non-cash expenses, which the Respondent alleges to have been incurred by the Respondent in their entirety due to the Claimant's alleged refusal to fund its obligations.[409]

563.    The Respondent submits that "[i]n monetary terms", the Claimant committed to pay (i) USD 1.01 million, i.e. the outstanding balance of the Claimant's agreed USD 2.5 million contribution to the Project; and (ii) USD 6.52 million, corresponding to the 60% share of additional capital expenditure referred to above.[410]

564.    Mr Aidasani divides the Project into three phases "from a financial operation standpoint", alleging that: (i) from the signing of the PSA until mid-March 2018, the cost of

---

[408] Statement of Defence and Counterclaim, paras. 118-129; Statement of Rejoinder and Reply on Counterclaim, paras. 99-102; Respondent's Post-Hearing Brief, paras. 26-32; Respondent's Opening Presentation, Slides 52-54; Transcript {Day 1, 156:5-166:3}.
[409] Statement of Defence and Counterclaim, para. 118.
[410] Statement of Rejoinder and Reply on Counterclaim, para. 100.

modifications and upgrades were made by the Parties through cheques issued to vendors; (ii) from mid-April 2018, the Respondent started running full operations without any revenue and either paid vendors directly or paid Gulf Energy for Gulf Energy to pay vendors in Saudi Arabia; (iii) from January 2019 and following revenue generation under the Project, costs were paid by Gulf Energy out of payments received from Saudi Aramco.[411] Mr Aidsani states that during this third phase, the revenue generated remained insufficient to cover all costs with the result that the Respondent continued to pay directly some of the expenses.[412]

565.    Mr Sola states that the Claimant agreed to contribute USD 2.5 million in cash and an additional 60% of the costs of the project.[413] He states that the "USD 2.5 million contribution was agreed in order to cover the equipment that ENEXD was required to purchase in accordance with the terms of the PSA and the modifications to the equipment that ENEXD provided up to the value of USD 2.5 million."[414] He denies that the payment of USD 2.5 million was subject to the condition that the USD 1.1 million paid by the Claimant would be deducted from the Claimant's share of the mobilization income received from Saudi Aramco.[415] Mr Sola further refers to Clause 9.5 of the PSA and states that the Claimant knew and accepted that it would be liable for its 60% share of mutually agreed upon expenses by co-signing the purchase orders for the required modifications to the Equipment it provided, for an amount equal to approximately USD 4.9 million.[416]

566.    With regard to the Claimant's defence that it did not receive any funding requests from the Respondent between 26 March 2018 and May 2019, the Respondent claims that this is both factually incorrect and irrelevant.[417] This is because, according to the Respondent, the Claimant co-signed multiple purchase orders with vendors and was expected to fund its share (60%) of such Project expenses.[418] The signature of these purchase orders constituted a mutual agreement on costs and expenses that were necessary and jointly funded in proportion to the Parties' profit shares under the PSA.[419]

---

[411] RWS-2 Aidasani, para. 19.
[412] RWS-2 Aidasani, para. 19.
[413] RWS-4 Sola, para. 32.
[414] RWS-4 Sola, para. 32.
[415] RWS-4 Sola, para. 32.
[416] RWS-4 Sola, para. 33.
[417] Statement of Rejoinder and Reply on Counterclaim, para. 45.
[418] Statement of Rejoinder and Reply on Counterclaim, para. 45.
[419] Statement of Rejoinder and Reply on Counterclaim, para. 46.

567.    The Respondent seeks damages in respect of these breaches.  These damages were provisionally quantified in the Statement of Defence and Counterclaim at USD 7.53 million,[420] and stated in the Respondent's Post-Hearing brief as USD 7,399,339.79.[421]   That figure is broken down into: "(i) US$1,004,488.18, being the outstanding balance of ENEXD's agreed US$2.5m contribution to the Project, (ii) US$1,329,613.67, which corresponds to 60% share of additional capital expenditure, including modifications to the equipment in excess of the US$2.5m and (iii) US$5,065,237.94, being the 60% share of other expenditure, but excluding non-cash expenses and depreciation, which were incurred by Nordic in their entirety due to ENEXD's refusal to fund its obligations."[422]  As demonstrated by the table at paragraph 32 of its Post-Hearing Brief, that figure appears to include USD 3,611,386.72 in Purchase Orders not signed by the Claimant.[423]

568.    The Respondent argues that the quantum of its counterclaim is supported by the documentary evidence, submitting that there are 808 Purchase Orders on record which are "countersigned by Claimant".[424]   This figure increased to 811 Purchase Orders in the Respondent's Final Submission, with an aggregate amount of USD 5,262,066.22.[425]  Of these 811 Purchase Orders, the Respondent alleges that it paid 610 for an aggregate amount of USD 3,868,936.19,[426] while the Claimant paid 145 for an aggregate amount of USD 1,284,312.97 and 23 (aggregate amount USD 423,733.47) were paid out of Project revenues.[427]

569.    The Respondent also refers to 607 Purchase Orders which are "not on the record and not signed by Claimant, which relate to expenses that were incurred for the Project in the ordinary course of business."[428]

570.    In its Final Submission, the Respondent argued that the Claimant had not provided any credible evidence that could undermine the validity of the Purchase Orders introduced to the record by the Respondent.[429]

---

[420] Statement of Defence and Counterclaim, para. 146.b.(iv).
[421] Respondent's Post-Hearing Brief, para. 32.
[422] Respondent's Post-Hearing Brief, para. 32.
[423] Respondent's Post-Hearing Brief, para. 32; Summary of Additional Purchase Orders, Exhibit R-88.
[424] Respondent's Post-Hearing Brief, para. 31; Purchase Orders, Exhibit R-39; Additional Purchase Orders, Exhibit R-87.
[425] Respondent's Final Submission, para. 10.
[426] Respondent's Final Submission, para. 11.
[427] Respondent's Final Submission, paras. 12-13.
[428] Respondent's Post-Hearing Brief, para. 31.
[429] Respondent's Final Submission, para. 6.

- 128 -

b)    Claimant's Submissions

571.    The Claimant argues that neither Clause 7.1 nor Clause 3 of the PSA imposed an obligation pursuant to which the Claimant was required to provide the funding that the Respondent claims to have been due.[430]

572.    The Claimant contends that Clauses 3, 7.13 and 9.5 of the PSA demonstrate that any financial support to the Project had to be agreed by the Parties.  The Claimant argues that Clause 7.1 should accordingly be read as referring to any "mutually agreed" financial support.[431]  Thus, the Claimant maintains, "if and to the extent that any funding obligation on ENEXD could arise, this would have to be the result of a mutual agreement prior to the expenditure being incurred".[432]  The Claimant states that the Respondent has not claimed that the Claimant agreed to any expenditure beyond the USD 2.5 million, which the Claimant says was discharged.[433]  The Claimant argues that there can therefore be no breach of contract as alleged.

573.    In support of its position, the Claimant refers to four "key" exchanges of correspondence on dates between 26 March 2018 and 29 May 2019[434] and asserts that: (i) the Parties had agreed by 26 April 2018 that the Claimant would provide USD 2.5 million of funding, with USD 1.4 million paid in cash and the balance of USD 1.1. million to be deducted from the Claimant's share of the mobilization fee and first invoice, with anything over that amount to be mutually agreed;[435] (ii) at no stage between 26 April 2018 and 3 February 2019 did the Respondent object to these funding arrangements or refer to a figure of USD 6.52 million; (iii) the minutes of a meeting in Dubai on 13 March record that the Claimant had agreed to provide a USD 2.5 million investment;[436] and (iv) on 29 May 2019, solicitors for the Respondent sent a letter to the Claimant claiming, for the first time, to be entitled to USD 7.19 million from the Claimant.[437]

---

[430] Statement of Case, para. 30; Statement of Reply and Defence to Counterclaim, para. 118; Claimant's Opening Presentation, Slides 4-32; Transcript, {Day 1, 34:15-70:19}; Claimant's Post-Hearing Brief, para. 3.
[431] Statement of Reply and Defence to Counterclaim, para. 121-122.
[432] Statement of Reply and Defence to Counterclaim, para. 118.
[433] Statement of Reply and Defence to Counterclaim, para. 118.
[434] Statement of Reply and Defence to Counterclaim, para. 125-135.
[435] Statement of Reply and Defence to Counterclaim, para. 126.
[436] Statement of Reply and Defence to Counterclaim, para. 128.
[437] Statement of Reply and Defence to Counterclaim, para. 129.

574.    Ms Zavarei states that "[w]e agreed at the outset of the PSA for the purchase and upgrade of the equipment our financial obligation would only be up to US $2 million."[438] She further states that "we later agreed to increase our capital expenditure up to US $2.5 million for the project which broke down as US $1.4 million in capital investment and USD $1.1 million from the profits of the project."[439] In respect of the same matters, Mr Eskici states that the Claimant "agreed to raise the capital contribution limit to US $2.5 million, and the difference in the amount of US $1.1 million would be from ENEXD share of the mobilization fee. We never agreed to provide Nordic US $2.5 million in cash."[440]

575.    The Claimant asserts that it completed payments of USD 1.4 million. It alleges that it also paid a cash contribution of USD 314,026 to ship the Equipment to Saudi Arabia, giving a total of USD 1,714,026 in "actual cash contribution [to] the Project".[441] The Claimant also asserts that it paid USD 900,000 representing its share of the mobilization monies.[442] The Claimant submits that these payments "represent the ENEXD's main position for satisfaction of the funding contributions under Clauses 7.1 and 3 of the PSA."[443]

576.    In addition, the Claimant submits that it contributed the following to the Project:

a.    USD 250,775 "related to Mr Alireza's salary and end of service benefits for the period from 17 July 2018 until 28 February 2019";[444] and

b.    USD 629,060 "payments withheld from ENEXD by Nordic against its allegedly missing contributions."[445]

577.    The Claimant further submits that the Respondent's counterclaim for USD 6.52 million is in contradiction with: (i) the Respondent's alleged claim on 13 March 2019 that it had paid USD 5.5 million; (ii) the Respondent's alleged claim on 29 May 2019 that it had paid USD 13 million; and (iii) the Respondent's alleged claim in September 2019 that it had paid USD 5 million.[446]

---

[438] CWS-1 Zavarei, para. 62.
[439] CWS-1 Zavarei, para. 62.
[440] CWS-2 Eskici, para. 14.
[441] Statement of Reply and Defence to Counterclaim, para. 133.4.
[442] Statement of Reply and Defence to Counterclaim, para. 133.5.
[443] Statement of Reply and Defence to Counterclaim, para. 133.6.
[444] Statement of Reply and Defence to Counterclaim, para. 133.7.
[445] Statement of Reply and Defence to Counterclaim, para. 133.8.
[446] Statement of Reply and Defence to Counterclaim, para. 135.1-2.

578.    With regard to the USD 6.52 million, Ms Zavarei states that "[w]e were never requested and agreed to provide US $6.52 million as financial support for the project."[447] Ms Zavarei also points out that "[w]e never agreed and / or were required under the PSA to increase our capital expenditure to US $6.52 million as Nordic now is claiming in this arbitration."[448]

579.    Mr Eskici similarly states that "we never agreed to an additional 60% of the CAPEX or project costs."[449] He argues that "[a]ny contribution for the 60% of purchase orders is only limited to the US $2.5 million as stated above."[450] He further alleges that the Claimant satisfied the agreed funding contribution through provision of the following sums: (i) USD 1,714,026 "to satisfy the cash funding needs of the Project"; (ii) USD 250,775 "related to Mr. Alireza's salary and end of service benefits for the period from 17 July 2018 until 28 February 2019"; (iii) USD 629,060 "payments withheld from ENEXD by Nordic against its allegedly missing contributions"; (iv) "[a]t least" USD 900,000 "representing ENEXD's share of the mobilization monies for US $1.5 million that Nordic had received and failed to transfer to the Dubai JV Account."[451]

580.    In its Post-Hearing Brief, the Claimant addresses the sums sought and the Purchase Orders relied upon by the Respondent.  The Claimant submits that, as a matter of law, the Respondent having "failed to explain the basis upon which it relies to seek to recover the value of its counterclaim (which related to supplier obligations) while the Project collections were allegedly blocked from the Dubai Account and Saudi Account", the Respondent is in effect "seeking to be paid for the alleged supplier obligations twice."[452] The Claimant accordingly submits that "the New Purchase orders cannot be relevant to the Respondent's counterclaim or to the case in its entirety."[453]

581.    The Claimant further argues that "in the event any purchase orders not related to the Equipment were signed," "the payments related to them should be deducted from the Project account."[454] It relies on Clauses 7.3, 9.1 and 9.5 of the PSA in this regard.[455]

---

[447] CWS-1 Zavarei, para. 65.
[448] CWS-1 Zavarei, para. 62.
[449] CWS-2 Eskici, para. 20.
[450] CWS-2 Eskici, para. 21.
[451] CWS-2 Eskici, para. 23.
[452] Claimant's Post-Hearing Brief, para. 3.6.
[453] Claimant's Post-Hearing Brief, para. 3.6.
[454] Claimant's Post-Hearing Brief, para. 3.7.
[455] Claimant's Post-Hearing Brief, para. 3.7.

582.    The Claimant also submits that the Respondent's reliance on the New Purchase orders is misplaced because, the Claimant argues, 573 of the 863 New Purchase orders are not signed by the Claimant.[456]  Such Purchase Orders do not constitute mutually agreed financial support within the meaning of Clause 7.1 of the PSA, the Claimant argues. [457]  The Claimant also alleges that 28 of the New Purchase Orders, amounting to USD 225,881.76, "were already paid by the Claimant."[458] The Claimant submits that the remaining Purchase Orders signed by the Claimant have no relevance to purchasing and upgrading Equipment and the Claimant is under no obligation to pay them.[459]

583.    In addition to these arguments, the Claimant relies on the Al Bah Expert Report in support of the argument that seven of the New Purchase Orders were forged. [460]  The Claimant also argues that: (i) the New Purchase orders included 3 Purchase Orders issued to Rig Max Wire Rope Manufacturing LLC which are inauthentic because Mr Saadat did not sign those Purchase Orders; (ii) 13 of the New Purchase Orders were issued following receipt of the mobilization fees from Saudi Aramco.  They should accordingly have been paid from the mobilization revenues; (iii) 49 of the New Purchase orders have a due date which follows the date of receipt of the mobilization fees.  The Claimant was under no obligation to finance the Project when the mobilization revenues were received and was prevented from accessing the mobilization funds by the Respondent; Mr Sola confirmed in his testimony that the value of the counterclaim was USD 600,000.[461]

c)    Tribunal's Decision

i.    *Claimant's Agreed Financial Contribution to the Project*

584.    As detailed, above, the Respondent claims that the Claimant should be ordered to pay USD 1.01 million, i.e. the outstanding balance of the Claimant's agreed USD 2.5 million financial contribution to the Project.[462]

---

[456] Claimant's Post-Hearing Brief, para. 5.4(a).
[457] Claimant's Post-Hearing Brief, para. 5.4(a).
[458] Claimant's Post-Hearing Brief, para. 5.4(c).
[459] Claimant's Post-Hearing Brief, para. 5.4(c).
[460] Claimant's Post-Hearing Brief, para. 5.4(3); Al Bah Expert Report.
[461] Claimant's Post-Hearing Brief, paras. 5.4(f)-(i).
[462] *See above* paras. 562-563.

585.    Pursuant to Clause 7.1 of the PSA, "[the Claimant] shall provide [the Respondent] with the support necessary for the conduct of business activities under this agreement in the Territory *including mutually* [sic] *financial support at the outset of this agreement* for purchasing and upgrading equipment (as described in Section 3)".[463]  The Parties agree that Clause 7.1 contains a typographical error and that the reference to "mutually financial support" must be read as "mutually *agreed* financial support".[464]  At the Hearing, both Parties clarified this point:

    a.    Claimant: "this 'mutually financial support,' it is not written properly, but we believe that it is *meant to be the 'mutually agreed financial support'*.[465]

    b.    Respondent: "So we go over leaf to clause 7.1.  We see that ENEXD is to provide Nordic with the necessary support for the conduct of business activities under the PSA in Saudi Arabia including mutually -- and *we agree it should say mutually 'agreed' -- financial support* at the outset of this agreement".[466]

586.    It is thus clear from Clause 7.1 of the PSA that the Claimant agreed to provide financial support for the purchasing and upgrading of equipment pieces at the outset of the PSA, but that the amount of this commitment was to be mutually agreed upon between the Parties.  The PSA itself does not contain any provision that determines this agreed amount.

587.    However, the Parties agreed on this amount in an email exchange between Mr Sola and Ms Zavarei in March 2018.  In this exchange, Ms Zavarei (text in black in the email) noted the following:

    "I have checked with Alireza and he has confirmed we have *given Nordic $1.4 million up until now*. As explained to you from the outset, *ENEXD agreed to give our support and investment for up to £2 million for purchasing and modification of equipment*. …

    However, based on the respect I have for you and the hard work   Nordic has done, ENEXD agreed to *increase our investment limit to £2.5 million*. …

    We will *inject the extra $1.1 million from ENEXD's share of the mobilisation fee and first invoice*. …"[467]

---

[463] PSA, Exhibit C-3, Clause 7.1 (emphasis added).
[464] Request for Arbitration, para. 5.2.7; Statement of Case, para. 7.1.
[465] Transcript, {Day 1, 62:25-63:3} (emphasis added).
[466] Transcript, {Day 1, 110:9-15} (emphasis added).
[467] Email correspondence between Delaram Zavarei and Sonny Sola, Exhibit C-25, p. 4.

588.    It is clear from the above that Ms Zavarei (i) considered that the Claimant had already provided USD 1.4 million to the Respondent; and (ii) was willing to increase the previously agreed figure of USD 2 million to USD 2.5 million.  The figure of USD 2.5 million is indeed not contested by the Claimant.[468]

589.    What is contested by the Claimant is in which form it agreed to inject USD 2.5 million into the Project.  According to the Claimant, USD 1.1 million from this overall investment was to be taken from the Claimant's share of the future mobilization fee, based on the above-mentioned note from Ms Zavarei that the Claimant would "inject the extra $1.1 million from ENEXD's share of the mobilisation fee and first invoice."

590.    However, this was only the starting point of the discussion, and further replies by Mr Sola (in red) and Ms Zavarei (in green) are recorded in the same email exchange.  In particular, Mr Sola notes as follows:

> "Nordic has more than $2 million in pending invoices (not paid) relating to this project. As I mentioned previously; I had to use my personal funds to pay for the workers salary so they could feed their families. We are way overdue on numerous vendors and this is a major problem for Nordic and this is not the way Nordic do business. *If ENEXD will use the mobilization fee to cover the remaining $1.1 million dollars then this will delay payment to our vendors* for an additional 4 to 6 weeks most likely. *My understanding was that the $2.5 million* for upgrading, modifications and new equipment *would be contributed to the project prior to mobilizing the equipment from Dubai*."[469]

591.    Ms Zavarei also notes in the same email:

> "However, based on the trust with you and our friendly and good co-operation we have set for long term together, we accept proposal that up to *$2.5 million ENEXD carry and up to $3.5 million paid by JV*."[470]

592.    This statement makes a clear distinction of an investment made by the "JV" and thus taken from the Project's revenues, and the investment by the Claimant to "carry" USD 2.5 million.

593.    This is also confirmed by another contemporaneous email exchange between the Parties in May 2018.  This exchange took place because Ms Zavarei noted that the Parties needed "to

---

[468] Request for Arbitration, para. 5.4.7; Statement of Reply and Defence to Counterclaim, para. 126.3.
[469] Email correspondence between Delaram Zavarei and Sonny Sola, Exhibit C-25, p. 4.
[470] Email correspondence between Delaram Zavarei and Sonny Sola, Exhibit C-25, p. 3.

- 134 -

finalize the amendment of the contract with the figures as well as terms of payments and other subjects."[471]  In this exchange, Mr Sola referred to the fact that the Parties had "**agreed to the payment plan i.e. ENEXD will contribute with USD 2.5 million** for necessary new equipment, modification and upgrades."[472]  He further notes that "[a]ny **additional expenses** over and beyond the agreed 2.5 million USD will be **covered from the revenue generated** from the contract and the cost split 60% for ENEXD and 40% for Nordic."[473]  This clarifies that only the additional expenses are to be taken from the revenue generated from the Project, but otherwise and up to the agreed USD 2.5 million, the Claimant was to make financial contribution.

594.    Accordingly, the Tribunal finds that the Claimant agreed to provide financial support, in application of Clause 7.1 of the PSA, in the amount of USD 2.5 million.  It is undisputed that the Claimant has contributed just over USD 1.4 million to the Respondent and/or the Project and that USD 1,004,488.18 are still outstanding.[474]

595.    Accordingly, the Tribunal finds that the Claimant owes the Respondent USD 1,004,488.18.

*ii.    Claimant's Share of Additional Expenditure*

596.    As detailed above, the Respondent claims that it should be awarded USD 6,394,850 in respect of the Claimant's alleged failure to contribute its 60% share of additional capital expenditure.[475]

476.    As already noted above, expenses under the PSA – be it for additional equipment (Clause 3) or joint venture expenses (Clause 9.1 (C)) or any other expenses more broadly (Clause 9.5) – must be either mutually agreed upon between the Parties (Clauses 3 and 9.5) and/or taken from the joint Dubai Account (Clauses 9.1 (C) and (D)).

597.    The questions the Tribunal now needs to address is (i) whether there were any "additional mutually agreed upon expense" in the sense of Clause 9.5 or "written permission"

---

[471] Delaram Zavarei's comments on email from Sonny Sola dated 16 May 2018 (17:51), Exhibit C-50, p. 1.
[472] Email from Sonny Sola dated 16 May 2018 (17:51), Exhibit C-50, p. 1.
[473] Email from Sonny Sola dated 16 May 2018 (17:51), Exhibit C-50, p. 1.
[474] Response to Request for Arbitration, para. 18; Statement of Reply and Defence to Counterclaim, para. 126; Respondent's Post-Hearing Brief, para. 32; Respondent's Opening Presentation, para. 53.
[475] *See above* paras. 562-563.

by the Claimant in the sense of Clause 3 of the PSA; and if so (ii) how these expenses would be paid.

598.    Regarding the first point, there is substantial disagreement between the Parties as to whether the Claimant co-signed purchase orders which would thus constitute "mutually agreed" additional expenses withing the meaning of the above-mentioned provision.

599.    Regarding the second point, the Parties are also in disagreement on how these expenses, if agreed, would have to be paid. According to the Respondent, it would have to pay 40% and the Claimant 60% directly. The Claimant does not take issue with these proportions but argues that the payment would come from the "ENEXD & Nordic joint account" and thus from the Project's revenues.[476]

600.    As already discussed, Clause 9 of the PSA deals with "remuneration and payment" in relation to the Project. On the one hand, it requires that Project revenues should be paid into the Parities' joint account, as discussed above.[477] On the other hand, Clause 9 also deals with related Project expenses.

601.    In particular, Clause 9.1(C) of the PSA provides that from the amounts to be deposited into the joint Dubai Account, Respondent takes its "3% management fee and *1.5% will be left for any joint venture expenses*."[478] Clause 9.1(D) of the PSA further provides that "[o]perational expenses are to be *deducted from this amount* (using agreed forecast financial statements – Appendix 15)."[479] While it is not entirely clear how "joint venture expenses" are different from "operational expenses", it is clear from Clause 9.1 that expenses are deducted from the Project revenue deposited in the joint Dubai Account.

602.    Clause 9.4 of the PSA further provides that if "[a]t [the] end of term of this agreement, any remaining *monies in account held for expenses*, will also be divided between [the Respondent] & [the Claimant], 40/60 respectively."[480]

603.    Finally, Clause 9.5 of the PSA adds that "[a]ny mutually agreed upon additional expense will be split between [the Respondent] & [the Claimant], 40/60 respectively."

---

[476] See, e.g., Claimant's Final Submission, para. 7.3.
[477] *See above* para. 324.
[478] PSA, Exhibit C-3, Clause 9.1(C).
[479] PSA, Exhibit C-3, Clause 9.1(C).
[480] PSA, Exhibit C-3, Clause 9.4 (emphasis added).

604.    The question therefore is whether Clause 9.5 of the PSA, in the continuity of the other provisions of Clause 9 of the PSA, deals with how expenses are paid from the joint Dubai Account, i.e. the revenue from the Project. Or whether, to the contrary, Clause 9.5 of the PSA contains an obligation for the Parties to contribute in cash and in the 60/40 proportion to the agreed additional expenses.

605.    In the Tribunal's view, the context of Clause 9 makes clear that it only deals with the payment of expenses from the Dubai Account, i.e. the revenue from the Project. All provisions of Clause 9 relate to the payment of expenses from this account. At no point makes Clause 9 clear that expenses would not be paid from the Dubai Account but by the Parties directly. Had the Parties wished to make an exception in Clause 9.5 of the PSA so that expenses would not be taken from this account, they would have made this clear.

606.    This understanding is indeed confirmed by Mr Sola himself. Indeed, in May 2018, Mr Sola wrote that the Parties had "agreed to the payment plan i.e. [the Claimant] will contribute with USD 2.5 million for necessary new equipment, modification and upgrades."[481] He further noted that "[a]ny ***additional expenses*** over and beyond the agreed 2.5 million USD will be ***covered from the revenue generated from the contract*** and the cost split 60% for [the Claimant] and 40% for [the Respondent]."[482] This confirms that the mutually agreed additional expenses in Clause 9.5 of the PSA, like other expenses dealt with under Clause 9, are to be taken from the revenues generated by the Saudi Aramco Contract and thus the monies in the joint Dubai Account.

607.    Accordingly, contrary to the Respondent's contention, the Respondent has no direct claim against the Claimant for the payment of any agreed expenses. Therefore, the Tribunal does not have to decide which of the submitted purchase orders have been co-signed and agreed and which are authentic or not. Even if the Claimant was right that these additional expenses had been agreed via the purchase orders, they would have to paid from the Project revenue and the Claimant would have no direct claim against the Respondent.

608.    In sum, for the reasons detailed above, the Tribunal upholds the Respondent's counterclaim partially for the amount of USD 1,004,488.18.

---

[481] Email from Sonny Sola dated 16 May 2018 (17:51), Exhibit C-50, p. 1.
[482] Email from Sonny Sola dated 16 May 2018 (17:51), Exhibit C-50, p. 1.

2.    Alleged Wrongful Termination of the PSA By the Claimant

609.    The Respondent seeks a declaration that the Claimant's purported termination of the PSA was unlawful, invalid, and ineffective.[483]

610.    The Tribunal has already decided above that the Claimant's termination of the PSA was valid and lawful,[484] and therefore dismisses the Respondent's counterclaim to this effect.

*      *      *

611.    In sum, for the reasons detailed above, the Tribunal partially grants the Respondent's counterclaims and orders the Claimant to pay USD 1,004,488.18 to the Respondent.  The Tribunal dismisses the Claimant's other counterclaims.

## F.    INTEREST

### 1.    Claimant's Submissions

612.    The Claimant seeks interest on any sums awarded pursuant to the Tribunal's powers under rule 26.4 of the LCIA Rules and/or Section 49 of the EAA.[485]  In its Statement of Reply and Defence to Counterclaim, the Claimant seeks a rate of 12% per annum or such other amount as the Tribunal sees fit.[486]

### 2.    Respondent's Submissions

613.    The Respondent seeks pre- and post-award interest on the amounts due to it pursuant to its counterclaims on the basis of the Tribunal's powers under rule 26.4 of the LCIA Rules and/or Section 49 of the EAA.[487]  With regard to the Claimant's request for a rate of 12%, the Claimant states that "there is no basis for ENEXD's request for interest at the rate of 12% and ENEXD has not provided any explanation for such a high rate."[488]

### 3.    Tribunal's Decision

614.    On the matter of interest, Article 26.4 of the LCIA Rules provides:

"Unless the parties have agreed otherwise, the Arbitral Tribunal may order that simple or compound interest shall be paid by any party on any sum awarded at such rates as

---

[483] Statement of Defence and Counterclaim, para. 146.b.(i).
[484] *See above* para. 475.
[485] Statement of Case, para. 36.12-13.
[486] Statement of Reply and Defence to Counterclaim, para. 162.2.
[487] Statement of Rejoinder and Reply on Counterclaim, para. 111.
[488] Statement of Rejoinder and Reply on Counterclaim, fn. 193.

the Arbitral Tribunal decides to be appropriate (without being bound by rates of interest practised by any state court or other legal authority) in respect of any period which the Arbitral Tribunal decides to be appropriate ending not later than the date upon which the award is complied with."

477.    Furthermore, Section 49 of the EAA provides:

"(1) The parties are free to agree on the powers of the tribunal as regards the award of interest.

(2) Unless otherwise agreed by the parties the following provisions apply.

(3) The tribunal may award simple or compound interest from such dates, at such rates and with such rests as it considers meets the justice of the case—

(a) on the whole or part of any amount awarded by the tribunal, in respect of any period up to the date of the award;

(b) on the whole or part of any amount claimed in the arbitration and outstanding at the commencement of the arbitral proceedings but paid before the award was made, in respect of any period up to the date of payment.

(4) The tribunal may award simple or compound interest from the date of the award (or any later date) until payment, at such rates and with such rests as it considers meets the justice of the case, on the outstanding amount of any award (including any award of interest under subsection (3) and any award as to costs).

(5) References in this section to an amount awarded by the tribunal include an amount payable in consequence of a declaratory award by the tribunal.

(6) The above provisions do not affect any other power of the tribunal to award interest."

615.    It results from the above-mentioned provisions of the LCIA Rules and the EAA that the Tribunal has the power, in the absence of the Parties' agreement to the contrary, to order simple or compound interest.   The Tribunal's power regarding the appropriate interest rate is discretionary ("such rates as the Arbitral Tribunal decides to be appropriate" or "at such rates and with such rests as it considers meets the justice of the case").

616.    In the present case, both Parties have requested post-award interest on sums to be awarded to it.   The Respondent has also requested pre-award interest.   In light of the Parties' aligned requests, the Tribunal decides that simple interest is due as from the date of this award on any sums ordered to be paid.

617.    Regarding the appropriate interest rate, the Claimant suggested 12% without any further justification.  The Respondent opposes this rate as being too high but does not provide any alternative interest rate.  In light of the absence of the Parties' arguments on appropriate interest rate, the Tribunal decides to apply a rate of 1 year LIBOR plus 2%, reflecting the approximate cost of borrowing US dollars at the date of the Award.

618.    In sum, for the reasons detailed above, the Tribunal decides to award interest at the rate of 2.24% per annum, calculated on a simple basis (i.e. non-compound) as from the date of this award.

### G.    COSTS

#### 1.    Claimant's Submissions

619.    The Claimant seeks that the Respondent pay the Claimant's reasonable costs incurred in connection with this arbitration.[489]  The Claimant's costs appear to be in the sum of USD 950,351.[490]

620.    The Claimant also noted in its Costs Submissions that it had an agreement with a third-party funder for the cost of the dispute, and that the contingent payment to the funder with respect to this arbitration would be USD 2,350,000.[491]  The Claimant contends that this payment should be deemed part of its recoverable costs.[492]

#### 2.    Respondent's Submissions

621.    The Respondent also seeks that the Claimant pay all costs of the arbitration, as well as the Respondent's legal fees and expenses.[493]  The costs and expenses incurred by the Respondent are stated to be GBP 100,000 and USD 537,676.26.[494]

#### 3.    Tribunal's Decision

622.    Pursuant to Articles 28.2 and 28.3 of the LCIA Rules, the Tribunal may decide the proportions in which the Parties shall bear the costs of the arbitration other than the legal or

---

[489] Statement of Case, para. 36.13; Claimant's Costs Submissions, para. 2.1.
[490] Claimant's Costs Submissions, table at para. 2.2.  The Tribunal notes that the figure given in the text at paragraph 2.2 is USD 938,911.  The Tribunal has taken the figure from the table.
[491] Claimant's Costs Submissions, paras. 3.1-3.2.
[492] Claimant's Costs Submissions, para. 3.3.
[493] Statement of Rejoinder and Reply on Counterclaim, para. 112.
[494] Respondent's Costs Submissions, para. 3.

- 140 -

other expenses ("**Arbitration Costs**"), as well as their legal and other expenses ("**Legal Costs**").

623.    First, regarding the Parties' Arbitration Costs, Article 28.1 of the LCIA Rules provides that they "shall be determined by the LCIA Court in accordance with the Schedule of Costs" and that "[t]he parties shall be jointly and severally liable to the LCIA and the Arbitral Tribunal for such Arbitration Costs."

624.    According to Article 28.1 of the LCIA Rules, the NET Arbitration Costs have been determined by the LCIA Court as follows:

| Description | Amount |
|---|---|
| Registration fee | GBP 1,750.00 |
| LCIA's administrative charges | GBP 28,052.52 |
| Tribunal's fees | GBP 141,771.60 |
| **Total Arbitration Costs** | **GBP 171,574.12** |

625.    Towards these costs, the Claimant has paid GBP 101,769.29 which includes the Registration fee, deposits lodged, interest accrued, and the Respondent has paid GBP 100,034.29 which includes deposits lodged and interest accrued.  The balance of funds will be returned to the Parties in the proportions they were paid in accordance with Article 28.7 of the LCIA Rules, that is GBP 15,113.60 to the Claimant and GBP 15,115.87 to the Respondent.

626.    Article 28.2 of the LCIA Rules states:

> "The Arbitral Tribunal shall specify by an award the amount of the Arbitration Costs determined by the LCIA Court.  The Arbitral Tribunal shall decide the proportions in which the parties shall bear such Arbitration Costs (in the absence of a final settlement of the parties' dispute regarding liability for such costs).  If the Arbitral Tribunal has decided that all or any part of the Arbitration Costs shall be borne by a party other than a party which has already covered such costs by way of a payment to the LCIA under Article 24, the latter party shall have the right to recover the appropriate amount of Arbitration Costs from the former party."

627.    Article 28.4 of the LCIA Rules further provides:

> "The Arbitral Tribunal shall make its decisions on both Arbitration Costs and Legal Costs on the general principle that costs should reflect the parties' relative success and failure in the award or arbitration or under different issues, except where it appears to

- 141 -

the Arbitral Tribunal that in the circumstances the application of such a general principle would be inappropriate under the Arbitration Agreement or otherwise. The Arbitral Tribunal may also take into account the parties' conduct in the arbitration, including any co-operation in facilitating the proceedings as to time and cost and any non-co-operation resulting in undue delay and unnecessary expense. Any decision on costs by the Arbitral Tribunal shall be made with reasons in the award containing such decision."

628.    In light of the above, and pursuant to Article 28.4 of the LCIA Rules, the Tribunal decides that the award of the Arbitration Costs should reflect the Parties' relative success and failure in this arbitration. While the Tribunal is minded to also take into account the Parties' conduct in the arbitration, including any co-operation in facilitating the proceedings as to time and cost and any non-co-operation resulting in undue delay and unnecessary expense, the Tribunal finds that in the present case no Party was responsible more than the other for any undue delays or incurred costs in the proceedings.

629.    The Tribunal considers that both Parties have been partially successful in this arbitration. In particular:

a.    The Claimant was successful, among other things, in showing that: (i) the Respondent breached Clauses 3, 4.1, 7.1, 7.4, 7.16, 9.1 and 9.5 of the PSA; (ii) it thus had validly terminated the PSA on 29 August 2019; and (iii) the Respondent misappropriated the Equipment and is obligated to deal with the same as directed by the Claimant and compensate the Claimant. The Claimant was also partially successful in defending the Respondent's counterclaim.

b.    The Respondent was successful, among other things, in defending the claims that: (i) it had breached Clause 7.17 of the PSA; (ii) it had breached the insurance provisions under Clause 10.5 of the PSA; (iii) it had caused delay in breach of the PSA; and (iv) it had committed an actionable misrepresentation in relation to future profits under the PSA. The Respondent was also partially successful in its counterclaim.

630.    In light of this conclusion, the Tribunal considers that each Party should bear 50% of the Arbitration Costs. Given that, after taking into account the return of surplus funds, the Claimant has paid GBP 84,905.69 and the Respondent has paid GBP 84,918.42 towards the Arbitration Costs, the Tribunal orders the Claimant to pay GBP 6.37 to the Respondent.

631.    Second, regarding the Parties' Legal Costs, Article 28.3 of the LCIA Rules provides:

"The Arbitral Tribunal shall also have the power to decide by an award that all or part of the legal or other expenses incurred by a party (the "Legal Costs") be paid by another party.  The Arbitral Tribunal shall decide the amount of such Legal Costs on such reasonable basis as it thinks appropriate.  The Arbitral Tribunal shall not be required to apply the rates or procedures for assessing such costs practised by any state court or other legal authority."

632.    Given the overall outcome of the case, as detailed above, the Tribunal decides that each Party shall bear its own Legal Costs.  No order is accordingly required from the Tribunal in this regard, and it is not necessary for the Tribunal to address the question of whether third-party funding fees are recoverable.

- 143 -

## VI.    AWARD

633.    NOW THEREFORE THE ARBITRAL TRIBUNAL DECIDES, HOLDS, AND ORDERS AS FOLLOWS

a.    Declares that the Respondent breached Clauses 3, 4.1, 7.1, 7.4, 7.16, 9.1 and 9.5 of the PSA;

b.    Declares that the Claimant's termination of the PSA on 29 August 2019 was valid and effective;

c.    Declares that the Claimant has sole and unencumbered ownership of the ENEXD Equipment (as defined at paragraph 509 above) and that the Respondent has no equitable or legal claim to it;

d.    Declares that the Respondent must deal with the ENEXD Equipment as directed by the Claimant, including any possible return of the ENEXD Equipment;

e.    Orders the Respondent to pay 188,336 USD to the Claimant;

f.    Orders the Respondent to pay interest on the amount at the previous paragraph at the rate of 2.24% per annum, calculated on a simple basis (i.e. non-compound) as from the date of this award;

g.    Decides that each Party bears half of Arbitration Costs pursuant to Article 28.2 of the LCIA Rules and thus orders the Claimant to pay GBP 6.37 to the Respondent.

h.    Decides that each Party bears its own Legal Costs pursuant to Article 28.3 of the LCIA Rules; and

i.    Denies all other and further prayers for relief, claims and motions that the Parties have put forward in this arbitration.

Place of Arbitration: London, England

Date: 1 September 2021

_____

Professor Dr Maxi Scherer

(Sole Arbitrator)

- 145 -