# EXHIBIT A



Neutral Citation Number: [2019] EWHC 472 (Comm)

Claim No. CL-2016-000153

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS**
**OF ENGLAND AND WALES**
**COMMERCIAL COURT (QBD)**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 01/03/2019

**Before** :

**MR JUSTICE BUTCHER**
- - - - - - - - - - - - - - - - - - - -
**Between :**

**IRANIAN OFFSHORE ENGINEERING**
**AND CONSTRUCTION COMPANY**

**Claimant**

**- and -**
**(1) DEAN INVESTMENT HOLDINGS SA**
**(formerly known as Dean International**
**Trading S.A.)**
**(2) DEAN LEGAL CONSULTANCY**
**(3) DEAN GENERAL TRADING FZE**
**(4) OMAR KAMEL MAHMOUD ALSWADEH**
**(5) SEPANTA INTERNATIONAL FZE**
**(6) REZA MOSTAFAVI TABATABAEI**
**(7) ALI TAHERI**
**(8) AGHA MORAD SHIRANI TAKABI**
**(9) ANSARI MEERAN PILLAI MUHAMMED**
**BASHEER**

**Defendants**

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**Andrew Onslow QC and Richard Hanke** (instructed by **Eversheds Sutherland**
**(International) LLP**) for the **Claimant**
**The Fourth, Sixth and Ninth Defendants in person. The Fifth Defendant was represented**
**by the Sixth Defendant**

Hearing dates: 3-5, 7, 10-14, 17, 19-20 December 2018
- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this Judgment and that copies of this version as handed down may be treated as authentic.


.............................

MR JUSTICE BUTCHER

**Mr Justice Butcher:**

1.    In this action, the Claimant, to which I will refer as "IOEC", claims that it has been the subject of a fraud perpetrated by the Defendants.  The essence of its case is that it paid an amount of US$87 million as the price of an oil rig, but did not acquire the rig, and the amount which it paid by way of the price was misappropriated by or with the collusion of the Defendants.  In ways which I will explain in more detail later, it makes various claims against the Defendants including for breach of fiduciary duty, knowing receipt, dishonest assistance, conspiracy and deceit.

2.    The Defendants include five individuals.  The Seventh Defendant, to whom I will refer as "Dr Taheri", was IOEC's Managing Director between 2010 and 2014.  The Eighth Defendant, to whom I will refer as "Mr Shirani", was an adviser to Dr Taheri, but also had a senior role in a company called Sepanta International Company, which I will refer to as "Sepanta Iran".  The Fourth Defendant, to whom I will refer as "Dr Alswadeh", is a lawyer, who was formerly a director of and shareholder in the First to Third Defendants.  The Sixth Defendant, to whom I will refer as "Mr Tabatabaei", is an entrepreneur, and is the sole director and shareholder of the Fifth Defendant.  The Ninth Defendant ("Mr Ansari") was formerly Finance Manager of the Fifth Defendant and of Energy Exploration & Development Co. Ltd ("ENEXD"), a company owned and controlled by Mr Tabatabaei.

3.    The other Defendants are corporate entities.  The First Defendant, to which I will refer as "Dean", is a BVI-registered company, which was incorporated on 5 June 2012.  The Second and Third Defendants are both UAE-registered, and are in fact the same entity, after a change of name in January 2013.  I will refer to both as "Dean Legal".  The Fifth Defendant, which I will call "Sepanta", is a UAE-registered company.  It is a special purpose vehicle which was set up by Mr Tabatabaei for the supply of oil and gas equipment from China to Iran.

Summary of IOEC's case

4.    I will consider in due course the causes of action against the Defendants which IOEC says the facts disclose, but it is helpful here to outline the essence of IOEC's factual case, which is as follows:

(1) IOEC was caused to enter into an agreement to purchase a jack-up rig called the GSP Fortuna as a device to extract funds from IOEC in order to allow the Defendants to make a secret profit of US$22 million.  This was to be represented by the difference between the price at which an intermediate company, Dean, would buy the rig, and that at which it would sell the rig to IOEC. Thereafter, when the ultimate vendor of the GSP Fortuna cancelled the contract under which it was to sell the rig to Dean, the Defendants capitalised on that development to extract substantially more.

(2) Central to the fraud were Dr Taheri and Mr Shirani, both of whom owed fiduciary duties to IOEC.  Dr Taheri and Mr Shirani were aware of the difference between the two purchase prices.  They orchestrated IOEC's entry into the agreement to purchase the GSP Fortuna.  Dr Taheri did so knowing that such conduct was commercially and financially detrimental to IOEC and in breach of IOEC's internal procedures.  Dr Taheri and Mr Shirani then arranged for and permitted IOEC to pay

a total of US$87 million to Dean Legal in respect of the purchase of the GSP Fortuna, knowing that the purchase was detrimental to IOEC and in the face of concerns and objections to the payments within IOEC, and as to US$69.6 million, in the knowledge that the agreement whereby Dean was to acquire the GSP Fortuna had been cancelled. They took these steps in order to realise secret profits from the transaction. IOEC contends that Mr Shirani received considerable amounts, which it at one point contended amounted to at least US$17.5 million, and that Dr Taheri "must have received, or have intended to receive, a share of these sums".

(3) The other Defendants provided wide-ranging assistance to Dr Taheri and Mr Shirani in their breaches of fiduciary duty and efforts to conceal those breaches. Dr Alswadeh, Dean and Dean Legal were at the centre of the mechanics of the fraud. Amongst other things, Dr Alswadeh drafted and provided to Dr Taheri and Mr Shirani the agreement under which IOEC was to purchase the GSP Fortuna, which had Dean as a counterparty. Dean Legal was used as the vehicle to receive the US$87 million. Dr Alswadeh and Dean entered into brokerage agreements with Sepanta, Mr Tabatabaei and Dean Legal in order to distribute the proceeds of the fraud and enable the remission of payments to Mr Shirani.

(4) Mr Tabatabaei and Sepanta "had a central role in the fraud". They brokered the transactions whereby the GSP Fortuna was to be purchased by Dean and sold to IOEC. Mr Tabatabaei directed the actions of all and each of Dr Alswadeh, Mr Ansari, Dean and Dean Legal. Dr Alswadeh held Dean and Dean Legal as Mr Tabatabaei's nominee and acted at his direction. Under Mr Tabatabaei's direction, Dean Legal transferred a substantial part of the sums which it received from IOEC to the accounts of Mr Tabatabaei and Sepanta, and Mr Tabatabaei and Sepanta were responsible for its onward distribution. Part of what was paid onwards were significant sums paid to Mr Shirani, which were a bribe.

(5) Mr Ansari assisted in Dr Taheri's and Mr Shirani's breach of fiduciary duties by managing Dean and Dean Legal at a time when they received funds from IOEC, and participating in the division of the funds extracted from IOEC.

<u>The Cases and Positions of the Defendants</u>

5.     Dr Taheri and Mr Shirani did not file Acknowledgements of Service or Defences. They have not participated in the trial.

6.     Dean served a Defence, the Statement of Truth for which was signed by Mr Ansari. That Defence took the point that IOEC's claims arose from contracts prohibited by international sanctions, and that accordingly the Court could not or should not make an order in favour of IOEC. It contended that Dr Taheri's and Mr Shirani's actions in securing IOEC's entry into the agreement for the purchase of the GSP Fortuna were known to and authorised by IOEC. Initially it had been intended by IOEC that Dean would buy the GSP Fortuna for US$66 million, and another rig, the GSP Britannia, for US$21 million. IOEC then decided not to purchase the GSP Britannia, but did not want to alter the purchase price payable to Dean, and rather wished to enter into a "cash-back" arrangement whereby US$87 million would be remitted to Dean Legal, Dean Legal would pay US$66 million to the vendor for the GSP Fortuna, and from the balance would be paid various fees in connection with the purchase, with the remainder being remitted to "recipient(s) nominated by IOEC". Dean pleaded that no money was

paid to Dean.  It also pleaded that Dean (by Mr Ansari) was told and believed that IOEC had ultimately acquired the GSP Fortuna via another entity; and that it (by Mr Ansari) was told by Dr Alswadeh that sums already paid to Dean Legal were to be returned, and that Dean Legal had made payments as directed by Dr Alswadeh.  Dean ceased to participate in the proceedings in June 2017.

7.      Dean Legal did not file an Acknowledgement of Service or a Defence.

8.      Dr Alswadeh has acted as a litigant in person.  His position has been that Dr Taheri and Mr Shirani were at all material times authorised to act as they did on behalf of IOEC.  It has also been his case that he held Dean and Dean Legal as Mr Tabatabaei's nominee and at all material times acted under Mr Tabatabaei's direction.  His contention is that Mr Tabatabaei has sought to keep the money paid by IOEC for his own benefit.  Dr Alswadeh did not attend the trial in person due, as he said, to lack of means, but participated via video link from Dubai. This included his making submissions, cross-examining witnesses and being cross-examined.

9.      Mr Tabatabaei and Sepanta were formerly represented by Portner Law Solicitors until August 2017, and then by Mishcon de Reya, and counsel, until October 2018. Following a mediation on 12 October 2018, on the morning of 15 October 2018, the date of a PTR in the action, Mishcon de Reya came off the record. Ms Clara Johnson, instructed on a direct access basis, conducted the PTR on behalf of Mr Tabatabaei and Sepanta and continued to act for them until 5 November 2018, when she too ceased to act. As a result, Mr Tabatabaei and Sepanta applied for an adjournment of the trial, but that application was refused by Robin Knowles J on 23 November 2018.  In the circumstances, and at least in part, as he says, because of lack of means, Mr Tabatabaei has represented himself and Sepanta at the trial.  Mr Tabatabaei and Sepanta's case is set out in a Re-Amended Defence which was prepared by counsel, and his main evidence to the Court was contained in a very lengthy witness statement (of 455 paragraphs) prepared and served during the period in which he and Sepanta were represented by Mishcon de Reya.  While English is not his first language, and though he is not a lawyer, Mr Tabatabaei has conducted his case during the trial with considerable energy and resourcefulness, displaying an extremely good understanding of the issues and the documents, and has made clear submissions.  I have had no doubt that his case has been adequately put before the Court.

10.     In very broad terms, the case of Mr Tabatabaei and of Sepanta is as follows.  The case against them is a "state sponsored" and politically-motivated one, brought by IOEC, which they contended is owned by the government of the Islamic Republic of Iran, and based on a careful selection of documents, several of the most important of which were forged by Dr Alswadeh.  Insofar as there was a fraud on IOEC, it was perpetrated by Dr Alswadeh, Mr Shirani and Dr Taheri, with the assistance of Mr Ansari, and Mr Tabatabaei had no part in it.  Mr Tabatabaei had acted only in securing the deal to purchase the GSP Fortuna for IOEC and had helped in the negotiation of that deal.  For those services he/Sepanta were to be paid a commission of AED 11.9 million.  He was not responsible for the interposition of Dean in the purchase arrangements.  That arrangement was devised by Mr Shirani with Dr Alswadeh.  Dr Alswadeh was the owner and controller of Dean and Dean Legal, and at no point did Mr Tabatabaei have any interest in or control of either.  Mr Tabatabaei did facilitate the remission of certain sums initially paid by IOEC to Dean Legal to Mr Shirani for the purpose of buying equipment for IOEC.  Mr Tabatabaei himself told IOEC what those sums were.

Otherwise he does not know what has become of the sums paid by IOEC to Dean Legal, but has not benefited from them.

11.    Mr Ansari did not serve an Acknowledgement of Service or a Defence.  Until late in the day he did not indicate that he wished to participate in the trial.  At a late stage he expressed a desire to do so.  This, however, was subject to constraints of time and place.  By this I mean that Mr Ansari was in India, and had to attend his hospitalised father, and therefore had relatively short periods in which he could participate, even by video link.  In addition, communications were not straightforward.

12.    Mr Ansari's case was that at the material times Dr Alswadeh owned and controlled Dean and Dean Legal; that there was no agreement whereby Dr Alswadeh was Mr Tabatabaei's nominee in relation to those entities; and that Dr Alswadeh had ordered the distribution of very large sums, much of it in cash, from Dean Legal to himself, and to or for the benefit of Mr Shirani and a Ms Nafiseh Mahmoudi, who is Dr Taheri's niece.  Insofar as Mr Ansari was involved at all, he was acting under the directions of Dr Alswadeh.

13.    As will be apparent from this summary, the main participating Defendants were Dr Alswadeh and Mr Tabatabaei/Sepanta.  These Defendants did not seriously dispute that there had been a fraud on IOEC.  What was in issue was its precise nature and their respective involvement (or lack of involvement) therein.

The Facts in Outline

14.    The basic facts giving rise to the present claims are apparent from the documents and many are not or not substantially in dispute.  It is convenient to provide an outline of the core facts at this juncture, deferring an analysis of the main issues on which there was a factual dispute which requires resolution until later.

15.    Mr Tabatabaei was born in Iran, studied civil engineering at Azad University, and has made a career in the upstream oil and gas industry.  He has been involved in numerous agreements, some as principal, some as agent, for the sale and rental of onshore and offshore drilling rigs.  He has done extensive business in Iran and the Middle East. One aspect of his business operations has been to develop and exploit links with the Chinese market.  In 2010 he was appointed as the agent of China Petroleum Technology and Development Corporation ("CPTDC") for the sale of offshore products in a number of Gulf and Middle East countries.

16.    Mr Tabatabaei has set up a number of companies under the name "Sepanta", which is his son's name.  One of these is Sepanta Iran, which was established in or about 2000 to handle Iranian transactions, and to build an Iranian asset base. Its activities generally involved commissioning and supplying equipment to Iranian clients. Mr Tabatabaei is not a shareholder of Sepanta Iran, but his wife was initially its majority shareholder.

17.    Mr Shirani was, before the matters giving rise to the present dispute, already a business associate of Mr Tabatabaei.  From about 2006 he started to work with Sepanta Iran, and indeed, given that Mr Tabatabaei had left Iran to reside in Dubai, came effectively to run its operations.  Mr Tabatabaei's wife transferred some of her shares in the company to Mr Shirani.

18.    IOEC is an engineering, procurement and construction contractor in the offshore oil and gas sector.  At the material time it was engaged in various phases of the South Pars gas field in the Persian Gulf, as well as in other Iranian offshore oil and gas projects.

19.    Dr Taheri was appointed as the Managing Director of IOEC in March 2010.  Mr Shirani appears to have had a role in advising IOEC prior to that point.  Whatever that role, it is clear that after Dr Taheri's appointment as Managing Director, Mr Shirani was appointed as his adviser.  A letter of 29 August 2010, on IOEC paper and signed by Dr Taheri, reads (in the translation with which the Court was provided) as follows:

> "Given your background and experience, hereby you are appointed as my advisor in drilling, investment and marketing affairs.
>
> We expect that you to dedicate yourself to identifying international markets with the objective development and expansion of company activities, attracting domestic & foreign investors for expediting the completion of projects and effective involvement in the domain of offshore activities.
>
> We wish you growing success in performing your tasks, advancing the plans and objectives of the company."

20.    In early 2012, IOEC decided that it needed to acquire an offshore drilling rig for works related to the South Pars gas field project.  A minute of a meeting of IOEC's board of directors on 1 January 2012 states that:

> "Considering the importance of our quick involvement in the State's Drilling Projects and the increasing complexity of the sanctions, it was decided that the shareholders would provide the necessary finance (in proportion to their share) for the purchase of one drilling rig (with the value of up to 200 million dollars) in order to make the purchase of mentioned rig possible."

Dr Taheri was a participant in the meeting and a signatory to that resolution.

21.    Mr Shirani was clearly made aware of this resolution.  It was Mr Tabatabaei's evidence, which in this respect I accept, that in about March 2012 Mr Shirani told Mr Tabatabaei that Dr Taheri wanted him to find a jack-up drilling rig for IOEC and that, as a result of this, Mr Tabatabaei's office in Dubai began calling contacts and vendors.  It seems likely that it was as a result of these feelers being put out that, on or about 25 April 2012, a Mr van Boxtel of The Offshore Partners B.V., who were brokers or agents, sent an email seeking to contact Mr Tabatabaei "to discuss the sale of some oil rigs". Mr Sarang Hashemi, the Head of Sepanta's Onshore Division and Acting Head of its Offshore Division ("Mr Hashemi"), replied on 8 May 2012, asking for the "complete specifications of the drilling unit(s)".  Mr van Boxtel then responded on 9 May 2012 giving the details of the GSP Fortuna, a three-leg Friede & Goldman L-780 Model II cantilever jack-up rig.  I will refer to this rig, which has also been called a mobile offshore drilling unit or "MODU", as "the GSP Fortuna".  Mr van Boxtel stated that the GSP Fortuna was owned by Grup Servicii Petroliere SA ("GSP").  GSP was a company

incorporated in Romania, and was in fact the parent company of the legal owner of the GSP Fortuna, GSP Fortuna Ltd ("GSPFL"), a Maltese company.

22.    In response, indications were provided, probably by Mr Hashemi and/or Dr Alswadeh, that one of the Sepanta companies was interested in acquiring the GSP Fortuna.

23.    In further email communications, Mr van Boxtel asked Mr Hashemi to state "whether you are the actual party buying the GSP Fortuna or whether you are an intermediate". Mr Hashemi replied in an email which included the following:

> "As mentioned earlier, Sepanta Holdings and her subsidiaries will be the sole buyer and owner of this unit. Sepanta Holdings, by no means, acts as an intermediary in this deal and receives no commissions from any party. The subsidiary to which the ownership shall be granted is yet to be decided by the Board. However, for the sole purpose of assuring your esteemed organization and GSP, I am at liberty to disclose that there is a joint venture between Sepanta Holdings and another organization to receive the ownership of this unit. The JV is owned and controlled by Sepanta Holdings. The complete information on this particular matter, shall be provided to you upon final decision of the Board …
>
> I must stress that this deal has no connections to Iran, in terms of ownership and financial matters."

This last statement was untrue: it appears clear, and I find, that Sepanta and/or Sepanta Holdings had progressed the matter to this point in order to seek to supply the GSP Fortuna to IOEC. It was a false statement which was being made in order to assure the vendor, or at least to provide the vendor with a written statement to the effect, that there would be no problems as to breach of international sanctions against Iran. What was clearly being planned was the interposition of a non-Iranian company which could purchase the rig and on-sell it to IOEC.

24.    Mr Hashemi and Mr van Boxtel also discussed an inspection of the GSP Fortuna, which was at that time located in the Gemak Shipyard in Tuzla, Turkey. It was arranged that this should take place, apparently on 17 May 2012. Shortly before it was due to take place, Mr Hashemi told Mr van Boxtel that Dr Alswadeh "of our Legal Division" would "legally represent Mr Tabatabaei", who was himself unable to attend "as he had to have an urgent trip to China". The inspection then went ahead, attended, on behalf of the potential purchasers from GSP, by Mr Shirani, by Mr Heidari and Mr Siroos Ansari who were Sepanta Iran engineers, and by Dr Alswadeh. Mr Shirani was ostensibly acting for Sepanta Iran and the engineers submitted a report to him in that capacity.[1] It may be noted that, given the identity of most of those who attended on behalf of the potential purchasers, it is difficult to believe that anyone was in any doubt that the rig was, in reality, destined for Iran.

25.    A further meeting or meetings took place in Istanbul on or about 24-25 May 2012, attended by Mr Tabatabaei. Mr Shirani was also present. It is unclear whether Dr

---

[1] I/244T/920-924.

Alswadeh was there.  For the sellers, GSP's CEO, Mr Gabriel Valentin Comanescu ("Mr Comanescu") was there, as was Mr Alireza Shahriary ("Mr Shahriary") who was representing and assisting GSP and Mr Comanescu.  There were negotiations about the price.  I see no reason to doubt Mr Tabatabaei's evidence that GSP's position was initially that the GSP Fortuna was worth \$85-\$90 million.  I also accept his evidence that, during this meeting, Mr Shirani was in contact with Dr Taheri by telephone, and discussed with him the course of the negotiations.  Equally I accept that those acting for the potential purchasers contended that the GSP Fortuna was worth less than the price initially suggested by GSP, and in consequence Mr Comanescu suggested discounting the price of the GSP Fortuna if another unit, the GSP Britannia, was also purchased.  The GSP Britannia was an old (1968) Breit Engineering D-221 Design cantilever jack-up rig, at that time, apparently, undergoing refurbishment at Hartlepool.

26.    The price was not finalised at the meeting(s) in Istanbul.  On 31 May 2012 Mr Shahriary sent an email to Mr Tabatabaei, copied to Dr Alswadeh, which stated:

>   "Regarding the price, the last offer for both units is 86 mil USD,
>   confirmed by Mr Comanescu."

In fact, the price which was ultimately agreed appears to have been US\$87 million for both.  On 5 June 2012 Mr Shahriary sent to Mr Tabatabaei drafts of purchase agreements for both the GSP Fortuna and the GSP Britannia.  In both the purchasing company was identified as Caribbean Sunrise International S.A. These drafts indicated a price for the GSP Fortuna of US\$66 million, and for the GSP Britannia of US\$21 million.

27.    At this point, on 5 June 2012, Dean was incorporated in the BVI, with Dr Alswadeh as its only director.  By 10 June 2012 it had been decided that it would be Dean, rather than Caribbean Sunrise International S.A., which would be the buyer of both rigs.  It is apparent that on about that day Mr Tabatabaei spoke to Mr Shahriary as to the payment structure in relation to the purchase contracts.  In an email referring to this conversation, Mr Shahriary said, amongst other things:

>   "… there is some serious risks in the mentioned deal which we
>   have to assume…"

I consider it likely that this is a guarded reference to the awareness of all concerned that the ultimate purchaser of at least the GSP Fortuna would be IOEC.

28.    On 12 June 2012 Dr Alswadeh sent a letter on Dean's headed paper to Mr Shirani as "Advisor to the Managing Director" of IOEC.  This included a copy of the specifications for "an offshore drilling unit – namely 'Jack-up 1'", together with a draft contract for the sale of this unit by Dean.  This draft, although it was not in the documents disclosed by the parties, appears to have been one which identified Dean as the seller, related only to the GSP Fortuna (which was called 'Jackup 1' in the draft), but specified that the price for the GSP Fortuna, alone, would be US\$87 million.[2]

29.    Matters then proceeded on these lines.  On 25 June 2012 purchase agreements were entered into whereby Dean agreed to purchase the GSP Fortuna from GSPFL for US\$66 million, and the GSP Britannia from GSP Britannia Ltd ("GSPBL") for US\$21 million.

---

[2] It is likely that it took essentially the same form as the draft which was at I/255/1014.

Each purchase agreement was signed by Dr Alswadeh for Dean and by Mr Comanescu acting for the relevant GSP entity.  The purchase agreement for the GSP Fortuna ("the Purchase Agreement") contained, amongst others, the following provisions:

"3. CONSIDERATION

3.1 Sale Price. Subject to the terms hereof, the aggregate purchase price (the 'Sale Price') to be paid by the Buyer to the Seller for the Unit, … is Sixty Six Million United States Dollars (US $ 66,000,000) net of VAT …

3.2 Deposit. As security for the fulfilment of this Agreement, the Buyer shall, within ten (14) (sic) Calendar Days of the date of execution of this Agreement, pay to the Seller a deposit equal to Thirteen Million Two Hundred Thousand United States Dollars (US $13,200,000 representing (20) per cent of the Sale Price) (the 'Deposit', which expression shall be interpred (sic) as including any interest accrued thereon) in immediately available funds …

3.3 The Deposit shall be refunded to the Buyer in full only:

1. if the Seller breaches a material term or condition of this Agreement and the Seller refuses or is unable to cure such breach within twenty (20) Business Days of the Seller's receipt of written notice from the Buyer of the Seller's alleged breach; or

2. if the Unit suffers a Total Loss prior to Closing …

3. if required pursuant to Article 0 (sic).

Otherwise, the Deposit shall be refundable less an amount of US$ Six Million Six Hundred Thousand (US $ 6,600,000) which represents the 'Liquidated Damages'.

3.4 Closing Payment.

3.4.1 No later than 10 Business Days before the Closing Date and subject to the provisions of this Agreement … the Buyer shall deposit an amount equal to the Sale Price less the Deposit into the Escrow Account in accordance with Clause 3.5 … of this Agreement.

…

3.5 Intermediary Payment and Closing Payment

3.4.1(sic) No later than 30 Business Days before the Closing Date and following the Seller prior four days notice the Buyer shall transfer an amount of US$46,200,000 (the 'Intermediary Payment') in the Seller's Bank Account.

3.4.2 No later than 10 Business Days before the Closing Date the Buyer shall transfer an amount of US$6,600,000 (the 'Closing Payment') in the Seller's Bank Account.

…

4.3 Seller's Representations. The Seller hereby represents, covenants and warrants to the Buyer the following:

(a) The Seller is the real, actual, current, legal and beneficial owner of the Unit and the Unit Equipment

…

7. CLOSING

7.1 Closing

7.1.1 Subject to the other terms and conditions of this Agreement, the Seller shall sell and the Buyer shall purchase the Unit, and the Closing shall be held in Malta at the offices of GSP FORTUNA LIMITED in Valetta, Malta. The Closing shall take place on 17 September 2012 (but not earlier than 90 days from the date when the Deposit is received in the Seller's Bank Account) or such other date on or before the Outside Date as may be agreed in writing between the Parties.

…

7.4 En Bloc Sale

(a) The sale and purchase of the Unit forms part of an en bloc sale with the sale and purchase of the GSP BRITANNIA pursuant to the GSP BRITANNIA MODU Sale Agreement. Sale and Purchase of the Unit is subject to and shall take place simultaneously with the Sale and Purchase of the GSP BRITANNIA.

…"

The Purchase Agreement also provided for English law and the exclusive jurisdiction of the English Courts.

30.    The purchase agreement entered into by Dean with GSPBL, for the purchase of the GSP Britannia, on the same day, was, save as to the Sale Price, which was to be US$21 million, in materially identical terms.[3]  It too provided for a Deposit equal to 20% of

---

[3] No copy of this agreement, as executed, was before the Court. There was a draft of the Agreement, and the terms of the final agreement are apparent from the materials produced in the proceedings begun in the Commercial Court by GSPFL and GSPBL in 2013.

the Sale Price, and payable within 14 days of execution, an Intermediary Payment equal to 70%, and a Closing Payment equal to 10%.[4]

31.    In addition, apparently on the same day, three "brokerage agreements" were entered into, as follows:

(1)    The first was entered into between GSPFL and Dean Legal. It was signed by Mr Comanescu on behalf of GSPFL and by Dr Alswadeh on behalf of Dean Legal. It identified GSPFL as "the Client" and Dean Legal as "the Broker" and stated that the Client and the Broker "wish[ed] to formalize their agreement for the services provided by Broker to Client assisting the Client in securing a sale satisfactory to Client of the GSP Fortuna jack-up drilling rig." The agreement then provided for the payment to Dean Legal of a "Brokerage Commission" of US$1 million.

(2)    The second was a similar brokerage agreement entered into between GSPBL and Dean Legal. Mutatis mutandis it was in identical terms to that between GSPFL and Dean Legal, save that it provided for the payment of a Brokerage Commission of US$500,000. I will refer to this, and the agreement referred to in (1) above as "the Dean Legal Brokerage Agreements".

(3)    The third was an agreement entered into between Dean and Sepanta. It was signed by Dr Alswadeh for Dean and by Mr Tabatabaei for Sepanta. Dean was identified as "the Client" and Sepanta as "the Broker".[5] It stated that the Client and the Broker "wish[ed] to formalize their agreement for the services provided by Broker to Client assisting the Client in securing a sale satisfactory to Client." It then provided for the payment of a Brokerage Commission "for the sale of the PG" of AED 13,858,000. "PG", which apparently stands for "Persian Gulf", is a reference to the GSP Fortuna.

32.    On 26 June 2012 Dr Alswadeh, on behalf of Dean, sent to IOEC a draft of the sale agreement between Dean and IOEC, together with a technical specification document, an invoice, and Dean's certificate of incorporation. The invoice was for US$87 million, which was stated to be in respect of "The Cantilever Jack-Up Drilling Rig 'PG 110' of Friede & Goldman L-780 Model II Design", i.e the GSP Fortuna (alone).

33.    A further copy of the proposed sale agreement was sent by Dr Alswadeh on the following day, 27 June 2012, together with other documents. It appears that it was this draft which came to be executed, by being signed by Dr Taheri, and apparently also by Mr Nejat Amini, on behalf of IOEC and by Dr Alswadeh on behalf of Dean. This agreement ("the Sale Agreement") contained the following provisions, amongst others:

> "THIS MODU SALE AGREEMENT … is entered into on the 27th day of June, 2012, by and between
>
> (1) [Dean] … duly represented by [Dr Alswadeh], Director. (the "Seller"),

---

[4] I/927/3963.
[5] Although this agreement apparently bears the date of 25 June 2012, there is doubt as to whether it was actually concluded on that date or was concluded later.

And

(2) [IOEC] ... duly represented by [Dr Taheri]. (the "Buyer").

WHEREAS the Seller (according to the documents and certificates attached hereto) is the owner of the Unit (as defined below) which is currently under refurbishment in Tuzla Yard, Turkey and in process of certification by ABS …

WHEREAS the Buyer wishes to purchase, and the Seller wishes to sell the Unit on the terms and conditions set forth below

…

1.DEFINITIONS AND INTERPRETATION

1.1…

(f) 'Closing' means the consummation of the purchase and sale of the Unit.

(g) 'Closing Date' means the date of Closing with respect to the Unit in accordance with Article 7.1.

(h) 'Closing Time' means the date and time stated on the Certificate of Acceptance of Delivery.

…

(p) 'Outside Date' means 130 business days from the date when the Deposit is received by the Seller in its Seller's Bank account.

…

(s) 'Unit' means the cantilever jack-up drilling rig 'PG', of Friede & Goldman L-780 Model II Design, originally built in 1984 by Astilleros Corientes SA in Argentina … [ie the GSP Fortuna]

3.CONSIDERATION

3.1 Sale Price. Subject to the terms hereof, the aggregate purchase price (the 'Sale Price') to be paid by the Buyer to the Seller for the Unit, free from all debts, liabilities and Liens, is Eighty Seven Million United States Dollars (US$87,000,000) net of VAT …

3.2 Deposit. As security for the fulfilment of this Agreement, the Buyer against receipt of a Sellers Company cheque guarantee in equivalent amount by the Buyer, shall, within seven (7) Calendar Days of the date of signing of this Agreement, pay to the Seller a deposit equal to Seventeen Million Four Hundred Thousand

United States Dollars (US$17,400,000) representing (20) per cent of the Sale Price (the 'Deposit', which expression shall be interpred (sic) as including any interest accrued thereon …

3.4 <u>Closing Payment.</u> 3.4.1 No later than 100 (hunred) (sic) Business Days from the Deposit is received in the Seller's Bank Account and subject to the provisions of this Agreement, the Buyer shall deposit an amount equal to the Sale Price less the Deposit into the Seller bank account in accordance with Clause 3.5 of this Agreement.

3.5 <u>Closing Payment.</u> No later than 100 (hunred) (sic) Business Days from the deposit actual payment and upon lawfully transfer of ownership of the Unit (rig) to the Buyer and satisfactory delivery of the Unit (rig) to Delivery Zone the Buyer shall transfer an amount of Sixty Nine Million Six Hundred Thousand US$69,600,000 in the Seller's Bank Account.

…

4. <u>REPRESENTATIONS AND WARRANTIES</u>

…

4.3. <u>Seller's Representations.</u> The Seller hereby represents, covenants and warrants to the Buyer the following:

(a) The Seller is the real, actual, current, legal and beneficial owner of the Unit and the Unit Equipment by rendering final ownership documents to the Buyer;

(b) On Closing, the Unit and the Unit Equipment will be free of any and all Liens and the Seller guarantee this issue…

…

7. <u>CLOSING</u>

7.1 <u>Closing.</u>

7.1.1 Subject to the other terms and conditions of this Agreement, the Seller shall sell and the Buyer shall purchase the Unit, and the Closing shall be held in the Mediterranean Sea or the Black Sea designated ship yard. The Closing shall take place on 30 October but not earlier than **100** days from the date when the Deposit is received in the Seller's Bank Account) or such other date on or before the Outside Date as may be agreed in writing between the Parties.

…"

34.     There was no agreement by IOEC to purchase the GSP Britannia. Instead, as is apparent from the above, the sum which IOEC had agreed to pay Dean to purchase the GSP Fortuna was US$21 million greater than the price which Dean had agreed to pay to GSPFL to acquire it.

35.     The bank account which had been specified as the "Seller's Bank Account" in the Sale Agreement was an account of Dean Legal, not of Dean. In anticipation of the arrival of the deposit under the Sale Agreement into this account, on 8 July 2012 Mr Tabatabaei, Dr Alswadeh and Mr Hashemi entered into an escrow agreement. Under this agreement, Dr Alswadeh agreed to provide a Dean Legal cheque for US$17.4 million to Mr Hashemi as "escrow agent", to hold as security.

36.     This agreement (the "Dean Escrow Agreement") provided, in part:

> "Whereas [Dr Alswadeh] is obliged to transfer an amount of USD 17,400,000 (seventeen million four hundred thousand) upon [Mr Tabatabaei's] request to the benefit of [GSPFL] and/or [GSPBL], [Dr Alswadeh] is giving the attached Cheque to [Mr Hashemi] … to hand it over to [Mr Tabatabaei] or [Dr Alswadeh] as per the terms and conditions stated in this agreement
>
> …
>
> As security for payment to [Mr Tabatabaei], [Dr Alswadeh] has agreed to deposit a security cheque (no. 000006) dated nil in the amount of USD 17,400,000 … with [Mr Hashemi]
>
> …"

37.     Contemporaneously, within IOEC, Dr Taheri made arrangements for the payment of the deposit under the Sale Agreement. On or about 8 July 2012 he issued a handwritten instruction to Mr Yahyavi to transfer 20% of the contract price to the account stated in the Sale Agreement. He also procured and signed a transfer instruction dated 8 July 2012 to an associated company of IOEC, OMC Ship Management LLC ("OMC"), to transfer the sum of US$17.4 million to Dean Legal's account. The instruction to pay was sent in this way because, due to sanctions, IOEC made use of credits which it had with counterparties outside Iran to make payments which were required of it. Payment of the amount of AED 63,858,000, equal to US$17.4 million, was effected by OMC to Dean Legal on 15 July 2012.

38.     Just before that payment was effected by OMC, namely on 14 July 2012, the arrangements whereby Dean should purchase the GSP Fortuna were restructured as a result of negotiations conducted between Mr Comanescu and Mr Tabatabaei. This restructuring had at least the following two aspects:

(1) First, by an Addendum to the Purchase Agreement, the "en bloc" provision in that Purchase Agreement, which had contractually linked the purchase of the GSP Fortuna with that of the GSP Britannia, was deleted; the amounts stipulated by way of liquidated damages were increased; the purchase price was increased to US$67 million; and the payment structure was revised to reflect that increase in price.

(2) Second, by variations to the Dean Legal Brokerage Agreements, those agreements were terminated so that Dean Legal would not receive a commission.

39. What is not clear is what was said and agreed as to the termination of the purchase agreement for the GSP Britannia. In proceedings which were subsequently brought by GSPBL, GSP contended that there had been no termination of that purchase agreement, and that it had remained in force, while on the other hand Dean contended that there had been an oral agreement to terminate the purchase of the GSP Britannia. What does appear clear is that Dean did not pay a deposit in respect of the GSP Britannia, and, indeed, that none was pressed for from the GSP side.

40. In conformity with the restructured agreement in relation to the purchase of the GSP Fortuna, on 14 July 2012 GSPFL issued an invoice for the deposit in the sum of US$13.4 million (i.e 20% of the new price of US$67 million). This amount was paid out of Dean Legal's bank account to GSPFL on 18 July 2012, from the US$17.4 million which it had received from OMC.

41. Further payments out of Dean Legal's account, representing parts of the amount of US$17.4 million which it had received from OMC, were as follows:

(1) A payment of AED 13,858,000 to Sepanta on 16 July 2012.

(2) On 16 July 2012 Dean Legal issued a cheque to Mr Ansari in the sum of AED 525,000.

42. On 2 August 2012 Dr Alswadeh sent an email to Mr Hashemi asking for the return of the cheque which he had provided under the Dean Escrow Agreement, on the basis that payment of the deposit had now been made to GSPFL. Mr Hashemi replied that the cheque would be returned, in the presence of Mr Tabatabaei, on submission of proof of the transfer.

43. The original Closing Date under the Purchase Agreement was 17 September 2012. This however came and went without Dean's having made any payments beyond the deposit, and without an extension having been agreed with GSPFL. Dr Alswadeh, in particular, sought to get IOEC to pay the balance of the contract price under the Sale Agreement in order to fund the payments required under the Purchase Agreement, sending regular reminder emails to Mr Shirani that payment should be made.

44. On 23 October 2012 half of the shares in Dean were transferred from Dr Alswadeh to Mr Ansari, and on the same date Mr Ansari was appointed as a director of Dean.

45. On 24 November 2012 a further Brokerage Agreement was entered into, this one between Dean and Mr Tabatabaei personally. It appears to have been entered into in anticipation of funds from IOEC and the conclusion of the purchase of the GSP Fortuna by Dean. It identified Dean as "the Client" and Mr Tabatabaei as "the Broker", and stated that the Client and the Broker wished to formalise their agreement for the services provided by the Broker to the Client "in securing a sale satisfactory to Client". The "Brokerage Commission" provided for was AED 50 million, or about US$13.5 million at then-current exchange rates.

46.    Mr Tabatabaei's witness statement suggested that there was another Brokerage Agreement, of the same date, in the sum of AED 10 million. I was left unsure, and could not find on the balance of probabilities, that that was the case.

47.    By this time in November 2012, however, GSPFL was losing patience with Dean's failure to pay under the Purchase Agreement. On 14 November 2012 Mr Comanescu had sent an email to Dr Alswadeh threatening to send a termination notice if a solution was not agreed by the following day. On 29 November 2012 Mr Shahriary sent a letter marked "Confidential" to Dr Taheri and Mr Shirani directly. The letter was careful to avoid using proper names, and employed cryptic language, but indicated that if "the buyer" failed to fulfil its financial obligations by 4 December 2012, "the vendor will be obliged to urgently terminate or provide the grounds of avoiding termination." This letter confirms the fact that those acting for GSPFL were aware that the ultimate purchaser of the GSP Fortuna was IOEC.

48.    On 1 December 2012 the issue of the purchase of a drilling rig (namely the GSP Fortuna, though it was not called by that name in the discussion) was raised by Dr Taheri at a meeting of IOEC's Board. The minute reads, in translation, as follows:

> "9. Securing funds for purchase of a drilling rig
>
> As IOEC has proceeded to purchase a second-hand drilling rig from Turkey for 87 million dollars, the company's shareholders, pursuant to article 2 of minutes of the board of directors' meeting number 316/1, dated [1 January 2012], will have to provide funds for the purchase to IOEC in proportion to their ownership share."

This minute was signed by the members of the Board, but the signature of the Chairman, Mr Maleki, was accompanied by the annotation "Article 9 is in force, subject to OPIC's approval". OPIC is a reference to the Oil Industry Pension Fund Investment Company in Iran.

49.    No further money having been paid under the Purchase Agreement, on 3 December 2012, GSPFL served a notice on Dean terminating that Agreement. On the following day, Dr Alswadeh sent an email to Mr Shirani, which stated:

> "Please be advised that I am doing my best to bring the contract alive after the big disaster happened yesterday, now I am waiting to have three days more to secure the fund, please be sure to transfer the fund maximum by Saturday, otherwise I am afraid that the deposit shall be lose under the liquidated damage and the penalty."

Given the fact that Dr Taheri had been party to Mr Shahriary's warning a few days earlier, and the links between him and Mr Shirani, I infer that Dr Taheri will have been made promptly aware of the termination of the Purchase Agreement.

50.    Notwithstanding that termination, and in the hope, at least initially, of resurrecting the Purchase Agreement by showing GSPFL that the money would be forthcoming, Dr Taheri took steps to have money paid to Dean Legal. He made use of CPTDC as an

intermediary to route the Closing Payment under the Sale Agreement to Dean Legal. On 10 December 2012, he issued an instruction to Naftiran Intertrade Company Sarl ("NICO") to re-route a payment of US$40 million that was about to be made by NICO on IOEC's behalf, from its originally intended beneficiary (Uno Steel Group Ltd), to CPTDC.

51.    On 19 December 2012, Dr Alswadeh sent an email to Dr Taheri, copied to Mr Shirani, in which he confirmed that "the Chinese" (ie apparently CPTDC) had received the payment and were going to forward it to Dean Legal. He asked Dr Taheri and Mr Shirani to "kindly proceed with the rest of the payment ASAP", and also stated "now I could start to re alive the contract again".

52.    On 6 January 2013, Dr Taheri issued an instruction to International Processed Steel ("IPS"), which was a subsidiary of IOEC, to re-route an amount of €25,640,263, also originally intended for payment to Uno Steel Group Ltd, to CPTDC.

53.    In December 2012/January 2013 there was a rearrangement of Dean Legal's shareholding and directorship. Under this, on 14 January 2013, two shares in Dean Legal were issued to Mr Ansari, and he was registered as its manager and licensee. On the same date the name change to Dean General Trading FZE became effective.

54.    On 24 December 2012, Mr Shirani asked Mr Yahyavi to prepare an instruction to the vice-president of CPTDC to transfer the US$40 million which had been diverted from NICO to Dr Alswadeh as "Dean Company Director". An instruction to be signed by Dr Taheri was then prepared and sent to CPTDC on 29 December 2012.

55.    Further payments were received by Dean Legal on behalf of IOEC, namely €10,999,923 from CPTDC on 9 January 2013 and €18,502,365.69 from CPTDC on or shortly after 18 January 2013. In addition, on 23 January 2013, Dr Taheri executed an instruction to CPTDC to transfer US$29,600,000 to Dean, an instruction which was repeated on 12 February 2013. He gave a further instruction to CPTDC to transfer funds to Dean Legal's account on 6 March 2013.

56.    In the meantime, Dr Alswadeh in particular was involved in attempts to revivify the Purchase Agreement with GSPFL. A part of these negotiations seems to have involved putting in place an alternative purchasing structure, under which a company called Global Consultants Investments Ltd ("GCI"), which Dr Alswadeh had established in September 2012, would become the legal owner of the GSP Fortuna, and ownership of GCI would then be transferred to IOEC. In mid-February 2013 it appeared that these efforts might be successful. On 19 February 2013 Dr Alswadeh sent an email to Dr Taheri and Mr Shirani which said, in part, that "the original seller [i.e. GSPFL] gave dean two days including today to attend to sign the new contract and pay the money in one hour." Dr Alswadeh sought to impose a condition that the rig should be inspected, but this was rejected, and the negotiations appear to have broken down on 20 February 2013, when Mr Shahriary sent an email to Dr Alswadeh saying that Mr Comanescu had instructed him to terminate discussions about the deal.

57.    By 5 March 2013 the tone of Dr Alswadeh's communications with GSP had changed. On that date he sent an email to Mr Comanescu, copied to Mr Shahriary, stating that, if the deal was not put back in place, he wanted to have the deposit returned and "in case

this doesn't match your highness mentality, let's go to the court, and there, be sure I will do my extremely best to get my money back and more…"

58.  Notwithstanding these developments, on or about 20 April 2013, CPTDC, in conformity with the previous instructions to it to do so, paid €22,105,972 (or approximately US$29 million) to Dean Legal's bank account.

59.  On 4 April 2013, GSPFL and GSPBL commenced proceedings against Dean in this Court, claiming declarations that each of the purchase agreements had been validly terminated by the respective vendor for breach by the respective purchaser of its obligation to pay the Intermediary and Closing payments, and for damages. These proceedings appear to have been served on Dean in early May 2013. Dr Alswadeh instructed Afridi & Angel to act on behalf of Dean, their first invoice being addressed, however, to Mr Tabatabaei, c/o Sepanta.

60.  In due course, the claimants in those proceedings issued an application for summary judgment confined to their claims for liquidated damages. Dr Alswadeh served a Witness Statement in opposition to that application, apparently dated 17 January 2014. That Witness Statement contained the following:

(1) In paragraph 4 a statement that Dr Alswadeh was the "sole director of [Dean]".

(2) A statement that "since 2011 … I have carried out a large number of successful deals in Dubai, United Kingdom, France, Italy and Turkey" (paragraph 5).

(3) A statement that it had been Dr Alswadeh who had initially approached Mr Comanescu in relation to the purchase of the GSP Fortuna (paragraph 8). That paragraph continued:

> "My initial approach to GSP was for Fortuna only because Dean generally had a secured and specific requirement from an end user for a particular rig with a particular technical specification. In the case of the Fortuna the end user was Chinese."

This passage was generally misleading, but the last sentence in particular was clearly a deliberate lie, intended to conceal from the Court that the "end user" was Iranian.

(4) In paragraph 14, statements that "I made an offer for both Fortuna and Britannia of US$87m" and that "I intended to on-sell Britannia". These statements, and others in the Witness Statement, were clearly designed to and did convey the impression that Dr Alswadeh alone was the decision-maker for Dean.

(5) In paragraph 30, a reference to Dean Legal as "my company".

(6) Evidence to the effect that the purchase of the GSP Britannia had been "abandoned". Dr Alswadeh testified that he had been "informed that the on-buyer of the vessels from Dean was no longer willing or interested any more in procuring the Britannia", and that "on the basis of negotiations between the on-buyer and GSP they had agreed to separate the two contracts, for the purchase of the Fortuna and Britannia units" (paragraph 38). This had led to the restructuring arrangements

dated 14 July 2012 (paragraph 39), of which the intention "was that in exchange for GSP agreeing to abandon the Britannia contract, Dean agreed to pay an extra US$1m for the Fortuna rig, and to the abandonment of the two brokerage agreements [with Dean Legal]" (paragraph 40).

61.    On 23 June 2013 Dr Alswadeh sent a letter to IOEC, attention Dr Taheri, which stated, amongst other things:

> "… 3. DEAN has paid the deposit to the original seller $17,400,000.00, in consideration that DEAN has paid from its own money in making this deal happen.
>
> …
>
> 6. DEAN is prevented from sending back the remaining amount in its account which is around $65,000,000.00 as the bank asked DEAN to pay the rest of the money to the original seller or to provide a court order showing that the deal is no longer valid.
>
> 7. The bank has advised verbally and in writing but not officially that the relative department in the central bank has some doubts about the amount so it's not advisable to do any suspicious moves. …"

The statements in this letter as to bank action and what the bank had stated were untrue.

62.    By June 2013, the amounts which I have described as having been received into Dean Legal's bank accounts had largely been extracted therefrom, and the balance on its accounts was nearly zero.

63.    The hearing of the summary judgment application in the GSP proceedings in this Court took place on 21 March 2014. By a judgment dated 9 July 2014 Walker J dismissed the application. Further pleadings were served in that action, including Amended Defences served by Dean, with Statements of Truth signed by Dr Alswadeh, on 16 October 2014.

64.    By April 2015, and against the backdrop of developing investigations at IOEC, Dr Alswadeh had started sending emails which sought to record his position and to distance himself from Mr Tabatabaei and Mr Ansari. On 8 April 2015 he sent an email to Mr Tabatabaei and Mr Ansari which included the following:

> "Reference to the nominee agreements have been signed between us as I was appointed as the nominee director of the company mentioned above and based on the articles of the nominee agreement/s, hereby; please be advised that I am no longer wish to continue the position in DEAN INVESTMENT HOLDING BVI, accordingly; please let me know what is your decision you would like to maintain, dormant, transfer to your name or any other or any other decision you would take in this regard, it was my pleasure to handle the company under your

> supervision and instructions since it was established … By this
> date I consider the termination of our nominee relationships."

65.    On 27 April 2015 Dr Alswadeh initiated the transfer of his remaining 50% share in
       Dean to Mr Ansari. On 16 May 2015 he sent an email to Mr Ansari which stated, in
       part:

> "1. I do agree that you are the real owner of 50% of the shares in
> the company in joint with [Mr Tabatabaei].
>
> …
>
> I reserve my right to receive one million dollar as my legal fees
> due to be paid on April 10th, 2015.
>
> [Mr Ansari] as real owner of the company and real and sole
> owner of [Dean Legal] with all of its bank accounts in emirates,
> ndb and Baroda Bank and other banks; is in the same position of
> [Mr Tabatabaei] in all cases, especially the financial matters (87
> million USD) for the purchasing of the Jackup FORTUNA from
> GSP company for the benefit of IOEC."

66.    On 26 August 2015 Dr Alswadeh sent to Mr Tabatabaei and Mr Ansari a document
       entitled "Termination of Nominee Agreement/s DEAN INTERNATIONAL
       TRADING S.A / DEAN INVESTMENT HOLDINGS S.A and others", which stated
       that the "nominee agreement/s whatever the company or the entity is terminated" and
       "the Owner", defined as Mr Tabatabaei, must protect and indemnify "the nominee",
       defined as Dr Alswadeh.

67.    The present proceedings were issued on 14 March 2016.

Contentious factual areas

68.    There were six broad areas where there were factual disputes or issues which it is
       convenient to consider and state my findings on, in turn.

Ownership and Control of IOEC

69.    Mr Tabatabaei raised issues as to who owned IOEC, and as to its closeness to the
       executive of Iran.

70.    While I do not consider that IOEC's ownership is determinative of any issue, I accept
       the evidence which was served by IOEC, to the effect that its largest shareholder, with
       51%, is Ahdaf Investment Company, which was formerly OPIC. That company is itself
       owned by National Iranian Oil Company Pension Fund ("NIOCP"). The second largest
       shareholder is Ghadr Investment Development Co, an investment company which is
       owned by the Cooperative Fund of NAJA, a pension fund for retired employees of the
       law enforcement agencies of Iran.[6]  It also appears that IOEC has since 2001 been a
       private company operating in accordance with the Iranian Commercial Code.

---

[6] G/12/115 para. 26.

71.    On the other hand, I formed the clear view that the links between IOEC and the executive of the Islamic Republic of Iran were close, and that it would be very unlikely that IOEC would contravene the wishes of the government of Iran on any material matter.

72.    I am also prepared to accept that Mr Tabatabaei's political and ideological positions have contributed to the vigour with which IOEC has pursued him, and the virulence of its allegations against him, which stand in contrast, for example, with its comparatively "gentle" treatment of Dr Alswadeh.

73.    What I did not conclude, however, was that these matters had resulted in IOEC, or the government of Iran, inventing an otherwise unsupported case against Mr Tabatabaei. In this Court IOEC has had to prove its allegations by means of relevant and admissible evidence.  To the extent that it has done so, Mr Tabatabaei will be found liable on the basis of the evidence, not on the basis of the government of Iran's animosity to him.

Compliance with procedures and knowledge of the transaction within IOEC

74.    In relation to what was known at the material time about the relevant transaction, and by whom, within IOEC, and as to what procedures were followed relating to it, I had the evidence of the documents, some evidence of Mr Tabatabaei and Dr Alswadeh, and the evidence of three witnesses from IOEC.  Those three witnesses were: Mr Naser Maleki ("Mr Maleki"), who was the Chairman of the Board of Directors of IOEC, and Managing Director of OPIC, IOEC's major shareholder, from about July 2012 to March or April 2014; Mr Ali Seifian ("Mr Seifian"), who was the head of the Contract Division within IOEC during the period February 2011 to October 2012, and was then a part time contract consultant for IOEC until March 2016; and Mr Hossein Yahyavi Saieein ("Mr Yahyavi"), who was Manager of Financial Affairs at IOEC from about April 2011 to about July 2013.  I found all of these three men to be cautious and reliable witnesses.

75.    This evidence indicated that, after the resolution in general terms that finance should be provided by IOEC's shareholders for the purchase of a rig in January 2012, the acquisition of the GSP Fortuna in particular was pursued by Mr Shirani in the period up to June 2012.  He attended the early meetings relating to the acquisition of the GSP Fortuna, in May 2012, as described above.  Mr Shahriary copied him into the bulk of the correspondence relating to the Purchase Agreement, including the email of 31 May 2012.[7]  I consider that he must have kept Dr Taheri informed of all these matters.  As I have already found, Dr Taheri was kept informed by Mr Shirani of the negotiations during the course of the meeting on 24-25 May 2012.  It seems to me clear that this reflects a close cooperation between these two men in relation to the acquisition in this period, which must have involved their both knowing that the price at which GSPFL would sell the GSP Fortuna was initially agreed at US\$66 million, and the price for which GSP agreed to sell it and the GSP Britannia was US\$87 million.

76.    Dr Taheri may have shared his knowledge of the price for which the GSP Fortuna was being sold by GSPFL with Mr Rahmanipanah, then the Head of IOEC's Contract Department.  This is suggested by certain evidence given to the Court by Dr Masoud Amani ("Dr Amani"), Mr Rahmanipanah's successor.  This was to the effect that, on the first day or almost the first day on which Dr Amani had started in his current

---

[7] Copied to Mr Shirani on 1 June 2012: I/254/1011.

position, in February 2014, the man who had been secretary to Mr Rahmanipanah was stopped while taking two packages of documents out of IOEC's building. The secretary said that he had been asked to do this by Mr Rahmanipanah. One of the documents was a draft of the Purchase Agreement between GSPFL and Dean, showing the price of US$66 million. There is no evidence indicating that anyone else within IOEC (i.e other than Mr Shirani, Dr Taheri and possibly Mr Rahmanipanah) was aware of this at any time before 2014.

77.    Furthermore, the evidence establishes that the project to purchase the GSP Fortuna was not discussed and approved within IOEC in the way which would have been normal and in accordance with ordinary procedures within IOEC. The evidence before me is to the effect that the Sale Agreement had not, prior to being entered into, received approval by the Transaction Committee or the IOEC Board, as it should have done had normal procedures been complied with. Indeed, it appears to have been first referred to in a communication addressed to IOEC, as opposed to sent to Mr Shirani as advisor to Dr Taheri, only on 26 June 2012, when IOEC was sent a draft of the Sale Agreement. That draft, of course, referred to the price of the GSP Fortuna as being US$87 million.

78.    Dr Taheri appears to have arranged for Mr Rahmanipanah to ask a former employee who was by June/July 2012 acting as a consultant to IOEC, Mr Hassan Salami, to review the draft. This itself appears to have been irregular, and the reason which had been given for its being considered by Mr Salami, namely its alleged confidentiality, was not considered to be a good one by Mr Seifian, when he learned that this had happened in early July 2012. It appears that Mr Salami's comments were reflected in a report on the draft dated 30 June 2012 prepared by Mr Rahmanipanah, which raised certain points, including a suggestion that IOEC should protect itself by the establishment of an escrow mechanism into which the deposit could be paid. Those suggestions were not implemented by Dr Taheri or Mr Shirani before the Sale Agreement was entered into by IOEC.

79.    Thereafter, at Dr Taheri's instigation, ordinary procedures were not followed in relation to the payments effected pursuant to the Sale Agreement. The payment of the initial sum of US$17.4 million was initiated by a handwritten note from Dr Taheri to Mr Yahyavi, this being unprecedented in Mr Yahyavi's experience. Thereafter the instruction for the transfer of US$17.4 million from OMC to Dean was approved by Dr Taheri himself, whereas there should have been approval and confirmation from the Manager of the Drilling Department, Mr Amrollahi, and his deputy. Mr Yahyavi's evidence was that this too was unprecedented.

80.    On or about 11 July 2012 Mr Yahyavi informally raised with Mr Rahmanipanah further concerns about the Sale Agreement, including that no funds had been contributed by IOEC's shareholders in pursuance of the resolution of 1 January 2012 to pay for a rig, and as to the inadequacy of the security held by IOEC for repayment of the US$17.4 million.

81.    As already mentioned, Dr Taheri raised the issue of the purchase of the GSP Fortuna – though it was not referred to under this name – at an IOEC Board Meeting on 1 December 2012. It was said that the purchase price for the "second hand drilling rig" was US$87 million. Mr Maleki's evidence, which I accept, was that Dr Taheri said that IOEC's shareholders would have to contribute funds for this purchase, for which the first payment had been made. Mr Maleki asked to be provided with a copy of the

contract and of the Board resolution authorising the purchase, but these were not provided.  Mr Maleki gave evidence that no resolution was made at the meeting in respect of the purchase, and there was no authorisation then given for the payment of any further sums.  Shortly afterwards, however, Mr Maleki was asked to sign a minute of the Board meeting, item 9 of which related to the rig purchase and was drafted in such a way as, in Mr Maleki's view, to constitute an approval of the purchase itself.  Mr Maleki stated to the Secretary of the Board that the minute did not properly reflect the discussion, and then signed the minute, stating in relation to item 9, as I have set out above, that it was "subject to OPIC's approval".   Mr Maleki stated that his understanding in light of this was that no further payments could be made in respect of the transaction without the obtaining of approval from OPIC itself.  There was no evidence and no suggestion that any such approval was subsequently obtained.

82.  When the Purchase Agreement was terminated by GSPFL on 3 December 2012, it is clear that Mr Shirani was immediately aware of this having occurred.  I have already set out above the email which Dr Alswadeh sent to Mr Shirani on the following day, which indicates that Mr Shirani already knew of the "big disaster" and its significance.  It is also apparent from the email which Dr Alswadeh sent to him and to Mr Shirani on 19 December 2012 that Dr Taheri was aware that the Purchase Agreement had been cancelled and that negotiations were now required to attempt to "re alive" it.  Notwithstanding this, Dr Taheri proceeded to arrange for further amounts to be transferred to Dean Legal's account, in order to finance the Closing Payment if the Purchase Agreement could indeed be revivified.  This was done notwithstanding that no proper security arrangements had been put in place to ensure that these sums would be returned if the deal did not go ahead.

83.  Any realistic possibility of the Purchase Agreement being brought back to life appears to have ceased by 20 February 2013.  I regard it as certain that Mr Shirani will have been fully aware of the course of negotiations and of the fact that from this point there was no realistic possibility of the Purchase Agreement being effective.  Mr Shirani's involvement was well-known to GSP, and it would not have been realistic for him to be kept out of knowledge of what was occurring.  I also infer that Dr Taheri will have been aware of the near inevitability that the Purchase Agreement would not go ahead, on or shortly after 20 February 2013.   This is not only because of the close working relationship between Mr Shirani and Dr Taheri, but also because Dr Taheri will undoubtedly have been aware that the funds necessary to comply with GSP's peremptory ultimatum of 19 February 2013 were not paid within the time specified.  Notwithstanding this, Dr Taheri gave a further instruction to CPTDC to transfer funds to Dean Legal's account on 6 March 2013, and as far as can be seen took no steps to countermand the making of this transfer at any point before it occurred on or about 20 April 2013.

84.  Mr Yahyavi described in evidence how, at a meeting with IOEC's auditors in May or June 2013, Dr Taheri had stated that there was an outstanding claim from Dean in respect of the rig transaction, and that once that claim was paid, the position would be resolved and the rig would be delivered.  Mr Yahyavi's evidence was that Dr Taheri had given a similar account to the General Assembly of IOEC's shareholders in late July 2013.  These steps indicate that Dr Taheri was concealing from others within IOEC a full account of what had actually occurred with the rig.

85.    In February 2014 Dr Taheri's contract as Managing Director of IOEC was terminated and he was succeeded by Mr Gholamreza Manouchehri.  Thereafter an investigation began within IOEC into the GSP Fortuna transaction.

86.    One further matter should be considered under this heading.  That is the issue of whether it was ever contemplated that IOEC should acquire the GSP Britannia.  I was told, and accept, that there is no documentation within IOEC which indicates that there was at any stage any suggestion that IOEC should acquire the GSP Britannia, either directly, or indirectly, and no documentation which suggests that IOEC was agreeing, in the price of US$87 million, to acquire - or acquire an interest in - the GSP Britannia. Certainly I was not shown any such document. Furthermore, I have seen and heard no evidence that the initially intended sale by GSP of the GSP Britannia at the same time as the GSP Fortuna was at the time known to anyone within IOEC except Dr Taheri and Mr Shirani.  This is subject to the point, which I have already mentioned, that Dr Taheri may at some point have shared a copy of the Purchase Agreement with Mr Rahmanipanah.

What loss did IOEC suffer?

87.    Part of the defence of Mr Tabatabaei and of Sepanta was to put IOEC to proof that the sums which were paid to Dean Legal by OMC and CPTDC, in the way and amounts which I have set out above, were IOEC's property and amounted to a loss to it.

88.    While the documentation was more scanty than might have been expected, I considered that the evidence of Mr Yahyavi did establish that IOEC had suffered losses in the amount of these payments.  It had used credit balances with third parties, who made the payments on to Dean Legal.  This arrangement was equivalent to use of a bank account: the liability of the third party to IOEC was discharged by that third party making the transfer to Dean Legal's bank account, IOEC thereby losing the value of the choses in action representing the credit balance with the third party.

Control and Direction of Dean and Dean Legal

89.    Under this heading I will consider what was one of the most important issues debated at the trial, and the one which took up the most time.  This is the question of who was in charge of the Dean companies, Dean and Dean Legal, and, more specifically, what Mr Tabatabaei's role was in relation to those companies, what he knew about them and their operations, and whether they were run at his direction and in his interest by nominees for him.  As I have already indicated, the competing cases on this were starkly at odds.  Mr Tabatabaei, and in effect Mr Ansari as well, denied that he had had any role in the setting up of the Dean companies or in their running, and had had very little knowledge of what they did: it was Dr Alswadeh who had been responsible for the setting up of the Dean companies, and for all their actions relating to the GSP Fortuna at all material times.  IOEC's, and Dr Alswadeh's, case was that Dean and Dean Legal were, in effect, part of the Sepanta Group, beneficially owned by Mr Tabatabaei, managed as part of the Group, and while nominally Dr Alswadeh and Mr Ansari owned shares and/or held positions in those entities they acted "solely at [Mr Tabatabaei's] direction".

90.    Determining where the truth lies between these two radically different accounts has been made more difficult because it is apparent that some documents were undoubtedly

forged, and there are issues as to whether others were. It has also been made more difficult by the fact that, even on IOEC's case, Dr Alswadeh was a man who produced a series of misleading or bogus documents. IOEC nevertheless contended that, even though its cross-examination of Dr Alswadeh was, in Mr Onslow QC's own word, "gentle", I should accept most of his evidence.

91.    I should therefore begin by giving my assessment of Dr Alswadeh's evidence. It appeared to me to be clear that Dr Alswadeh is a man who is, and was throughout the course of these transactions, prepared to engage in serious, repeated and persistent dishonesty. There are a significant number of instances in which he was responsible for misleading or fake documents. Thus by way of a non-exhaustive list:

(1) I was shown a Profile of Dr Alswadeh which he prepared for Dean Holdings' internet site. Its precise date was not clear. It stated, however, that Dr Alswadeh had, since 2011, been "running successful private business Dean Group which carried out a number of successful deals in Dubai, United Kingdom, France, Italy and Turkey. That was mainly trading with well known clients as well as acting as an investor / private developer of his own." It also stated that "Since 2008 Dr [Alswadeh] was involved in oil and commodities supply as a consultant later as President of newly registered [Dean]. As of today, The holdings grows and much more progressive on oil and gas business worldwide..." Almost all these statements were false. Dr Alswadeh accepted in his evidence that some of this document was "made up". This is of potential significance in that it was not, and could not plausibly have been, suggested that these fabrications were the responsibility of Mr Tabatabaei.

(2) Dr Alswadeh was responsible for the production of the various Brokerage Agreements, which were deliberately inaccurate and misleading in identifying the nature of the transactions actually involved, as he accepted.

(3) The Witness Statement which he submitted in relation to the summary judgment application in the GSP proceedings in this Court contained a number of deliberately misleading statements designed to convey the impression that he was not only the sole significant decision-taker at Dean, but was an experienced businessman, which on any view he was not, as well as to obscure the fact that the GSP Fortuna had been destined for Iran.

(4) The report which he sent on 23 June 2013 to Dr Taheri contained deliberately false statements as to funds being detained by bank action, as I have set out above.

(5) It seems probable that Dr Alswadeh forged a document purportedly dated 23 May 2013 and apparently from HSBC, stating that sums would not be released "unless cleared by the relative department of the central bank". This document was clearly produced in order to explain why sums paid in respect of the GSP Fortuna were not being returned to IOEC, and to support the false story which is also contained in Dr Alswadeh's report to Dr Taheri of 23 June 2013.

(6) I also find that Dr Alswadeh produced a doctored version of the Particulars of Claim in the GSP proceedings, in order to forward it to IOEC to disguise the consideration which had been agreed with GSPFL for the GSP Fortuna. This is one of the most surprising documents in a case with a number of fabrications. It was a

version in which the purchase price for the GSP Fortuna had been changed from that shown in paragraph 4 of the version served by Allen & Overy LLP in the proceedings ($66 million), to show instead an amount of US$86 million. There had also been changes to the amount of the Deposit in paragraph 5 and to the amounts of the Intermediary and Closing Payments in paragraph 6. The signature of Allen & Overy had also been forged on the new version, in the sense that, while purporting to be the name of that firm written by Ms Page, it was not actually the same as that which she had added to the original version of the Statement of Case. In his evidence before me, Dr Alswadeh initially accepted that he had been responsible for this forgery, though he later seemed to backtrack on that. In any event, I am satisfied that he was indeed responsible for it, and it is difficult to see who else could have been.

92.    Given these matters, I treated Dr Alswadeh's evidence with very considerable caution. I proceeded on the basis that I would accept his evidence only if it was supported by documentary evidence which I was satisfied was genuine or by the inherent probabilities as they could be seen to be from such documentary evidence.

93.    As to Mr Tabatabaei, I had the opportunity to consider him and his evidence over the course of the trial. He certainly emerged as a highly intelligent, astute, and determined man. I do not, however, profess to have been able to assess the truthfulness of his account by reference to his demeanour; just as with Dr Alswadeh's, it must be tested principally by reference to the contemporary documents.

94.    On the basis of a careful consideration, principally, of that documentary material, I have reached the conclusion that Mr Tabatabaei was in ultimate control of the Dean companies throughout the material period; that their involvement in the relevant transactions and proceedings was at his direction; and that Dr Alswadeh and Mr Ansari acted, at least as to major decisions, if not in all details, in accordance with his wishes. That is not to say that Dr Alswadeh was not capable of independent actions, including independent dishonesty, but I conclude that Mr Tabatabaei had overall direction.

95.    My reasons for this conclusion can be grouped under five heads.

96.    In the first place, there is the evidence in relation to Dr Alswadeh's engagement and subsequent employment by the Sepanta Group.

97.    As to this, on Mr Tabatabaei's account, Dr Alswadeh had worked with Mr Shirani and it was Mr Shirani who had introduced him to Mr Tabatabaei in about 2011; that Dr Alswadeh, having been employed by ENEXD, one of the companies in the Sepanta group, in late 2011, brought Mr Ansari into the company; but that in April 2012 Dr Alswadeh resigned, and was thereafter no longer employed by the Sepanta Group. On this account, Dr Alswadeh had, from April 2013, worked for Mr Tabatabaei and Sepanta only on a consultancy basis, undertaking and being paid principally for work on various property transactions.

98.    I considered that this account was inconsistent with the following:

(1) The documentary evidence that Mr Ansari had been employed by a company within the Sepanta Group before Dr Alswadeh arrived. This includes evidence of

regular salary payments to him from Sepanta from August 2011 onwards.[8] Payments to Dr Alswadeh commenced in January 2012.

(2) There is no indication in the documents that Dr Alswadeh was introduced to Mr Tabatabaei by Mr Shirani. Instead there is a set of documents recording his being interviewed, and engaged as Director of Legal Affairs for the Sepanta Group in December 2011.

(3) Although there is a communication whereby Dr Alswadeh purported to resign from that position on 10 April 2012, salary payments from Sepanta continued to him and to Mr Ansari until about April 2013. The regularity of payments of identical amounts is irreconcilable with Mr Tabatabaei's suggestion that Dr Alswadeh invoiced for the legal work he undertook and was paid on an hourly basis.

(4) Dr Alswadeh and Mr Ansari continued after April 2012 to use sepantaholdings email addresses, and their sepantaholdings emails gave their addresses as the office of Sepanta at AU Gold Tower in Dubai, and identified them as Director of Legal Affairs and Director of Financial Affairs of Sepanta respectively.[9]

(5) Mr Ansari signed the deposit receipt for the AED 13,848,000 on 16 July 2012 as Finance Manager for Sepanta.

(6) The continued involvement of Dr Alswadeh in the Sepanta Group into 2014 is demonstrated by a number of communications, including the issuance by the Head of HR for EXEND on 7 October 2013 of a statement of non-objection to Dr Alswadeh's enrolling on a PhD course at Dubai Police Academy, and Mr Tabatabaei's email of 3 February 2014 directing Nader Sadad of ENEXD to copy Dr Alswadeh in on emails "as he is in legal division".

99.   Secondly, there is the evidence relating to the establishment of Dean and Dean Legal. Most significant in this regard is that discussions of the acquisition of the GSP Fortuna had begun with Sepanta before Dean was incorporated, on the basis that the purchase agreement would be entered into by a Sepanta subsidiary.[10] Dean was incorporated on 5 June 2012, by which time the negotiations for the purchase were at an advanced stage. The clear inference is that Dean was the Sepanta-related entity which it was always envisaged would enter into the purchase agreement, and was incorporated at the direction of Mr Tabatabaei and Sepanta as the vehicle for the purchase of the GSP Fortuna.

100.  In relation to Dean Legal, while the evidence left it unclear to me as to whether Mr Tabatabaei had actually directed the incorporation of this entity, I was satisfied that he knew about its existence and had effective control of it. He clearly knew about the existence of the Dean Legal Brokerage Agreements, as indeed he accepted. Furthermore, Dr Alswadeh's evidence that he lacked practical control of Dean Legal's bank account, because he was required to sign blank cheques and payment instructions which were held to Mr Tabatabaei's direction, appeared to me to be supported by the

---

[8] IOEC "Salary Payments" schedule.
[9] Eg I/386/1802-3; I/469/2038.
[10] I/236/896.

number of blank cheques shown in what has been referred to as "the first cheque book report", and the existence of copies of blank cheques numbered 12 and 13 on papers signed by Mr Hashemi, which were subsequently filled out and paid to Sepanta.

101.    Mr Tabatabaei's personal interest in the purchase transaction, notwithstanding the involvement of Dean and Dean Legal, is demonstrated by the Dean Escrow Account. The purpose of this agreement was to ensure that, if and when Dean Legal received a sum from IOEC, Dr Alswadeh would be under compulsion to pay it on to GSPFL and/or GSPBL as Mr Tabatabaei should direct. Thus Mr Tabatabaei was taking steps to ensure the performance of the purchase agreements, despite the fact that they were being entered into through Dean.

102.    Thirdly, there is the evidence relating to the transfer of shares in Dean Legal and of signing power over its bank accounts to Mr Ansari. That this was initiated by Mr Tabatabaei as Dr Alswadeh said was, I considered, supported by the email from Mr Hashemi to Dr Alswadeh of 22 December 2012. This email which, as with subsequent emails on the subject, was copied to Mr Tabatabaei, is consistent with directions from Mr Tabatabaei/Sepanta to Dr Alswadeh to effect a "complete transfer of the company", as part of which process Dr Alswadeh was required to give a full account of all the cheques drawn on Dean Legal's account.

103.    Fourthly, there is the evidence of the Nominee Agreement, the "Facts Deed" and related documents. This aspect of the evidence has had to be considered with particular care both because of its importance and because of Mr Tabatabaei's case that the Nominee Agreement and a number of other documents said to support its authenticity were forgeries.

104.    The Nominee Agreement is a document[11] headed "Dean International Trading S.A. Nominee Agreement" apparently recording an agreement "made as of June 8th, 2012" between Dr Alswadeh, defined as "the Nominee" and Mr Tabatabaei, defined as "the Owner". It includes, amongst others, the following provisions:

> "**WHEREAS:** The Owner is the only beneficial Owner of the company, including all assets and other fixed improvements thereon and all interests therein and rights appurtenant thereto;
>
> **AND WHEREAS:** It has been agreed between the Nominee and the Owner, at the request of the Owner and as a matter of convenience, that for the time being the said Company will be registered in the name of the Nominee and that the Nominee shall hold, as nominee for the Owner on the terms and subject to the conditions hereinafter set forth, the said Company and all related rights and interests (including without limitation those under agreements and other documents such as Jackups, land drilling rigs or any other to be the assets of the company in any kind, shape or form) that the Owner may from time to time assign to the Nominee (such Company and related rights and interest are

---

[11] In fact it exists in two copies.

collectively called the 'Assets'), the Nominee having itself no beneficial interest in the Company;

**NOW THEREFORE THIS AGREEMENT WITNESSES**

…

1.The Nominee hereby acknowledges, declares, covenants and agrees that:

(a)The Nominee will hold, as and from the date hereof, the company, and all right, title and interest therein and benefit to be derived there from, as nominee for and on behalf of the Owner;

(b)The Nominee otherwise has no legal or beneficial interest in the Company;

(c)All other attributes of the beneficial Ownership of the Company shall be and remain in the Owner.

(d)The ownership of the 'Assets' along with all documents pertaining to ownership of those assets at the discretion of the owner, at any time deemed necessary by the owner, shall be transferred to the owner unconditionally.

2.The Nominee covenants and agrees, subject to the indemnity hereinafter provided, that it shall at all times and from time to time deal with the Company as nominee for the Owner only in accordance **with the written or verbal instructions and directions of the Owner and not otherwise; and that it will do not (sic) act relating to the Company without the express authorization and direction of the Owner, and that it has no active or independent duties to perform in respect of the Company except as may be specifically provided for herein, in case the nominee act out of the written directions; the nominee shall indemnify the owner against accrued any damage.**

…"

105.    This document is stamped with Dean's stamp, and bears the signatures, ostensibly, of Dr Alswadeh as Nominee, of Mr Tabatabaei as Owner, and of Mr Hashemi and Mr Ansari as witnesses.

106.    As I have said, Mr Tabatabaei claims that this document is a forgery. He has been able to establish that it could not have been signed on 8 June 2012, as he was not in Dubai at the time. His initial case was that his signature on the document had been forged.

107.    Expert evidence was accordingly adduced in relation to the authenticity of the document: of Dr Audrey Giles by IOEC and of Mr David Browne by Mr Tabatabaei and Sepanta. Both Dr Giles and Mr Browne concluded that Mr Tabatabaei's signature on the document was genuine. Mr Tabatabaei put forward a different case on the day

that Mr Browne's first expert report, which contained Mr Browne's view that the signature was genuine, was served. This new case, supported by Mr Browne's first report, was to the effect that Mr Tabatabaei's signature had been written on the paper before the text of the Nominee Agreement was printed on it.

108.   At the trial, the expert evidence was focused on whether there was evidence to support this case. Dr Giles's evidence was that, given that Mr Tabatabaei's signature was written with aqueous ink, it was not possible to determine the sequence of the signature and the printed text using any non-destructive process. Mr Browne's evidence was to the effect that there was moderate evidence that Mr Tabatabaei's signature was written before the printed text was applied.

109.   I considered that Dr Giles was clearly the more reliable expert. Mr Browne had very little experience of the sequencing of print and signatures. His first report betrayed an apparent ignorance of the significance of the presence or absence of specular reflectance[12] or of the nature of the ink used for the signature. Faced with Dr Giles's evidence in her first report that, though there was no specular reflectance, no conclusion could be drawn from this because the relevant signature was in aqueous ink, he produced an argument that Mr Tabatabaei's signature was written in hybrid aqueous ink, possibly applied by a gel pen, and that ink applied by such a pen would produce specular reflectance if written after the print. In oral evidence the bases of this argument were shown to be unreliable. Thus he accepted that it was not possible to identify the writing instrument used from the indentations on the paper. He also accepted that he was unable to draw any conclusions as to the type of pen used from the width of the pen lines. And he agreed that it was not possible to say whether the ink used to write the Tabatabaei signature would produce specular reflectance or not.

110.   Mr Browne also suggested in his third report that yellow security dots applied in the printing of the text of the Nominee Agreement were on top of the Tabatabaei signature. In his oral evidence, however, he agreed with Dr Giles's evidence that, once examined with a raman spectral comparator, no clear conclusion could be drawn from the examination of the yellow dots.

111.   Finally, in his oral evidence, and after Dr Giles had completed hers, Mr Browne put forward a thesis that, even though aqueous ink would pass through black toner printed by a black and white printer, and though the relevant text of the Nominee Agreement was printed in black toner, nevertheless because the printer used had been a colour printer, aqueous ink would not have passed through it, but would have sat on top of the printed text, until it evaporated, dried out or was blotted. Mr Browne accepted that there was no published support for the thesis that there was this difference between black toner printed by a colour printer as opposed to by a black and white printer. The only basis for it which he identified were some experiments which he said he had done, of which Dr Giles had had no notice, and which had not been disclosed or reported. I considered that I could attach no weight to this evidence. In any event, even if the printed text of the Nominee Agreement had been impermeable, I considered that no

---

[12] A technique whereby a beam of light is directed onto the intersection of pen line and laser printing at a high angle, and in which, if oily ink has been used and the writing is subsequent to the printing, the oily ink deposit on top of the printing will shine brightly.

safe conclusion could be drawn from this as any deposited ink might have evaporated, dried or been blotted.

112.    Accordingly I accept Dr Giles's evidence that there was no evidence from an examination of the document as to the sequence of Mr Tabatabaei's signature and the printing of the document.

113.    I should also record that it was Dr Giles's unchallenged evidence that there was strong positive evidence that two other signatures on the Nominee Agreement, namely of Dr Alswadeh and Mr Hashemi, were genuine. She concluded that it was not possible to say whether the signature of Mr Ansari was genuine.

114.    On the basis of this evidence, I conclude that the Nominee Agreement is a genuine document.  That is the most obvious explanation of a document which contains the genuine signatures of Mr Tabatabaei, Mr Hashemi and Dr Alswadeh.

115.    In addition to consideration of the document itself, it has also been important to consider whether there is evidence from other documentation which bears on whether the Nominee Agreement is genuine, or otherwise provides evidence that the relationship which it records existed between Mr Tabatabaei and Dr Alswadeh. In this regard, the most significant document is what has been termed the "Facts Deed".  This is a document sent by email from Dr Alswadeh to Mr Tabatabaei and Mr Ansari, initially on 25 December 2012. It states that it is an explanation of the signature of cheques which Dr Alswadeh had given to Mr Tabatabaei.  It is in the following terms:

> "Facts Deed
>
> This facts deed has been signed on 25th of December 2012 by and between:
>
> Mr. Reza Mostafavi Tabatabaei (Reza) and Mr. Omar Kamel Alswadeh (Omar), the purpose for signing this deed is to state that:
>
> 1.Mr. Omar was holding and running the establishment (Dean Legal Consultancy FZE 'the establishment') for and on behalf of Mr. Reza.
>
> 2.The establishment under transferring to another employee of Mr. Reza (Mr. Ansari Meeran Billie).
>
> 3.For the purposes of smooth running of the business; Omar is giving a (ten cheques blank leafs to Mr. Reza, signed and stamped.
>
> 4.Cheques are issued by Emirates NBD Banks and carrying the serial no. 000027, 000028, 000029, 000030, 000031, 000032, 000033, 000034, 000035, 000036, 000037 (ten cheques).
>
> 5.Mr Reza is committed under the terms of AMANAH not to hand over these cheques to any legal or natural body unless availability of the fund in the account.

> 6.Once the Establishment complete including the transferring the Bank account to Mr. Ansari Meeran Billie, Mr Reza shall return the cheques (torn and scratched) to Mr Omar.
>
> 7.The relationship between Mr Reza and Mr Omar for this deed is a trust and Amanah.
>
> 8.Mr Reza shall use these cheques only for the period until the Establishment transferred to Mr Ansari or other but no later than three month from the date of this deed."

116.    There were in the documents before the Court a number of emails which appeared to show that this "Facts Deed" was sent to Mr Tabatabaei five times,[13] and in respect of one of these emails there is a receipt indicating that he had read the email.[14] While it is the case that on none of these occasions did Mr Tabatabaei specifically agree to the Facts Deed as requested by Dr Alswadeh, it is equally the case that on none of these occasions did Mr Tabatabaei or the other recipients challenge the accuracy of the Facts Deed.

117.    At the trial Mr Tabatabaei challenged the authenticity of these emails.  This is notwithstanding that none was on the Notice to Prove served on Mr Tabatabaei/Sepanta's behalf by Mishcon de Reya on 25 July 2018 and that, accordingly, they were all subject to the deemed admission in CPR 32.19(1).  In any event, the suggestion that all these documents were fabricated was improbable, not least because at least one of the emails sending the Facts Deed exists in native format[15], and I do not accept it.

118.    The other document of particular significance is what has been called the "second cheque book report".  This bears the date 20 February 2013, and is apparently signed by Mr Tabatabaei as "Owner", Dr Alswadeh as "Nominee" and Mr Hashemi.  Again, Mr Tabatabaei denied the authenticity of his signature on this document.  I accept Dr Giles's evidence that there is "strong positive evidence" that that signature is genuine, and that Mr Browne's suggestion of a lack of fluency in the signature is "fanciful".  In addition, Dr Giles gave unchallenged evidence that Mr Hashemi's signature on this document was genuine.

119.    The significance of the second cheque book report in this context is that one of its Notes states:

> "In congruence with the Nominee Agreement signed by 'the Owner' and 'the Nominee', the Nominee has agreed to sign Ten (10) cheques – from No. 000027 to 000037 (including) - and leave with the Owner to be used solely for the operational purposes of TR project from DEAN's account to any accounts deemed necessary by the Owner/."

120.    Dr Alswadeh's evidence was that there had been a Nominee Agreement, similar to that for Dean, in relation to Dean Legal.  I was left uncertain whether that was the case.  If

---

[13] 25, 26, 31 December 2012, 5 January, 18 February 2013.
[14] I/706/2628.
[15] I/705/2625.

it was, then the reference in the Note would be to that agreement.  If there was no such separate Nominee Agreement, then the Note would tend to indicate that the Dean Nominee Agreement was considered applicable to Dean Legal as well.  Either way, the second cheque book report supports the existence of a nominee relationship between Mr Tabatabaei and Dr Alswadeh which had been embodied in a formal document or documents.  It also indicates Mr Tabatabaei's close involvement in the process of transferring control – or at least a measure of control – over Dean Legal's bank accounts to Mr Ansari.

121.    My findings in relation to these documents is of considerable significance.  They mean that I have rejected Mr Tabatabaei's case in relation to these matters, and given the nature of that case it follows that he must have deliberately lied about the nature of his involvement in these arrangements and with these documents.

122.    Fifthly, there is the evidence of Dr Alswadeh.  While as I have already said, I have treated this with considerable circumspection, given my findings in relation to the Nominee Agreement and the Facts Deed, his account has been to a significant extent corroborated.

123.    Against his evidence there can be set the evidence of Mr Ansari, which was to the effect that it was only Dr Alswadeh, and not Mr Tababataei, who had control of Dean and Dean Legal.   Having seen Mr Ansari, and taking into account the available documentation, I was only able to attach very limited weight to his evidence.  When he gave oral evidence, he did not appear to me to be making a real attempt to assist the Court as opposed to seeking to expound a version of events which he wished to introduce.  I concluded that his aim was essentially to assist Mr Tabatabaei's position and to damage Dr Alswadeh's by reason of loyalty to the one and animosity to the other.

<u>The state of Mr Tabatabaei's knowledge in relation to the progress of the GSP Fortuna transaction, and as to the cancellation of the Purchase Agreement</u>

124.     My conclusions in relation to the Nominee Agreement, the Facts Deed and associated documentation, and my rejection of Mr Tabatabaei's case in relation to them, have a significant influence on my assessment of his overall knowledge and involvement in the transaction and its progression.

125.    In summary, I find the position to be this:

(1) He was clearly heavily involved in the making of the initial contact with GSP, and his role went beyond that of a broker, in that the initial intention was for the GSP Fortuna to be acquired by Sepanta or a subsidiary.

(2) He was involved throughout the negotiations for the purchase of the GSP Fortuna, and Dr Alswadeh, to the extent he was involved, did so primarily – even if not nominally – as Mr Tabatabaei's representative.

(3) After Mr Comanescu had suggested a discounted price for the GSP Fortuna if the GSP Britannia was also purchased, Mr Tabatabaei was aware that there was no indication, whether from Mr Shirani, Dr Taheri or otherwise, that IOEC would purchase the GSP Britannia.  I reach this conclusion not least because, given his control over the activities of Dean, I consider that he must have been aware that there was no Sale

Agreement for the GSP Britannia equivalent to that for the GSP Fortuna. By contrast, it is clear that he knew that Mr Shirani / Dr Taheri were agreed that IOEC would be paying an amount of US$87 million. What I infer is that the initial intention within Sepanta / Sepanta Iran, including of Mr Tabatabaei and Mr Shirani, was that, out of the amount which IOEC was agreeing to pay for the GSP Fortuna alone, Dean would be able to purchase the GSP Britannia with a view to its being chartered out, or possibly on-sold. An attempt to charter the GSP Britannia to Total Abu Al Bukhoosh ("Total AAK") for deployment in the Abu Al Bukhoosh Field was made by Mr Hashemi on 3 – 11 July 2012. This foundered because the GSP Britannia was too old.

(4) I find that, thereafter, and doubtless influenced by the difficulty encountered with Total AAK, it was decided within Sepanta / Sepanta Iran, and in particular by Mr Tabatabaei and Mr Shirani, that the proposed purchase of the GSP Britannia from GSPBL should not take place. While it is unclear as to exactly what their dealings were with GSP on this subject, they seem to have believed that that purchase had been consensually abandoned. This left a position whereby IOEC would be paying US$87 million for the GSP Fortuna, and Dean would be due to purchase only that rig, but for a price of US$66 million. There is no documentary material which indicates that it was agreed on behalf of IOEC that the difference should be paid back to it via Mr Shirani (or otherwise). I conclude that Mr Tabatabaei must have known and intended that, out of the payments which would be made by IOEC, the sum of US$21 million was to be appropriated by Mr Shirani and others, including himself.

(5) Thereafter, he was aware of the arrangements IOEC was making to effect payments in respect of the GSP Fortuna through CPTDC.[16]

(6) He was also aware of the increasing likelihood of the cancellation of the Purchase Agreement before that happened.[17] I also conclude that he was made aware of the actual cancellation when or shortly after it occurred. Although there is no direct contemporaneous documentation showing this, his knowledge of what had occurred is assumed in later communications.[18]

(7) He also knew of the fact that payments continued to be made on behalf of IOEC to Dean Legal. This is apparent not least from the speed with which various payments made by CPTDC, and in particular that made on 9 January 2013, were transmitted on to his or Sepanta's bank accounts.

(8) He knew that some of these funds – on his own case totalling US$17.5 million – were remitted to Mr Shirani. As I have concluded, he could not have thought that this was under any arrangement with IOEC. As discussed further below, I conclude that some of the funds came to him personally.

(9) He continued to be aware of the dispute which developed between GSP and Dean. He / Sepanta paid for Dean's costs of the proceedings brought by GSPFL and GSPBL, and Afridi and Angell, the solicitors initially retained, treated Mr Tabatabaei as their client.

---

[16] I/580/2144.
[17] I/530/2144, I/532/2149.
[18] I/736/2748.

What happened to the money paid to Dean Legal's bank account?

126.    IOEC accepted that it could not show what had happened to all the sums paid into Dean Legal's account in relation to the purchase of the GSP Fortuna. It produced a number of schedules summarising the information which was available, but these left significant sums unaccounted for.

127.    As I have already said, there is evidence that, of the amounts received by Dean Legal, a sum of AED 525,000 was paid to Mr Ansari.[19]

128.    In addition, it was not in dispute that Mr Tabatabaei / Sepanta received certain amounts out of the sums received by Dean Legal. I considered it to be established that at least the amounts of AED 13,858,000[20], AED 40 million[21], AED 10 million[22], AED 2,359,500[23], and AED 11.9 million[24] had been so paid. Mr Tabatabaei's evidence was to the effect that all the sums received by himself or Sepanta, except AED 11.9 million which was his commission, were remitted, with the agreement of IOEC, to Mr Shirani, via hawala mechanisms, for Mr Shirani to use in purchasing equipment for IOEC.

129.    There seemed little doubt that significant sums were remitted to Mr Shirani by such mechanisms: they were of at least AED 11 million, and were probably significantly more than that. I was unable to accept, however, that they were remitted to him with the agreement of IOEC in order to purchase equipment. There was no documentary support for that suggestion. It also appeared to me to be implausible. No satisfactory explanation was given as to why IOEC, if it had wanted to purchase equipment in Iran, would not have kept the money, rather than pay it to Dean / Dean Legal for it to be paid to Sepanta / Mr Tabatabaei, and then re-routed back to Mr Shirani. Furthermore, given that Iranian entities had difficulties with sanctions, and problems remitting sums out of the country, it seemed unlikely that IOEC would have wished sums which had been sent abroad to be repatriated, rather than remaining capable of being used abroad.

130.    My conclusions in relation to the payments to Mr Tabatabaei / Sepanta which I have enumerated and which he says were paid on to Mr Shirani are accordingly as follows. Insofar as such payments were, contrary to his account, retained by Mr Tabatabaei / Sepanta, they can only have been the fruits of a dishonest participation in the defrauding of IOEC. There is no other explanation for Mr Tabatabaei / Sepanta retaining such amounts. Insofar as they were paid on to Mr Shirani, they were dishonestly received by Mr Shirani, again as proceeds of his participation in the fraud on IOEC.

131.    Apart from the amounts described above, and the sum of US$13.4 million paid to GSPFL, what became of most of the approximately US$87 million received into Dean Legal's account is unclear.

132.    While there was a conflict between them as to which was in control of the account after December 2012, there is little doubt that Dean Legal's bank account was under the direct control of either Dr Alswadeh or Mr Ansari. It is necessary therefore to consider

---

[19] I/352/1673.
[20] I/347/1668 (15-16 July 2012).
[21] I/1035.1/4228.1 (9-10 January 2013); I/594/2340.
[22] I/1035.1/4228.2 (9 January 2013).
[23] I/611/2375 (12 January 2013).
[24] I/1035.1/4228.1 (9 March 2013).

carefully the evidence which Mr Ansari gave on this point, because it is almost the only direct evidence bearing on the question of what happened to the balance of the funds. In a statement dated 9 July 2018 which he sent to the Court shortly before the trial, he stated that, pursuant to an instruction to him from Dr Alswadeh, he had paid some US$42.8 million of the amounts received, in cash, to individuals introduced by Mr Shirani and Ms Nafiseh Mahmoudi.  In a statement prepared later, in October 2018, Mr Ansari stated that, over a period of about six months, in six to ten transfers, Dr Alswadeh had delivered cash amounting to US$42,867,000 to a man called Mohammed Kian, who had been introduced to Dean Legal by Ms Nafiseh Mahmoudi, and confirmed by Mr Shirani.  In this second statement, Mr Ansari's evidence that these payments had been done "only by [Dr Alswadeh]", though he, Mr Ansari "was witness that arrangements had been done".

133.    Dr Alswadeh's account was that, given that he had effectively been divested of all control over Dean Legal's account at the end of 2012 / beginning 2013, these payments out can only have been arranged by Mr Ansari. Dr Alswadeh's evidence was to the effect that they will have been directed by Mr Tabatabaei.

134.    I consider that, in light of the evidence that control of Dean Legal was effectively transferred to Mr Ansari in late 2012 / early 2013, the transfers to which Mr Ansari refers were probably done by him, not by Dr Alswadeh.  However, I accept his evidence that large payments in cash were made to an individual or individuals who he considered to be linked to Mr Shirani and to Ms Nafiseh Mahmoudi.  Given my findings as to the degree of control which Mr Tabatabaei maintained over Dean Legal, I consider that Mr Tabatabaei must have been aware that such payments were being made.  I do not, however, consider that the evidence before me allowed me to conclude that he (or Sepanta) had himself (or itself) received any of these amounts.

Overall Factual Conclusions

135.    As will be apparent from the foregoing, I broadly accept IOEC's case that a fraud was practised upon it; and that that fraud had two stages.  In the first, IOEC was committed to paying US$21 million more for the GSP Fortuna than the price for which it was being sold by GSPFL; in the second, advantage was taken of the cancellation of the Purchase Agreement, and funds which IOEC procured should be paid in respect of the GSP Fortuna were abstracted and not returned to it.  I have also made findings in relation to key areas of factual dispute.  It is now necessary to consider whether the facts which IOEC has established give rise to the causes of action against the Defendants for which it contends.

The Causes of Action alleged

136.    IOEC asserts the following causes of action:

(1) Against Dr Taheri and Mr Shirani, for breach of fiduciary duty.

(2) Against all the Defendants, for dishonest assistance in breach of fiduciary duty. In respect of Dr Taheri and Mr Shirani, the case is that they assisted each other in breaching their fiduciary duties; in respect of the other Defendants, that they assisted Dr Taheri and Mr Shirani in breaching their fiduciary duties.

(3) Against all the Defendants, for conspiracy to injure by unlawful means.

(4) Against Dean Legal, Sepanta, Mr Tabatabaei and Mr Ansari, for knowing receipt of sums paid in breach of fiduciary duty.

(5) Against Dean and Dr Alswadeh, for fraudulent misrepresentation.

(6) Against Dean in contract.

137.    I will consider each of these claims in turn, but before doing so it is convenient to consider two preliminary matters: the applicable law, and the standard of proof which the Court requires in cases such as the present.

<u>Applicable Law</u>

138.    By an order dated 16 October 2018, and for reasons which he set out in a judgment dated 22 October 2018, Andrew Baker J ruled that, subject to any successful application by Mr Tabatabaei and Sepanta to amend their pleadings, which did not happen, IOEC was entitled to rely on the presumption that Iranian law, insofar as applicable to the claims against the Defendants, is the same or is to be treated as the same as English law; that the Defendants were not permitted to contend otherwise; and that any consideration of the substance of Iranian law or its difference from English law were to be excluded from consideration at trial.

139.    As a result of this ruling I have not had to consider whether Iranian law might or might not otherwise have been applicable to the claims brought by IOEC, or what the content of Iranian law might be.  The only law which is to be applied is English law.

<u>Burden of Proof</u>

140.    This was addressed by Eder J in *Otkritie International Investment Management Ltd v Urumov [2014] EWHC 191 (Comm)* as follows:

> "88.… it has been firmly established that:
>
> i) First, there is only one civil standard of proof and that is proof that the fact in issue more probably occurred than not: <u>Re B</u> at para 13 per Lord Hoffmann.
>
> ii) Second, the proposition that "the more serious the allegation, the more cogent the evidence needed to prove it" is wrong in law and must be rejected: <u>Re S-B</u> at §13 per Baroness Hale; <u>Re J</u> [2013] 1 AC 680 at para 35 per Baroness Hale.
>
> iii) Third, while inherent probabilities are relevant in considering whether it was more likely than not that an event had taken place, there is no necessary connection between seriousness and inherent probability: <u>Re S-B</u> at para 12 …

> 89. …. it may well be true to say that it is inherently improbable that a particular defendant will commit a fraud. But it all depends on a wide range of factors. For example, if the court is satisfied (or it has been admitted) that a defendant has acted fraudulently or reprehensibly on one occasion, it cannot necessarily be considered inherently improbable that such defendant would have done so on another; or if, for example, the court is satisfied (or it has been admitted) that a defendant has created or deployed sham or false documents, the court cannot assume that it is inherently unlikely that such defendant did so on other occasions. For the avoidance of doubt, I should make absolutely plain that this is not to say that inherent probability is irrelevant. On the contrary, as submitted by Mr Casella, I accept, of course, that the court should take into account the inherent probability of an event taking place (or not taking place) as is made abundantly plain by Baroness Hale in the passage from Re S-B quoted above. However, as it seems to me, the court must in each case consider carefully what is – and is not – inherently probable having regard to the particular circumstances – but the standard of proof in civil cases always remains the same i.e. balance of probability."

141. I consider that this is an accurate and helpful summary, and have proceeded in accordance with this approach.

Breach of Fiduciary Duty

142. In considering the cases against Dr Taheri and Mr Shirani for breach of fiduciary duty and against the other Defendants for dishonest assistance in such breach, the first issue is whether each of the two men owed fiduciary duties to IOEC and what such duties were.

143. The circumstances in which a person will owe fiduciary duties have very recently been summarised by Leggatt LJ in *Al Nehayan v Kent* [2018] EWHC 333 (Comm):

> "157 In considering this submission, I bear in mind that it is exceptional for fiduciary duties to arise other than in certain settled categories of relationship. The paradigm case of a fiduciary relationship is of course that between a trustee and the beneficiary of a trust. Other settled categories of fiduciary include partners, company directors, solicitors and agents. … While it is clear that fiduciary duties may exist outside such established categories, the task of determining when they do is not straightforward, as there is no generally accepted definition of a fiduciary. Indeed, it has been said that a fiduciary "is not subject to fiduciary obligations because he is a fiduciary; it is because he is subject to them that he is a fiduciary": see Finn, Fiduciary Obligations (1977), p2, cited with approval by Millett LJ in Bristol and West Building Society v Mothew [1998] Ch 1, 18. If this is right, it simply begs the question of how to determine when a person is subject to fiduciary obligations if not

by analysing the nature of their relationship with the person to whom the obligations are owed.

158.     Despite saying in the <u>Mothew</u> case that a fiduciary is defined by the obligations to which he is subject and not the other way round, Millett LJ did give a general description of a fiduciary as "someone who has undertaken to act for or on behalf of another in a particular matter in circumstances which give rise to a relationship of trust and confidence": see [1998] Ch 1, 18. This description has often since been cited with approval, including by the Supreme Court in <u>FHR European Ventures LLP v Cedar Capital Partners LLC</u> [2014] UKSC 45, [2015] AC 250, para 5.  To similar effect, in another much quoted statement, Mason J in the High Court of Australia in <u>Hospital Products Ltd v United States Surgical Corp</u> (1984) 156 CLR 41, 96-97, said:

"The critical feature of these relationships is that the fiduciary undertakes or agrees to act for or on behalf of or in the interests of another person in the exercise of a power or discretion which will affect the interests of that other person in a legal or practical sense. The relationship between the parties is therefore one which gives the fiduciary a special opportunity to exercise the power or discretion to the detriment of that other person who is accordingly vulnerable to abuse by the fiduciary of his position."

159.     Thus, fiduciary duties typically arise where one person undertakes and is entrusted with authority to manage the property or affairs of another and to make discretionary decisions on behalf of that person.  (Such duties may also arise where the responsibility undertaken does not directly involve making decisions but involves the giving of advice in a context, for example that of solicitor and client, where the adviser has a substantial degree of power over the other party's decision-making: see Lionel Smith, "Fiduciary relationships: ensuring the loyal exercise of judgement on behalf of another" (2014) 130 LQR 608.)  The essential idea is that a person in such a position is not permitted to use their position for their own private advantage but is required to act unselfishly in what they perceive to be the best interests of their principal.  This is the core of the obligation of loyalty which Millett LJ in the <u>Mothew</u> case [1998] Ch 1 at 18, described as the "distinguishing obligation of a fiduciary".  Loyalty in this context means being guided solely by the interests of the principal and not by any consideration of the fiduciary's own interests.  To promote such decision-making, fiduciaries are required to act openly and honestly and must not (without the informed consent of their principal) place themselves in a position where their own interests or their duty to another party may conflict with their duty to pursue the interests of their principal.  They are also liable to account for any profit obtained for themselves as a result of their position."

144.    There are two key aspects of fiduciary duties, which are reflected in this summary, which may be described as the no-conflict and no-profit rules.  As Lord Neuberger stated in *FHR European Ventures v Cedar Capital Partners LLC* [2015] AC 250, a fiduciary '"must not make a profit out of his trust" and "must not place himself in a position in which his duty and his interest may conflict"-and, as Lord Upjohn pointed out in <u>Phipps v Boardman</u> [1967] 2 AC 46 , 123, the former proposition is "part of the [latter] wider rule"'.  Further, as Cockerill J noted in *FM Capital Partners Ltd v Marino* [2018] EWHC 1768 (Comm): '77. Because a director's duty of loyalty requires him to act in what he in good faith considers to be the best interests of his company (see s.172 CA 2006), he is required to disclose his own misconduct: <u>Item Software (UK) Limited v Fassihi</u> [2004] BCC 994 at [41], [63-68].'

145.    There was no serious challenge at the trial to the proposition that both Dr Taheri and Mr Shirani owed fiduciary duties to IOEC, and I find that each did.

(1)    In the case of Dr Taheri, the matter is straightforward: he was the Managing Director of IOEC and a member of its Board of Directors.  It is well-established that a director owes fiduciary duties to the company of which he is a director.

(2)    I consider that Mr Shirani also owed such duties to IOEC.  He occupied a senior position in relation to IOEC as Dr Taheri's "technical adviser".  His appointment letter required him to "dedicate" himself to developing and expanding IOEC's activities.  It also appears clear that the role which he was given was one which involved an element of managing projects and taking decisions on behalf of IOEC.  This is reflected in his role in relation to the transactions relevant to the present case: he played a central part in relation to the sourcing of the GSP Fortuna, determining whether it was suitable for IOEC, negotiating the terms on which GSPFL would sell the rig, negotiating the terms of the Sale Agreement with Dean, in arranging and giving instructions for payments to Dean Legal, and in attempts to keep the deal alive notwithstanding GSPFL's cancellation.

146.    I find, furthermore, that both Mr Shirani and Dr Taheri were in breach of their fiduciary duties to IOEC.

147.    In the case of Mr Shirani, the evidence to this effect was, in my judgment, clear.

(1)    Mr Shirani was initially involved in the negotiations for the Purchase Agreement as a representative of Sepanta Iran.  While not part of a formal group with Sepanta, the two entities were closely associated and their interests aligned.  This created a conflict with his duties to IOEC.

(2)    As a result of his attendance at the early meetings with GSP relating to the sale of the GSP Fortuna, and his being copied into the bulk of the correspondence relating to the Purchase Agreement by Mr Shahriary, he was aware of the price agreed for the GSP Fortuna under the Purchase Agreement.  He was also aware of the price which IOEC was to pay for the GSP Fortuna,[25] and thus of the difference between the two.  He was also clearly aware of the nature of the roles of Sepanta, Dean and Dean Legal.  He should have disclosed these matters to IOEC.  He did not do so.  Insofar as he revealed these matters to Dr Taheri this, as I conclude, can

---

[25] I/273/1239.

only have been done on the basis that he and Dr Taheri were, jointly, engaged in a scheme to avoid full or adequate information being revealed to others in IOEC who had responsibility for concluding agreements such as the Sale Agreement.

(3) Despite knowing that the Purchase Agreement had been cancelled by GSPFL on 3 December 2012, Mr Shirani participated in making arrangements for significant further sums to be paid to Dean Legal in respect of the purchase of the GSP Fortuna, without any adequate security arrangements being in place to secure the repayment of such amounts, and notwithstanding that any revivification of the Purchase Agreement was at best a speculative possibility.

(4) Mr Shirani also personally profited from the arrangements. Even on the basis of what is known about the payments out of the Dean Legal account, it is apparent that large sums were paid out to Mr Shirani. I have already given reasons why I did not accept the suggestion that such sums were paid out with IOEC's concurrence to permit purchases of equipment.

148.    In the case of Dr Taheri, the evidence was less abundant and less direct, and as he did not participate in the trial I did not have the benefit of hearing him give evidence and be subjected to cross-examination. Nonetheless, I have concluded that Dr Taheri acted in breach of his fiduciary duties to IOEC.

(1) As I have already found, he was aware, through Mr Shirani, of the price at which the GSP Fortuna was being sold by GSPFL. He was clearly also aware of the price under the Sale Agreement. He was thus aware of the difference between the two prices. He nevertheless procured that IOEC should enter into the Sale Agreement, in a manner which breached IOEC's internal procedures for contract formation. He further arranged for the making of the payment in respect of the deposit thereunder in a way which, again, did not comply with IOEC's internal procedures, and where the payment was contrary to IOEC's interests in that it was for an amount in excess of that required to fund the initial payment by Dean to GSPFL in respect of the GSP Fortuna, and in any event put IOEC's funds at significant risk because no proper security arrangement had been put in place.

(2) Notwithstanding the knowledge, which I have found that he had, of the cancellation of the Purchase Agreement shortly after that occurred, Dr Taheri arranged for the making of substantial further payments to Dean Legal in respect of the GSP Fortuna, including giving an instruction to CPTDC to transfer funds on 6 March 2013 after any realistic possibility of the revivification of the Purchase Agreement had passed. These arrangements were made notwithstanding that, as I have said, there were no adequate security arrangements in place to secure the repayment of these amounts if the purchase did not go ahead.

(3) Dr Taheri took steps to conceal from IOEC's auditors and from the General Assembly of IOEC's shareholders the true picture as to what had occurred in relation to the purchase of the rig, in May/June and July 2013. It also appears that Dr Taheri must have worked with Dr Alswadeh to obtain documents to impede investigations within IOEC and to conceal the reality of the transaction. Thus I have concluded that the doctored Particulars of Claim in the GSP proceedings, which I have found that Dr Alswadeh produced, was probably produced by him at

the request or with the knowledge of Dr Taheri, to facilitate the misleading of others within IOEC as to the purchase price agreed between GSPFL and Dean.

149. My conclusion is that Dr Taheri must have received, or have intended to receive, a share of the sums which were initially paid to Dean Legal and were then routed to Mr Shirani or paid out from Dean Legal's account in cash. There appeared no other sufficient explanation as to why he had been willing for IOEC to enter into the Sale Agreement, or thereafter personally to take repeated steps to arrange payments to Dean Legal, and to attempt to obscure the true nature of the transaction from others within IOEC.

150. In these circumstances I find that Dr Taheri and Mr Shirani were in breach of both the no conflict and no profit rules.

151. I also consider that it is apparent that, had Dr Taheri and Mr Shirani not breached their fiduciary duties, IOEC would not have entered into the Sale Agreement, and would not have paid away the US$87 million which it did. Acting in accordance with their fiduciary duties, Dr Taheri and Mr Shirani would not have arranged for IOEC to enter into a contract whereby it was to pay US$21 million more for the GSP Fortuna than the price for which it was being sold by GSPFL; and would not have arranged for payments to be made in respect of that Sale Agreement, especially when they were not secured.

152. The remedy which IOEC seeks in its Closing Submissions in respect of Dr Taheri's and Mr Shirani's breach of fiduciary duty is equitable compensation. I consider that Dr Taheri and Mr Shirani are jointly and severally liable to make such compensation in the amount of the sums which IOEC lost, which are approximately US$87 million, though I will hear further argument, if necessary, as to the precise amount and currency/ies in which the judgment should be rendered.

<u>Dishonest Assistance in Breach of Fiduciary Duty</u>

153. The requirements of a claim of this nature were helpfully summarised by Cockerill J in *FM Capital Partners Ltd v Marino* [2018] EWHC 1768 (Comm), as follows:

> "82... i) There must be a trust or fiduciary obligation owed by the trustee/fiduciary to the claimant. It suffices if the trust in question is a constructive or resulting trust: McGrath, Commercial Fraud in Civil Practice (2nd ed.) at [9.34].
>
> ii) Because dishonest assistance is a type of accessory liability, there must be a breach by the trustee/fiduciary: <u>Royal Brunei Airlines v Tan</u> [1995] 2 AC 378, 382, <u>Novoship (UK) Ltd v Mikhaylyuk</u> [2014] EWCA Civ 908; [2015] QB 499. That is common ground for the purposes of my decision. However, I should note that Mr Ohmura reserves the right to argue, if this matter were to go to a higher court, that liability for dishonest assistance would not arise in relation to a breach of the kind that is alleged in this case.
>
> iii) The breach by the trustee/fiduciary need not be dishonest: because liability of the third party is fault-based, what matters is the nature of their fault, not that of the trustee/fiduciary: <u>Royal</u>

Brunei Airlines, 384-5, 392, Twinsectra Ltd v Yardley [2002] UKHL 12; [2002] 2 AC 164 at [109].

iv) The third party must have assisted in, induced or procured the breach. It is necessary to show that the relevant assistance played more than a minimal role in the breach being carried out, but there is no requirement to show that the assistance provided would inevitably have resulted in the beneficiary suffering a loss: Baden v Société General pour Favoriser le Development du Commerce et de l'Industrie en France SA [1993] 1 WLR 509 at [246].

v) The third party must have acted dishonestly in providing the assistance. The test in its modern incarnation derives from Royal Brunei Airlines at 386-7 and is now set out in Ivey v Genting Casinos (UK) t/a Crockfords [2017] UKSC 67 at [74]:

"When dishonesty is in question the fact-finding tribunal must first ascertain (subjectively) the actual state of the individual's knowledge or belief as to the facts. The reasonableness or otherwise of his belief is a matter of evidence (often in practice determinative) going to whether he held the belief, but it is not an additional requirement that his belief must be reasonable; the question is whether it is genuinely held. When once his actual state of mind as to knowledge or belief as to facts is established, the question whether his conduct was honest or dishonest is to be determined by the fact-finder by applying the (objective) standards of ordinary decent people. There is no requirement that the defendant must appreciate that what he has done is, by those standards, dishonest."

vi) However, the standards in question are those of an ordinary honest person in the circumstances of the defendant. Thus, in applying the test of dishonesty, the Court must have regard to all the circumstances known to the defendant at the time, and have regard to the defendant's personal attributes, such as their experience and the reason why they acted as they did: Royal Brunei Airlines v Tan at 391.

83. Accordingly:

i) There is no need to prove that the defendant was aware of the details of the underlying fraud, that there existed a trust, and/or they knew the facts which give rise to the trust: McGrath at [9.133]. It suffices if they simply know that they are assisting the fiduciary to do something he or she is not entitled to do: Ultraframe (UK) Ltd v Fielding [2005] EWHC 1638 (Ch) at [1505], Twinsectra v Yardley at [24] per Lord Hoffmann.

ii) The defendant has the requisite dishonest state of mind if they deliberately close their eyes and ears, or deliberately refrain from

asking questions, lest they learn something they would rather not know, and then proceed regardless: Royal Brunei Airlines, 389. Or as it was put by Lord Scott in Manifest Shipping Co v Uni-Polaris Insurance Co [2003] 1 AC 469:

"In summary, blind-eye knowledge requires, in my opinion, a suspicion that the relevant facts do exist and a deliberate decision to avoid confirming that they exist. But a warning should be sounded. Suspicion is a word that can be used to describe a state-of-mind that may, at one extreme, be no more than a vague feeling of unease and, at the other extreme, reflect a firm belief in the existence of the relevant facts. In my opinion, in order for there to be blind-eye knowledge, the suspicion must be firmly grounded and targeted on specific facts. The deliberate decision must be a decision to avoid obtaining confirmation of facts in whose existence the individual has good reason to believe. To allow blind-eye knowledge to be constituted by a decision not to enquire into an untargeted or speculative suspicion would be to allow negligence, albeit gross, to be the basis of a finding of privity."

iii) However, a defendant does not have the requisite dishonest state of mind if he merely suspects what is going on: Heinl v Jyske Bank (Gibraltar) Ltd [1999] Lloyd's Rep Bank 511 where (in the context of a case with a distinct factual parallel to this one) Colman J put the matter with characteristic clarity and good sense:

"it is not enough that on the whole of the information available to [the defendant] he ought as a reasonable man to have inferred that there was a substantial probability that the funds originated from the Bank. It must be established that he did indeed draw that inference…. If third parties are to be held accountable on the basis of accessory liability for breaches of trust committed by others the standard of proof of dishonesty, although not as high as the criminal standard, should involve a high level of probability."

84. If the requirements above are satisfied, the third party is liable to: (a) compensate for the losses resulting from the trustee/fiduciary's breach of duty; and/or (b) personally account for his or her profits: Snell's Equity [30-079] to 30-081; McGrath [9.137] to [9.138].

85. The defendant's liability is not limited to the loss caused by his assistance, but extends to the loss resulting from the relevant breaches of fiduciary duty. It is inappropriate to become involved in attempts to assess the precise causative significance of the dishonest assistance in respect of either the breach of trust or fiduciary duty or the resulting loss: Otkritie at [456]; Snell's Equity [30-081]."

154.    I have already found that each of Dr Taheri and Mr Shirani owed fiduciary duties to IOEC and were in breach of them. Accordingly, the requirements identified in sub-paragraphs i) and ii) of paragraph [82] of Cockerill J's summary are made out.

155.    As to the issues of whether there was assistance in the breach by Dr Taheri and Mr Shirani of such duties, and as to whether any assistance was dishonest, these have to be considered in relation to each Defendant separately.

*Dr Taheri and Mr Shirani*

156.    I find that each of Dr Taheri and Mr Shirani assisted each other in the breaches of their respective fiduciary duties, and furthermore that this was dishonest. The evidence indicated that they collaborated closely, and there was, I consider, no innocent explanation of the nature of their actions in relation to the relevant transaction.

*Dean and Dean Legal*

157.    Dean and Dean Legal played a central role in the extraction of funds from IOEC. They were a significant part of the mechanics of both stages of the fraud on IOEC. Dean was the counterparty to both the Purchase and Sale Agreements, at their different prices. Dean Legal received approximately US$87 million from IOEC, of which US$13.4 million was paid to GSPFL, but the remainder was paid away to others and has not been returned to IOEC, despite the Purchase Agreement having fallen through, and no rig having been acquired by IOEC.

158.    The knowledge of Dr Alswadeh, of Mr Ansari and of Mr Tabatabaei is attributable to Dean. The knowledge of all three, in the case of Dr Alswadeh at least up until early 2013, is also attributable to Dean Legal. As I set out below, I consider that each of them acted dishonestly and that the Dean Defendants accordingly acted dishonestly.

*Dr Alswadeh*

159.    Dr Alswadeh, by himself, and through Dean and Dean Legal, played a highly significant role in assisting the breaches of duty on the part of Dr Taheri and Mr Shirani. He was involved in the negotiation of the contractual terms of the Purchase Agreement, and also drafted the Sale Agreement, and provided it to Dr Taheri and Mr Shirani; he arranged for Dean Legal to be the recipient of the sums which were remitted on behalf of IOEC in respect of the purchase of the GSP Fortuna, and generated demands for the payment of the deposit and the second tranche; he drafted, and Dean and Dean Legal entered into, the Brokerage Agreements, including with Sepanta and Mr Tabatabaei, and facilitated substantial sums being paid to Sepanta, and to Mr Tabatabaei; and he helped Dr Taheri and Mr Shirani to attempt to avert suspicion within IOEC, including by doctoring the Particulars of Claim in the GSP proceedings, and producing bogus explanations as to why the funds which IOEC had arranged should be remitted could not be returned.

160.    I am in no doubt that Dr Alswadeh's involvement in these matters was dishonest. In many respects this speaks for itself: in particular in relation to the misleading Brokerage Agreements, the fraudulently altered Particulars of Claim and the bogus HSBC letter. He was aware that funds which had been remitted on behalf of IOEC were being diverted away, and his help to Dr Taheri and Mr Shirani in covering up what had

occurred indicates clearly, in my view, that he was aware that they had acted improperly and in breach of their duties to IOEC.

*Mr Tabatabaei and Sepanta*

161.    I have already set out my findings as to Mr Tabatabaei's and Sepanta's roles in the various transactions and given my reasons for rejecting Mr Tabatabaei's case that he was essentially uninvolved in Dean and Dean Legal's participation therein.

162.    The role of Mr Tabatabaei was to provide and operate the infrastructure outside IOEC which permitted the fraud to take place.  Without his involvement there would have been no Purchase Agreement and no Sale Agreement, Dr Taheri and Mr Shirani would not have been able to access the initial US$21 million, and the second stage of the fraud could not have proceeded as it did.

163.    I consider that Mr Tabatabaei's involvement in these matters was dishonest.  That conclusion is supported by: (1) his attempts to conceal the nature of his relationship with the other parties from IOEC and third parties, including by the nominee arrangements for the Dean Defendants, which enabled his involvement and the conflicted position of Mr Shirani through his link with Sepanta to be obscured; (2) the Brokerage Agreements, into which he and Sepanta entered, which did not accurately reflect services which he or Sepanta had provided; and (3) his attempts during this litigation to deny his role, including by the creation of a false story to account for documents which indicated his responsibility for the activities of the Dean Defendants.

164.    Sepanta was involved as a part of the infrastructure outside IOEC.  In particular it entered into one of the brokerage agreements, and received significant sums from Dean Legal's bank account which had been paid into it on behalf of IOEC in respect of the GSP Fortuna.

165.    There was little dispute that Mr Tabatabaei's was the directing mind and will of Sepanta.  His knowledge and state of mind is, for present purposes, attributable to Sepanta.

*Mr Ansari*

166.    It can be said that Mr Ansari gave assistance to Dr Taheri and Mr Shirani in their breaches of fiduciary duty through the financial management of Dean and Dean Legal at least from the end of 2012.

167.    I was not able to conclude, however, that Mr Ansari acted in this capacity dishonestly.  It was no one's case – including his own – that he had taken any steps independently.  Everyone contended that he had acted under direction.  It was not established to my satisfaction that Mr Ansari had any real appreciation of the nature of the transactions, or of Dr Taheri's and Mr Shirani's breaches of duty.  I was accordingly unable to conclude that he was acting dishonestly.

168.    I recognise that Mr Ansari's role included facilitating the withdrawal of significant amounts of cash.  However, these payments were, as I find, authorised by Mr Tabatabaei and known to Dr Alswadeh.  Furthermore, a part of Mr Ansari's evidence

was that the sending of cash to businesses involved in hawala money transfers was not unusual.

169. It is also the case that Mr Ansari's evidence to this Court appeared to indicate a desire to assist Mr Tabatabaei's defence. Again, however, this is not sufficient to allow me to conclude that, at the time, Mr Ansari was acting dishonestly in relation to the actions which can be said to have assisted the breaches of fiduciary duty which I have found to be made out.

170. In accordance with the principles stated in paragraphs [84] and [85] of *FM Capital Partners* the Defendants (save for Mr Ansari) are liable to compensate IOEC for the loss resulting from Dr Taheri's / Mr Shirani's breaches of fiduciary duty; and it is inappropriate to try to assess the precise causative significance of the dishonest assistance. In the circumstances, the Defendants (save Mr Ansari) are jointly and severally liable to compensate IOEC for the sum of approximately US$ 87 million. As before I will hear argument if necessary as to the precise sum and currency/ies.

Conspiracy to Injure

171. The requirements of a conspiracy to injure by unlawful means were also summarised by Cockerill J in *FM Capital Partners Ltd v Marino*, as follows:

> "i) A combination, arrangement or understanding between two or more people. It is not necessary for the conspirators all to join the conspiracy at the same time, but the parties to it must be sufficiently aware of the surrounding circumstances and share the same object for it properly to be said that they were acting in concert at the time of the acts complained of: Kuwait Oil Tanker at [111].
>
> ii) An intention to injure another individual or separate legal entity, albeit with no need for that to be the sole or predominant intention: Kuwait Oil Tanker at [108]. Moreover:
>
> a) The necessary intent can be inferred, and often will need to be inferred, from the primary facts – see Kuwait Oil Tanker at [120-121]…
>
> b) Where conspirators intentionally injure the claimant and use unlawful means to do so, it is no defence for them to show that their primary purpose was to further or protect their own interests: Lonrho Plc v Fayed [1992] 1 AC 448 , 465-466; see also OBG v Allan [2008] 1 AC 1 at [164-165].
>
> c) Foresight that his unlawful conduct may or will probably damage the claimant cannot be equated with intention: OBG at [166].
>
> iii) In some cases, there may be no specific intent but intention to injure results from the inevitability of loss: see Lord Nicholls at [167] in OBG v Allan …

iv) Concerted action (in the sense of active participation) consequent upon the combination or understanding: McGrath at [7.57].

v) Use of unlawful means as part of the concerted action. There is no requirement that the unlawful means themselves are independently actionable: Revenue and Customs Commissioners v Total Network [2008] 1 AC 1174 at [104]. 62 BCCI v Akindele [2001] Ch 437, 450, 455; Brent LBC v Davies [2018] EWHC 2214 (Ch), at [558]; Snell's Equity at [30-072].

vi) Loss being caused to the target of the conspiracy.

However, a person is not liable in conspiracy if the causative act is something which the party doing it believes he has a lawful right to do: Meretz Investments NV v ACP Ltd [2007] EWCA Civ 1303; [2008] Ch 244, per Arden LJ (paragraphs [126]-[127]) and Toulson LJ (paragraph [174]); Digicel v Cable & Wireless [2010] EWHC 774 (Ch) at Annex I, paragraphs [117]-[118] (Morgan J)."

172.    I consider that the elements of this cause of action are made out, in respect of the Defendants save for Mr Ansari.

(1) In my judgment it can be said that these Defendants were sufficiently aware of the circumstances involved in the fraud perpetrated on IOEC, and participated in it, in their different ways, that it can be said that they were acting in concert.

(2) The unlawful means employed were principally of Dr Taheri and Mr Shirani acting in breach of their duties to IOEC, and the other Defendants assisting them, and also receiving funds extracted from IOEC by way of those breaches of fiduciary duty.

(3) Thus, Dr Taheri and Mr Shirani acted in breach of fiduciary duty in procuring IOEC's entry into the Sale Agreement and its making payments to Dean Legal.  Mr Tabatabaei and Sepanta arranged the transaction and, with Dean and Dean Legal and Dr Alswadeh set up the transactions which allowed the fraud to take place, and assisted in the extraction of funds from IOEC and the distribution of those funds.

(4) In the case of all these Defendants it is possible to infer an intention to injure IOEC.

173.    Once again, I am not satisfied that the elements of this cause of action are established in relation to Mr Ansari.  I have not been persuaded that he knew enough of the circumstances or shared in the objects of causing IOEC to enter into a disadvantageous transaction, or of extracting sums from it, for it to be possible properly to describe him as acting in concert with the others; and equally have not been persuaded that he had the intention to injure IOEC.

174.    Again, the consequence of these findings is that that the Defendants, save for Mr Ansari, are jointly and severally liable for the approximately US$87 million which IOEC lost as a result of the conspiracy and the use of unlawful means.

Knowing Receipt

175.    A claim for knowing or unconscionable receipt requires: (1) a disposal of the claimant's assets in breach of fiduciary duty; (2) the beneficial receipt by the defendant of assets which are traceable as representing the assets of the claimant; and (3) knowledge on the part of the defendant that the assets received are traceable to a breach of fiduciary duty. (See *El Ajou v Dollar Land Holdings plc* [1994] 2 All ER 685, 700.)  It is not a necessary feature of this cause of action that the defendant should have been dishonest.  Instead the question is whether the defendant had such knowledge as to render it unconscionable for him to retain the benefit of the receipt: *BCCI v Akindele* [2001] Ch 437, 450, 455; *Brent LBC v Davies* [2018] EWHC 2214 (Ch) at [558].

176.    I consider that these requirements are made out, in respect of Dean Legal, in relation to almost all the approximately US$87 million extracted from IOEC, in that those sums were paid, in stages, into its bank account.

177.    On the other hand, IOEC accepts that it is not able to show what became of most of the money paid into, and out of, Dean Legal's account in respect of the GSP Fortuna.  I regard it as probable that each of Dr Taheri, Mr Shirani, Mr Tabatabaei and Sepanta, and Dr Alswadeh  beneficially received at least some amounts which were traceable as representing the assets of IOEC in circumstances where they knew that those assets were so traceable,  but, save that (1) Sepanta received AED 13,858,000, AED 40 million, AED 2,359,500 and AED 11,900,000 and (2) Mr Tabatabaei received an amount of AED 10 million from the payment made by CPTDC which Dean Legal received on 9 February 2013, I am not able to identify the amounts concerned.

178.    I have not been satisfied that Mr Ansari received any sums in circumstances where he knew that they were traceable to a breach of fiduciary duty.

Fraudulent Misrepresentation

179.    IOEC makes a claim against Dean and Dr Alswadeh for fraudulent misrepresentation.

180.    The basis of this claim is said to be Article 4.3(a) of the Sale Agreement, which I have quoted above, and in particular by the representation that Dean was the "real, actual, current, legal and beneficial owner [of the GSP Fortuna]", which, IOEC says: (1) was made by Dean, the party to the contract and by Dr Alswadeh who signed it; (2) was false, in that Dean was not at the time the owner of the rig; and (3) was known by Dean and Dr Alswadeh to be false.

181.    I was not persuaded that this cause of action has been made out.  The statement which is relied upon is one which, in my judgment, was capable of being understood in more than one sense, because of the words at the end of 4.3(a), "by rendering final ownership documents to the Buyer".  Dr Alswadeh in his evidence stated that he considered that the sentence as a whole meant that Dean would be the owner of the rig at the point at which ownership documents were rendered to the Buyer.

182.    Chitty on Contracts, 33rd edition (paragraph 7-053) states:

> "If the statement is ambiguous, the representee must first prove that he understood the statement in a sense in which it is in fact false.  If the representor intended the statement to be understood in that sense, he will be guilty of fraud.  But a person who makes a statement honestly believing it to be true in the sense which he understands it to bear is not guilty of fraud merely because the representee understands it in a different sense which is false to the knowledge of the representor. And this is still the case even though the court may agree that the sense in which the representee understands the statement is the meaning which, on its true construction, it ought to bear.  To hold a person guilty of fraud it must be shown that he intended, or at least was willing, that the representation should be understood in a sense which is false."

183.    In the present case, IOEC has difficulty in pointing to any individual who actually understood the representation in the sense which it says Article 4.3(a) bears.  In any event, I have not been satisfied that Dr Alswadeh (or therefore Dean) intended it in that sense, or that he can be properly described as having been "willing" that the representation should be understood in that sense.

184.    Accordingly this aspect of IOEC's claim fails.

<u>Contractual Claims</u>

185.    IOEC has also brought contractual claims against Dean, for restitution of the contract price on the ground of total failure of consideration, damages for breach of contract or an indemnity.

186.    IOEC made clear, however, that in the event that the Court were to conclude that there was a fraudulent conspiracy to which Dean and Dr Alswadeh were party, it would be unnecessary to consider these contractual claims.  As I have found such a conspiracy, it is not necessary to say more about these claims.

<u>The Issue of Sanctions</u>

187.    Dean, Mr Tabatabaei and Sepanta all contend that IOEC should not, in any event, be granted any relief, by reason of the effect of the sanctions on trading with Iran.

188.    The way in which this point is put involves two principal contentions, as follows:

> (1) That "the claim arises from a contract which was prohibited by [Regulation EU/267/2012 ("the Regulation")] and in any event [was] entered into by IOEC for the purpose of circumventing the sanctions imposed by the Regulation".  This is said to arise from the fact that IOEC was listed in Annex IX of the Regulation, and that under Article 8, "it was prohibited for any person subject to the Regulation to sell, supply, transfer or export to IOEC drilling equipment".

(2) That, "Given that IOEC is majority owned by [NIOCPF], the Court is disabled from making any order by which IOEC's claim might be satisfied within the meaning of the Regulation". This was clarified as principally a reference to Article 38 of the Regulation.

189.    To consider this issue it is necessary to set out a summary of the relevant sanctions regime.

(1) The Regulation established the relevant EU Iran sanctions regime. Prior to the coming into force of the Joint Comprehensive Plan of Action ("JCPOA") on 16 January 2016, IOEC was an entity listed in Annex IX of the Regulation.

(2) The Regulation was implemented in England and Wales by the Iran (European Union Financial Sanctions) Regulations 2012, which came into force on 26 March 2012 and which made it a criminal offence to act in breach of the EU sanctions regime. By the Iran (Restrictive Measures) (Overseas Territories) Order 2012, which came into force on 12 July 2012, the EU regime, and the criminal sanction for its breach, were extended to British Overseas Territories, including the BVI.

(3) The Regulation was amended pursuant to the JCPOA, effective as of 16 January 2016. The relevant amendments were made by Council Regulation (EU) 2015/1861. Article 7 of that Amending Regulation deleted Article 8 of the Regulation. Annex IX of the Regulation was not amended by that Amending Regulation, but the EU removed IOEC from the list in Annex IX pursuant to the JCPOA.

(4) The changes made following the JCPOA were implemented in England and Wales by the Export Control (Iran Sanctions) Order 2016, and in British Overseas Territories (including the BVI) by the Iran (Sanctions) (Overseas Territories) Order 2016.

(5) The Claim Form in the present case was issued after the JCPOA and associated Regulations came into force.

190.    The relevant provisions of the Regulation prior to the JCPOA are:

(1) Art.8: "It shall be prohibited to sell, supply, transfer or export key equipment or technology listed in Annex VI, directly or indirectly, to any Iranian person, entity or body or for use in, Iran." An oil rig, such as the GSP Fortuna, fell within the equipment or technology listed in Annex VI.

(2) Art. 23(2)-(3): "All funds and economic resources belonging to, owned, held or controlled by the persons, entities and bodies listed in Annex IX shall be frozen. […] No funds or economic resources shall be made available, directly or indirectly, to or for the benefit of the natural or legal persons, entities or bodies listed in Annexes VIII and IX."

(3) Art. 38: "1. No claims in connection with any contract or transaction the performance of which has been affected, directly or indirectly, in whole or in part, by the measures imposed under this Regulation, including claims for indemnity or any other claim of this type, such as a claim for compensation or a claim under a

guarantee, notably a claim for extension or payment of a bond, guarantee or indemnity, particularly a financial guarantee or financial indemnity, of whatever form, shall be satisfied, if they are made by: (a) designated persons, entities or bodies listed in Annexes VIII and IX; (b) any other Iranian person, entity or body, including the Iranian government; (c) any person, entity or body acting through or on behalf of one of the persons, entities or bodies referred to in points (a) and (b). 2. The performance of a contract or transaction shall be regarded as having been affected by the measures imposed under this Regulation where the existence or content of the claim results directly or indirectly from those measures. 3. In any proceedings for the enforcement of a claim, the onus of proving that satisfying the claim is not prohibited by paragraph 1 shall be on the person seeking the enforcement of that claim."

(4) Art.41: "It shall be prohibited to participate, knowingly and intentionally, in activities the object or effect of which is to circumvent the measures referred to in Article … 8 …"

(5) Art.49: "This Regulation shall apply: (a) within the territory of the Union, including its airspace; (b) on board any aircraft or any vessel under the jurisdiction of a Member State; (c) to any person inside or outside the territory of the Union who is a national of a Member State; (d) to any legal person, entity or body, inside or outside the territory of the Union, which is incorporated or constituted under the law of a Member State; (e) to any legal person, entity or body in respect of any business done in whole or in part within the Union."

191.   Against that background, I can turn to consider the two contentions put forward.

192.   As to the first, at the date that the Sale Agreement was entered into, while IOEC was listed in Annex IX, neither it nor Dean was subject to the Regulation which, by Article 49 applied to the territory of the EU and nationals of Member States. IOEC was and is Iranian, while Dean is a BVI company.

193.   However, while GSP, GSPFL and GSPBL have not been parties to the action and have not appeared or been represented at the trial, there seem to be cogent grounds to consider that GSPFL was acting to circumvent the Regulation, in that I consider that it was known to those concerned in the Purchase Agreement that the ultimate destination of the rig was Iran, and that the sale to Dean was intended to disguise this. GSPFL was an EU company, and such circumvention would have been a breach by it of the sanctions regime. Further, I consider that it is apparent that Dean's involvement was in order to permit such circumvention; and I also consider that IOEC, by at least Dr Taheri and Mr Shirani, knew that what was being done in the interposition of Dean was a circumvention of the sanctions regime, and was assisting in an attempted circumvention of it, by GSPFL. If it matters, I reject IOEC's contention that, for the present purpose, the knowledge of those two individuals cannot be attributed to it. It would be inconsistent with the policy behind the sanctions regime not to attribute to a company the knowledge of those controlling it and directing its involvement in a circumvention of that regime. In any event, I was not satisfied that, in relation to the specific issue of whether a rig should be procured notwithstanding that it involved a circumvention of EU sanctions, Dr Taheri and Mr Shirani were acting in fraud of IOEC. On the contrary, it appeared to me probable that they had authority to seek to circumvent such sanctions whenever that was considered necessary.

194.   Furthermore, shortly after the entry of the Sale Agreement, the sanctions regime was made applicable to Dean by the implementation of the Iran (Restrictive Measures) (Overseas Territories) Order 2012.  Thereafter Dean sought to breach Article 8, in that it attempted – albeit unsuccessfully - to proceed with the sale of the rig to IOEC, or was at least seeking to circumvent Article 8 by its involvement in the contemplated alternative purchase structure involving GCI, a Seychelles company.  IOEC was encouraging and abetting such breaches.

195.   The position therefore is one where, in 2012/2013, while the prohibitions in the Regulation did not apply to IOEC, IOEC was a sanctioned entity, and one which participated in activities which, had it been an EU national, would have involved a breach of the Regulation, and also abetted breaches of the Regulation by entities to which it did apply.  In my judgment these matters bring into play considerations of illegality and of public policy, and require the Court to ask itself whether such considerations dictate that the claims which IOEC brings and which, subject to this point I have found to be good ones, cannot succeed.

196.   The relevant test to be applied in considering this issue is that which was summarised by Lord Toulson (giving the judgment of the majority of the Supreme Court) in *Patel v Mirza* [2017] AC 467, at [120] – [121]:

> "The essential rationale of the illegality doctrine is that it would be contrary to the public interest to enforce a claim if to do so would be harmful to the integrity of the legal system (or, possibly, certain aspects of public morality, the boundaries of which have never been made entirely clear and which do not arise for consideration in this case). In assessing whether the public interest would be harmed in that way, it is necessary (a) to consider the underlying purpose of the prohibition which has been transgressed and whether that purpose will be enhanced by denial of the claim, (b) to consider any other relevant public policy on which the denial of the claim may have an impact and (c) to consider whether denial of the claim would be a proportionate response to the illegality, bearing in mind that punishment is a matter for the criminal courts. Within that framework, various factors may be relevant, but it would be a mistake to suggest that the court is free to decide a case in an undisciplined way. The public interest is best served by a principled and transparent assessment of the considerations identified, rather by than the application of a formal approach capable of producing results which may appear arbitrary, unjust or disproportionate.
>
>  A claimant, such as Mr Patel, who satisfies the ordinary requirements of a claim for unjust enrichment, should not be debarred from enforcing his claim by reason only of the fact that the money which he seeks to recover was paid for an unlawful purpose. There may be rare cases where for some particular reason the enforcement of such a claim might be regarded as undermining the integrity of the justice system, but there are no such circumstances in this case. I would dismiss the appeal."

197. In making the assessment required in *Patel v Mirza* a number of considerations appear to me to be important.

> (1) In the first place, it is to be recalled that IOEC's relevant claims are not to enforce the Sale Agreement. The Sale Agreement did not and will not go ahead, and IOEC did not and will not obtain the GSP Fortuna.

> (2) IOEC was not, by the date of issue of the Claim Form, listed in Annex IX. Furthermore an agreement on the terms of the Sale Agreement would not, if made at that date, have involved a breach of the sanctions regime, even if entered into by an EU national as seller, and would not do so now.

> (3) IOEC's relevant complaints are that it was defrauded of sums by persons acting in breach of fiduciary duty to it, or assisting such breaches, and related causes of action. They are serious wrongs, which are in a real sense independent of the intended breach of the sanctions regime, which only provided the opportunity for them to take place.

198. Taking these matters into account, I have concluded that it would not be contrary to the public interest to enforce IOEC's relevant claims. Denial of those claims would not enhance the purpose of the sanctions, given that enforcement of those claims would not provide IOEC with a rig, and the purpose of the prohibition was never to prevent the recovery of money obtained by fraud. In any event since the JCPOA, the purpose no longer exists, as there is no longer a prohibition on the supply of equipment for the oil and gas industry in Iran. By contrast, I consider that denial of the claim would adversely impact the public policy of preventing and deterring fraud, and that of the victims of fraud being able to take steps to recover money and property of which they have been defrauded. Furthermore, I consider that denial of the claims would be a disproportionate response to any illegality involved, as it would result in the parties who have been complicit in the fraud to get away with some US$73.6 million.

199. As to the second way in which the point is put, as I have already set out, I find that NIOCPS is not, strictly, the majority shareholder of IOEC, though it is the owner of IOEC's majority shareholder. In any event, I consider that the short answer to this second contention is that Article 38 of the Regulation is not engaged here because IOEC's relevant claims are not ones whose existence or content results directly or indirectly from the measures imposed by the Regulation. Those claims are not the result of the Purchase or Sale Agreements having become unenforceable or illegal because of the sanctions regime, but of the frauds perpetrated on IOEC.

Conclusion

200. IOEC's claims succeed to the extent as indicated above. I will consider submissions as to the precise form of order appropriate.