# EXHIBIT B

Neutral Citation Number: [2020] EWHC 2497 (Comm)

Case No: LM-2020-000003

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**COMMERCIAL COURT (QBD)**

Royal Courts of Justice, Rolls Building
Fetter Lane, London, EC4A 1NL

Date: 21/09/2020

**Before** :

**HIS HONOUR JUDGE PELLING QC**
**SITTING AS A JUDGE OF THE HIGH COURT**
- - - - - - - - - - - - - - - - - - - -
**Between :**

| | |
|---|---|
| **IRANIAN OFFSHORE ENGINEERING AND CONSTRUCTION COMPANY** | **Applicant** |
| - and - | |
| **DELARAM ZAVAREI** | **Respondent** |

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**Mr Andrew Onslow QC and Mr Richard Hanke** (instructed by **Eversheds Sutherland (International) LLP**) for the **Applicant**
**Lord Marks QC** (instructed by **Signature Litigation LLP**) for the **Respondent**

Hearing dates: 6-9 April and 14 May 2020
- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this Judgment and that copies of this version as handed down may be treated as authentic.

**Covid-19 Protocol: This judgment was handed down by the Judge remotely by circulation to the parties' representatives by email and release to bailii. The date and time for hand-down is deemed to be 14:00 on Monday 21st September 2020.**

.............................

HIS HONOUR JUDGE PELLING QC SITTING AS A JUDGE OF THE HIGH COURT

## HH Judge Pelling QC:

## Introduction

*This Application*

1.  This is the trial of an Application by the Applicant (the claimant in the main claim) ("IOEC") for a declaration that the Respondent (the wife of the sixth defendant in the main claim ("RMT")) holds a property called Henfield Lodge in West Sussex ("Property") on resulting alternatively constructive trust for RMT and so comes within the scope of a freezing undertaking she has given to the court to the extent that RMT has a beneficial interest in it. Although the factual enquiry has been complex and in many ways much more complex than it need have been, the issue between the parties reduces to this – IOEC maintains that it is to be inferred that the Respondent holds the legal title of the Property on a resulting or common interest constructive trust for the sole benefit of RMT or mostly for RMT's benefit from the fact that allegedly the whole or most of the purchase price of the Property was paid from resources that belong beneficially to RMT, whereas the Respondent (supported by RMT) maintains that the whole of the purchase price was paid either from resources that belonged beneficially to her or which she borrowed on terms that obliged her exclusively and personally to repay the sums borrowed and thus that she is solely the beneficial as well as legal owner of the Property.

2.  Although the Property was purchased for cash, it was subsequently charged in order to raise cash. Mortgage possession proceedings have been commenced but are currently stayed by operation of <u>Practice Direction 51Z</u>. If the mortgagee succeeds in obtaining possession and an order for a sale of the Property, the Respondent maintains that there will be little left after the discharge of the secured loan and the costs of the proceedings and sale – see Lords Marks QC's closing submissions, where he values the net equity at £235,811. That said, I reject Lord Marks' submission on behalf of the Respondent that " … *the small, negligible or even negative value of the equity in* …" the Property ought to lead to the dismissal of this application without consideration of the merits. This submission is mistaken because until the possession proceedings have been resolved and the Property offered for sale by the mortgagee in possession (if that is what happens) it is not possible to know what equity will be left. On the Respondent's own case there will be over £235,000 remaining and that depends on the property being sold at the 7 November 2019 valuation notwithstanding that more was paid for it when it was acquired by or in the name of the Respondent and it may well achieve more than that when sold. In any event the fact that the net sum left may be small in amount does not justify leaving it in the hands of the Respondent if some or all of the equity belongs to RMT, when the alternative is that it will be available for collection by RMT's trustee for the collective benefit of his creditors. I consider Lord Marks' broader submission that in the exercise of discretion I ought to dismiss this application without considering the merits below.

*The Underlying Proceedings*

3.  The main proceedings against RMT and others were commenced by IOEC on 14 March 2016. The Respondent is not and never has been a party to the main proceedings. The main proceedings concerned a complex international fraud. In essence, it was alleged

and ultimately proved by IOEC that RMT, together with the seventh and eighth defendants had procured the claimant to pay sums denominated in various units of account equating to US$87 million for a mobile oil rig that was never delivered. The purchase price has never been recovered. Those allegations having been found proved by Butcher J following a trial – see the judgment reported at [2019] EWHC 472 (Comm) ("Judgment"), on 8 March 2019 Butcher J entered judgment against various defendants including RMT in sums exceeding the sterling equivalent of £75 million. I expand on the detail relating to the main claim further below.

4.    The agreements that underpinned the fraud the subject of the main claim were entered into between 25 June – 8 July 2012 – see paragraphs 29-37 of the Judgment. The closing date for the rig purchase was ostensibly 17 September 2012 – see paragraph 43 of the Judgment; but the rig was not delivered, the purchase agreement was terminated on 3 December 2012 and by 20 February 2013, the arrangement had broken down irretrievably – see paragraph 83 of the Judgment.

5.    At paragraph 128 of the Judgment, Butcher J held that RMT or an entity controlled by him had received (a) AED 13.858m on 15-16 July 2012, (b) AED 40m on 9-10 January 2013, (c) AED 10m on 9 January 2013, (d) AED 2,359,500 on 12 January 2013 and (e) AED 11.9m on 9 March 2013. This totals AED 78,117,500. Assuming a conversion rate of AED 6 to £1, this equates to about £13m. RMT had maintained that all but AED 11.9m (£1.984m applying the conversion rate mentioned earlier) had been transferred to another defendant. Butcher J accepted that at least AED 11m of the total sums received by RMT and " … *probably significantly more than that* …" were transferred to another defendant – see paragraphs 128-9 of the Judgment – and at paragraph 130, Butcher J held that:

> "My conclusions in relation to the payments to Mr Tabatabaei I Sepanta which I have enumerated and which he says were paid on to Mr Shirani are accordingly as follows. Insofar as such payments were, contrary to his account, retained by Mr Tabatabaei / Sepanta, they can only have been the fruits of a dishonest participation in the defrauding of IOEC. There is no other explanation for Mr Tabatabaei / Sepanta retaining such amounts. Insofar as they were paid on to Mr Shirani, they were dishonestly received by Mr Shirani, again as proceeds of his participation in the fraud on IOEC."

6.    It follows from these findings that RMT has been found to have received on dates between 15 July 2012 and 9 March 2013 no less than AED 11.9m as the proceeds of his " … *dishonest participation in the defrauding of IOEC*." It follows inevitably from these findings that RMT knew the true position throughout.

7.    IOEC relies on the chronology summarised above to support adverse inferences that it submits I should draw as to the Respondent's knowledge of the events with which the main claim was concerned and to her case that she is the sole beneficial owner of the Property. The Respondent maintains that she first learned of the proceedings in late Summer 2016 and denies that it is appropriate to draw any inferences against her in relation to her interest in the Property on that basis. I return to this issue further below.

*RMT's Bankruptcy*

8.     On 21 March 2019, RMT was made bankrupt on his own application from which he was automatically discharged a year later. The claimant is RMT's largest creditor. His Trustee in Bankruptcy is Mr Paul Allen. Mr Allen is not a party to these proceedings. His position in relation to these proceedings, as set out in his solicitor's letter of 23 January 2020, is:

> "The Court should be aware that the Trustee does not wish to adopt the 6th Defendant's position in the above applications and is not in a position to go on the Court Record at this stage. However, he has reviewed the supporting evidence filed on behalf of all interested parties and he is of the view that it is more likely than not that the Bankrupt has a beneficial interest in Henfield Lodge. If so, such beneficial interest has automatically vested in our client pursuant to s.306 of the Insolvency Act 1986. Given that the Trustee has only very recently been appointed, he is unable at this stage to form a more certain view.
>
> In the circumstances, our client's position is that the appropriate course is for the Declarations Application to proceed to a final determination by the Court at the hearing listed to commence on 31 March 2020 on the basis that is in the best interests of the 6th Defendant's creditors as a whole and that there should be no further delay in determining questions of the ownership of Henfield Lodge."

This has generated a technical issue relating to the standing of the Applicant to bring these proceedings to which I turn below.

*The Trial of this Application*

9.     The trial took place between 6-9 April 2020 remotely by Skype for Business. I heard oral evidence for the Applicant from its solicitor Mr Richard Little and for the Respondent, RMT, Ms Noushin Yeganeh (the Respondent's aunt), Ms Hilary White (the legal executive who handled the conveyancing of the Property on behalf of the Respondent) and Sepanta Tabatabaei (the son of RMT and the Respondent). The evidence of Ms Hediyeh Fetanat was adduced on behalf of the Respondent and is agreed. Evidence was to be adduced from Mr Hussein Albalooshi, who lives and works in Dubai. Although he was available to give evidence by video link from Dubai, the timing differences meant that his evidence could not be completed if started as a result of the COVID-19 lockdown procedures that then applied in Dubai and so it was agreed between the parties that his evidence would be admitted under the Civil Evidence Act 1995 ("CEA"). Finally, a witness statement from Ms Heather Souter was admitted under the CEA by agreement at the end of the trial to meet a point put in cross examination concerning her conduct.

10.    As I explain below and as is common ground, the legal burden is on IOEC to prove that the Respondent holds the legal title in the Property on resulting or constructive trust for RMT. This  seeks to do by drawing inferences adverse to the Respondent's case from a number of documents that relate to events that took place mostly some years ago. It

is right to observe at the outset that there are at best only a few documents that are directly material to the real issues. The principal reasons for this are first that the Respondent has not complied with her disclosure obligations in all respects as she should have and secondly because some documents that IOEC has been able to source in an attempt to fill the gaps come from an unreliable source whose cache of documents may be incomplete and who may not have disclosed all relevant documents in his possession to IOEC's solicitors. I develop this point in greater detail below.

11.     These difficulties mean that oral evidence, particularly from witnesses who are independent of the parties and with no obvious interest in the outcome of this dispute or who I otherwise judge to be reliable takes on more importance (to the extent relevant to the issues that matter) than would be usual in a conventional commercial dispute. In those circumstances, I have tested the oral evidence of each of the witnesses wherever possible against the contemporary documentation that there is, admitted and inconvertible facts and, subject to the point I make in the following paragraph, inherent probabilities. This is an entirely conventional approach – see <u>Onassis and Calogeropoulos v. Vergottis</u> [1968] 2 Lloyds Rep 403 at 407 and 413. This is not to say that a judge can, or should attempt to, resolve factual disputes by referring only to contemporaneous documentation. It is necessary to consider all of the evidence – see <u>Kogan v. Martin</u> [2019] EWCA Civ 164 *per* Floyd LJ at paragraphs 88-89. There is however nothing either in this authority or the requirement to consider all of the evidence that prevents the evaluation of oral evidence using the techniques I have referred to.

12.     In relation to inherent probabilities, there is an added complication in this case that has to be borne in mind throughout. The Respondent maintained that " … *there is a prevalent culture difference between Iran and the United Kingdom with regard to the holding of assets between spouses. In Iran, spouses tend to keep their assets separate from one another and it is common for formal marital loans to be executed. The reason for this is that wives have few legal protections upon divorce, with the result that it is prudent to keep their assets reason legally separate*" – see paragraph 6 of her affidavit of 8 May 2019. This was not challenged by IOEC in cross examination. I conclude therefore that it would be unsafe to draw inferences adverse to the Respondent's case solely from the fact that formal agreements were apparently entered into by the Respondent and RMT that would be considered unusual between couples in the UK. However, this point does not of itself lead to the conclusion that in fact RMT and the Respondent maintained segregation of all the assets I have to consider below. That question has to be considered by reference to all the evidence available and relevant to the asset being considered.

13.     Both RMT and the Respondent were cross examined on the basis that the Respondent's case that she is and always has been the beneficial owner of the Property is dishonest invention. In those circumstances, I remind myself at the outset that (a) as I explain in more detail below, the onus of proving that the Respondent is the (or, possibly, a) beneficial, as well as the legal owner of the property rests on IOEC; and (b) whilst the standard of proof in a civil case is always the balance of probabilities, the more serious the allegation, or the more serious the consequences of such an allegation being true, the more cogent must be the evidence if the civil standard of proof is to be discharged – see <u>Re H (Minors) (Sexual Abuse: Standard of Proof)</u> [1996] AC 563 per Lord Nicholls at 586, where he said:

"'The balance of probabilities standard means that a court is satisfied that an event occurred if a court considers that on the evidence the occurrence of the event was more likely than not. In assessing the probabilities, the court will have in mind as a factor to whatever extent it is appropriate in the particular case that the more serious the allegation the less likely it is that the event occurred and hence the stronger should be the evidence before court concludes that the allegation is established on the balance of probabilities. Fraud is usually less likely than negligence...Built into the preponderance of probabilities standard is a generous degree of flexibility in respect of the seriousness of the allegation.'"

14.    Finally, it is necessary to remember that it does not necessarily follow from the fact that a witness has been shown to be dishonest in one respect that his evidence in all other respects is to be rejected. Experience suggests that people may give dishonest answers for a variety of reasons including an entirely misplaced wish to strengthen a true case that is perceived to be evidentially weak as opposed to a desire to advance a dishonestly conceived case in a dishonest manner. What such conduct will usually mean however is that the evidence of such a witness will have to be treated with great caution save where it is corroborated, either by a witness whose evidence is accepted or by the contents of contemporaneous documentation or is against the witness's interests or is admitted.

*Credibility*

15.    IOEC makes wide ranging challenges to the credibility of RMT and the Respondent and to a lesser extent to that of the other witnesses who gave evidence on behalf of the Respondent. Since most of the credibility issues concerning the Respondent and (to an extent) RMT are heavily entwined with the substantive issues from which (on the Applicant's case) it is to be inferred that in truth the Respondent holds the Property on trust for RMT, I address the credibility issues concerning the Respondent, other than that referred to in the following paragraph, and those concerning RMT that relate to those issues when considering those substantive issues, rather than attempting a free standing assessment of the credibility of the Respondent at the outset. That said, for the detailed reasons that appear later in this judgment, I have concluded that I should not accept the evidence of either the Respondent or RMT save where it is corroborated, against the interest of the Respondent or is admitted.

16.    There is one issue concerning the Respondent's credibility that I should mention at this stage and that concerns her immigration application. At or about the time of the purchase of the Property, the Respondent applied for leave to remain on an entrepreneur's visa. The Respondent's application contained a description of the business conducted by Comparts Corporation that even Lord Marks accepts " … *was overstated in the CV* …" attached to that application. It is no excuse that the CV was prepared by someone else because the information contained within it could only have come from the Respondent nor is the impact of the inaccuracies mitigated because the Respondent " … *did not attempt to pretend that the CV had not presented an exaggerated account of the size and significance of Comparts' plant hire business and its staff* …". The immigration system depends on applicants honestly presenting

applications to the Home Department. The Respondent either read or should have read the application before it was submitted and knew what was being said to be untrue. Whilst this factor is nowhere being decisive in relation to my assessment of the Respondent's credibility, it is a factor that is material to the conclusion that I arrive at when weighed with the other factors to which I refer below.

17.     I regard Ms White as a transparently honest witness whose evidence I accept in its entirety. I need to be more cautious about the evidence of Ms Yeganeh and Sepanta Tabatabaei because of their close familial connection with the Respondent. I return to their evidence as necessary later in this judgment.

18.     In relation to RMT it is necessary to remember that Butcher J held RMT to be one of the three primary instigators of the fraud the subject of the underlying proceedings, having rejected in its entirety RMT's defence that he had no involvement. Butcher J held RMT to have been dishonest both in the conduct of the fraud and, more importantly for present purposes, in his evidence to the court at the trial of these proceedings – see paragraphs 91-163 of the Judgment. So, at para. 121 of the judgment, having rejected RMT's case concerning the forgery of his signature on a document. Butcher J concluded that:

> "My findings in relation to these documents is of considerable significance. They mean that I have rejected Mr Tabatabaei's case in relation to these matters, and given the nature of that case it follows that he must have deliberately lied about the nature of his involvement in these arrangements and with these documents."

It was this that led to the wholesale rejection of the remainder of his case – see para. 125 -  and further led to the conclusions that:

> "162. The role of Mr Tabatabaei was to provide and operate the infrastructure outside IOEC which permitted the fraud to take place. Without his involvement there would have been no Purchase Agreement and no Sale Agreement, Dr Taheri and Mr Shirani would not have been able to access the initial US$2 1 million, and the second stage of the fraud could not have proceeded as it did.
>
> 163. I consider that Mr Tabatabaei's involvement in these matters was dishonest. That conclusion is supported by: (1) his attempts to conceal the nature of his relationship with the other parties from IOEC and third parties, including by the nominee arrangements for the Dean Defendants, which enabled his involvement and the conflicted position of Mr Shirani through his link with Sepanta to be obscured; (2) the Brokerage Agreements, into which he and Sepanta entered, which did not accurately reflect services which he or Sepanta had provided; and (3) his attempts during this litigation to deny his role, including by the creation of a false story to account for

documents which indicated his responsibility for the activities of the Dean Defendants."

Whilst this does not lead to the conclusion that all of RMT's evidence in this trial must be rejected out of hand, it does mean that great caution has to be exercised before it is accepted save where it is corroborated, admitted or is against his interest or that of the Respondent. In fact, as I have alluded to already, I conclude below that in certain respects RMT has given untruthful evidence at this trial and therefore I have concluded that I am unable to accept his evidence other than to the extent that it is corroborated by a document or witness whose evidence I can accept or is contrary to his or the Respondent's interests or is admitted.

19.     Mr Little, IOEC's solicitor, gave evidence on its behalf. By definition he could not give evidence relevant to the primary facts. Whilst I accept that Mr Little was a witness of truth, I also accept (perhaps not unnaturally in the circumstances) that he had formed a poor view of RMT that reflected itself in the manner in which he interpreted events or documents. This was not helpful and indeed his evidence as to the meaning and effect of particular documents is inadmissible, that being an issue for argument and ultimately judicial determination. Mr Little's opinions are of little or no value in the assessment of the merits of this case. His evidence is not mentioned at all in IOEC's written closing submissions. In those circumstances I need comment no further on it.

20.     There is one issue that arises out of Mr Little's evidence that I should mention at this stage because it impacts on a number of the issues that I have to consider later in this judgment.

21.     One of the purposes of Mr Little's evidence was to introduce documents that had been obtained on behalf of IOEC by his firm from Dr Alswadeh – the fourth defendant in the main proceedings. Butcher J considered Dr Alswadeh to be dishonest, unreliable and someone whose evidence could be accepted only on much the same terms as I have concluded I can accept that of RMT – see Judgment, paragraphs 91-92. Notwithstanding these findings, Mr Onslow QC told me that:

> "… at various turns in this litigation we have been able to review what Ms Zavarei said, go back to Dr Alswadeh and he has helped us with documents that put what Ms Zavarei has said in a rather different light."

The real difficulty about this approach is that there is no evidence that Dr Alswadeh has supplied IOEC's solicitors with all the relevant documents in his possession or that he has been asked about all the issues that arise. Mr Little was cross examined about this in the following exchange between him and Lord Marks:

> "Q. And you have accepted his help throughout these proceedings against Ms Zavarei?
>
> A. From the point when Ms Zavarei had a solicitor from her former lawyers , Enyo, provide a witness statement, at that point we contacted him to see if he would be willing to provide documents to explain the matters or shed any light on the matters that were asserted in that evidence from Mr Allen.

Q. And what attempt have you made to ensure that the documents received by your firm and/or IOEC in these proceedings have been a clear and full account of the documentary evidence?

A. Dr Alswadeh has provided us with documents he had searched in a batch and which we then reviewed, so there are documents he provided to us that we have decided are not relevant , and therefore we have disclosed and handed over those that are relevant . He did some searching, we understand, using keywords, so fairly crude, but we don't have control of his documents.

Q. Nor do you know anything about the searches he carried out except from what he has told you?

A. No, we don't, but we do know that the documents have been delivered in native form, so therefore we're actually able to review them to see whether or not they appear to be genuine, they appear to be genuine, and as far as I understand it, they've been accepted on your side that they are genuine.

Q. That's not addressing the point that I'm asking about. You have no understanding of the degree of selectively which Dr Alswadeh or Mr Alswadeh applied to his choice of which documents to send you?

A. What Dr Alswadeh told us is he used keywords and he provided us with all the documents that came back against those keywords, that's all we know. So what became apparent, and was apparent in the trial before Mr Justice Butcher, is that while quite clearly he had been involved in dishonesty, quite clearly he had been involved in forgery of documents and other activities , he had come to realise that actually the position was that he had been -- he was involved in this, he was going to be a defendant in this, and he decided that he would behave properly and disclose documents, so he provided a disclosure statement and provided documents against that, then there were further documents he produced. There has been no suggestion that since he has adopted that position, which is a position he adopted at trial, when he was frank with the judge and admitted what he had done, that he continues to fabricate documents for others .

We do not have access to the cache of documents he took. These are, of course, the documents that came from when he was employed in the companies of Mr Tabatabaei, so they're documents that Mr Tabatabaei had and should have disclosed but did not, and there's no suggestion from Mr Tabatabaei who has seen these documents and who is a witness in this case that there

are material documents that he has omitted to produce"
[Emphasis supplied]

A little later in his evidence Mr Little acknowledged that IOEC had decided not to call Dr Alswadeh to give evidence. His explanation for this when asked was: "…*that's a request about the tactical decisions that have been made with my client. Dr Alswadeh has not volunteered to be a witness and that is a matter for us how we run our case, a matter for the client based on the instructions to me as to how to conduct his case.*".

22.    Whilst I agree that documentation sourced by IOEC from Dr Alswadeh has at least the difficulties I have mentioned – that is that IOEC's solicitors have no access to the cache, have no real knowledge as to how documents within the cache were identified and no means of knowing whether all the documents that are relevant and within the cache have been disclosed - it is not suggested that IOEC is in any way complicit in any selectivity on the part of Dr Alswadeh. IOEC were forced to approach Dr Alswadeh only because of the failure by the Respondent to disclose all the documents that would have established critical parts of her positive case. In my judgment therefore the difficulties that exist concerning the documents obtained by IOEC has to be balanced against the substantial failures by the Respondent to comply with her disclosure obligations to which I refer in more detail below.

23.    I have set out above how I have attempted to test the contentions of the parties by reference to the documentation that is available. Plainly however in carrying out that exercise I have had to bear in mind that some of the contemporaneous documentation relied on by IOEC has been supplied by Dr Alswadeh, is not complete and thus the impression to be gained from particular documents may simply be wrong. This has particular importance in relation the Respondent's positive case that she was at all material times the legal and beneficial owner of a BVI corporation called Comparts Corporation and an apartment known as Unit 4902 in the Burj Khalifa Tower in Dubai, both of which she maintains she sold and used the proceeds to fund in part the acquisition of the Property. I return to this when considering those issues in detail below.

**Jurisdiction**

24.    As summarised already, the application I have to determine is that contained in the Application Notice dated 7 January 2020 ("Application Notice"). It identifies the Respondent as the only respondent to the application and identifies the relief sought as being:

> " Paragraph 6 of the Consent Order of Mr Justice Teare dated 16 April 2019 ("Consent Order") provided the Claimant and the Respondent with liberty to apply. The Claimant applies for declarations that (a) the Respondent holds the legal title in the Property known as Henfield Lodge, Brighton Road, Henfield SNS 9SU and associated land with title numbers WSX204103 and WSX200370 (the 'Property') as the Sixth Defendant's nominee, who is the sole beneficial owner of the Property, and (b) the Property is an asset that falls within the scope of

Paragraph 1 of the Schedule to the Consent Order. The Clamant
seeks its costs of the application, to be assessed if not agreed."

On 16 April 2019, IOEC had obtained a post judgment freezing order against RMT that
prevented him from dealing with a number of assets including any interest he might
have in the Property. The Consent Order made on the same day ("Consent Order")
contained undertakings that by the Respondent that she would not remove from
England or otherwise dispose of deal with or diminish the value of various classes of
assets including any assets which she held for or with RMT whether as agent, nominee,
trustee or otherwise. Paragraph 3 of the Consent Order provided for the provision of
various categories of information by the Respondent and paragraph 6 said that there
was "*…Liberty to Apply"*.

25.    Given that the Respondent maintains that she is the sole beneficial owner of the
Property and IOEC maintains that she holds it on bare resulting or constructive trust for
RMT, there is clearly a dispute as between the Respondent and IOEC as to whether the
property falls within the scope of the Consent Order. Where such a dispute genuinely
exists, it is difficult to see how it can be resolved other than by an application such as
that issued by IOEC. The alternative (that it be left to be resolved on a committal
application after the Property has been dealt with otherwise than in accordance with the
undertakings contained in the Consent Order) is obviously unsatisfactory. Although it
might be contended that RMT (or his trustee) could also have been joined to the
application, in my view that is unnecessary because the Respondent is the registered
proprietor of the Property. If IOEC succeeds in its application the effect will be to freeze
the Property in the hands of the Respondent and it will then be up to the Trustee to
realise the Property as he judges appropriate. It is against that background that the
challenge to jurisdiction must be viewed.

26.    Lord Marks submits on behalf of the Respondent that the application is one that is
precluded by operation of section 285(3)(a) of the Insolvency Act 1986. It provides:

"Restriction on proceedings and remedies.

…

(3)    After the making of a bankruptcy order no person who
is a creditor of the bankrupt in respect of a debt provable in the
bankruptcy shall—

(a)    have any remedy against the property or person of the
bankrupt in respect of that debt,

…"

In my judgment that submission is mistaken and must be rejected. My reasons for
reaching that conclusion are as follows.

27.    Section 285(3)(a) is not engaged. My reasons for reaching that conclusion are as
follows. It is not in dispute that the IOEC is a creditor of RMT or that the judgment debt
due from him to IOEC is provable in his bankruptcy. The only issue is whether the
remedies sought by the Application Notice are " *… against the property or person of*

*the bankrupt in respect of that debt* …". Lord Marks submits that the declarations sought and in particular the first declaration sought is a declaration against the property of the bankrupt because the words " … *against the property…"* in the section mean merely " … *in respect of the property*". I reject that submission. It is entirely self-serving. No attempt has been made to identify any purposive justification for it and in my judgment there is none. Bankruptcy is a class remedy that attempts as far as possible to ensure that all unsecured creditors within the same class get an equal part of the bankrupt's estate after payment of trustee costs and expenses and the claims of preferential and secured creditors. In my judgment the purpose of the statutory provision that Lord Marks relies on is to ensure that all unsecured creditors are treated *pari passu*. This is achieved by preventing such a creditor from obtaining an advantage over other creditors in the same class by obtaining a remedy against property that would otherwise be available for all such creditors. Lord Marks was correct to maintain that the application for a charging order was contrary to section 285(3)(a) for precisely that reason. However, the application I have to determine does not defeat that purpose because its effect is not to prefer IOEC over other creditors in the same class. On the contrary it strengthens the position of all such creditors by ensuring (if otherwise IOEC is entitled to succeed) that the Property is available for all creditors.

28.    Lord Marks submits that since what is sought is a declaration as to the ownership of the Property on the sole basis that it belongs beneficially to RMT it follows that the claim is for a remedy against the property of RMT. I reject that submission as well because it fails to recognize the purpose of the section is as I have described and that the remedy sought is not for the benefit of IOEC at the expense of its fellow creditors but is for a declaration that the Property is beneficially owned by RMT and thus (a) is frozen in the hands of the Respondent by operation of the undertakings she has given the court contained in the Consent Order and, incidentally, (b) is available for all such creditors including IOEC.

29.    Lord Marks submits that the Application before me at this hearing is an impermissible stratagem to evade the consequence that IOEC has been prevented from pursuing its charging order application. I reject that submission as well. The application before me is entirely different from the Charging Order application. The Charging Order application, had it succeeded, would have resulted in IOEC being secured for the whole of what is due to it against the Property and so would have obtained an advantage over other creditors in the same class. The application I have to decide does not have that effect and so cannot have the effect in any legally relevant sense of evading the consequence that IOEC is not entitled to apply for a charging order.

30.    Finally Lord Marks submits that the application before me is one that only the trustee in bankruptcy has standing to bring. He argues that this follows because the Insolvency Act 1986 requires the estate of a bankrupt to pass to the trustee for the benefit of creditors generally not just one of them. Whilst I agree with the general proposition (indeed it underpins my rejection of Lord Marks' other arguments considered earlier) it is entirely unsupportive of Lord Marks' submission concerning standing. The application arises because there is a dispute between IOE and the Respondent as to whether the Property is property that she is precluded from dealing with under the terms of the Consent Order. That dispute can only be resolved by an application such as this. The alternative, as I have said, would be the obviously less attractive solution of leaving the issue to be resolved on a committal application or perhaps on an application for an

injunction to restrain the Respondent from disposing of the Property or any surplus proceeds following its sale by the Respondent's mortgagee. It either benefits or has no material impact on the interest of unsecured creditors generally because (a) if IOEC succeeds, the property is frozen in the hands of the Respondent; (b) if the mortgagee obtains possession and sells the Property the surplus proceeds of sale are likewise frozen in her hands and (c) if the application fails, the outcome is not binding on the trustee who remains able to take such steps as he considers appropriate for collecting in RMT's estate as it was before his discharge.

**Discretion To Make The Declarations Sought**

31.    It is common ground that the power to make declarations is discretionary. Lord Marks submits that even if (as I have concluded is the case) I have jurisdiction to entertain the application, I should dismiss it without going onto the merits because I am bound to refuse the Declarations sought in the exercise of my discretion. I reject that submissions for the reasons that follow.

32.    Lord Marks submits first that this is so because IOEC has no interest in the Property. This misses the point of the application which, as I have explained, is to resolve a dispute between IOEC and the Respondent as to whether the Property is property to which the Respondent's undertakings in the Consent Order apply.

33.    Lord Marks submits that this is an academic dispute because only the Trustee could take action for possession and sale of the Property. Again, this misses the point. There is no doubt that the Trustee would have to take action to recover any interest that RMT has in the Property but that does not mean that IOEC has no interest in ensuring that the Respondent does not dispose of the Property until any such action has been taken. Plainly IOEC has such an interest as RMT's largest creditor. There is no material that suggests the Trustee has decided not to seek to recover whatever interest RMT had in the Property or its proceeds of sale. All that he has indicated so far – see his solicitors' letter quoted earlier - is that he does not seek to adopt RMT's position in these proceedings and is not in a position to go on the court record at this stage. The trustee is fully entitled to await the outcome of these proceedings before deciding whether to take proceedings to recover the Property and he is equally fully entitled to wait until possession proceedings have been taken by the mortgagee with a view to securing the surplus proceeds of sale of the Property following a sale by the mortgagee. In the event that the Trustee decided not to take possession of the Property, it is at least arguable that at that point IOEC could take action itself to charge the Property. This is so because RMT is no longer bankrupt and the judgment against him in favour of IOEC survives his bankruptcy by operation of <u>section 281(3)</u> of the <u>Insolvency Act 1986</u>. This contingent right of itself justifies IOE seeking the Consent Order against the Respondent and the declarations now sought to ensure the Consent Order has the effect intended. In those circumstances, this dispute is not an academic one.

34.    Lord Marks submits that I should not entertain these proceedings further because they have no practical utility since IOEC has no right to apply for an order requiring the Property to be sold even if it succeeds in obtaining the declarations that it seeks. Again, that misses the point. There is a dispute between the Respondent and IOEC as to whether the Respondent owns the Property beneficially (as she alleges) or holds it on bare resulting or constructive trust for RMT (as IOEC alleges). If IOEC is right then

the Property is property that the Respondent cannot deal with by operation of the undertakings she gave to the court contained in the Consent Order. That enables the trustee if he chooses to commence proceedings for the realisation of the Property or, if the mortgagee sells the Property, to recover any surplus proceeds and it enables IOEC to seek changing orders now that RMT has been discharged from bankruptcy if the Trustee decided not to seek possession and sale of the Property or to recover the surplus net proceeds if any following a sale of the Property by the mortgagee. That being so, the proceedings have sufficient practical utility to justify the determination of these proceedings on their merits and the grant of the declarations sought if the claimant is able to prove its case concerning the beneficial interest in the Property.

35.    Finally, Lord Marks submits that even if I have jurisdiction to entertain the application, I should nonetheless refuse to do so in the exercise of my discretion because these proceedings represent a usurpation by IOEC of the powers of the Trustee. I reject that submission. These proceedings are concerned exclusively with the position as between the Respondent and IOE concerning whether the Property is property the subject of the undertaking contained in the Consent Order. They have absolutely no impact on what the Trustee can do concerning the Property or any surplus proceeds of sale following possession and sale by the mortgagee.

36.    In those circumstances, I conclude that (a) I have jurisdiction to determine IOEC's application and (b) there is nothing in the circumstances that should lead me to refuse to determine the application as a matter of discretion without considering the application on its merits.

**Scope of the Dispute**

37.    The remaining threshold issue concerns the scope of the enquiry that I should undertake. In opening this case, Mr Onslow set out the rival contentions of the parties in paragraphs 3 and 5 of his written opening submissions. He made clear that IOEC's case was that the Respondent's case that she is the "*... 100% legal and beneficial owner ...*" of the Property was "*... demonstrably false both in its detail and its overarching themes of asset segregation and independent business experience and success*". However, at paragraph 4.4 of his written opening, Mr Onslow submitted that it was improbable that RMT "*…did not have at least a 50% share in the family home and main asset*" and at paragraph 34 of his written opening, Mr Onslow submitted that:

> "If, alternatively, the Court were to find that she did contribute to the purchase price, that contribution expressed as a percentage should be regarded as the limit of her interest."

This led Lord Marks to submit that this was not something that featured in the Application before the Court, had not formed any part of IOEC's case prior to the service of Mr Onslow's written opening submissions and was not an alternative case that ought to be permitted. As Lord Marks put it in his oral opening submissions: " … *it's not open to you, we say, to take the middle course of looking at the contributions or anything else and saying: well, I'm going to order a shared ownership declaration in this case*" – see T1/66/14-17.

38.    Having considered this point and whether to apply to amend the Application Notice over the short adjournment, Mr Onslow said this:

> "The point of substance is this: that we are content to rest where we are. We say we will establish 100% beneficial interest, but if we don't, looking at (b), which is a standalone declaration, the property is now seeking a standalone declaration, the property and assets which fall within the scope of paragraph 1 of the schedule to the consent order, we will be inviting your Lordship to make that order, in parentheses, whether or not it's 100%, because if it is, your Lordship comes to the conclusion, some lesser percentage of the beneficial interest, the reason that it is an asset that falls within the scope of paragraph 1 of the schedule of the consent order is because of the existence of that beneficial interest, whatever the court may find it to be, and that's all I wish to say about it at the moment. We're not going to apply for permission to amend."

39.    Mr Onslow also submits that if I conclude that RMT beneficially owns less than 100% of the Property, then I am entitled so to declare because that is the effect of the order by Philips J by which these proceedings were transferred to this Court. I am not able to agree with that analysis for the following reasons.

40.    The recital to Philips J's order makes clear that the applications then pending were the applications for interim charging orders to be made final. That application has now been withdrawn by IOEC for the reasons already explained. Paragraph 2 of Philips J's Order provided that:

> "The Applications shall be adjourned to a trial (in the London Circuit Commercial Court) to determine the issues of:
>
> 2 .1. whether the Sixth Defendant has any beneficial interest in the Property; if so,
>
> 2.2. the extent of that interest; and
>
> 2.3. whether final charging orders shall be made over any such interest that he has in the Property."

As is manifest, that order was concerned exclusively with the charging order applications then pending. The "*Applications*" referred to the opening line are defined by the opening recital to be the charging order applications. Philips J's Order was made on 11 December 2019.

41.    The Application Notice was issued on 7 January 2020. Mr MacDonald Eggers QC sitting as a Judge of this Court on 12 February 2020 ordered:

> "UPON the Claimant's applications for charging orders over the Property known as Henfield Lodge, Brighton Road, Henfield BNS 9SU and associated land, with title numbers WSX204103 and WSX200370 ('the Property') dated 1 July 2019 ('the Charging Order Applications')

> AND UPON the Claimant stating that it no longer pursues the Charging Order Applications and undertaking to apply to the Land Registry to remove the interim charging orders registered against the title to the Property within 14 days of this order
>
> AND UPON the Claimant's application of 7 January 2020 for declarations as to the scope of a freezing order against the Respondent dated 16 April 2019 ('the Application for Declarations') … "

That Order then went on to record that there would be no order on the charging order applications but then proceeded to give directions for the only application that then remained to be determined namely the applications contained in the Application Notice now before me – see para. 5 of Mr MacDonald Eggers' Order. Philips J's Order referred to above ceased to have any relevance once the charging order applications were disposed of. The applications he had transferred to this court had been finally disposed of by Mr MacDonald Eggers' Order.

42.   The relief sought on the applications now before me is that set out in the body of the Application Notice. As I have said, the Application Notice contains both paragraphs (a) and (b). It is manifest that para. (a) is exclusively concerned with the binary case to the effect that the Respondent holds the Property on bare resulting or constructive trust for RMT. However, Mr Onslow submits that para (b) goes wider than that and permits me if my findings justify it to declare the extent of any beneficial interest that RMT might have in the Property that is lower than 100%. The contrary argument is that para. (b) is simply parasitic on para. (a) by simply providing for the consequence of IOE succeeding in obtaining the relief sought by para. (a).

43.   That para. (b) was simply the means for providing for the consequence of IOEC succeeding in obtaining a declaration in the terms sought in para. (a) derives some support from the terms of the draft Order attached to the application, the operative part of which is in these terms:

> "IT IS DECLARED THAT:
>
> 1. The Respondent holds the legal title in the Property known as Henfield Lodge, Brighton Road, Henfield BNS 9SU and associated land with title numbers WSX204103 and WSX200370 (the 'Property') for the Sixth Defendant who is the sole beneficial owner of the Property.
>
> 2. For the avoidance of doubt, the Property is an asset that falls within the scope of Paragraph 1 of the Schedule to the Consent Order."

This view also derives support from the terms of para. (b) in the Application Notice. Had it been intended that the paragraph was to be the vehicle for a finding that the Respondent was only in part beneficially interested in the Property then it could have said so – as for example paras. 2.1 and 2.2 of Philips J's Order had stated. That conclusion is supported by the use of the word "*and*" between paras. (a) and (b). Had it been intended that para. (b) was to cater for the possibility that I concluded that the

Respondent was only part beneficially interested in the Property the word used would have been "*or*".

44.    All that said, in my view the language used is capable of being read in either of the ways that I have identified. There would be absolutely no point in the parties having gone to the time and expense of these proceedings for an Order to be made that did not reflect a finding to the effect that the Respondent had a beneficial interest in the property of less than 100% if that is the conclusion that I reach. This is all the more the case because I am entirely satisfied that all the relevant evidence that the parties and in particular the Respondent wished to delay has been deployed, none has been identified that the claimant would have chosen to adduce but for the language used in the Application Notice and at no stage did Lord Marks indicate that an adjournment would be required if I did not agree with his analysis of the terms of the Application Notice, much less did he identify why such an adjournment might be required. Finally, if this was a point that was to be taken it was one that could and should have been taken much earlier than the start of the trial.

45.    In those circumstances, if I conclude that the Respondent has a beneficial interest in the Property of less than 100% I consider it appropriate that there should be a declaration to that effect. I set out my findings hereafter. At the hand down of this judgment I will invite short submissions from the parties as to the terms of the order and any declarations in it that should follow.

**Beneficial Ownership of the Property - Applicable Legal Principles**

46.    This Application is concerned with whether (as IOEC alleges) when the Property was acquired in the sole name of the Respondent. She and RMT had a common intention that it would be held on constructive trust either for RMT absolutely or for them jointly in shares to be ascertained in these proceedings or (as the Respondent contends) acquired by her both legally and beneficially from funds that belonged to her beneficially. This question is to be answered at any rate in the circumstances of this case by reference to the position as it was at a date no later than completion. Although Lord Marks maintains that the question must be decided by reference to the agreement arrangement or understanding of the parties (if any) much earlier than that and perhaps as early as when they first viewed the Property, I do not agree. The arrangements could change as the issue concerning payment for the Property developed and indeed afterwards. However for reasons that I explain below, I consider the position is one that depends almost entirely on the financial contributions to the purchase and thus any agreement arrangement or understanding that is to be inferred from those arrangements can have been concluded by no later than completion. I accept Lord Marks submission that there is no evidence from which I could infer a change of intention after completion had taken place.

47.    This case being concerned with a property that it is common ground was the family home shared by RMT and the Respondent with their children, it is also common ground that the principles applicable to the resolution of this application in summary are as follows:

    i)    The starting point, where a property that is a family home is registered in the name of a sole registered proprietor, is that equity follows the law and the sole

registered proprietor is also the sole beneficial owner – see <u>Stack v. Dowden</u>
[2007] UKHL 17; [2007] 2 AC 432 *per* Lord Hope JSC at para. 4-5; Lord
Walker JSC at para 14; Lady Hale JSC at para. 56 and Lord Neuberger JSC at
para. 109;

ii)     The onus of proving that someone other than the sole registered proprietor has
a beneficial interest and if so the nature of that interest rests on the asserting
party - see <u>Stack v. Dowden</u> (ibid.) *per* Lord Hope JSC at para. 4-5; Lord Walker
JSC at para 14 and Lady Hale JSC at para. 56. The asserting party will usually
be a spouse or cohabitee claiming an interest in a family home that has been in
shared occupation, but where a third party is claiming that such is the case the
onus will rest on the third party concerned – see <u>Stack v. Dowden</u> (ibid.) *per*
Lady Hale JSC at para. 56;

iii)    The party seeking to prove that the starting point ought to be departed from must
prove that the parties had a common intention that their beneficial interests be
different from their legal interests and in what way, which common intention is
to be ascertained from the parties shared intentions, actual, inferred or imputed,
with respect to the property in the light of their whole course of conduct in
relation to it, the search being for the result which reflects what the parties must,
in the light of their conduct (including the contributions each made to the
acquisition of the relevant property), be taken to have intended either at the time
the property was acquired or which they later formed. - see <u>Stack v. Dowden</u>
(ibid.) *per* Lady Hale JSC at paras 59-62; but

iv)     Where assets are transferred into the name of a spouse or cohabitee (A) by a
third party pursuant to an agreement, arrangement or understanding between A
and B that the assets should be or should remain beneficially owned by B, then
A holds the assets concerned either on a common interest constructive trust
reflecting that agreement arrangement or understanding applying the principles
in <u>Stack v. Dowden</u> (ibid.) - see <u>National Bank Trust v. Yurov</u> [2020] EWHC
100 (Comm) per Bryan J at 1365.

48.    Although it was submitted on behalf of IOEC that financial contribution represented
the best guide to who has what beneficial interest, that is to overstate the importance of
financial contributions. The comment relied on by the claimant (that of Lord Hope in
<u>Stack v. Dowden</u> (ibid.) at para. 11) was not a statement of general principle but was
his analysis of the particular facts of the case. The statement of general principle which
was agreed by the majority (Lady Hale, Lord Hoffmann and Lord Walker) was Lady
Hale's formulation at para. 61 – that arriving at a conclusion involved " … *undertaking
a survey of the whole course of dealing between the parties and taking account of all
conduct which throws light on the question what shares were intended* …" in the search
for " … *the result which reflects what the parties must, in the light of their conduct, be
taken to have intended*". As Lady Hale added at para. 69: "*Many more factors than
financial contributions may be relevant to divining the parties true intentions*".

49.    In carrying out that exercise however, I accept that financial contribution is likely to be
at least a consideration in most cases, may in particular cases outweigh other factors
and, in the absence of any other cogent evidence, will probably be decisive. However,
it goes too far to say that financial contribution trumps all other factors. <u>JSC BTA Bank</u>

v. Shalabayev [2017] EWHC 2906 (Comm.) is not material because that case was not concerned with a family home. Similar considerations apply to the decision of the Privy Council in Gany Holdings (PTC) SA v. Khan [2018] UKPC 21.

50.     Finally and before turning to the facts of this case it is necessary I refer back to the issue of onus. As noted above, the legal burden rests on IOEC to prove on the balance of probabilities that the Respondent holds the whole or alternatively some part of the beneficial interest in the Property on a common interest constructive trust for RMT. However, none of this detracts from the applicability in this case of the general principle that " … *wherever a person asserts affirmatively as part of his case that a certain state of facts is present or is absent, or that a particular thing is insufficient for a particular purpose, that is an averment which he is bound to prove positively …*" - see Abrath v. NE Railway Company (1883) 11 QBD 440 *per* Bowen LJ at 457. This is of particular importance in a case such as this, where the evidence relevant to many of the affirmative assertions made by the Respondent will be contained in contemporaneous documentation and other evidence in the possession of or obtainable by the Respondent.

**Knowledge of RMT and Respondent Concerning Discovery of and Investigation into the Fraud**

51.     I consider this issue first for two reasons. First, my conclusions in relation to it may be relevant to my assessment of the credibility of both RMT and the Respondent and second, the Respondent's state of knowledge may be relevant to an assessment of what happened in relation to various assets, which the Respondent contends belonged to her beneficially and were sold by her to finance the acquisition of the Property.

52.     RMT's evidence at the trial of the main claim was that investigation into the fraud commenced in early 2014 and the Iranian prosecuting authorities had commenced action against him by December 2014. That this is so is apparent from a travel ban dated 14 December 2014 and other restrictions imposed on him on or about that date and gains further support from a summons by the Iranian authorities directed to him dated 8 February 2015. On 26 March 2015, various shares registered in his name were ordered to be seized by the Iranian prospecting authorities. I therefore reject as untrue RMT's reply at T3/151 in cross examination by Mr Onslow:

> "Q. It was obvious to you, wasn't it , by the middle of 2015 that IOEC were wanting to know where their money was and that the finger was being pointed at you and that the criminal authorities in Iran were taking steps to freeze your assets so that the money might be recovered?
>
> A. No, sir. This is not correct."

The untruthful nature of this answer is one reason why I have concluded that I ought not to accept RMT's evidence other than to the extent referred to earlier.

53.     The seizing of assets and the involvement of RMT and Sepanta International FZE (one of RMT's main trading entities) in the IOEC fraud the subject of the main proceedings was reported on the Reuters website on 4 September 2015 and the Financial Tribune website on 6 September 2015. In Reuters' report, RMT is reported as " … *Speaking to clear his name after being accused by a former Iranian official and conservative media*

*close to security forces of stealing some of the money, Reza Mostafavi Tabatabaei gave a rare first-hand description of the case."* RMT also maintained in the course of his oral evidence that he had been interviewed by the BBC concerning events that were the subject of the main claim – see T3/151. The explanation offered is contrary to the findings made by Butcher J and I need not take up time setting it out. However, he is reported to have told Reuters that:

> "… he had not been formally charged, but his family in Iran had come under pressure from the authorities and he had been blocked from accessing tens of millions of dollars of assets in the country."

RMT accepted in cross examination that he had been accurately reported by Reuters – see T3/152/24-153/17. All this led to the following question and, I hold, untruthful answer from RMT:

> "Q. … The point is simply this , that by the time that your wife bought the property at Henfield Lodge you knew very well that you were likely to be the subject of very large claims, legal claims, made by IOEC and likely to be the subject of claims in prosecution in Iran in relation to your role in the loss of IOEC's $87 million. You knew that, didn't you?
>
> A. No sir, that nobody can think or believe what happens tomorrow in Iran because it is a country that the jurisdiction is not managed normally by -- it is managed by politic,… "

The untruthful nature of this answer is obvious from the contents of the press reports I have mentioned and is another reason why I cannot accept RMT's evidence other than to the extent noted earlier.

54.    This was followed by the following exchange, where again RMT provided answers that were plainly untruthful when viewed against the contemporaneous documentation referred to earlier:

> "Q. Now, let's stop there. Let's get back to the point. You knew by the end of 2015 that you were facing very large financial claims in connection with the loss of $87 million to my client IOEC. You knew that, didn't you?
>
> A. No, sir . Because if you also -- one of the documents you open the case here in 2016 is my letter to your client, Mr Amani, as he going to help them to accept to pay from so many money they have debts to me in Iran that remained on commission they don't have the problem with me and they need me to help them for other subject, even they solved the problem with them in China, because your great client lost 120 million in China and I think they are very wealthy, they are making (inaudible) to follow that money. They need my help on that one, sir .

Q. Stop there, are you asking his Lordship to accept that by the end of 2015 you did not appreciate that you were likely to be subject to large claims, financial claims, in relation to the loss of IOEC's money?

A. I don't know nothing about your client's intention or anything that they want to open any chase in the UK. I told you, excellency, if you go in BBC interview it is Mr Richard Little is referring, RMT13, but I don't know where it is written -- I have been the person invited IOEC to come and open the case to follow the subject. This is the BBC, I'm not talking Fars News Agency.

Q. Mr Tabatabaei, stop. It doesn't matter whether it was in the UK or anywhere else. You knew that you were facing very large claims in relation for the recovery of $87 million that my client had lost, didn't you?

A. No, sir. I have been a person who has brought this up. I know I had going to face my life in difficulty in Iran because in Iran it is something different, excellency. We cannot say in Iran is there the BBC or UK jurisdiction or justice. In Iran it is something different because even maybe respectfully you agree so many British Iranians in prison there at no stance, no reason, but the justice in Iran says they are guilty"

55.    These answers taken together are plainly untrue given the contextual material set out earlier, I reject the answers as untrue and the untruthfulness of the answers together constitute another reason why I cannot accept RMT's evidence other than to the extent noted earlier. I find therefore that by no later than February 2015 and in any event by no later than 4 September 2015 RMT knew that he was or was likely to be the subject of civil and/or criminal action in Iran and elsewhere.

56.    It is against that background that I have to come to a view concerning RMT's evidence as to what he told the Respondent and when. That evidence was given in cross examination and in supplementary answers to me. That evidence was follows:

"Q. And you will have discussed that risk, discussed the prospect of you facing claims in respect of the $87 million with your wife, won't you?

A. No, sir . If your client really looking for justice why they not disclose the meeting I had with Mr Amani? I have been the person who proposed to them keep me asset within the family and go through the story and don't give the chance to the people to abuse you. But I told you --

Q. Let me put it bluntly to you: that's why, Mr Tabatabaei, this property Henfield Lodge was put in your wife's name alone isn't it?

A. No, sir, that's not correct. You have my passport. I had ten years multiple visa in the US. I had also evidence I have been in France. I have been so many options to go. I love this country, I choose to live here, my children have a good education here and there is no any matter or reason to go into any strange thing -- you think this is Mrs Zavarei's decision for her family live there, she bought the house, I not happy with that and that's it, this is the true story .

JUDGE PELLING: Can I just ask you a question, Mr Tabatabaei. Would you go please to bundle B2, page 40. Are you there?

A. Yes.

JUDGE PELLING: Now, counsel has already drawn your attention to what the final paragraph on page B2/40 says "As an Iranian now living in Dubai" you told Reuters you hadn't been formally charged but your family in Iran had come under pressure and you'd been accessing tens of millions of dollars of assets in the country. Right

A. Yes, sir , definitely .

JUDGE PELLING: And that is dated 4 September 2015.

A. Yes, my Lord.

 JUDGE PELLING: Top of the page. Now, is it your evidence to me, just so that I'm clear , that you were telling Reuters on or before 4 September that you were being blocked from accessing tens of millions of assets in the country whilst at the same time not sharing that with your wife?

A. Yes, my Lord, I say about myself, not talk about anybody, because my Lord it is very difficult to explain how they play a political game. The Iran they try to show the reason of block of this because it is dispute with Mr Shirani and court and others , but all is designed and managed as being something else and me or my lawyer have never ever had a chance to access any document and also the only thing I had so many meetings with IOEC and their people, but they do not even refer to all those meetings even in it their witness statements in 2016, my Lord.

JUDGE PELLING: Mr Tabatabaei, we've got to get on so I will just give you one more opportunity because I have to come to an evaluative view about all of this in the end. The report from Reuters is dated 4 September 2015. Is it your evidence that notwithstanding you were apparently telling Reuters about all of this, see the report, you were not telling your wife? Is that the position ?

A. Yes, it's talking about myself, my Lord, and family.

JUDGE PELLING: Right, thank you.

A. Family, it includes my sister, my mother, all this family, my Lord.

JUDGE PELLING: Thank you very much.

A. You are welcome."

I return to this evidence once I have considered the Respondent's evidence on this issue.

57.    The Respondent's evidence on this issue was off the point and her answers appeared to be intended to divert attention from this issue – see T2/151/22 – 155/6. In the end there was this exchange between Mr Onslow and the Respondent:

"MR ONSLOW: When do you say you became aware of the allegations made against your husband in these proceedings, or for that matter, by the Iranian authorities ?

A. For the Iran case or for UK case?

Q. For either case?

A. For Iranian case I think it was end of 2017 and for UK case it was, I think I can say it was somehow we received the -- I think it was August or September, if it was not later, maybe October. I don't remember.

Q. Of what year?

A. 2016."

The Respondent denied seeing either of the web published articles referred to earlier at the time they were published but there was then the following exchange between Mr Onslow and the Respondent:

"Q. Are you saying to his Lordship that Mr Tabatabaei wasn't telling you about any of these matters in September 2015 or until later ?

A. Yes, I had some idea that he met Mr Amani, he decided to help them, even he was happy to give his 3 million commission, return it back, and helping them even it was Reza that told them: okay, let's keep my assets in your hand, don't let to be misappropriate, we can go to sort out the issues, but unfortunately I had no idea that it's officially frozen until 2018 in Iran ."

58.    I reject the Respondent's evidence that RMT did not inform her of the allegations being made against him in 2015 and that she was not aware of them until 2018 as inherently

improbable, contradicted by her earlier and unforced answer that she knew from 2016 and untrue. In my judgment this evidence is also inconsistent with the fact that her assets had been frozen from 5 April 2015 and with RMT's evidence that he was discussing the issue with all his family by no later than September 2015 but not the Respondent. As the Respondent observed in the course of her cross examination, when being pressed to give an account of RMT's business activities in England " … *It is my husband, of course, I'm very close to him, maybe I know everything about him* …". This reflects the fact that during the period material to the events I am now considering, the relationship between RMT and the Respondent was close and trusting.

59.    Whilst it is possible that someone in RMT's position would seek to conceal what was happening from his wife – he suggested at T3/149 that he did so in order to protect her from stress - it is inherently improbable that someone in the position of RMT would be discussing the allegations made against him with print and broadcasting journalists, whilst not discussing them with his wife. I reject as untrue the suggestion that the Respondent first learned of the allegations in 2018.

60.    I now return to RMT's evidence on this issue. I reject that evidence as untrue. I do so on the basis that RMT earlier gave answers in relation to his knowledge that were manifestly untrue when compared with the contemporaneous documentation, because this evidence is entirely uncorroborated and because his evidence that he was not discussing the issues with his wife is inconsistent with his evidence that he was discussing the issues with all of his family as well as the media and because it is inherently improbable that these issues would not have been discussed between RMT and his wife the Respondent as these events were unfolding. This provides yet further reason for rejecting RMT's evidence save to the extent referred to earlier.

61.    In those circumstances, I reject the Respondent's evidence that she was not aware of what was happening until 2018 as untrue. This leads me to reach similar conclusions in relation to her evidence as those I have so far reached concerning RMT's evidence.

62.    In light of these conclusions, I find that the Respondent was aware of the allegations faced by RMT and of the action being taken as a result probably by no later than February 2015 and certainly by no later than the beginning of September 2015.

## FINDINGS CONCERNING ACQUISITION OF THE PROPERTY

*Purchase and Sale of 46 Woodruff Avenue*

63.    In is common ground that the Respondent and RMT purchased their first property in England in September 2013, when they purchased 46 Woodruff Avenue ("Woodruff Avenue"). The purchase price was £1.27 million, It was registered in the joint names of the Respondent and RMT.

64.    It is common ground that Woodruff Avenue was sold for £1,253,000 and the net proceeds of sale were paid over to the Respondent in their entirety by the solicitors instructed by RMT and the Respondent on the sale. On 27 June 2016, the Respondent transferred a sum equivalent to the net proceeds of sale less about £72,000 to the solicitors instructed on the purchase of the Property, which was then used to part fund the acquisition of the Property. This is made good by the contemporaneous documentation to which I refer in detail below.

*Purchase of the Property*

65.    Contracts for the sale and purchase of the Property were exchanged on 11 December 2015 and the acquisition was completed on 30 June 2016. The purchase price was £4,299,490.

*The Conveyancing of the Property to the Respondent*

66.    There is no doubt and I find that the conveyancing instructions to Ms White came exclusively from the Respondent. However, that of itself is neutral since it is consistent with either the Respondent's case that she paid the whole of the purchase price and is the sole beneficial as well as legal owner of the Property of IOEC's case being correct or for that matter both the Respondent and RMT having beneficial interests in the Property.

67.    Although the initial file opened by Ms White's firm was opened in the joint names of RMT and the Respondent, Ms White said and I accept that this was the result of instructions from the vendor's agent. Ms White confirmed that as soon as the Respondent became aware that Ms White's firm was proceeding on the basis that the purchase was to be in joint names, she gave very clear instructions that was not to be so and the result was that Ms White's firm closed the file they had opened initially in joint names and opened a new one in the sole name of the Respondent. To the extent that AML checks had been commenced following the opening of the file in the joint names of the Respondent and RMT, they were repeated once the new file in the Respondent's own name had been opened. Again, that of itself says nothing about who was beneficially interested in the Property and in what shares.

68.    I accept Ms White's evidence without hesitation but two facts stand out from it – first, she did not seek (indeed there was no reason for her to seek) instructions as to why the purchase was to be in the sole name of the Respondent and, secondly, it remains the case that the vendor's agents were left with the impression that the purchase was to be a joint one. I discount this last point however as immaterial. As Ms White said, agents frequently make assumptions concerning how a property is to be purchased that do not reflect anything other than that the property concerned was viewed by a couple. That being so what the agent may have thought says nothing about what agreement, arrangement or understandings have been reached concerning how the property is to be paid for, in whose name it is to be registered and what if any beneficial interest each is to have in it in the absence of evidence from the agent as to the basis for the agent's apparent view.

69.    This is therefore one of those cases where the source of the financial contributions to the purchase price is likely to be decisive, particularly when viewed against the circumstances leading to the commencement of these proceedings. My conclusions as to the credibility of the testimony of RMT and the Respondent means that no reliance can safely be placed on what they say was agreed other than to the extent already noted, the conveyancing aspects of the acquisition say nothing material about the issue I am now considering for the reasons I have explained and how the expenses relating to the Property were met after acquisition does not point to a particular answer as I explain later in this judgment. It therefore follows that the source of the funds for the purchase of the Property are likely to be determinative of the questions whether it is to be inferred

that the Respondent holds the Property on a common interest constructive trust for RMT or for herself and RMT and if the latter in what shares.

*Financial Contributions*

70.   The Respondent maintains that she paid the purchase price from her own resources consisting of:

    i)   £1,180,000 being "*… part of the proceeds of sale of 46 Woodruff Avenue including my 50% share … and a loan made to me by [RMT] in respect of his 50% share of the proceeds…*" ("the Woodruff Avenue Contribution");

    ii)   £2,050,000 arising from "*…sale of investments held through Credit Suisse …*";

    iii)   £550,000 being "*… funds advanced by a family friend …*" ("the X Contribution");

    iv)   £90,990 being "*savings*"; and

    v)   £428,500 being "*amounts paid by me to the seller directly (from savings)*".

I refer to those parts of the contributions not specifically defined above collectively below as "the Savings Contribution". The total of the sums referred to above is £4,299,490.

71.   IOEC maintains that it is to be inferred that the Credit Suisse and other cash funds referred to by the Respondent (those referred to at (ii), (iv) and (v) above) were funds that belonged beneficially to RMT. IOEC does not accept that she is or was independently wealthy or beneficially entitled to the sums she claimed to supply from her own resources. It will be necessary for me to consider each of these sources in turn but it is as well at this point to state once again that the onus rests on IOEC to prove that the Respondent does not have a beneficial interest that reflects her legal interest in the Property, not for her to prove that she has such an interest, although as I have said, the Respondent bears the evidential burden of proving any affirmative case she seeks to advance. It is necessary to bear these points in mind at all times since there is otherwise a danger of unconsciously reversing the onus of proof.

72.   *The Woodruff Avenue Contribution*

The Respondent maintains that she and RMT were each entitled on completion of the sale of Woodruff Avenue to half of the net proceeds of sale by reason of their agreement, arrangement or understanding reached when it had been purchased.

73.   Most of the proceeds of sale of Woodruff Avenue were used in the purchase of the Property. The Respondent maintains that the whole of this contribution should be treated as being made by her because half of the proceeds belonged to her beneficially and RMT lent her his half of the net proceeds (£590,000) for use in the purchase of the Property.

74.   The Respondent's part of the Woodruff Avenue proceeds (assuming she was beneficially interested in 50% of the proceeds of sale of that property) represents about

13.72% of the acquisition cost of the Property. If the balance of the Woodruff Avenue proceeds was lent by RMT to the Respondent by an unsecured personal loan to her that was not intended to give RMT a constructive or resulting trust interest in the Property, that would give the Respondent a beneficial interest in the Property of approximately 27.45%.

75.     In relation to the use of the proceeds of sale of Woodruff Avenue, IOEC submits in paragraph 11.3 of its closing submissions that:

> "… a full analysis of those documents reveals that only one strand of her case – that *some of* the proceeds of the sale of 46 Woodruff Avenue contributed to the purchase of Henfield Lodge – is correct. Thus, a credible explanation, supported by documents has been provided for only £1,180,000 of the total purchase price of £4.3million. Despite Ms Zavarei's attempt to provide an elaborate account of the origin of the remainder of the purchase monies, that account is wholly unsupported by any documents"

and at paragraph 119 that:

> "It is now apparent that, save for the £1,180,000 originating from the proceeds of sale of 46 Woodruff Avenue in respect of which contemporaneous records of bank transfers have been disclosed, Ms Zavarei's account must be rejected. It is unsupported by contemporaneous documents in circumstances in which it is plain that those documents are in her control and could have easily been disclosed. Her failure to disclose them can only be because they do not support her account. "

76.     The concession that " *... only one strand of her case – that some of the proceeds of the sale of 46 Woodruff Avenue contributed to the purchase of Henfield Lodge – is correct* …" is a concession that half of the proceeds of sale of Woodruff Avenue belonged beneficially to the Respondent and, therefore, that 13.72% of the total sum spent on acquiring the Property came from the Respondent. This concession was correctly made. It reflects the basis on which their matrimonial home in Dubai was held and is consistent with the paper title position in relation to Woodruff Avenue.

77.     The effect of the concession is that it is accepted by IOEC that the Respondent has a beneficial interest in the Property equivalent to the proportion her share in the proceeds of sale of Woodruff Avenue bears to the acquisition cost of the Property. This means that what was IOEC's primary case, at any rate until the start of the hearing, that the Respondent held the whole of the beneficial interest in the Property on trust for RMT is wrong and bound to fail. Had I accepted Lord Marks' submission that it was not open to IOEC to contend for any other outcome, that would have meant that the Application I am determining would have had to be dismissed.

78.     In paragraph 214 of IOEC's closing submissions, IOEC invited me "*...to conclude that it was intended that she would have a 15% share in Henfield Lodge according with her financial contribution resulting from her registered interest in 46 Woodruff Avenue, this purchase having concluded at a time when Mr Tabatabaei did not have a pressing*

*need to hide his assets.*" The 15% figure appears to assume the rejection of her case in relation to the supposed loan of RMT's share of the Woodruff Avenue proceeds. This does not tie in with my calculations and therefore the figures I give should be regarded as provisional until after hand down of this judgment when I will invite short further submissions as to the correct figure on the basis of the conclusions that I reach below.

79.    The whole of the proceeds of sale of Woodruff Avenue were routed to the Respondent's bank account and then to Ms White's client account – see the Santander UK Plc notification dated 15 June 2015 confirming the transfer of the proceeds of sale (£1,251,818) by the solicitors handling the sale to the Respondent's account and a similar notification dated 27 June 2016 confirming the transfer of £1,180,000 from the Respondent's account to Ms White's firm's account. Ms White's purchase ledger shows the sum of £1,180,000 to have been received that day from the Respondent's account. This documentary evidence establishes that just short of £72,000 of the proceeds was retained by the Respondent. Since on her own case RMT's share was loaned for the specific purpose of purchasing the Property, it follows that either the £72,000 must be treated as coming from the Respondent's share of the Woodruff Avenue proceeds or that she holds the sum retained on a Quistclose type resulting trust for RMT. The parties have been content to treat the £72,000 as retained by the Respondent from her share of the Woodruff Avenue sale proceeds. I am content to adopt that analysis. It follows that (aside from the loan issue) the Respondent is to be treated as having and I find her to have contributed half the proceeds of sale less £72,000.

80.    Although IOEC criticises the Respondent for failing to produce relevant bank statements I do not see how this would have assisted in an evaluation of this part of the evidence given the very clear terms of the notifications that are in evidence and the contents of Ms White's purchase ledger. I accept the Respondent's evidence and find that £1,180,000 of the purchase price for the Property was funded from the Woodruff Avenue proceeds because her evidence on this issue is corroborated by the entries in Ms White's ledger which I accept accurately reflect the source of the funds.

81.    The more significant issue concerns the contribution made using RMT's 50% share of the Woodruff Avenue proceeds of sale. The Respondent's case is that this was the subject of a formal loan agreement dated 22 February 2016 between her and RMT by which RMT ostensibly agreed to lend his share of the proceeds quantified at £625,000 "*... to be paid back within 24 months (2 years) ...*" by the Respondent. The agreement is silent as to when the 24 month repayment period was to run from. As I said earlier in this judgment, the fact that this agreement is unusual when viewed from the perspective of how UK couples mostly manage their affairs does not assist in an evaluation of the intended effect of this agreement. However, this document is dated well after the latest date I have concluded that RMT had informed the Respondent about the difficulties he was facing.

82.    The Respondent maintains that the loan arose from a disagreement between her and RMT concerning the acquisition of the Property. She maintains that she wished to purchase the Property but that RMT objected to its purchase because he considered that the Property was overpriced and would be expensive to maintain, but "*... he would not object to my purchase provided that I bought [the Property] myself using my own resources. To this end he agreed to loan me his share of the proceeds of sale of 46*

*Woodruff Avenue on the basis that I would raise the rest of the funds and repay the loan to him within 24 months…We specifically agreed that since I would be funding the purchase of [the Property] I would own the property absolutely"* – see para. 61 of her 4[th] witness statement. RMT gives similar evidence to this in para. 5 of his 5[th] witness statement.

83.    I accept this evidence only because it has been corroborated both by Mr Sepanta Tabatabaei in his oral evidence that

> "… in relation to Henfield Lodge for example I remember like me having to convince my mum to buy the house and my dad didn't want to -- didn't want to live there . You know, why would you want to live there? I'm sorry, but why would you want to live next to all his in-laws and like his wife' s whole family?"

It is also corroborated by Ms Yeganeh (the Respondent's aunt) in particular at paragraphs 30 and 31 of her statement. I am satisfied that Mr Sepanta Tabatabaei gave truthful evidence on this issue. This is a conclusion that depends upon my personal assessment of the manner in which his evidence was given. He was I am sure aware of the consequences of attempting to mislead a court and I am satisfied that he was not attempting to do so. I am more circumspect about Ms Yeganeh because in relation to an issue that I consider in detail below I consider her evidence was unsatisfactory by reason of a lack of recollection by her in relation to a critical point. Thus I have left her evidence out of account when concluding that the purchase was the source of friction between the Respondent and RMT. However, it remains the case that the loan is corroborated only by the loan agreement apparently signed by the parties.

84.    IOEC submits that I should reject this document. Since its authenticity is not in issue, I could only do so on the basis that it is a sham – that is a genuine document in the sense that it has been signed by the parties that is intended by them to give to third parties or to the court the appearance of creating legal rights and obligations between them that are different from the actual legal rights and obligations (if any) that they intend to create – see <u>Snook v. London and West Riding Investments Limited</u> [1967] 2 QB 786 *per* Diplock LJ as he then was at 802C-E.

85.    IOEC submits that the document was a sham created either to disguise RMT's contribution to the purchase price of the Property or to enable the conveyancing solicitors handling the sale of Woodruff Avenue to pay the proceeds of the sale of that jointly owned property into an account held only in the Respondent's name. I reject that submission and conclude that the Respondent's version of events (corroborated as I have explained) is to be preferred. Neither of the reasons for rejecting this documentation suggested by IOEC make sufficient sense to justify me holding the loan agreement to be a sham for the following reasons.

86.    First, to the extent that it is asserted the loan agreement was made in order to disguise RMT's contribution, whilst I bear in mind that the document is dated well after the Respondent had become fully aware of the difficulties faced by RMT, I reject that because it does not have that effect. All it does is to memorialise a personal loan by RMT to the Respondent repayable at a fixed future date. It follows that at the date the agreement was apparently signed its effect was that the sum loaned would became

repayable in accordance with its terms and repayment could be enforced (once the date for repayment had passed without repayment having been made) by third party debt order proceedings or by RMT's trustee. Thus the loan agreement is ineffective to disguise a secret contribution by RMT to the acquisition costs of the property. Had the parties wished to disguise a contribution by him it would have been more effective simply for half the net proceeds of sale to be paid to each of the Respondent and RMT and for RMT to have arranged to transfer the sum so received by a more indirect route.

87.    In relation to the assertion that the loan agreement was entered into by RMT and the Respondent on the advice of the solicitors handling the Woodruff Avenue sale for the purpose of enabling the proceeds to be paid into the Respondent's bank account, I reject that too. There is no evidence whatsoever that supports such a proposition. The allegation was put to the Respondent in cross examination but was denied – see T2/177/22-181/9 and T3/45/12 – 46/18. This theory was put to Ms White. Although it was submitted on behalf of IOEC in closing that " … *the need for such documentation [was] explained by Ms White in cross-examination* …" that is not a fair or accurate summary of her evidence. She said simply and unsurprisingly that where the proceeds of sale of a property in joint names was to be paid into an account otherwise than in those joint names " … *we have to take instructions from the second party that they agree the sale proceeds are paid there.*" That is undoubtedly correct. That does not come anywhere near Ms White explaining the need for co-owners to execute a sham loan agreement in such circumstances. With respect, it is entirely wrong to suggest that parties in those circumstances should or could be required or advised by their solicitor to enter into a sham loan agreement for this or any other reason and in my view it would be professionally improper for a solicitor to suggest such a thing or carry out instructions to that effect. It is a suggestion that I reject as a motive for entering into the agreement in the absence of very clear evidence suggesting the contrary. In fact there is no evidence that supports the suggestion.

88.    Finally, that there was a loan by RMT to the Respondent as set out in the loan agreement is supported by the rationalisation of their affairs set out in the document entitled "*Loan Agreement and Receipt"*, which acknowledges a loan by RMT to the Respondent of 50% of the proceeds of sale of Woodruff Avenue and the Respondent giving credit for that sum in the rationalisation of her affairs. That document is signed by both RMT and the Respondent and their signatures have been witnessed.

89.    In those circumstances, I conclude that in relation to this issue the Respondent has discharged the evidential burden that rested on her in relation to the loan agreement issue and I conclude that the parties signed the agreement because it reflected what had been agreed between them and that, as set out in the agreement, RMT personally loaned his share of the Woodruff Avenue proceeds to the Respondent for the purpose of enabling her to complete the purchase of the Property without it being agreed that he would thereby obtain a beneficial interest in the Property. Had it been intended that RMT would have a beneficial interest in the Property by reference to his share of the Woodruff Avenue proceeds, a loan agreement would have been unnecessary.

90.    In those circumstances I conclude that it is to be inferred from the facts and circumstances set out above that that the Respondent and RMT intended that the Respondent would have at least a beneficial interest in the Property of 27.45% based on her contribution of £1,180,000 from the sum of her part of the Woodruff Avenue

sale proceeds (less £72,000 odd) and the loan to her of RMT's half share in the proceeds. As I have said earlier, I will hear the parties briefly following hand down of this judgment as to whether this figure is mathematically correct.

91.    Had I concluded that the loan agreement was a sham and that RMT had contributed his half share of the Woodruff Avenue proceeds to the purchase of the Property, I would nonetheless have concluded that the Respondent was beneficially entitled to half of the net proceeds, had used her half to part finance the purchase of the Property and that it is to be inferred that she was entitled to a beneficial interest in the Property equivalent to the proportion that contribution bore to the cost of acquiring the Property.

92.    *The Savings Contributions*

The Respondent's case is that of the balance of the purchase price remaining to be paid once account is taken of the proceeds of sale of Woodruff Avenue (other than the sum supposedly borrowed from X), she raised £2,050,000 from "*...sale of investments held through Credit Suisse ...*", £90,990 from her "*savings*"; and £428,500 being " *amounts paid by me to the seller directly (from savings)*". Her case is that her investments of £2,050,000 had been accumulated from three sources - the sale of a BVI incorporated company carrying on business in Dubai that she maintains was owned and controlled by her called Comparts Corporation ("Comparts") and the sale of two residential units in Dubai, being Unit 104 Althanyah Third ("Unit 104") and Unit 9402 Burj Khalifa Tower ("Unit 9402"), each of which she alleges belonged to her beneficially. The Respondent also asserted that the SDLT payable on the purchase was paid by her from savings and is the last of the sums she transferred to Ms White's firm as recorded in her Purchase ledger.

93.    All this is challenged by IOEC, which maintains that all the assets in the name of the Respondent were in fact held by her as nominee "*... front or cypher ...*" for RMT and that her case should be rejected because she has failed to produce any documentary evidence that shows her real participation in any of the businesses she claims to be interested in, or to be beneficially entitled to the money that she has claimed she used to purchase her alleged beneficially interest in the Property or in the assets that are said to have generated such funds. Although the Respondent claims to be an experienced and successful business operator and manager, IOEC maintain that she has failed to produce any documents that demonstrate a managerial as opposed to a formal role in any of the businesses she claims to have been interested in. Arriving at a conclusion in relation to the detailed issues that arise is difficult because each is clouded in obscurity, the documentation is incomplete and at least in part mutually contradictory.

94.    Before turning to the detail it is right to note one overarching theme against which the evidence available has to be viewed. The Respondent has maintained throughout that she and RMT maintained a strict separation of their assets and that all the assets that were registered in her name had been acquired by her from her own resources and thus that the proceeds of sale of those assets belonged beneficially exclusively to her. I should make clear at this stage that I do not accept that was so and that the evidence that is available and to which I refer below suggests both that assets apparently registered in her name were either registered in her name or because they were jointly interested in the assets concerned. That conclusion is consistent with the way in which RMT and the Respondent's home in Dubai was held and with how Woodruff Avenue

was held. This is not inconsistent with the point I made earlier concerning the approach Iranian married couple adopt to their respective assets because jointly owning assets and each being entitled to a part of jointly held assets can be protected by agreement and formal registration. This conclusion is consistent too with the evidence of Mr Albalooshi given in relation to Unit 9402, which I refer to in detail below and with the dealings with that property. It explains the apparently contradictory nature of some of the documentation. In my judgment the one point that can be taken as fairly established by the incomplete documentary record is that in at least some instances the interests of the Respondent and RMT were not kept separate and in some cases at least they dealt joint with assets.

95.    *The Credit Suisse Bonds*

There is an initial difficulty about this part of the Respondent's case – Ms White's purchase ledger. Leaving to one side the fact that the ledger does not identify Credit Suisse as being the paying bank, the more material point is that is that the ledger records receipts from this source totalling £2.1 not £2.050 of £2.032m. Although IOEC place some reliance on this difference, I regard it of itself as of little importance since the difference (£50,000 odd) is not significant and given the time that has passed it would not be surprising if the Respondent's memory as to this level of detail had faded. If otherwise I am satisfied that the sums transferred to Ms White's firm from the Respondent's Swiss account belonged to her beneficially then nothing of substance turns on this point.

96.    It is necessary to start with the documentation available in respect of sums transferred from Switzerland. In considering this material it is necessary to bear in mind that I have concluded that I cannot accept the uncorroborated testimony of either RMT or the Respondent and that the transfers took place well after both were aware of the difficulties faced by RMT as a result of the fraud the subject of the Judgment.

97.    The documents that the Respondent relied on demonstrate that on or about 15 January 2016, Credit Suisse purchased UK Government Treasury bonds ("gilts") for the Respondent in the total sum of about £2.032m. There is no evidence that the sources of the funds used to purchase the gilts were the proceeds of sale of any of the assets on which the Respondent relies other than her uncorroborated evidence. It is said that they were sold on 8 June 2016. There is no evidence that this is so other than the uncorroborated evidence of the Respondent.

98.    According to Ms White's ledger, sums totalling £2.1m were transferred from "*Frau Delaram Zavarei*" to her firm (Mayo Wynne Baxter) on dates between 21 June and 29 June 2016. If the sums transferred were the proceeds of sale of the gilts purchased in January 2016, then it would be relatively straightforward to demonstrate the sale (by production of the sale notes), the crediting of the proceeds of sale to a bank account in the name of the Respondent after sale on 8 June (by the production of copies of the relevant bank statements) before transfer to Ms White's firm. It would have been equally straight forward to prove the source of the funds used to purchase the gilts by producing bank statements showing the receipt of the proceeds of sale of the assets identified by the Respondent into an account controlled by her and then the onward transfer of those funds to her account in Switzerland and the debiting of the purchase costs from that account. No such documentation has been disclosed by the Respondent.

There is therefore no documentary evidence demonstrating that the sums coming from Switzerland belonged beneficially to the Respondent or were the proceeds of sale of the gilts that were purchased in her name in January 2016.

99.    There is no satisfactory explanation as to why this documentation has not been disclosed. It is documentation that could easily have been obtained by the Respondent from her banks in Dubai and Switzerland. IOEC ask me to infer that the reason why this material has not been disclosed is because the Respondent knows or believes that either it will not support her case or would lead to enquiries that would damage or destroy her case. I accept that this is an inference that is open to me in these circumstances but whether I should draw it depends in part at least on the evidence available and conclusions I reach in relation to the assets the Respondent claims to have owned and sold to generate the sums she says were used to acquire the gilts and then the Property. That being so, I return to this issue at the end of this section of the judgment.

100.    *Comparts Corporation*

Comparts Corporation ("Comparts") is a Seychelles registered corporation that carried on business in Dubai to the extent that it leased from the Jebal Ali Free Zone Authority a plot in the free zone that Comparts was entitled to develop and which incorporated a free zone licence entitling Comparts to employ up to 150 people without complying with all otherwise applicable labour immigration laws. At T2/17 the Respondent explains why this was a valuable asset and in principle I accept that this evidence since it is not disputed by IOEC.  However, there is no evidence of its true value nor how long the lease lasted or whether and if so on what terms Comparts could be entitled to renew it on its expiry. The Respondent alleges that she carried on an oil and gas parts and equipment rental business using Comparts as her vehicle for that business. There is no reliable evidence that supports this other than her uncorroborated evidence.

101.    The Respondent's evidence was that she had acquired Comparts in 2011, was responsible for its management and operations down to the date in 2015, when it was sold, and that she was beneficially entitled to the proceeds of sale. This is an issue in respect of which the Respondent bears the burden of proving her affirmative case. I reject that evidence and conclude that she has failed to discharge the evidential burden of proof she bears in relation to this issue. My reasons for reaching that conclusions are as follows

102.    The Respondent's written evidence had been that Comparts had been acquired by her. So in Mr Allen's witness statement it had been said on her behalf at paragraph 17(1) of his statement:

"I understand from Ms Zavarei that she owned 100% of Comparts Corporation which she acquired in 2011. Comparts Corporation owned land in Jebal Ali industrial estate in Dubai, which had been acquired by the previous owner. As owner and managing director of this company, Ms Zavarei was responsible for constructing warehousing facilities at the site and then overseeing the letting out of rental units on the land. … I

> understand from Ms Zavarei that Comparts Corporation was sold
> in April 2015 for c.£1.2 million … "

The implication of this was that the Respondent operated independently of RMT, acquired Comparts using her own resources and then operated the company until it was sold. It is inconsistent with the assertion by the Respondent that Comparts operated a parts rental business.

103. The Respondent was taken to a document apparently dated 17 May 2011 that is apparently an agreement made between RMT and the Respondent by which the Respondent sold 40% of the shares in Petro Hortash Engineering and Drilling apparently held by her in return for RMT transferring to her " … *100% of shares of the company and the warehouse purchased on behalf of Mr. Tadayon in Jebel Ali Company …*". This had been redacted in its entirety from the copy disclosed by the Respondent originally. The Respondent suggests that this was done on the advice of her former solicitors to protect the confidentiality of third parties. I consider it inherently improbable that a firm of solicitors would redact material from a disclosable document in that fashion at any rate without explaining formally what had been done and why. The weakness of this point was acknowledged implicitly by Lord Marks at paragraph 98 of his closing submissions, where he states that " … *Seddons made redactions of material on the grounds of confidentiality that did not pass the test of irrelevance, though how far that was apparent when the redactions were made is unclear* …" The only person who could have obtained evidence from the solicitor that would otherwise be privileged to corroborate what was said is the Respondent. This is something that the Respondent could have dealt with straightforwardly by obtaining a short statement from the solicitor concerned confirming what she says. I reject this assertion as uncorroborated and inherently implausible having regard to the issues that arise in this litigation.

104. Having taken the Respondent to the 17 May agreement there then followed this exchange between Mr Onslow and the Respondent:

> "Q. But the point is, this document shows, as we'll see in a moment, this document shows that whatever interest you acquired in Comparts -- and it certainly appears as if you did become the legal shareholder -- you acquired from your husband, didn't you?
>
> A. No. It's not correct, sir."

She was asked to confirm that at the date of the document (17 May 2011) RMT was the beneficial owner of Comparts to which she replied "*No*" even though the 17 May agreement is between her and RMT and purports to contain or evidence an agreement by her to sell her Petro Hortash shares to RMT in return for the transfer of RMT's shares in Comparts. The Respondent was then asked

> "Q. … So how did he come to be transferring to you 100% of the shares in Comparts, or agreeing to do that?
>
> A. All right. Mr Tadayon has debt to my husband. He did some business with my husband. He didn't have enough money to

> repay to my husband. He gave a proposal to my husband, if my
> husband is interested to have this company in exchange with the
> debt they had to him …"

The effect of this answer was to acknowledge the truth of what Mr Onslow had put to
her earlier namely that whatever interest she acquired in Comparts was acquired from
RMT.

105.    The shares were transferred to the Respondent by a transfer agreement dated 19 October
2011 (5 months after the 17 May agreement) by Mr Tadayon. No consideration is
identified in the agreement as passing from the Respondent for the shares. Thus, the
transfer can only have been because he held the shares as nominee for RMT by reason
of the transaction to which the Respondent referred in the evidence set out above. It
follows that she could only have acquired the shares in Comparts from RMT and the
only payment made was her agreement to transfer her shares in Petro Hortash to RMT.
It is that context that the following exchange needs to be evaluated:

> "MR ONSLOW: …We were looking at what Mr Allen had to
> say on your behalf and what you heard him say on your behalf
> was: "I understand from Ms Zavarei that she owned 100% of
> Comparts Corporation which she acquired in 2011." Why didn't
> you tell us and the court that you acquired Comparts as that share
> sale agreement in May 2011 shows from your husband?
>
> A. Sir, I haven't got it from my husband, and in addition, it is the
> job of the lawyer to guide me, to advise me, how I have to
> answer…"

106.    In light of the evidence to which I have referred this last answer is plainly wrong and
untrue. That is one of the factors that I have taken into account in concluding that I
should not accept the Respondent's uncorroborated evidence save where it is admitted
or against her interest. It is plain from this material that the shares in Comparts were
transferred to RMT (or RMT become solely beneficially entitled to the shares) by
agreement between him and Mr Tadayon. He apparently agreed to direct Mr Tadayon
to do so to the Respondent in return for most of the shares she apparently held in Petro
Hortash. I accept that thereafter the Respondent became the holder of the shares in
Comparts.

107.    The transfer of the shares in October 2011 could only have been on the basis of an
instruction from RMT to Mr Tadayon. Why he gave that instruction then is unclear.
The transfer at that time is not consistent with the terms of the 17 May agreement.
Although clause 2.2 of the agreement says that RMT was obliged " … *to transfer these
companies, properties or estates to Ms. Zavarei or her legal representative in 60 days
after her request* …" there is no evidence of any such request being made, much less
one expiring in October 2019. In clause 2.4 of the agreement it is provided that
"*According to the request of Ms. Zavarei, Mr. Tabatabaei should transfer these shares
and the ownership to Ms. Zavariei or her legal representative in 60 days.*" The transfer
of the shares in Comparts did not take place within this time limit. The Petro Hortash
documentation does not suggest that there had been a transfer of 40% of the shares in
that company held by the respondent by that date – see the Minute of Meeting dated 30

November 2011, where the Respondent was said to hold 67% of the shares following an acquisition by her of more shares and that RMT held only 30% of the shares.

108.    Notwithstanding the untruthful evidence that the Respondent has given in her evidence, if the 17 May agreement is one that took effect in accordance with its terms then the shares in Comparts were validly transferred by RMT to the Respondent free of any interest that RMT might have had in them prior to that transfer and the shares belonged beneficially to the Respondent from 17 May 2011. The real issue as I see it therefore is whether 17 May agreement can safely be accepted as one that is not a sham in the sense I identified earlier either because it never took effect in accordance with its terms or only took effect as a transfer to the Respondent as nominee for RMT.

109.    IOEC relies on the Respondent's attempts to disguise what had happened (by the terms in which she instructed Mr Allen and by causing the copy of the 17 May agreement originally disclosed to be redacted so as to mask the reference within it to acquisition by her of the Comparts shares) as being relevant to an evaluation of that issue. The Respondent's explanation for the redactions is one that I have rejected for the reason set out earlier. However, I don't accept that of itself this conduct is a proper basis for inferring that the agreement was a sham although it is difficult to see what reason there would be for redacting this information if the agreement was one intended to take effect in accordance with its terms. I return to the effect of this conduct at the end of this section of the judgment.

110.    It is necessary to start with what is said to have been the source of Comparts' value. I find that its sole asset was a lease of Plot S10132 in the Jebel Ali Free Zone. I have rejected the Respondent's evidence that it carried on a plant hire business either from the plot or otherwise. I have explained why the lease and licence to employ is a valuable asset already.

111.    By a Memorandum of Understanding ("MoU") dated 9 October 2011 between Comparts (acting by the Respondent) and Sepanta International FZE (an entity which it is common ground was wholly controlled by RMT) (acting by RMT) it was rehearsed that there was seven years left on the lease and that it had been agreed that Sepanta would pay the rent for the remaining period of the lease but by paying Comparts the rent payable by it to its lessor on the basis that Sepanta would lease the plot from Comparts – see Clauses 2 and 3 – and by Clause 5 it was recorded that:

> "The both parties have agreed that as from the date of signing of this MOU; the second party shall have full right to use the said plot and utilize the same in the legal ways. And the first party shall have no right to interfere in the second party's affairs or utilize of the said plot during the left period of the lease. unless the second party failed to pay the due instalments to the first party."

112.    In effect therefore this was the sub-lease by Comparts of the whole of the remaining term at a rent equal to that which Comparts had to pay its lessor (so that it would not make any profit from the sub-lease) whilst at the same time remaining primarily liable to its lessor. This agreement was one that on its face benefited only Sepanta and conferred no benefit on Comparts. There was no means by which rent could be

increased other than by reference to the rent payable by Comparts to its lessor and by definition it was unable to use the land for its own purposes other than with the licence and consent of Sepanta. Lord Marks submits that in this respect at least the MoU is a sham because *" ...Clause 5 provided for exclusive occupation by Sepanta Dubai. However that clause was never implemented and was never intended by Ms Zavarei and Mr Tabatabaei to be implemented..."* However that depends upon the uncorroborated evidence of the Respondent, which I am not able to accept for the reasons explained elsewhere.

113.    This document is dated 9 October 2011 - that is after the agreement by which RMT became ostensibly beneficially entitled to all the shares in Comparts (17 May 2011) but before the shares were transferred to the Respondent (19 October 2011). The MoU was ostensibly signed by the Respondent on behalf of Comparts and by RMT on behalf of Sepanta. Thus the Respondent was apparently acting for Comparts before the shares in it had even been transferred to her. This can only be because she had been asked to do so by RMT since the shares at that point appear to have been held by Mr Tadayon as his nominee. This was put to the Respondent whose evidence was:

> "Q. But in any event, you're signing this memorandum of understanding between Comparts and Mr Tabatabaei's company, Sepanta International, even before the shares are being transferred to you, aren't you, on 9 October 2011?
>
> A. No, it is not correct, because before that we had the Farsi version and we signed it.

However this Farsi language document has never been produced. Thus apart from the uncorroborated oral evidence of the Respondent it remains the case that the Respondent was apparently signing on behalf of a company that she had no interest in because there had been no transfer of the shares in Comparts at that stage.

114.    Assuming all these documents are to be taken at face value, the effect of these transactions was that Comparts sublet the plot to Sepanta after RMT became beneficially entitled to the Comparts shares and after the Respondent had become entitled to receive the shares but before they had been transferred to her. If right, this means that at the date when the shares in Comparts were transferred to her it had no real commercial value because its only asset (the lease of the Jebel Ali Free Zone plot and allied benefits) had been in effect sub-let to Sepanta for no more than an indemnity in respect of the rent payable by Comparts to its lessor. That this was so was the result of an agreement that the Respondent had signed. Thus having accepted a promise from RMT to transfer the Comparts shares to her as part of the price for the Petro Hortash shares, the Respondent then participated in a transaction which deprived it of its ability to exploit its one asset before then accepting the transfer of the Comparts shares. That only makes sense if the Respondent's interest in Comparts was only ever nominal. It was only if RMT controlled both Comparts as well as Sepanta that the 9 October transaction makes sense. From the Respondent's perspective it could only make sense if in truth she never expected to obtain any real value from the transfer to her of the Comparts shares. It makes no commercial sense if the intention was that she should receive the shares in Comparts beneficially in return for her beneficial interest in the

Petro Hortash shares. This suggested that the 17 May agreement was sham other than as a nominal rearrangement.

115.    The explanation offered by the Respondent for these apparently uncommercial arrangements was:

> "Reza, as I remember, accepted to reduce the risk to pay the lease of the land to help me in Jebel Ali because, you know, normally men are more risk taker than women. He accepted to pay the lease as its paid and to me that I could pay to Jafz, that's why I accepted with this condition to develop the construction, and in case in the future Reza wants to continue or expand using that warehouse, I allow him to increase the amount that he has to pay to me."

This explanation is one that I must reject as untrue. It is entirely uncorroborated, is inherently improbable and is contrary to the terms of the MoU. It is inherently improbable because there is no good reason why Sepanta should be taking on the rent obligations of Comparts other than on the basis that it was interested in the Plot and its development and the suggestion that if the Respondent succeeded in contracting a warehouse on the plot she would increase the rent payable by Sepanta if it wished to occupy the warehouse is inconsistent with the terms of the MoU by which the plot had been let to Sepanta at a rent that equated only to that payable by Comparts to its lessor. It was no doubt for this reason that Lord Marks was driven to submit that *" ...Clause 5 provided for exclusive occupation by Sepanta Dubai. However that clause was never implemented and was never intended by Ms Zavarei and Mr Tabatabaei to be implemented ..."* however, this ignores the fact that the issue did not arise because the warehouse was never finished and suggests that there was some form of collateral agreement for which there is no evidence or at least any evidence that I can accept. Finally, this explanation is inconsistent with one offered by the Respondent later in her evidence, which was that RMT " ... *just leased the land from me to do some business with his Chinese partner, but at the end, that licence belongs to me, Comparts belongs to me.*"

116.    There is no formal agreement for the construction of the warehouse in evidence. The only evidence of such an agreement is an incomplete draft supplied by Dr Alswadeh. I accept that this document must be treated with caution for the reasons identified earlier. That said, it is not suggested by the Respondent that the document is a forgery, only that is an "*early draft*". However, the significance of the draft for present purposes is that it is dated 6 December 2011 (that is over 6 weeks after the apparent transfer of the shares in Comparts to the Respondent and just short of two months after Comparts' plot had been sub-let to Sepanta) and is made between "... *Comparts Corporation ... represented by [RMT] President ...*" and the contactor who is described as being "... *AQQ Contracting ... represented by Mr D.K.Gupta ...*". Thus at a time when ostensibly all the shares and control of Comparts had supposedly passed to the Respondent and when the plot had been sublet to Sepanta, RMT was apparently willing to enter into agreements on behalf of the company that he no longer had any interest in. In my judgment this conduct is most likely explained by what I have said already – that in reality RMT controlled both companies; that Comparts had entered into the 9 October agreement only because that was so and that the development of the site was being

controlled by RMT whatever the corporate niceties might have been. It was necessary that Comparts' name be used in the construction contract because it was the lessee from the free zone authorities.

117.    Although the Respondent maintained that it was she who signed the final construction contract, there is no evidence that is so other than her uncorroborated evidence and in any event even if true is as consistent with IOEC's case that her interest in Comparts was a nominee as it is with her case. The evidential value of the draft is that it suggests that RMT was exercising control over Comparts at a time when on the Respondent's case he had no interest in it. Similar consideration apply to cheques being drawn on Comparts account to pay for the construction work. It says nothing about who beneficially controlled Comparts any more than Comparts being the formal employer under the construction contract.

118.    All the circumstantial contemporaneous documentary evidence is consistent with Comparts being owned beneficially and controlled by RMT. Thus by an email of 1 May 2013 (two years after the 19 October transfer and at a time when on the Respondent's evidence she was the sole beneficial owner of Comparts) , Mr Hashemi, Sepanta's Head of Onshore Division emailed "*Omar*" at the legal department of Sepanta in these terms:

>   "Please kindly proceed with the following including but not limited to names, logos, trademarks, and other matters you deem necessary);
>
>   1- Sepanta Holdings Limited,
>
>   2- Sepanta international FZE,
>
>   3-'Sepanta international,
>
>   4- Sepanta Group or Sepanta International Group,
>
>   5-. Energy Exploration and Development,
>
>   6- ENEXD,
>
>   7- Enexd Holdings,
>
>   **8- Comparts Corporation,**
>
>   9- Dean Holdings,
>
>   10- Dean General Trading FZE,
>
>   11- Dean International Trading SA,
>
>   12.- International Oil and Gas Company,
>
>   13- IOGC …" [Emphasis supplied]

There is no credible explanation for this other than that in truth Comparts formed part of the Sepanta group of companies and so in truth was beneficially owned and

controlled by RMT. Both RMT and the Respondent suggested in effect that this was an error but that is self-serving and uncorroborated as well as being inherently improbable and I reject it. There is absolutely no reason why an employee in Sepanta would have any reason to know of or mention Comparts in an internal email of this sort unless its affairs were routinely managed as part of the Sepanta group.

119.    These conclusions are not merely relevant to the Comparts issue but also to each of the other issues I refer to below where the Respondent relies on the 17 May agreement. As I have said, the subsequent dealings within and concerning Comparts set out above mean that the 17 May agreement cannot be taken as one intended by the parties to take effect in accordance with its terms.

120.    Finally, it is necessary for me to consider the sale of Comparts, because it will be recalled that it is the Respondent's case that part of the sums with which the gilts were purchased on her behalf by Credit Suisse, that she maintains were later sold in order to finance the purchase of the Property, came from the proceeds of sale of her shares in Comparts. It will be apparent from what I have said so far that I reject her contention that she was ever interested in Comparts other than as bare nominee for RMT and hold that RMT was the beneficial owner of Comparts at all material times. As with every other aspect of this part of the case, the circumstances surrounding the sale of the shares in Comparts are opaque in the extreme.

121.    Earlier I referred to the draft contract for the construction of the warehouse on the plot at Jebel Ali Free Zone leased by Comparts and then sublet for the whole of the remainder of the term to Sepanta International FZE. Clause 9.1 of the draft construction contract records the construction price as being AED 6,125,000.

122.    The only written evidence of the sale of the shares in Comparts is a written agreement dated 7 April 2015. To an English lawyer the document makes no sense because the parties to it include Comparts as the seller. Corporations generally cannot sell their own previously allotted shares. That is a transaction that can be undertaken only by the registered shareholder. However the structure of the sale appears to be that Comparts would purchase its own shares then sell them on. Other than in special circumstances, this would be an unlawful transaction as a matter of English law. However, I make no findings about the inherent lawfulness of the transaction because Comparts is a Seychelles registered entity.

123.    The ultimate purchaser was to be Mr Gupta, the individual identified in the draft construction contract as acting for AQQ. The share sale agreement purports to record in clause 3 an obligation on the part of Comparts to acquire the whole of its issued shareholding for AED 6.5m and at clause 4 to sell the shares so acquired by Comparts to Mr Gupta at a price of AED 6,500,000. The agreement is apparently signed by the Respondent. On the face of it (and contrary to IOEC's closing submissions) this suggests that AED 6.5m would pass from Mr Gupta to the shareholders in Comparts. Two cheques evidence payment of the purchase price – a cashiers cheque for AED 4.5m dated 7 April 2015 which was payable " *... to the order of ...*" the Respondent and a personal cheque drawn by Mr Gupta and payable to the Respondent for the balance of AED 2m. These cheques are not consistent with the agreement because on the face of the agreement the consideration should have been paid to Comparts for it then to purchase its own shares for onward sale to Mr Gupta. The total sum paid when

converted to sterling would be broadly the figure identified by Mr Allen in his statement quoted earlier – that is about £1.2m

124.    Nowhere in the sale agreement are the shareholders selling to Comparts identified and no documentation has been disclosed showing the passing of funds from Mr Gupta to Comparts or from Comparts to the Respondent. Even if obtaining documentation belonging to Comparts was difficult, there is no obvious difficulty for the Respondent to obtain bank statements showing the sums she claims to have received for her shares in Comparts being credited to her account or the transfer of the shares in Comparts by her to Comparts. That said, I accept that the two cheques together show that the sum payable under the share sale agreement was paid to the Respondent. However, as I have said there is no evidence showing the accounts to which these sums were credited, the transfer of these sums to the Respondent's account in Switzerland or the use of the funds then to purchase the gilts.

125.    At the time of the sale the warehouse being constructed on the plot leased by Comparts but sublet by it to Sepanta had not been completed. The Respondent was unable to recall what had been paid to Mr Gupta in respect of construction costs down to the date of sale but she said of the sale that " … *we really need to have crane and lots of things included, the construction fee which we had to pay to AAQ to do their construction , but we couldn't provide it and then we decided to sell it and this is the price that we agreed together.*" [Emphasis supplied]. Although semantic points are generally of little weight in the assessment of the oral evidence of a witness whose first language is not English, I place some limited weight on the Respondent's use of the word "*we*" in her evidence at this point because it is consistent with her not being the sole beneficial owner of Comparts. A similar point arises in relation to the sale of Unit 104 to which I refer below. Earlier in her oral evidence, the Respondent had said that construction had not been completed at the time of sale and that Mr Gupta agreed to buy the shares in Comparts because " … *he decided to pay the rest of the construction payment by himself.*" None of this is consistent with the Respondent's evidence that Comparts was operating a plant hire business at the plot. Had that been so, then the sale would have reflected not merely the benefit of a partly completed warehouse but the profits of the plant hire business.

126.    I return at last to the issue that matters. The Respondent's positive case is that she part funded the acquisition of the Property from the sale of gilts acquired for her beneficially by Credit Suisse and then sold on her instructions and that the gilts were acquired by her in part from the proceeds of sale of her shares in Comparts. The Respondent bears the evidential burden of proving that case. As I have explained I am unable to accept the uncorroborated evidence of either RMT or the Respondent save where it is admitted or against the Respondent's interest on this application.

127.    On the evidence available I reject her case that she was ever beneficially interested in Comparts. At best the evidence suggests she may have been the shareholder in Comparts as nominee for RMT. I reject her evidence that she operated a business in the name of Comparts at any stage or that anyone operated a business in its name other than that of developing a warehouse on the plot that it leased from the Jebel Ali Free Zone. Had it operated any meaningful business Comparts would not have been sold for the price I have mentioned. A sale at that price is consistent with the only business being carried on at the plot being the construction of the warehouse that had not been

completed at the date of sale. I reject the Respondent's evidence that the warehouse development was being carried on in reality by Comparts as opposed to Sepanta having regard to the terms of the MoU and the draft construction agreement. I am satisfied from the material I have referred to that Comparts was owned beneficially by RMT and not by the Respondent. There is no evidence that the proceeds of sale were used to purchase the gilts which it is said were sold to finance the part purchase of the Property. If and to the extent that the proceeds of sale were paid to the Respondent they were paid to her as nominee for RMT. If and to the extent the funds so received were used to purchase the gilts purchased in the Respondent's name they were held by her as nominee for RMT. It follows that if and to the extent those gilts were sold to fund the payments from the Swiss bank to Ms White's client account those funds belonged beneficially to RMT.

128.    I now return to the failure to disclose the banking documentation referred to in paragraph 79 above. Having regard to the conclusions I have reached above, I conclude that the probable reason for not disclosing that material (and the probable reason for redacting the reference to Comparts in the 17 May agreement when it was disclosed originally), was to conceal the fact that Comparts was not in truth owned by the Respondent beneficially and/or that the sums transferred to Ms White's firm do not represent the sale of the gilts.

129.    _Units 104 and 9402_

Aside from the proceeds of sale of the Comparts shares, the Respondent's case is that the acquisition of the gilts had also been funded by the sale of two properties in Dubai referred to in these proceedings as Unit 104 Al Thanyah Third, Dubai ("Unit 104") and Unit 9402 Burj Khalifa Tower, Dubai ("Unit 9402"). Her case is that she acquired Unit 9402 in 2010 for about US$1.5m (about £1.31m) and sold it in 2015 for about US$2m and that Unit 104 contributed about £400,000. IOEC's case is that on analysis neither of these properties was owned beneficially by the Respondent. When converted, the sum of these sums and the approximately £1.2m from the sale of Comparts (£2.9m) exceed by a substantial margin the sums said to have been spent on the acquisition of the gilts.

130.    _Units 9402_

By a written sale agreement dated 5 April 2008, RMT purchased from a Mr Basiri 4 properties in the Burj Khalifa development while still under construction. The units purchased included Unit 9402. Mr Albalooshi maintains in his statement (admitted under the CEA as I explained earlier) that he was involved in the negotiations leading to this agreement and that "_... I regarded myself as acting for both [the Respondent] and [RMT] because both had a stake in the investment_". This contradicts the suggestion that at least initially the units were being acquired on any other basis than that of a joint venture between RMT and the Respondent. Mr Albalooshi maintains that the Respondent and RMT then " _... withdrew from this deal and ultimately agreed to purchase a 30% stake ..._" in the four units for "_... around AED 27m ..._". This is said to be because of a shortage of funds. Although Mr Albalooshi maintains that there was an agreement to this effect, a copy of it has not been disclosed. The Respondent's case supported by Mr Albalooshi is that she agreed by an agreement dated 7 April 2008 to participate in this revised arrangement by paying AED 2m for 10% of the 30% interest

that it is said that RMT acquired under the revised arrangement. Assuming there was such an agreement, RMT had a 27% interest in each of the four apartments and the Respondent had a 3% interest in the same four apartments. This is consistent with Mr Albalooshi's evidence that the investment was a joint one but does not of itself suggest that the Respondent was entitled to the whole of the beneficial interest in Unit 9402.

131. There had been no mention of this agreement in the Respondent's December 2019 witness statement, where the only agreement relied on by the Respondent as leading to the conclusion that she was beneficially entitled to 100% of Unit 9402 was the 17 May agreement to which I referred already. The Respondent maintained that the 7 April agreement between the Respondent and RMT had only recently been discovered following a search of some other papers. Ms Yeganeh corroborated the Respondent's evidence concerning a late search for relevant documents. She does not appear to have been asked specifically about this particular document. I return to this issue having considered the remainder of the documentation that might shed light on the beneficial ownership of the Unit.

132. According to Mr Albalooshi, various difficulties developed concerning what Mr Basiri should have but failed to do concerning the units and in particular his failure to pay the developer what was due as between him and the developer. Following some complex negotiations that I need not take up time describing, Mr Albalooshi says that Mr Basiri agreed to transfer Unit 9402 and pay AED 3m and in accordance with that arrangement Mr Basiri issued a Power of Attorney "… *that enabled me to apply for the title of Units 13501 and 9402 …*". This agreement is said by Mr Albalooshi to have been negotiated on behalf of both the Respondent and RMT. In fact the Power of Attorney was given to RMT. This is inconsistent with the ownership of the interest in the four units being as described in the 7 April agreement. It is unclear whether the Power of Attorney is dated 10 January or 1 November 2011. Mr Albalooshi says it was 10 January.

133. The next written document that is relevant is the 17 May 2011 agreement. It purported to record a promise that RMT would transfer " … *100% of shares of Burj Khalifa apartment, unit 9402 which had been purchased from Mr Ali Asghar Basiri in 2008*" as part payment for the 40% of the issued shares in Petro Hortash that she apparently sold to RMT under that agreement. This document too is not consistent with the 7 April agreement, because if that agreement had been entered into as alleged then she would already have had an interest in that Unit. It is also inconsistent with the 7 April agreement that it is alleged RMT entered into with Mr Basiri in substitution for that of 5 April because it asserts that the Unit had been purchased from Mr Basiri in 2008, which would only be correct if the only agreement concerning the apartments was that of 5 April.

134. All of this notwithstanding, RMT was registered with title to the Unit by a Title Deed dated 28 August 2012. That was never altered until the Unit was sold. Mr Albalooshi says that he was instructed to register title in this fashion but he does not say by whom. He says that the reason for this instruction as because "… *the timeliness of the registration of the title in the units did not coincide with that of the Petro Hortash deal.* ". This does not make sense because it would appear that shares in Petro Hortash were transferred by 30 May 2012 – see the list of Petro Hortash shareholders referred to earlier. Thus it would appear that RMT was registered with title after not before the transfer of the Petro Hortash shares. Registering RMT with title was consistent with the

agreement of 5 April 2008, inconsistent with both agreements said to have been made on 7 April and is consistent with the assertion in the agreement of 17 May that the unit had been purchased by RMT from Mr Basiri in 2008 and inconsistent with the agreement to transfer title to the Respondent. The Respondent's comment on this paper trail was as follows:

> "As a registration it was under his name, but the owner has been transferred to me through the power of attorney which I got from him … "

It is unclear what power of attorney is here being referred to other than that under which she managed the sale of Unit 9402. In my judgment in these circumstances I conclude that registration accorded with reality in this instance and is another reason why the 17 May agreement must be treated with great caution other than as one concerned with nominal as opposed to real interests.

135.    The next document that matters is a lease agreement dated 12 November 2013 by which RMT, not the Respondent, let the unit to a Mr Zinkus for a term expiring on 17 November 2014. This is consistent with the Respondent owning Unit 9402 as set out in the 5 April sale agreement and title documents that I referred to in the previous paragraph. The Respondent's evidence in relation to this document was contained in the following questions and answers:

> "Mr Tabatabaei was the -- as the owner, was the landlord under the lease to Mr Zinkus, the American. Do you see that?
>
> A. Yes, sir.
>
> Q. And Mr Tabatabaei was no doubt in receipt of the rent; yes?
>
> A. Mr Onslow, this document hasn't signed by my husband.
>
> Q. Well, there's a signature on the lease agreement, that's his signature, isn't it, on the bottom right-hand corner?
>
> A. No, sir, this is not my husband's signature.
>
> Q. Well, are you suggesting that this is somehow not the lease of this property?
>
> A. No, because it is not a legitimate document. This is not even my husband's initial signature.
>
> Q. Well, who did let the property out to Mr Zinkus then?
>
> A. I have no idea, but this is not the signature of my husband."

This evidence is off the point, uncorroborated, self-serving and in my judgment was designed to divert attention from the point being made. However, even if correct it does not meet the point. In the confirming email from the letting agents, the landlord is described as being " … ("Ansari (on behalf of [RMT])" and the contact details for that individual is given as being an email address at finance@enexd.com. ENEXD Dubai is

as I have said is an entity that was at the time controlled and owned beneficially by RMT and which at that time was one of his principal trading vehicles. When faced with this material and emails to similar effect, the Respondent's response was that:

> "Dear sir  even if this is a legitimate document and right, which I confirm it with you, the issue is the title deed was under the name of Reza. According to the regulation in UAE, it must be the lease agreement according to the title deeds, but the position of that property and the rent amount came to me, because we did deal together regarding the Petro Hortash in advance."

This is not a real answer either. First it is inconsistent with the previous answer which was to put in issue the authenticity of the leasing documents. This inconsistency further fuels my views concerning the credibility of the Respondent's uncorroborated testimony. However the real point is that whilst the title issue might justify the lease (being a formal document) being in the name of RMT, it does not in fact do so because the leasing documentation goes far further than that and shows that RMT was (or rather his staff on his behalf were) managing the leasing process. This is consistent with RMT being beneficially interested in the Unit, is consistent with the original 5 April agreement but not either of the 7 April agreements and is not consistent with the 17 May agreement being concerned with the transfer of real interests and or of it having taken effect on that basis. This analysis is supported by the fact that the "*Guarantee cheque"* supplied by the tenant was made payable to RMT not the Respondent. This is not consistent with the suggestion that the lease was in the name of RMT simply because he was formally registered with title.

136. Finally, the Respondent relies on the fact that she managed the sale of the Unit. Ms Fetanat's statement was not challenged. She was the estate agent in Dubai who handled the sale. It demonstrates that the Respondent instructed her to market the Property for sale, was the sole source of her instructions, that she met the charges relating to the sale and that the proceeds of sale were paid into her bank account. In my judgment this does not of itself say anything about who of the Respondent or RMT was beneficially interested in Unit 9402 and even if such evidence could in other circumstances assist on that question, it does not here because it is outweighed by the other material to which I have referred.

137. In my judgment, on this material the Respondent has failed to establish her affirmative case that Unit 9402 was ever hers beneficially. The material establishes that the Unit was acquired by RMT from Mr Basiri, registered in his name and managed thereafter on his behalf. Ultimately the Respondent's case depends on me concluding that the 17 May agreement took effect in accordance with its terms. There is no evidence that it did so and the parties conduct after 17 May is not consistent with it having done so. When the Unit was sold in 2015, the proceeds of sale belonged beneficially to RMT not the Respondent. There is no evidence in the form of bank statements that demonstrates what happened to the proceeds of sale after they were transferred to the Respondent's account.

138. *Unit 104*

The contract for the purchase and sale of the property is dated 17 June 2013, states the purchase price to be AED 2.4m with a deposit of AED 240,000 and names the purchaser as the Respondent. It provided for completion on 17 July 2013. The Respondent was registered with title – see the title deed of 18 July 2013. It was accepted by Mr Onslow in the course of cross examination that this property had been registered in the Respondent's name. According to the Respondent's oral evidence, " … *I bought that property for my older son, it was the plan, but for some reason we sold it.*" The "*we*" is again some albeit weak evidence suggesting that this property was at least jointly owned rather than owned exclusively by the Respondent.

139. Three cheques are in evidence. One is dated 19 June 2013 and is for the deposit. It was drawn by Sepanta International FZE in favour of the vendor. There is a cheque dated 20 June 2013 apparently drawn by the vendor in favour of the Respondent for the deposit sum and a third cheque dated 19 June 2013 drawn by Sepanta International FZE in favour of Hamptons for a transfer fee payable under sale and purchase agreement for AED48,000. On the face of it therefore, the deposit was paid by Sepanta, possibly an earlier payment of it by the Respondent was repaid by the vendor following payment by Sepanta and Sepanta paid the transfer fee.

140. The key point advanced in cross examination concerned the payment of the deposit for the acquisition of this property. It was put to the Respondent that the deposit was paid by Sepanta and thus that in truth the property belonged to RMT not the Respondent. In answer to a question in cross examination as to payment for the property, the Respondent said:

> "Q. … who paid for this property?
>
> A. As I remember, it was me, I paid it, or if for example, they pay it through the company which belongs to my husband, we had a transaction between each other, but it was me, that's why the property transferred to me.
>
> Q. You see, the only evidence that we have got and that we've seen for a financial involvement in payment of a sum for this property, if you can move to D1/170.
>
> A. Yes, sir.
>
> Q. Do you remember there was an exchange of deposit cheques, and the deposit cheque for the purchase was paid by Sepanta International, wasn't it ? Look at the bottom of the page, 240,000 dirhams?
>
> A. Sir, if even this is the case, the guarantee cheque --or -- this is two cases, because I am not sure if they are right or wrong. There are two options. One of them is by mistake they issued the cheque from the Sepanta International, and the buyer understood it and returned it back the money that he deposited in the account, later on I transferred to him, or the other option is even if this is a right document, maybe I was out of the country, they paid me with this cheque and then in return I returned them back the

money. At the end the ownership changed to me and I was the one that visited this house, and please let me -- allow me to let you know that I bought that property for my older son, it was the plan, but for some reason we sold.

Q. The only documentary evidence we've got of payment towards or in relation to the purchase of this property shows that the money came from Sepanta International, your husband's company; that's right, isn't it ?

A. Sir, as I explained to you, I cannot judge according to the cherry-picked document."

141.    The difficulty about the explanation given by the Respondent is that is does not fit with the facts. If the payment by Sepanta had been a mistake and had been replaced by a payment by the Respondent, then it is to be expected that the return cheque would have been payable to Sepanta not the Respondent and the Respondent would be able to show by reference to a bank statement that she had in fact paid not merely the deposit but the whole of the purchase price. The alternative – that the payment was made by Sepanta while the Respondent was out of the country and was repaid by her to Sepanta -does not fit with the cheques that have been produced either. The reality looks like the deposit was paid by both but the vendor refunded the deposit paid by the Respondent. Although the Respondent claims that these documents have been "*cherry picked*" by Dr Alswadeh, if this was a straightforward property acquisition by the Respondent using her own funds, that is something that could and should have been capable of being demonstrated very easily by documentation that she should have access to, if only her bank statements.

142.    RMT's evidence was that the whole of the purchase price was paid by the Respondent but this of course is uncorroborated and on the face of it contradicted by the cheques in evidence. When taken to the deposit cheque in cross examination his evidence was as follows:

"Q. Well, do you or do you not remember that a property called unit 104 --

A. I don't remember --

Q. -- was bought in your wife's name?

A. I remember she had a few properties but I don't specifically recognise by the unit and address, but I remember she had a property, yes .

Q. And you will remember, will you, that a deposit cheque was provided -- if you turn to page 170?

A. This is my signature, this is my stamp, this is my chequebook, yes, I confirm this, but --

Q. The deposit cheque being paid to Mr Thomas Verghese in the sum of 240,000 dirhams.

A. It shows this, okay, but with respect, this -- the authenticity of this document I cannot confirm it. Maybe because Mrs Zavarei in operation in whole 20 years they had sometimes debt to me, maybe my company need to pay to her, maybe through the financial office they arrange and pay, but as you see also in second cheque the same guy is written back the cheque to Mrs Zavarei. I really am not in a position to answer this to you but I -- can I add something, Mr Onslow?

Q. Well, no, let me ask you this: can you tell his Lordship who paid for this property? Who paid the price?

A. Of course. This property I believe -- I don't know where is the contract. I don't think so the price must be 240,000 dirham because it has been $50,000, it definitely must be much more than that and it is not possible with this amount you buy the property. Even if this is a genuine document and as far as the document is out of my control and my knowledge, maybe it is paid, Mrs Zavarei had -- you know, I had debt to Mrs Zavarei for some operation, from Iran or others, she paid me back or been my mistake paid and the guy has written back to Mrs Zavarei. I think this is because --

Q. Just stop there, Mr Tabatabaei. The only documents that we have seen that show any payment coming from the buyer's side of the purchase of this property are made by Sepanta International. Now, are you able to tell his Lordship where the balance of the payment -- where the purchase price was paid from?

A. I don't have -- it is not supposed I have because Mrs Zavarei she is the owner and definitely Mrs Zavarei paid the rest that they got the title under her name and sorry because maybe Mr Dahman has not provide more information to you or maybe he had and for some reason he is not giving you the full picture, you would be aware about that.

Q. You are unable to tell us, are you, whether or not Sepanta International paid for it and if so how much?

A. No, definitely Sepanta International is not paying as I know the rest of anything related to this matter. As I told you, it is very honest my position . It is my cheque, my signature, my bank, that I don't remember, I can't -- to be honest I don't remember."

143.    After purchase it would appear that the Respondent paid the service charges as appears from the receipts that are addressed to the Respondent personally. The draft sale

agreement relevant to the subsequent sale of the unit shows the Respondent as the vendor. There is however no signed sale agreement in evidence.

144.    This issue has been a difficult one to resolve because the documentation that carries most weight (the contract for the purchase of the Unit and the subsequent registration of title in the name of the Respondent) suggests that this unit belonged beneficially to the Respondent in the absence of evidence to the contrary. However, neither RMT nor the Respondent has given frank evidence as to how the balance of the purchase price was paid or as to what happened concerning the payment of the deposit. The documentation that could demonstrate how the purchase was funded could easily have been obtained by the Respondent from her bank even if it was not otherwise in her possession.

145.    All of that said, with some hesitation and notwithstanding these evidential lacunae I have come to the conclusion that on this material I should accept Lord Marks' submission that this Unit was purchased by the Respondent and was owned by her both legally and beneficially and when it was sold it was sold by her on that basis. This was a personal not a commercial purchase and if it had been purchased by RMT or partly by him then I am confident that he would have ensured there was a document to that effect. Whilst the deposit dealings are unexplained, I consider that it would be unsound to draw an adverse inference from that given the terms of the contract by which the Unit was purchased, its registration in the sole name of the Respondent, the receipts for the payment of service charges and the draft contract of sale identifying her as the vendor.

146.    However, there is no evidence that shows that the proceeds of sale of the property were paid to an account in her name with Credit Suisse, much less that it was then used to purchase the gilts that she claims were sold in order to finance the payments to Ms White's firm. This is significant because there is a considerable time gap between the date when the flat was sold by the Respondent and the date when the gilts were purchased.

147.    All this leads me to conclude that the Respondent has failed to discharge the evidential burden that rested on her to prove her affirmative case that the sums paid to Ms White's firm from the Swiss bank included any part of the sums she received from the sale of this Unit.

148.    *Cash Contributions From Respondent's Bank Accounts*

The sums apparently paid by the Respondent from her own account to Ms White's firm totals £240,000 (being £50,000 transferred to Ms White's firm on 30 June 2016 and £190,000 transferred to Ms White's firm on 15 July 2016) because on the Respondent's oral evidence the sum paid in cash at the counters of Barclays came from X – see T2/101/5-9. This does not equate with the evidence given on the Respondent's behalf by her then solicitor Ms Allen at an early stage in these proceedings. In her most recent statement she stated that £90,990 was funded from her bank account but there is no payment recorded in Ms White's ledger in that sum. No bank account statements evidencing these payments have been disclosed, so the only reliable record of the sums paid are those in Ms White's purchaser ledger. There is therefore a plain inconsistency between that record and what the Respondent has stated to be the position. Whilst I accept that the funds recorded in Ms White's purchase ledger as having come from a

bank account in the name of the Respondent came from such an account, I do so only because that is what is recorded in Ms White's ledger. The difficulty about this from the Respondent's perspective is that this says nothing about where the funds transferred from the Respondent's account came from.

149.    The Respondent's explanation concerning the payment of SDLT was unsatisfactory and is consistent with a transfer from another source. The only evidence of the source of these funds is the entry in Ms White's purchase ledger for 15 July 2016, which suggests the sum was transferred from the Respondent's bank account. However, what matters is the source of the money. As to that, although the Respondent was apparently able to transfer £190,000 from her account to Ms White's firm on 15 July, she claims that some 2 weeks earlier she had to borrow £50,000 from X, because that was when the cash she alleges was borrowed from was paid over the counter at the Hove branch of Barclays. On that basis it would appear that the or at least a substantial part of the £190,000 paid on 15 July must have been credited to the Respondent's account some time after 30 July.

150.    The Respondent was cross examined about this issue, which had not been addressed in her various witness statements. Initially her explanation was as follows:

> "Q. Where did it come from? Where did the payment for the stamp duty come from?
>
> A. Sir, I had the money from the dividends of the company in Iran ."

When it was suggested to her that this could not be so because her evidence is that her interests in the Iranian companies she claimed to be interested in had been frozen prior to that, her evidence changed as the following exchanges show. It is necessary that I set out these exchanges in full:

> "Q. We're not talking about that, we are talking about 2016 and 2017 and you're telling me that you used money that you had from the dividends in the Iranian companies to pay the stamp duty; is that your evidence?
>
> A. Yes, it was the saving that I had in Dubai.
>
> Q. The saving you had in Dubai? You had, what, millions of dollars, did you, in Dubai? How much did you have in Dubai, do you say, Ms Zavarei?
>
> A. Sir , it was eight years ago. I don't think anybody remembers exactly how much money they had in the accounts.
>
> Q. It wasn't eight years ago, Ms Zavarei. We're talking here about the payment of the stamp duty three or four or five years ago. Where did that money come from?
>
> A. Sir, as I explained to you, I had a different, different income. One of the income I had was from the money that I sold the

property in Maeen 5 which before that I got the mortgage on that, 4.5 million AED and you can find it easily in the bundle. I had money at that time and I paid the money for the stamp duty.

Q. You had money from, what, amounts of cash you say you had in a bank account somewhere, you had no difficulty paying the stamp duty; is that what you're saying?

A. Yes. Just one of the properties that I had I got 4.5 million remortgage it and it is in the bundles.

Q. When do you say that happened, Ms Zavarei? This mortgage on what property did you raise money in order to be able to pay the stamp duty on this property?

A. One of the properties that I had which I got the mortgage from that one was the property in 140 Maeen 5.

Q. Property where?

A. Maeen 5, Al Thanyah Street.

Q. When did you get this mortgage?

A. It was before that, sir. It was in 2014 I believe.

Q. You see you have been telling us -- I must say, I'm having great difficulty understanding what you are saying, but you are telling us that at the time that the stamp duty was due, which must have been in 2016 or so, you had large amounts of cash that you could draw on to pay it. Now, let's be clear: is that what you are saying?

A. Sir, I had money in my accounts in Dubai, 2014 and 2015, and I didn't have any problem to pay for this stamp duty here.

Q. No, and that you paid without any problem, so you are telling us, from some unidentified account in 2016 or 2017, some hundreds of thousands of pounds.

A. Sir, you check please the way that the company operates in Iran, you will understand that this money was not a big amount in comparing with the money from the operation of each rig, 30,000 to 40,000 being made per day. At least the minimum things that we can get after doing the operation is the 10%, 10% benefit interest from the operation we did. It's not a big amount.

Q. Well, I'm simply not understanding this, but anyway, what I'm taking from your evidence is that you had a large amount of cash available at around the time of the purchase of the Henfield Lodge property to enable you to pay the stamp duty on its

purchase. What I'm going to ask you now is why in that event
did you need, as you were trying to explain to us yesterday, why
did you need to borrow all that money from Mr X?

A. The reason is very clear, because I wanted -- I had a flat in
London, in Stonor Road, unfortunately I couldn't sell it on time
and it took time for me to sell it. I think I sold it -- I could sell it
in September 2016. That's why, because of this delay, I didn't
have any option except borrowing money from Mr X.

Q. We don't accept a word of what you're saying about any of
this, Ms Zavarei, because we simply don't know where all this
money came from because you have never provided us with the
bank statements that show for example how the money you say
you got for the sale of Comparts ever found its way into your
hands and then into the hands of the solicitors and so on. Where
is the documentary trail, by bank statements, that show how the
money that ended up in the solicitors' hands for the purchase of
Henfield Lodge actually got there?

A. Sir, if you check, as you have my visa application you can
find out there's a statement, you will see the dates money came
to my account yearly. That money was the money that it was
supposed I had it earlier for my property, for paying to the
completion of the property, but unfortunately it was late and I
didn't have any option to borrow from Mr X, although it was so
difficult for me.

Q. And how did you repay Mr X?

A. I haven't paid it . That's the reason that I had to hand over
ENEXD to him. If I had a chance -- if your client didn't dry out
everything I had and take over everything , I had a chance to pay,
but because of all the issues happened, all the things you wrote
against me and my husband around the board, all the bank
accounts frozen, we couldn't work like before, we had lots of
difficulties. That's why all of my family helping me, it doesn't
mean that anybody needs to be the nominee. If we want we can
do easily our work, if we want I can establish a company again;
no need to be nominee of anybody and we don't believe to any
nominee.

Q. But, Ms Zavarei, you have just explained to us, explained to
his Lordship, how you had large amounts of cash available to
you in 2016 and 2017 to pay the stamp duty. Why didn't you just
repay Mr X then? Why didn't you pay Mr X out of the money
you say you had in Dubai?

A. Sir, I didn't have enough money to cover all the expenses that
happened to us. We had to deal with lots of issues. We had two
children. Lots of problems in our life. It was not easy for us and

> he accepted to give his money to me, leave it with me. I accept
> to receive the interest which I couldn't even pay the interest to
> him until the debts that I can repay to him. If I couldn't do that,
> transfer that ENEXD company to him."

151. This is seriously contradictory and uncorroborated evidence. Fundamentally it is inconsistent with a need to borrow £50,000 on 30 June that the Respondent was able to provide £190,000 on 15 July from resources that were apparently available to her as well before as after 30 June. Furthermore this exchange demonstrates that when pressed to explain the source of the funds she gave an explanation (that the funds came from dividends or income generated by companies in which she was interested in Iran) which could not have been true and then provided a further explanation namely that she had " *… money in my accounts in Dubai, 2014 and 2015, and I didn't have any problem to pay for this stamp duty here.*" without explaining in that case why it was necessary to borrow £50,000 from X 14 days before.

152. The explanation offered (that she was suffering a cash flow issue because she could not or had not sold a London flat) entirely misses the point that she had cash allegedly in her account in Dubai. There is no documentation disclosed by the Respondent that demonstrates the mortgaging of property in Dubai or the existence of large cash balances in accounts in her name in Dubai.

153. In light of these contradictions I reject the Respondent's explanation. As things stand, the funds transferred to Ms White's firm from the Respondent's account must have been transferred into that account from another source or sources but there is no evidence that I can accept that demonstrates in particular the source of the £190,000 paid to Ms White's firm on 15 July.

154. The key to the Respondent's claim to have cash available from her own resources is her case that she was entitled and received dividend income in very substantial amounts of over a number of years from the three Iranian companies to which I referred in passing earlier in this judgment – Sepanta International Company ("Sepanta Iran"), Petro Hortash Engineering and Drilling Company ("Petro Hortash") and Persia Energy, which were credited to her Dubai bank account and then, presumably transferred to her UK bank account. However, the Respondent has not disclosed any statement for either her Dubai accounts to which the dividends were ostensibly credited or of her UK accounts which would presumably have shown the transfer of the dividends. Even with closely held companies, it might be expected that some documentation would be available evidencing the payment of dividends, if only in the accounts of the company concerned.

155. The funds that the Respondent claims to have received by way of dividends were, she claims, all received in years prior to 2015 – see T2/142/17-22. Given the historical nature of these receipts it would have been relatively straightforward to demonstrate the receipt of the sums alleged into the Respondent's Dubai bank account and then onward transfer to her UK account. The unexplained absence of this material viewed in the context of what I have said above, leads me to conclude that the Respondent has failed to discharge the evidential burden that rested on her to prove her affirmative case concerning the source of these funds.

156.   *The X Contribution*

This has been a difficult issue to resolve not least because X could have but did not give evidence and as with every other part of this case is made all the more difficult because of the piecemeal and partial disclosure, particularly by the Respondent.

157.   I am satisfied that £550,000 was provided towards the purchase price by X. I am only satisfied that is so because Ms White's ledger records two payments of £400,000 and £100,000 on 28 June 2016, which she confirms in her statement came from X. There is no direct evidence that the over the counter payment of £50,000 came from or was made by X. The evidence that it was comes from the testimony of the Respondent. This evidence is uncorroborated other than by one document to which I turn in a moment. I am satisfied from this material that these sums were transferred by X to Ms White's firm and were used by way of part payment for the Property at completion because that much is apparent from Ms White's purchase ledger.

158.   What is in doubt is whether these sums were personal loans to the Respondent or were either directly or indirectly sums raised or provided by RMT.

159.   The first issue that arises concerns the plan for repayment. The Respondent's case is that she was forced to borrow these sums because a sale of a flat she owned fell through prior to completion planned for 31 May 2016. I accept that the Respondent was the registered proprietor of the flat from July 2014. I accept too that on or before 4 May 2016, a sale of the flat had been negotiated subject to contract with completion to take place on or before 31 May 2016. I accept all of this because it is corroborated by documentation from third party sources that are credible. That sale did not take place but I accept that a sale did take place on or before 7 September 2016 and that the proceeds of sale of £530,000 were sent to the Respondent's account on 7 September 2016. There is no evidence that corroborates the link between the sale of the flat and the purchase of the Property. The suggestion that the Respondent was forced to borrow money does not fit in with her evidence that she had large sums of cash available in her bank accounts in Dubai nor her apparent ability to pay the very substantial SDLT sum from her own resources.

160.   The Respondent says that she had intended to repay the loan from the proceeds of sale of the flat but again that is not corroborated. The Respondent's case is that in the end did not because she used the money instead to demonstrate that she had at least £200,000 in an account in order to satisfy the requirements for her application for an Entrepreneur's visa. This is not satisfactory evidence because it ignores altogether her evidence that she had large sums available to her held in her accounts in Dubai and because it shows that when she received £530,000 into her account on 7 September 2006 she would then have had available to her £330,000 that could have been but was not in fact used to repay most of the alleged loan. This is all the more odd given her evidence that she felt "*... really bad ...*" and "*... uncomfortable ...*" about not repaying the loan. She maintained that was why "*... we decided ... to transfer the company to him ...*". The use of the word "*we*" is again instructive suggesting that the decision was a joint one between her and RMT. The company referred to is ENEXD Dubai.

161.   There is no documentation that supports the contention that these sums were a personal loan by X to the Respondent apart from a heavily redacted document dated 23 April

2017 headed "*Minute of Meeting*". This document is dated about nine months after the making of the loan.

162.    The originally disclosed version of this document has redacted from it (a) all the attendees other than the Respondent, (b) the identity of the entity whose future was being discussed at the meeting, (c) the identity of the lender and (d) the person appointing the Respondent as Managing Director of the entity referred to. The document has apparently been signed by the Respondent who gives her address as the Property. The purpose of the meeting that the document memorialises is described as being "*To discuss the future of [ENEXD Dubai] and to document the points agreed in that meeting*". It is entirely unclear why this description was adopted if the purpose of the meeting was to record the making in the past of a loan to the Respondent to enable her to buy the Property.

163.    The loan referred to in the 23 April Minute is in a different sum from the total referred to in Mr Allen's statement (which was £750,000) is different from the sums in fact used to purchase the Property (£500,000 plus £50,000 if the cash payment is assumed to have come from X) and is referred to in prospective rather than retrospective terms and in different tranches from those referred to in Mr Allen's statement. The document states that "*... It was agreed that a total of £800,000 would be paid to [the Respondent] by way of loan ... in three instalments of £550,000, £200,000 and £50,000.*".

164.    A less redacted version was disclosed subsequently. It disclosed that one of the other persons present was Ms Noushin Yeganeh and that the company concerned was ENEXD Dubai but otherwise remained redacted. The note was drafted by Ms Yeganeh. Ms Yeganeh was asked why the note had been drafted prospectively if the loan had already been made. The relevant exchanges were as follows:

> "Looking first at paragraph 1, do you agree with me that that refers to a loan that would be made in the future?
>
>  A. I agree with what you are saying "would be paid" is written there, but by mistake by me. The money was already paid.
>
> Q. Then why did you not say "A total of £800,000 has been paid"?
>
> A. Obviously lack of knowledge of writing proper English I'm afraid. Sorry, this is -- to me it sounded well but obviously it doesn't sound and I shouldn't have been relied upon to write this, but the money was already paid. I would have thought that I wrote it down thinking that "Okay, this money has been paid and in respect of that, so once" ... I don't know why I wrote it. I'm sorry.
>
> Q. It is not that you wrote "would be paid" because it would be paid in the future?
>
> A. No. No, no."

A prospective loan lies more easily with the identified purpose of the meeting being as described in the document rather than being to record the making of a loan months before to find the purchase by the respondent of the Property as a home for herself and her family. Although Ms Yeganeh was minded to explain away this use of English as because of her lack of knowledge of written English, I am not satisfied that really explains the point not least because of the very high quality of her spoken English demonstrated while she was giving her oral evidence. Ultimately her evidence on this issue was that " … *I don't know why I wrote it* …" This means that I am left with her evidence that she cannot explain why the document was prospectively expressed, the uncorroborated evidence of the Respondent that it should not have been, a document that does not anywhere expressly refer to a personal loan to assist in the purchase of the Property, no evidence from X and no explanation as to why (given the first language of each of the people at the meeting was Farsi) the document was not written in that language. In those circumstances, I can put very little weight on this document.

165.    The Respondent's case was that the funds she says came from X were originally a loan to her but in the end ENEXD Dubai was transferred to X in discharge of the liability.

166.    The Respondent's case is that she became the owner of the ENEXD Dubai in 2015, when the shares that RMT had agreed to transfer to her by the 17 May 2011 agreement was supposedly transferred to her. For the reasons that I have explained already I do not accept that this agreement was intended to transfer the beneficial interest in any of the entities or assets referred to in the document to the Respondent. If and to the extent the shares were transferred to the Respondent in 2015 I do not consider it was intended that should alter the fundamentals. According to the 17 May agreement, what was to be transferred to the Respondent was " … *100% of shares of ENEXD company, including all properties and equipment at the time of signing the contract* …" If the 17 May 2011 agreement took effect in accordance with its terms, then the Respondent apparently beneficially owned and was entitled to call for the transfer of all the shares in ENEXD Dubai from May 2011 even though at that time it was still one of RMT's main operating companies. This is inherently unlikely and commercially improbable. If the position was otherwise then the result would be that from May 2011, the Respondent would have owned outright the company that RMT had developed over a number of years and which was his major trading vehicle. There is no evidence that the value supposedly obtained by RMT as a result of the 17 May 2011 agreement could justify such an arrangement.

167.    I now return to whether the Respondent has discharged the evidential burden of proving that £550,000 was loaned to her and ultimately repaid by the transfer of her interest in ENEXD Dubai to X. As I have said, I am not able to accept the Respondent's uncorroborated evidence. I reject the notion that RMT transferred beneficial title in his shares in ENEXD Dubai to the Respondent in 2011 as inherently implausible and contrary to the fact that he continued to use that entity after as he had before the supposed transfer and in the absence of any evidence as to what the value of those shares (in combination with those other assets apparently transferred at the same time) to the value of what was apparently being transferred by the Respondent. I am not satisfied that the 23 April Minute was referring to a loan to finance the purchase of the house but if it is it was ultimately funded by the transfer of ENEXD Dubai to X. I conclude that the Respondent has failed to discharge the evidential burden that rested upon her to prove that a loan was made to her by X that was repaid by her transfer of

her beneficial interest in ENEXD Dubai. I consider it much more probable that RMT was at all material times the beneficial owner of ENEXD, that the Respondent's role in relation to its affairs was as his nominee and that any exchange of the shares in ENEXD Dubai for funds provided by X was in truth between X and RMT.

168.    *The Cash Payment*

Although the Respondent says that this was a further loan from X, there is no evidence that this is so. The Respondent's evidence on this issue was as follows:

> "Where's the £50,000?
>
> A. If you come, it has been mentioned cash over counter and Barclays for 50,000 also it was him that paid it.
>
> Q. Mr X provided that money, did he?
>
> A. Yes, sir."

There is no explanation offered as to why this sum would be paid by cash as opposed to bank transfer and for what it is worth Ms White's evidence was that it was the Respondent who was seeking to pay the money in cash. It is entirely unclear why X would pass cash to the Respondent who then would want to pay it to her solicitors in cash rather than crediting it to her bank account for onward payment to her solicitors by transfer from her account. In the absence of any corroborating evidence I reject this account of the source of the £50,000.

**Running Costs**

169.    Whilst I consider that this issue is a relatively minor one in my assessment of whether IOEC has established its case, it nonetheless provides some support for its case. The Respondent's case at the outset as set out in paragraph 22 of Mr Allen's statement referred to earlier was:

> "I understand from Ms Zavarei the following about Henfield Lodge since it was acquired:
>
> …
>
> (2) The plan when the property was acquired was to renovate Henfield Lodge. Such funds were partially disbursed by Mr Tabatabaei. These were treated as repayments of the sums he owed Ms Zavarei. However, the funding of Mr Tabatabaei's legal fees for the IOEC Proceedings has meant that the renovation work is only partially complete.
>
> (3) In terms of the costs of the property, most of the utility and similar accounts relating to Henfield Lodge are in Ms Zavarei's name, and discharged by her. However, the sole exception to this is the council tax account, which is in both Ms Zavarei and Mr Tabatabaei's names since it is convenient for Mr Tabatabaei to

be able to demonstrate his place of residence from time-to- time
(for example, for the purpose of obtaining medical treatment or
opening bank accounts)."

170.    However that is not what RMT said in his bankruptcy application, where he claimed as
part of his expenses:

| | |
|---|---|
| "Home and utilities | £802.00 per month |
| Rent | £700.00 per month |
| TV licence | £12.00 per month |
| Gas | £30.00 per month |
| Electricity | £30.00 per month |
| Water | £30.00 per month" |

This inconsistency is damaging to RMT's credibility and is a yet further reason why I
cannot accept his uncorroborated evidence other than to the extent noted above. The
inconsistency was put to the Respondent in cross examination

"Q. … So what was the true position, Ms Zavarei?

A. Reza was helping me for some of the payments, but not the
main rent. Approximately the total amount that Reza helped me
at that time was around 700, but right now nothing.

Q. But at this time and at the time that Mr Allen was making his
witness statement, he was or was not paying you rent of £700 a
month?

A. Maybe it doesn't mean the rent. He helped through different
payment for some of the house -- some of the jobs in the house,
not the rent means that paying the rent of the property. Because
we are wife and husband I'm not going to get a fixed amount of
the rent from him and right now we are not together any more.

Q. So who was paying or is paying for the TV licence, gas,
electricity, water and so on?

A. Yes, some of them which he used to pay before helping me
he used to pay, but right now I don't think so anything he can
pay."

This inconsistency between what she had apparently instructed Mr Allen and what in
fact was the position as set out in her oral evidence (which I accept only because it is
contrary to her interests in this case having regard to what was said in Mr Allen's
statement) further damages her credibility as a witness. However, in my view who
contributed what to the running costs says very little about the beneficial interests of

the parties and I prefer to arrive at a conclusion by reference to my conclusions concerning the payment of the purchase price.

**Conclusions Concerning Financial Contributions to Purchase of the Property**

171.   The evidence of both the Respondent and RMT was profoundly unsatisfactory  in at least the ways identified above. The obscurity created by their evidence was enhanced by the failure of the Respondent to disclose all the documents that were or should have been in her possession and to disclose the documents that were disclosed in a straightforward manner.

172.   Whilst the legal burden rested on IOEC to prove that the beneficial interest in the property were different from the way in which legal title was held, the evidential burden rested on the Respondent to prove her affirmative case that all the purchase price was paid by her from her own resources or from resources borrowed by her for her account. Other than in relation to the part of her share from the Woodruff Avenue proceeds of sale used in the purchase and the personal loan to her of RMT's share of those proceeds, she has failed to discharge the evidential burden of proving that the balance of the purchase price came from funds that belonged beneficially to her or which she personally borrowed for her own account. In those circumstances I conclude that she is entitled to a beneficial interest in the Property equivalent to the proportion borne by the sum of the part of her share from the Woodruff Avenue proceeds of sale used in the purchase and the personal loan to her of RMT's share of those proceeds to the total purchase price.

**Conclusions on Application**

173.   The Respondent has failed to establish each of the elements of her case where she bore the evidential burden of making good her affirmative case because I was not able to accept her evidence save where it was corroborated or admitted or was against her interest. Her disclosure was partial in critical areas without any legitimate excuse and many of the documents that were disclosed either did not support her positive case or suggested it was wrong. In those circumstances this application succeeds other than in relation to the contribution represented by the net proceeds of sale of the parties of Woodruff Avenue less £72,000.

174.   I will hear the parties further as to the form of order that should follow having regard to the ruling I made earlier concerning the scope of the declarations available to me. Provisionally, I consider the order ought to make clear that RMT's trustee is entitled to take such steps as are considered necessary for the benefit of the RMT's creditors without further reference to this Court by analogy with the reasoning of Mr Richard Salter QC at paragraph 88 of his judgment in Eco Quest v  GFI [2014] EWHC 4329 (QB).